UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD B. HUBBUCH, | Case No. _____ |
| Plaintiff, | |
| *v.* | |
| J&M REALTY SERVICES CORP., JERRY EDELMAN, DAVID EDELMAN, DAVIDOFF HUTCHER & CITRON LLP, and GEORGE ESSOCK JR., in his individual and official capacity as a New York City Marshal, | **COMPLAINT** |
| Defendants. | **[ TRIAL BY JURY DEMANDED ]** |

Plaintiff Edward B. Hubbuch brings this civil action for actual, punitive, declaratory, injunctive, and equitable relief arising from violations of the Civil Rights Act of 1871, 42 U.S.C. § 1983, which prohibits the deprivation of property and liberty interests without due process of law; and from related violations of New York State and New York City law, including fraudulent inducement, conversion, commercial tenant harassment under NYC Admin. Code § 22-902, deceptive business practices under New York General Business Law § 349, breach of the implied covenant of good faith and fair dealing, and tortious interference with prospective economic advantage:

## I. INTRODUCTION

1. This action seeks redress for a coordinated scheme by Defendants J&M REALTY SERVICES CORP., JERRY EDELMAN, DAVID EDELMAN, DAVIDOFF HUTCHER & CITRON LLP, and New York City Marshal GEORGE ESSOCK JR. (in both his individual and official capacities), who—acting jointly and under color of state law— orchestrated a fraudulent lease, sabotaged Plaintiff's business through utility

manipulation, and then provided a successor tenant with all the repairs, concessions, and services they had deliberately withheld from Plaintiff. This disparate treatment proves Defendants' bad faith and discriminatory conduct was designed to destroy Plaintiff's viable restaurant venture.

2. The strength of Defendants' malicious intent is proven by their post-eviction conduct: within months of forcing Plaintiff out, Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN provided immediate successor tenant Compton's Sandwich Shop with free rent, full gas restoration, complete exhaust system repairs, and building code compliance—the very accommodations they refused to provide Plaintiff despite his repeated requests and substantial out-of-pocket expenditures exceeding $200,000.

3. This side-by-side comparison reveals that Plaintiff's business was always viable, the Premises were always repairable, and Defendants J&M REALTY SERVICES CORP., JERRY EDELMAN, and DAVID EDELMAN always possessed the resources and capability to remedy all defects. Their refusal to assist Plaintiff while later providing identical services free to a successor tenant constitutes textbook bad faith, commercial tenant harassment, and tortious interference with prospective economic advantage.

## II.  JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983, as Plaintiff asserts claims arising under the Constitution and laws of the United States, including the deprivation of property without due process of law.

5.  This Court has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367(a), as those claims form part of the same case or controversy and arise from a common nucleus of operative fact as Plaintiff's federal civil rights claim.

6.  Jurisdiction is not based on diversity of citizenship under 28 U.S.C. § 1332, as all parties are residents of the State of New York or domiciled therein.

## III.  THE PARTIES

7. Plaintiff Edward B. Hubbuch is an individual residing in Brooklyn, New York. He is the sole proprietor of the hospitality company Memphis Seoul and brings this action in his individual capacity as the party directly harmed by Defendants' conduct, and as the personal guarantor of the commercial lease that forms the basis of this dispute. The commercial lease was initially executed in the name of "Tasteland Holdings LLC d/b/a MEMPHIS SEOUL," an entity formed by Plaintiff solely as a vehicle for the expansion of his existing sole proprietorship. Pursuant to an allowance for one name change in the lease, Plaintiff subsequently changed the named entity to "Memphis Seoul No. 2 LLC," for which Plaintiff remains the sole member and personal guarantor. Upon information and belief, "Memphis Seoul No. 2 LLC" is now a dissolved and defunct entity, further establishing Plaintiff's individual standing to recover damages arising from the conduct of Defendants

8. Defendant J&M REALTY SERVICES CORP. is a New York corporation with its principal place of business located in New York City. The Lease Agreement at issue in this complaint identified "Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC" as the Owner, but explicitly directed all Owner communications to J&M REALTY SERVICES CORP. as the designated "c/o" address at 343 St. Nicholas Avenue, New York, NY 10027. Throughout Plaintiff's tenancy, J&M REALTY SERVICES CORP. also functioned as the property's on-site manager and leasing agent.

9. Defendant JERRY EDELMAN, upon information and belief, is the principal owner of J&M REALTY SERVICES CORP. and resides in the Greater New York City Area. He

personally participated in the lease negotiations, property management, and post-eviction conduct at issue in this case.

10.  Defendant DAVID EDELMAN is the son and agent of Defendant JERRY EDELMAN and resides in the Greater New York City Area. DAVID EDELMAN participated directly in the post-eviction seizure and withholding of Plaintiff's business property.

11.  Defendant DAVIDOFF HUTCHER & CITRON LLP is a law firm organized under the laws of New York, with its principal office located in New York, New York. At all relevant times, DAVIDOFF HUTCHER & CITRON LLP acted through its attorney, BENJAMIN NOREN, who was acting within the scope of his employment.

12.  Defendant GEORGE ESSOCK JR. is a New York City Marshal (Badge No. 71) appointed pursuant to § 1601 of the New York City Civil Court Act. He executed the eviction of Plaintiff on July 18, 2024, and is sued in both his individual and official capacities for actions taken under color of state law.

## IV.  BACKGROUND AND OVERVIEW

13.  On or about October 15, 2022, Plaintiff, through his entity Tasteland Holdings LLC, entered into a Lease Agreement and Lease Rider for the Premises located at 123 First Avenue in New York, New York. The lease identified "Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC" as the "OWNER" and explicitly directed all Owner communications to Defendant J&M REALTY SERVICES CORP. ("J&M REALTY") at 343 St. Nicholas Avenue, New York, N.Y. 10027. Upon information and belief, "Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC" is owned by Won Moon, a dental professional and full-time resident of the greater Los Angeles, California, area. As a result, Plaintiff's only interactions regarding the Premises—before, during, and after the lease execution—were with Defendants J&M REALTY, JERRY EDELMAN and DAVID EDELMAN.

14.  During the summer and fall of 2022, Plaintiff was actively seeking to expand his successful Brooklyn-based restaurant, Memphis Seoul, into Manhattan. He was drawn to the Premises based on representations made by Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN, including a large banner affixed to the building advertising the space as a turn-key restaurant ready for immediate, gas-powered operation. These representations were made to Plaintiff both physically and orally following the departure of the previous tenant, The Organic Grill, which had occupied the space for approximately 24 years before vacating in or around May 2022.

15.  After signing the lease, Plaintiff took possession on October 15, 2022, without any notice or disclosure from Defendants J&M REALTY, JERRY EDELMAN, and DAVID

EDELMAN of The Organic Grill's substantial outstanding utility arrears. Plaintiff commenced renovation without immediately establishing a utility account on the advice of his architect and general contractor, both of whom specifically recommended not to set up an account with the Consolidated Edison Company of New York ("Con Edison") during the initial permitting and renovation process to avoid possibly having to assume prior utility debt and incurring unnecessary costs during construction.

16. Just days into the start of physical renovations in February 2023, Plaintiff's general contractor discovered that the gas meter had been seized and the gas line disconnected. Plaintiff later learned from Con Edison that this seizure was due to significant unpaid arrears left by prior tenant The Organic Grill. More critically, Plaintiff discovered that Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN had received multiple turnoff notices from Con Edison regarding The Organic Grill's arrears in the summer of 2022—months before Plaintiff signed the lease—yet deliberately concealed this critical information from Plaintiff.

17. Moreover, the gas meter seizure itself occurred because an employee of Defendant J&M REALTY—the building superintendent, known to Plaintiff as "Sean"—had granted Con Edison access to Plaintiff's designated basement space without notice to Plaintiff, in direct violation of Paragraph 83 of the Lease Rider. This unauthorized entry by Con Edison and the resulting disconnection thus rendered Plaintiff's entire business model commercially unviable before his restaurant had even opened, as gas service was both fundamental and mandatory to his restaurant's operating model.

18. Plaintiff also discovered that the Premises were not, in fact, operational due to other issues. The kitchen had never been legally permitted by the New York City Department of Buildings ("DOB") as a commercial kitchen, while the rooftop extension of the commercial space's exhaust system was dangerously non-compliant and posed a fire hazard due to years of grease accumulation. These additional defects rendered the space unfit for commercial use and in violation of multiple building and fire codes.

19. Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN failed to disclose these material defects—including the ongoing utility arrears and imminent gas disconnection—during high-pressure lease negotiations. Their concealment of known hazards and regulatory deficiencies, despite their exclusive knowledge of the building's condition, constitutes fraud by omission, and was an apparent attempt by Defendants to saddle Plaintiff with another tenant's unpaid bills, knowing that Con Edison's policy prevented Plaintiff from establishing an account or restoring service due to this outstanding debt.

20. As a result of these deliberate misrepresentations and omissions by Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN, Plaintiff incurred more than $200,000 in out-of-pocket expenses in a fruitless effort to restore gas service and bring the Premises into compliance. Despite these extensive and costly efforts by Plaintiff, the space remained uninhabitable, and Plaintiff was ultimately forced to abandon the Premises on July 18, 2024, following an unannounced eviction executed by a New York City Marshal.

21. Plaintiff later learned that Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN provided the successor tenant, Compton's Sandwich Shop, with extensive concessions—including free rent, full gas restoration, and repairs—at no cost. This disparate treatment underscores the bad faith and discriminatory conduct directed at Plaintiff and confirms that the Premises were always capable of being made operational, had Defendants chosen to act in good faith.

22. This conduct constitutes gross negligence and a breach of the implied covenant of good faith and fair dealing. Landlords may not intentionally frustrate the essential purpose of a lease or deprive tenants of its benefits. The preferential treatment given by Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN to the successor tenant— while sabotaging Plaintiff's tenancy—violated these principles and caused substantial and lasting harm.

## V.  FACTUAL AND LEGAL ARGUMENTS

### A.  Formation of the Lease and
### Defendants' Control Over the Premises

23.  Plaintiff is the founder and sole proprietor of Memphis Seoul, a restaurant and catering company known for its distinctive fusion of Southern and Korean cuisine. Plaintiff launched the business in Crown Heights, Brooklyn, in 2018 and, by 2022, sought to expand into Manhattan's East Village.

24.  After evaluating several locations, Plaintiff selected the ground floor and a portion of the basement at 123 First Avenue in New York, New York (the "Premises") as the site for Memphis Seoul's second location. On or about October 15, 2022, Plaintiff, acting through his entity "Tasteland Holdings LLC d/b/a MEMPHIS SEOUL," executed a commercial Lease Agreement and Lease Rider for the Premises. The Lease identified "Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC" as the Owner, and explicitly directed all Owner communications to Defendant J&M REALTY. (*See **Exhibit A**.*)

25.  Upon information and belief, Lunar Estates LLC d/b/a Lunar Estates of CA is owned by Won Moon, an absentee landlord who resides full-time in the greater Los Angeles, California, area and is not involved in the day-to-day management of the property. (*See **Exhibit B**.*) Because the Lease explicitly designated J&M REALTY as the Owner's primary contact and administrative agent, Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN effectively served as the property's on-site manager and leasing agent throughout Plaintiff's tenancy.

26. Throughout the negotiation, execution, and duration of Plaintiff's lease, Defendants JERRY EDELMAN and DAVID EDELMAN acted as the *de facto* landlords. They managed all aspects of the tenancy, including lease negotiations, maintenance, repairs, and communications. Both Defendants also repeatedly referred to themselves as the "owners" of the Premises to Plaintiff, and Plaintiff never had direct contact with Won Moon or any representative of Lunar Estates LLC d/b/a Lunar Estates of CA.

27. Under New York law, a party who exercises dominion and control over leased property, manages the lease, and holds themselves out as the landlord may be deemed a *de facto* landlord and held liable for breaches of the lease or related torts. (See *Harlorn LLC v. Poy Ao Cheng*, 2018 NY Slip Op 50642[U] [Sup. Ct. N.Y. Cty. 2018]). Moreover, where multiple parties are named as lessors in a lease agreement, each may be independently liable for breach of contract or related misconduct, regardless of ownership status. (See *DiBuono v. Abbey, LLC*, 83 A.D.3d 650 [2d Dep't 2011]).

28. Although Lunar Estates LLC d/b/a Lunar Estates of CA is the titled owner of the Premises and listed first on the Lease Agreement, it is not named as a defendant in this action due to a disputed Stipulation of Settlement executed in February 2024. (*See **Exhibit C**.*) That stipulation—entered into under pressure and without Plaintiff's informed consent—was negotiated by Plaintiff's former counsel and permanently bars Plaintiff and any affiliated entity from asserting claims or counterclaims against Won Moon or Lunar Estates LLC d/b/a Lunar Estates of CA relating to the Premises.

29. The disputed stipulation was not favorable to Plaintiff. It was misrepresented to him by his former counsel, who did not inform Plaintiff that he would required to waive all

defenses and counterclaims, admit jurisdiction, and acknowledge more than $130,000 in alleged arrears, despite the ongoing disputes over utility access, habitability, and lease compliance that now form the basis of this Complaint. The stipulation agreement was executed under circumstances that raise serious concerns about the ineffective assistance of Plaintiff's former counsel and material misrepresentations by both opposing counsel and Plaintiff's own legal representatives.

30. This action is therefore brought against Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN, who were not released by the February 2024 stipulation and who are independently liable as the designated agent of the Owner and *de facto* landlords. Those three Defendants exercised full control over the Premises and are directly responsible for the conduct and omissions alleged in this Complaint.

### B. Defendants' Material Misrepresentations and Deceptive Leasing Conduct

31. Plaintiff took possession of the Premises in October 2022 but quickly discovered that Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN had made numerous material misrepresentations and omissions during lease negotiations— effectively and intentionally renting Plaintiff a "lemon."

32. Prior to and during lease negotiations, Defendant J&M REALTY repeatedly represented through their commercial broker that the Premises constituted a turn-key restaurant that had been "*fully operational just six months earlier.*" They reinforced these claims with a large banner affixed to the building advertising the space as a "*RESTAURANT FOR LEASE.*" These representations were false. At the time of the lease signing, Defendants

J&M REALTY, JERRY EDELMAN and DAVID EDELMAN knew or should have known that:

- **The kitchen had never been legally permitted as a commercial kitchen by the DOB;**

- **The rooftop extension of the commercial space's exhaust system was dangerously non-compliant and posed a fire hazard;**

- **The gas line was subject to imminent disconnection due to unpaid arrears left by prior tenant The Organic Grill;** and

- **Con Edison had both mailed and posted multiple disconnection notices to the space due to unpaid arrears during the summer of 2022, before Plaintiff's entity had signed its lease in October 2022.**

33. These omissions constituted material deception. Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN had exclusive knowledge of the building's numerous utility and code-compliance issues, yet concealed these highly relevant facts while soliciting Plaintiff to sign a lease at an above-market rent of $12,000 per month. Defendants' failure to disclose these known defects induced Plaintiff (through his entity, as a vehicle for his sole proprietorship) to enter into the lease under false pretenses and structure his limited budget and compressed timeline accordingly.

34. Under New York law, a fraudulent inducement claim is viable where a party makes a misrepresentation of present fact—rather than future intent—that is collateral to the contract and induces the plaintiff to enter into the agreement. (See *First Bank of the Americas v. Motor Car Funding, Inc*., 257 A.D.2d 287, 291–92 [1st Dep't 1999]). Here, Defendants' statements about the Premises being "*turn-key*" and "*fully operational*" were misrepresentations of present fact, not mere puffery or future promises.

35.  Moreover, the conduct of Defendants J&M REALTY, JERRY EDELMAN, and DAVID
     EDELMAN constitutes a deceptive business practice under New York General Business
     Law § 349 ("GBL § 349"), which prohibits materially misleading conduct directed at
     consumers and small business operators. (See _Oswego Laborers' Local 214 Pension Fund_
     _v. Marine Midland Bank_, 85 N.Y.2d 20, 25 [1995]). Plaintiff, as a small business owner
     leasing a commercial space marketed to the public, falls squarely within the class of
     protected parties.

36.  Defendants' misrepresentations and omissions therefore were not isolated or private—
     they were part of a broader pattern of deceptive leasing practices aimed at inducing a
     prospective tenant to sign a lease for a non-compliant, non-functional space. Such
     conduct is precisely what GBL § 349 was enacted to prevent.

## C.  Surprise Gas Disconnection in February 2023 and Defendants' Breach of Duty

37.  After obtaining the necessary permits from the New York City DOB in November and
     December 2022, Plaintiff commenced physical renovations at the Premises in February
     2023. On or about February 7, 2023, Plaintiff's general contractor began work on the
     First Floor, with plans to follow that by starting work on the designated basement area on
     February 22, 2023.

38.  However, on or about February 21, 2023, Plaintiff's general contractor discovered that
     the gas meter for Plaintiff's commercial space had been removed and the gas line  for
     Plaintiff's commercial space had disconnected—both without notice. The general
     contractor also observed that the dedicated hot water line for Plaintiff's commercial space

had been severed using a specialized tool. These discoveries were both unexpected and highly alarming. (*See a February 22, 2023, email from Plaintiff to his commercial broker contemporaneously describing the damage his general contractor had discovered annexed hereto as **Exhibit D**.*)

39. Upon inquiry, Plaintiff learned from Con Edison that the gas disconnection had occurred the previous day, executed with the express permission and assistance Defendant J&M REALTY's building superintendent (an employee known to Plaintiff as "Sean"). The disconnection was due to the combination of the unpaid arrears left by prior tenant The Organic Grill and Con Edison's policy of terminating dormant commercial gas lines after six months unless the property owner intervenes.

40. At no point before or after executing the Lease Agreement did Defendants J&M REALTY, JERRY EDELMAN, or DAVID EDELMAN disclose that prior tenant The Organic Grill had left behind a substantial unpaid gas bill, or that Con Edison had issued multiple written disconnection notices that left the Premises at imminent risk of losing the gas service critical to Plaintiff's business model.

41. This deliberate omission of material facts—known exclusively to Defendants J&M REALTY, JERRY EDELMAN, or DAVID EDELMAN—constitutes fraud by omission. Under New York law, a party with superior knowledge of material facts not reasonably discoverable by the other party has a duty to disclose them. (See *P.T. Bank Central Asia v. ABN AMRO Bank N.V.*, 301 A.D.2d 373, 378 [1st Dep't 2003]). Defendants' silence, in the face of known and imminent utility termination, was not mere nondisclosure—it was actionable concealment.

42. Moreover, this conduct violated GBL § 349, which prohibits deceptive acts and practices in the conduct of business. Courts have held that the deliberate concealment of critical financial liabilities—such as utility arrears or code violations—can support a GBL § 349 claim when directed at small business operators. (See *Oswego Laborers*.)

43. Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN have claimed that Plaintiff's failure to immediately establish a Con Edison account triggered the disconnection. However, the Lease Agreement and Rider *contain no specific deadline or timeline for account setup*, and Plaintiff had just begun a multi-month renovation. Plaintiff's architect and general contractor furthermore had advised against immediate account activation, warning that Plaintiff might be forced to assume the prior tenant's debt or incur unnecessary utility costs during construction.

44. Critically, Con Edison's own policy also prevents new commercial tenants from opening a utility account at a given service address until any arrears on the prior account have been resolved by the landlord. Thus, Plaintiff not only was under no contractual obligation to activate service immediately upon executing the lease, but he also would have been structurally barred from doing so until the prior tenant's outstanding balance was addressed—further undermining the later attempts by Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN to shift blame for the disconnection onto Plaintiff.

45. Compounding the harm, Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN materially breached Paragraph 83 of the Lease Rider—which requires at least 24 hours' notice before entering the Basement—when their building superintendent

voluntarily granted Con Edison access to Plaintiff's designated area without prior notice of an emergency, or any directive from law enforcement, and without Plaintiff's notice or consultation. (*See the applicable paragraph in the Lease Rider annexed hereto as **Exhibit E**.*) Unauthorized entry into leased commercial space constitutes a breach of contract under New York law.

46.    The consequences were catastrophic. Restoring gas service in New York City is a notoriously complex, lengthy, and expensive process. Plaintiff ultimately spent more than a year and $125,000 attempting to replace outdated, leaking gas lines that were not up to code—another cumbersome condition for restoring gas service. Despite these extensive efforts, bureaucratic delays and mounting costs rendered restoration impossible. By April 2024, Plaintiff's financial reserves were exhausted, and the location at 123 First Avenue was no longer viable for his restaurant.

47.    As a result, within just 14 days of beginning renovations in early 2023, Plaintiff's entire business model had been destroyed—not by market forces, but by the negligence, concealment, and breach of duty of Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN.

### D.  Destruction of Business Viability and Lost Profits Due to Utility Sabotage

48.    Fried food is central to Plaintiff's menu and business model. Operating a profitable restaurant in New York City that specializes in fried food requires a functioning gas line, as electric alternatives cannot meet the volume or cost-efficiency needed for commercial viability. While electric fryers exist, they are prohibitively expensive to operate at the

scale of Plaintiff's business model and were never contemplated as a long-term substitute

or permanent replacement for gas service in the lease or in Plaintiff's business plan.

49. After months of delay and mounting costs in restoring gas service, Plaintiff attempted to

salvage the venture by opening in August 2023—five months behind schedule—using

only electric equipment. But without gas service, the kitchen operated at no more than

one-quarter of its intended and expected capacity. Plaintiff as a result was forced to

decline lucrative corporate catering contracts and therefore could not generate sufficient

revenue to properly market his restaurant, cover the above-market rent or recoup his

investment.

50. This loss of business viability was not due to market forces or mismanagement—it was

the direct and foreseeable result of the failure of Defendants J&M REALTY, JERRY

EDELMAN, and DAVID EDELMAN to disclose numerous material defects, their

sabotage of the utility infrastructure, and their refusal to assist in restoring essential

services. These actions frustrated the very purpose of the lease and rendered the Premises

commercially unusable.

51. Under New York law, a tenant may recover lost profits as general damages where the loss

flows directly from the breach and was within the contemplation of the parties at the time

of contracting. (See _Biotronik A.G. v. Conor Medsystems Ireland, Ltd._, 22 N.Y.3d 799,

805–06 [2014]). Moreover, the doctrine of frustration of purpose may excuse

performance or support termination where an unforeseen event substantially undermines

the principal purpose of the lease. (See _Jack Kelly Partners LLC v. Zegelstein_, 140

A.D.3d 79, 85 [1st Dep't 2016]).

52.   Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN also materially breached Paragraph 83 of the Lease Rider a second time in February 2023 by voluntarily ordering their representatives to enter the Basement and sever Plaintiff's designated hot water line—again without notice. Defendant DAVID EDELMAN later admitted to this unauthorized entry and sabotage, and even reimbursed Plaintiff $1,000 via Plaintiff's general contractor for a portion of the resulting damage. (*See a copy of David Edelman's payment to Plaintiff's general contractor annexed hereto as **_Exhibit F_**.*) This unauthorized entry and sabotage further impaired Plaintiff's ability to operate and constitutes an independent breach of contract. (See *Warshaw*.)

53.   As a direct and proximate result of the conduct by Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN, Plaintiff suffered substantial damages, including:

- **A five-month delay in opening;**
- **The loss of lucrative corporate catering contracts and seasonal revenue;**
- **Reputational harm to the Memphis Seoul brand;**
- **Repair and mitigation costs exceeding $125,000;** and
- **The effective destruction of a viable restaurant venture.**

54.   These damages are not speculative. They are supported by invoices, correspondence, and industry-standard projections, and they will be proven at trial with reasonable certainty.

### E.  Proof of Bad Faith:
### Identical Problems, Opposite Treatment for Successor Tenant

55. The discriminatory nature of the conduct by Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN is proven definitively by their treatment of successor tenant Compton's Sandwich Shop, which upon information and belief opened at the Premises in April 2025—just nine months after Plaintiff's eviction.

56. Despite having provided Plaintiff with a $35,000 tenant improvement allowance in October 2022 (demonstrating their initial investment in Plaintiff's tenancy), Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN thereafter deliberately sabotaged that same investment by refusing utility repairs, code compliance assistance, and basic landlord cooperation that would have ensured Plaintiff's success.

57. In stark contrast, successor tenant Compton's Sandwich Shop, who upon information and belief received no tenant improvement allowance whatsoever, was instead provided with extensive free concessions, including:

- **Complete restoration of gas service and gas lines;**
- **Full repair of the non-compliant rooftop exhaust system;**
- **All necessary DOB permits and code compliance work;**
- **Free rent during the repair and opening period;** and
- **Full building access and cooperation from Defendants.**

58. These are the identical defects that rendered Plaintiff's tenancy commercially impossible and that Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN had arrogantly dismissed as "not their problem" or claimed were Plaintiff's sole responsibility

under the lease, asserting that their $35,000 tenant improvement allowance absolved them of any further obligation. In stark contrast, these same defects and services were later provided by Defendants at no charge to successor tenant Compton's Sandwich Shop.

59. This disparate treatment proves that the Premises were always repairable and that Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN possessed the resources, expertise, and vendor relationships necessary to remedy all defects. Defendants' successful completion of gas restoration, exhaust repairs, and code compliance for the successor tenant demonstrates they could have provided identical assistance to Plaintiff but deliberately chose not to. Their earlier dismissive claims that utility issues were "not their problem" and entirely Plaintiff's responsibility are exposed as false by their willingness to handle these exact problems for the successor tenant.

60. No rational landlord destroys their own $35,000 investment in one tenant while simultaneously providing greater value free to another tenant with no corresponding obligation. This irrational conduct proves that the refusal by Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN to assist Plaintiff was discriminatory and retaliatory, not based on legitimate business concerns. Plaintiff's damages are quantifiable and provable based on the documented value of services Defendants provided free to the successor tenant, including repair costs, permit expenses, and rent abatement periods.

61. Under New York law, this evidence establishes breach of the implied covenant of good faith and fair dealing through deliberate frustration of lease benefits despite Defendants' own financial investment in Plaintiff's success. As established in _Kagan v. HMC-New York, Inc._, 94 A.D.3d 67, 72 (1st Dep't 2012), landlords may not act in bad faith to deprive tenants of

the benefits of the lease, and under *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004), a party breaches the implied covenant when it acts in a way that deprives the other party of the fruits of the contract.

62.    The conduct of Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN here—sabotaging their own $35,000 investment in Plaintiff while providing superior accommodations free to a successor—exemplifies such bad-faith deprivation. This evidence also supports claims for tortious interference with prospective economic advantage, as no legitimate business justification exists for preferential treatment of a successor while sabotaging an existing tenant-investor relationship. Additionally, this conduct violates NYC Administrative Code § 22-902's prohibition on commercial tenant harassment, as it was specifically designed to force tenant departure despite landlord's own investment. Finally, Defendants' claims that defects were unresolvable constitute fraudulent misrepresentation, proven false when they later resolved identical issues easily and at their own expense.

63.    The chronology reveals a calculated pattern of bad faith that violates fundamental principles of landlord-tenant law. In October 2022, Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN invested $35,000 in Plaintiff's tenancy, demonstrating apparent commitment to his success. By February 2023, however, they began sabotaging their own investment by allowing utility disconnection and refusing all requests for restoration assistance. In July 2024, Defendants completed destruction of their $35,000 investment by orchestrating Plaintiff's eviction through property seizure and coercive demands. Then in April 2025, they provided successor tenant Compton's Sandwich Shop with repairs, utilities, and concessions worth substantially more than their original investment in Plaintiff,

proving their capability and resources were always available but deliberately withheld from Plaintiff.

64. This conduct constitutes textbook bad faith dealing that is actionable under multiple theories of liability and warrants substantial compensatory and punitive damages. This pattern of conduct also constitutes constructive eviction under New York law. The deliberate refusal of Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN to remedy defects that rendered the Premises commercially unusable—combined with their later demonstration that these same defects were easily resolvable—shows they intentionally made continued occupancy untenable to force Plaintiff's departure. (See *Barash v. Pennsylvania Terminal Real Estate Corp.*, 26 N.Y.2d 77 [1970]).

## F. Abrupt Marshal's Eviction
### And Illegal Post-Eviction Conversion

65. On July 18, 2024, following a Housing Court decision authorizing eviction, Defendant GEORGE ESSOCK JR., a New York City Marshal, executed a warrant of eviction at the Premises while accompanied by Defendant DAVID EDELMAN, acting on behalf of Defendants J&M REALTY and JERRY EDELMAN.

66. Although Defendant GEORGE ESSOCK JR. had issued a written notice (*see **Exhibit G***) dated July 3, 2024, stating that the "*earliest date of eviction*" would be July 18, 2024, Plaintiff was subsequently informed by ESSOCK's office during a phone call on July 15, 2024, that the eviction had been officially delayed to July 24, 2024. *(See a true and correct copy of Plaintiff's phone records from his provider AT&T Wireless showing a two-minute phone call to George Essock Jr.'s office on July 15 annexed hereto as **Exhibit H**.)*

Plaintiff reasonably relied on this representation from ESSOCK's office and therefore was not present at the Premises on July 18, 2024.

67. At the time of the eviction, Plaintiff's staff—including his operations director—was actively preparing meals. Defendant GEORGE ESSOCK JR. ordered them to vacate the Premises immediately, allowing only approximately twenty (20) minutes to retrieve a handful of small items limited to what Plaintiff's shocked employees could carry by hand —a gesture ESSOCK described to Plaintiff's operations director as "*doing* [Plaintiff] *a favor*."

68. While Defendant GEORGE ESSOCK JR. conducted a cursory and deficient inventory of the remaining property, failing to comply with requirements for a detailed itemization, and provided a copy to Plaintiff's operations director, that document was lost amid the confusion of the hurried eviction and was never provided to Plaintiff himself. Crucially, no retrieval protocol, schedule, or written instructions accompanied this deficient inventory, as required by Marshal procedures.

69. When Plaintiff's on-site operations director asked Defendant DAVID EDELMAN how Plaintiff could retrieve the remaining business property, EDELMAN replied that Defendants J&M REALTY would be "*holding it until you give me something*"—a clear reference to back rent or other monetary concessions. This statement, made in the presence of a city Marshal and immediately following a state-assisted eviction, underscores the coercive and extrajudicial nature of Defendants' conduct.

70.  Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN thereafter seized and retained Plaintiff's property, including such assets essential to Plaintiff's sole proprietorship Memphis Seoul as trademarked proprietary recipe books, federally protected signage, leased cooking equipment, and confidential business records. No court order authorized this seizure, and DAVID EDELMAN made clear that the property would not be returned unless Plaintiff surrendered legal rights and paid disputed sums—conduct that on its face constituted unlawful self-help, conversion, and commercial tenant harassment under New York law.

71.  Rather than permitting retrieval, Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN demanded coercive concessions—including back rent, a general liability release, and a non-disparagement agreement—as strict conditions for the return of Plaintiff's property. No court order authorized such self-help actions, and under New York law, landlords may not unilaterally seize or condition access to tenant property without judicial authorization. (See *Matter of 1414 Holdings, LLC v. BMS-PSO, LLC*, 202 A.D.3d 547 [1st Dep't 2022]).

72.  The refusal by Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN to immediately return Plaintiff's property unless he relinquished legal rights constitutes both conversion and commercial tenant harassment. Under New York law, conversion occurs when a party intentionally interferes with another's property rights without lawful justification. (See *Pappas v. Tzolis*, 20 N.Y.3d 228, 234 [2012]).

73. Moreover, Defendants' conduct violated New York City Administrative Code § 22-902(a), which prohibits commercial tenant harassment. That statute defines harassment to include:

- **Code § 22-902(a)(6)**: *Removing personal property belonging to a commercial tenant;*

- **Code § 22-902(a)(8)**: *Preventing a commercial tenant from entering the premises*; and

- **Code § 22-902(a)(10)**: *Engaging in any other repeated or enduring acts or omissions that substantially interfere with the operation of a commercial tenant's business.*

74. Courts have recognized that conditioning the return of property on legal concessions—especially after eviction—constitutes coercive conduct that violates both common law and statutory protections. Defendants' actions therefore were not only unlawful—they were retaliatory and calculated to suppress Plaintiff's legal claims. The property seized included not just physical assets, but the core intellectual property of Plaintiff's business. The coercive conditions imposed for its return were designed to extract waivers and silence Plaintiff under duress.

## G. Defendants' Coercive Post-Eviction Conduct and Illegal Conversion

75. Following the eviction, Defendant DAVID EDELMAN—acting on behalf of Defendants J&M REALTY and JERRY EDELMAN—made multiple phone calls to Plaintiff in which he issued a clear ultimatum: Plaintiff's business property would not be returned unless Plaintiff agreed to:

- **Payment of back rent;**

- **Removal of Plaintiff's social-media post about the situation critical of Defendant J&M REALTY;** and

- **Dismissal of a small-claims lawsuit Plaintiff had filed in July 2024 against Defendant JERRY EDELMAN to compel the return of Plaintiff's property.**

76. These demands by Defendant DAVID EDELMAN were made despite the absence of any court order authorizing owner Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC or Defendants J&M REALTY to seize or condition access to Plaintiff's commercial property. Their conduct violated Plaintiff's constitutional right to due process and constitutes unlawful conversion under New York law.

77. Under well-established precedent, conversion occurs when a party intentionally interferes with another's property rights without lawful justification. (See *Pappas* and *Salatino*.) Here, Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN not only withheld Plaintiff's property—they used it as leverage to extract legal concessions under duress.

78. This conduct also violated New York City Administrative Code § 22-902(a), which prohibits commercial tenant harassment. Specifically, § 22-902(a)(10) defines harassment to include *"removing, retaining, or disposing of personal property belonging to a commercial tenant"* and *"conditioning the return of such property on the waiver of legal rights."* The actions of Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN fall squarely within this statutory prohibition.

79. Courts have consistently held that landlords may not engage in self-help or impose extrajudicial conditions for the return of tenant property. (See *Matter of 1414 Holdings*.)

The coercive demands of Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN—made after eviction, without legal authority, and under threat of permanent deprivation—therefore constitute not only conversion and harassment, but a deprivation of property without due process of law. These actions were not isolated missteps; they were part of a coordinated scheme to silence Plaintiff, suppress legal claims, and retain control over valuable business assets in violation of both state and federal law.

### H.  State Actor Liability of Marshal GEORGE ESSOCK JR. for Unlawful Seizure and Deprivation of Property

80.  Defendant GEORGE ESSOCK JR. is a licensed New York City Marshal (Badge No. 71) appointed pursuant to § 1601 of the New York City Civil Court Act. At all relevant times, ESSOCK acted under color of state law and was authorized to enforce Housing Court eviction orders within the City of New York.

81.  On July 18, 2024, Defendant GEORGE ESSOCK JR. and his deputies executed a warrant of eviction at the Premises while accompanied by Defendant DAVID EDELMAN, acting on behalf of Defendants J&M REALTY and JERRY EDELMAN. Although ESSOCK had issued a written notice to Plaintiff dated July 3, 2024, stating that the earliest date of eviction would be July 18, 2024, Plaintiff was subsequently informed by ESSOCK's office—during a phone call on July 15, 2024—that the eviction had been delayed until July 24, 2024. Plaintiff reasonably relied on this representation by ESSOCK's office, and as a result was not present at the Premises on July 18, 2024.

82.  The eviction was therefore carried out without meaningful notice. Plaintiff's staff, including his on-site operations director, was actively cooking at the time. Defendant

GEORGE ESSOCK JR. ordered them to vacate immediately, allowing only approximately twenty (20) minutes to retrieve a handful of small items—a gesture ESSOCK described as *"doing* [Plaintiff] *a favor."* No advance warning, written instructions, or retrieval protocol was provided by ESSOCK or his deputies.

83. Although Defendant GEORGE ESSOCK JR. conducted a cursory inventory of the remaining property and gave a copy to Plaintiff's operations director, that document was lost amid the confusion of the unexpected eviction and never provided to Plaintiff himself. No follow-up communication, itemized list, or retrieval schedule was issued by ESSOCK's office regarding assets essential to Plaintiff's sole proprietorship Memphis Seoul, such as trademarked recipe books and other intellectual property, custom signage and marketing materials, leased kitchen equipment, perishable food, inventory, and catering files.

84. Although the Housing Court had authorized possession of the Premises to be returned to the landlord, no order authorized Defendant GEORGE ESSOCK JR. to seize, impound, or transfer custody of Plaintiff's personal property to Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN. Under well-settled law, a commercial eviction warrant does not entitle a Marshal or landlord to convert or condition access to a tenant's chattel. (See *Matter of 1414 Holdings*.)

85. Defendant GEORGE G. ESSOCK JR. executed the eviction with full knowledge that Plaintiff's valuable business property, comprising assets essential to his sole proprietorship Memphis Seoul, remained on-site. Despite this, ESSOCK left that property in the exclusive custody of the evicting landlord—Defendants J&M REALTY, JERRY

EDELMAN, and DAVID EDELMAN—without providing any inventory to Plaintiff, retrieval schedule, or legal safeguards.

86. On information and belief, no such procedures were followed. Plaintiff received no itemized list, no retrieval protocol, and no supervision from Defendant GEORGE ESSOCK JR.'s office. This abdication of duty enabled Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN to extort Plaintiff's access to his own property by demanding legal concessions, including a liability waiver and dismissal of pending litigation.

87. By failing to safeguard Plaintiff's property and knowingly transferring control to private actors without judicial oversight, Defendant GEORGE ESSOCK JR. participated in a coordinated deprivation of due process under 42 U.S.C. § 1983. (See *Fuentes v. Shevin*, 407 U.S. 67 [1972]; and *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 [1982]).

88. Defendant GEORGE ESSOCK JR.'s conduct also reflects deliberate indifference to Plaintiff's constitutional rights. ESSOCK knew the property was sensitive, valuable, and business-critical, yet failed to document, protect, or supervise its disposition. This is sufficient to support § 1983 liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which recognize liability for state actors whose conduct foreseeably enables third parties to violate protected rights.

89. Upon information and belief, Defendant GEORGE ESSOCK Jr. also has a documented history of failing to ensure proper procedures and protections during evictions. The New York City Department of Investigation ("DOI") has cited ESSOCK twice since 2018 for

failing to ensure required caseworkers were present during evictions of vulnerable tenants, with the department noting in particular his repeated disregard for official protocol. This pattern of conduct further underscores ESSOCK's deliberate indifference to the rights of tenants during the execution of evictions. (*See **Exhibit I**, "City Marshals Cited for Unprofessionalism, Antisemitic Remarks or Other Misdeeds," THE CITY, [May 28, 2024], detailing DOI findings regarding GEORGE ESSOCK JR. and other New York City Marshals*.)

90. As a direct and proximate result of Defendant GEORGE ESSOCK JR.'s failure to follow required procedures and his cooperation in the unlawful seizure, Plaintiff suffered financial loss, reputational harm, and emotional distress—all while being denied fair process of law.

## I. Role of Defendant DAVIDOFF HUTCHER & CITRON LLP In Furthering the Coercive Scheme

91. Defendant DAVIDOFF HUTCHER & CITRON LLP ("DHC LLP") is a prominent New York law firm. At all relevant times, DHC LLP acted through its attorney, BENJAMIN NOREN, who was acting within the scope of his employment as counsel for DHC LLP while representing Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN in connection with Plaintiff's tenancy and post-eviction property dispute.

92. On August 1, 2024—two days after Plaintiff had filed a *pro se* small-claims action (*see **Exhibit J***) seeking the return of unlawfully withheld business property—Defendant DHC LLP, through its attorney BENJAMIN NOREN, initiated a willfully coercive negotiation via email. (*See a true and correct copy of the entire email thread from August 1, 2024, to*

*September 10, 2024, that was initiated by Benjamin Noren with Plaintiff annexed hereto*

*as __Exhibit K__.)*

93. Acting on behalf of Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC, and Defendant J&M REALTY, Defendant DHC LLP, through its attorney BENJAMIN NOREN, conditioned the return of Plaintiff's federally trademarked recipe book, leased equipment, and branded materials on a series of legal concessions, including:

- **Dismissal with prejudice of the pending lawsuit;**
- **Removal of a social media post criticizing J&M REALTY's "gross negligence";**
- **Execution of a broad non-disparagement agreement;** and
- **A general release of all claims against Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC, and Defendant J&M REALTY.**

94. At the time of this conversation with Defendant DHC LLP, Plaintiff was unrepresented, financially distressed, and facing the permanent loss of proprietary business assets. The small-claims filing was not part of a broader litigation strategy but instead a last-ditch effort by a panicked small-business owner unaware of his rights at the time to compel the return of unlawfully retained property. But rather than propose a lawful remedy—such as escrow, judicial intervention, or stipulation—Defendant DHC LLP, through its attorney BENJAMIN NOREN, instead escalated the illegal pressure campaign, falsely asserting that no property would be returned absent full compliance with their terms.

95. Plaintiff explicitly refused to sign a general release, citing the unlawful retention of his intellectual property and detailing—at length—Defendant J&M REALTY's breaches of the lease and violations of New York City utility maintenance requirements.

96.  Despite Plaintiff's objections and legal warnings, however, Defendant DHC LLP, through its attorney BENJAMIN NOREN, reiterated that property would not be returned unless Plaintiff signed a general release and non-disparagement agreement. This constituted a clear threat to withhold essential property unless Plaintiff relinquished his legal rights, in violation of NYC Admin. Code § 22-902(a)(10).

97.  This position is captured most starkly in the email statement to Plaintiff from Defendant DHC LLP, through its attorney BENJAMIN NOREN, on August 2, 2024: "*We need a general release and a non-disparagement agreement. If you are not amenable to that, we will await the outcome of your lawsuit*." This is not a negotiation over terms—it is a direct admission that Defendant DHC LLP was intentionally using Plaintiff's property as leverage. The firm was not offering to have its clients return the property while negotiating other matters; NOREN was making the return of the property itself the bargaining chip. This is the essence of unlawful self-help and conversion.

98.  Moreover, this exchange refutes any claim that Defendant DHC LLP was merely engaged in standard settlement negotiations. Plaintiff repeatedly asserted that the property was being held illegally and that he was being deprived of federally protected intellectual property. Yet DHC LLP's position remained unchanged: the property would not be returned unless Plaintiff surrendered his legal rights. This conduct goes beyond negotiation—it is coercion.

99.  Ultimately, under extreme duress and unaware at the time of any viable alternative, Plaintiff agreed to remove the Instagram post and dismiss the small-claims action in

exchange for access to his property. On August 6, 2024, Defendant DHC LLP, through its attorney BENJAMIN NOREN, transmitted a formal settlement agreement that falsely recited Plaintiff was *"represented by counsel"* and had executed the agreement *"of [his] own free will."* (See **_Exhibit L_**.) These statements are directly contradicted by the contemporaneous email record and constitute material misrepresentations.

100.   The agreement was not the product of mutual negotiation. It was a willfully coercive instrument drafted by BENJAMIN NOREN, transmitted on the official email letterhead of Defendant DHC LLP, and enforced under threat of continued deprivation. The agreement specifically and conditionally required Plaintiff to:

- **Waive litigation rights;**

- **Remove public criticism;**

- **Bear the full cost of property retrieval, including securing a $1 million insurance policy naming Defendant J&M REALTY and Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC, as additional insureds;** and

- **Leave the premises in broom-swept condition, despite having been evicted and denied access for weeks.**

101.   Even after execution, Defendant DHC LLP, through its attorney BENJAMIN NOREN, imposed arbitrary and restrictive retrieval conditions on behalf of Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN. Plaintiff was given narrow time windows to access the premises, often on short notice, and was required to coordinate with J&M REALTY's agents under surveillance.

102.   These actions by Defendant DHC LLP, through its attorney BENJAMIN NOREN, violated multiple provisions of the New York Rules of Professional Conduct, including:

- **Rule 4.1 (Truthfulness in Statements to Others)**: *by formalizing a false legal premise that the property could lawfully be withheld;*

- **Rule 8.4(d) (Conduct prejudicial to the administration of justice)**: *by using legal threats to subvert judicial process;* and

- **Rule 3.4(a) (Fairness to opposing party)**: *by advising clients to condition return of property on waiver of litigation rights.*

103.    While violations of the Rules of Professional Conduct do not, standing alone, create a private cause of action, they are highly relevant to establishing bad faith, coercion, and joint action under 42 U.S.C. § 1983. (See *Sebco Dev., Inc. v. Siegel & Reiner, LLP*, 2024 NY Slip Op 50292[U] [Sup. Ct. N.Y. Cty. 2024]). Moreover, attorneys, acting through their firms, are not immune from § 1983 liability when they act as willful participants in joint activity with state actors. (See *Dennis v. Sparks*, 449 U.S. 24, 27–28 [1980]; and *Lugar*).

104.    Here, the eviction carried out by Defendant GEORGE ESSOCK JR.—a state actor—was immediately followed by the participation of Defendant DHC LLP, through its attorney BENJAMIN NOREN, in a scheme to extort legal concessions in exchange for access to Plaintiff's property. The use of formal legal correspondence to enforce this scheme transformed a private dispute into a state-assisted constitutional deprivation, satisfying the "joint action" standard for § 1983 liability.

105.    Finally, under *Fuentes* and its progeny, a state-assisted seizure of property without prior notice or hearing violates procedural due process. No judicial order authorized the retention or conditioning of Plaintiff's property. The absence of a pre-deprivation hearing alone establishes a viable due process violation under prevailing federal standards.

# VI. DAMAGES AND CAUSATION

106. As a direct and proximate result of the conduct described above, Plaintiff suffered substantial and ongoing damages, including but not limited to:

- **Out-of-pocket expenditures exceeding $200,000 for architectural plans, permitting, demolition, and partial renovation of the Premises;**

- **More than $125,000 in unreimbursed costs related to the failed restoration of gas service, including engineering reports, DOB filings, and contractor fees;**

- **The exhaustion of a $312,000 Economic Injury Disaster Loan ("EIDL") obtained from the U.S. Small Business Administration, for which Plaintiff is the sole personal guarantor. The full amount of this federally backed loan was invested in the buildout of the Premises. Due to the collapse of the venture, the loan remains outstanding, and the federal government has begun issuing formal notices demanding immediate repayment in full. Plaintiff has been advised that this debt is currently non-dischargeable in bankruptcy, leaving him personally liable for a six-figure obligation with no viable business revenue to satisfy it;**

- **Lost revenue and business opportunities estimated at more than $300,000, including:**

  - *Corporate catering contracts that could not be fulfilled due to insufficient kitchen capacity;*

  - *Delayed restaurant opening by six months, resulting in missed seasonal revenue and media exposure;* and

  - *Reputational harm to the Memphis Seoul brand due to the failed Manhattan expansion;*

- **The loss of proprietary business assets—including trademarked recipes, signage, and leased equipment—valued at more than $100,000, which were unlawfully withheld and only partially recovered under coercive conditions;** and

- **Emotional distress, reputational damage, and loss of goodwill, the full extent of which will be established at trial.**

107.    Importantly, the August 6, 2024, settlement agreement did not include a general release and does not bar Plaintiff's claims. Rather than mitigating harm, the agreement was a product of coercion and served to deepen Plaintiff's losses by delaying access to essential business assets and suppressing public accountability.

108.    But for Defendants' misrepresentations, omissions, and post-eviction coercion, Plaintiff would have successfully opened and operated a profitable restaurant at the Premises. The successor tenant's full restoration of gas service and receipt of free rent and repairs—provided by the same Defendants—demonstrates that Plaintiff's business model was viable and that the harm he suffered was not only foreseeable but avoidable.

# VII. CAUSES OF ACTION

## COUNT ONE:

### Deprivation of Property Without Due Process (42 U.S.C. §1983)

**(Against George Essock Jr., J&M Realty, Jerry Edelman,
David Edelman, and DHC LLP)**

109.    Plaintiff realleges and incorporates by reference all prior paragraphs.

110.    Defendant GEORGE ESSOCK JR., a New York City Marshal appointed pursuant to § 1601 of the New York City Civil Court Act, is a state actor who, at all relevant times, acted under color of state law.

111.    On July 18, 2024, Defendant GEORGE ESSOCK JR. executed a warrant of eviction at the Premises. Although a cursory inventory was created and briefly provided to Plaintiff's operations manager, no retrieval protocol, schedule, or legal process was offered. The inventory was never provided to Plaintiff himself, and the property was left in the exclusive control of private parties who immediately conditioned its return on extrajudicial concessions.

112.    Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN—acting in concert with Defendant GEORGE ESSOCK JR.—seized Plaintiff's property and imposed coercive conditions for its return, including demands for back rent, legal waivers, and non-disparagement agreements. These actions were taken without a court order and in violation of Plaintiff's constitutional right to procedural due process under the Fourteenth Amendment.

113.   Defendant DHC LLP, through its attorney BENJAMIN NOREN, acting as legal counsel for Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN, participated in this deprivation by formalizing and transmitting these coercive demands on official law firm letterhead, thereby furthering the unlawful scheme and transforming a private dispute into state-assisted deprivation.

114.   The conduct of all remaining Defendants constituted a joint action under color of state law—as defined by *Lugar* and *Dennis*—and resulted in the unlawful seizure and deprivation of Plaintiff's protected property interests without adequate pre-deprivation or post-deprivation process.

115.   Plaintiff does not assert municipal liability under *Monell* at this time, but reserves the right to amend the complaint should discovery reveal a policy, custom, or practice by the City of New York or the Marshal's office that contributed to the constitutional violation.

116.   As a direct and foreseeable result of Defendants' joint conduct under color of law, Plaintiff was deprived of valuable business property and suffered quantifiable economic losses, including the destruction of a viable restaurant venture and the loss of proprietary assets.

## COUNT TWO:
### Federal Declaratory Judgment Invalidating and
### Limiting Effect of August 6, 2024, Settlement Agreement

**(Against J&M Realty, Jerry Edelman, David Edelman, and DHC LLP)**

117.   Plaintiff realleges and incorporates by reference all prior paragraphs.

118.   On August 6, 2024, Plaintiff executed a document titled "Settlement Agreement" (the "Agreement") under conditions of economic duress and coercion. The Agreement was drafted and transmitted by Defendant DHC LLP, through its attorney BENJAMIN NOREN, on behalf of Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN, and was transmitted via the official email letterhead of Defendant DHC LLP.

119.   The Agreement conditioned Plaintiff's access to his own business property—including a federally trademarked recipe book, leased equipment, and branded materials—on Plaintiff's agreement to dismiss a pending small-claims action, remove a public Instagram post critical of J&M REALTY, execute a non-disparagement clause, and bear the full cost and logistical burden of retrieving his property.

120.   The Agreement falsely recites that Plaintiff was *"represented by counsel"* and executed the document *"of [his] own free will,"* despite the fact that Defendant DHC LLP, through its counsel BENJAMIN NOREN, was fully aware that Plaintiff was unrepresented, financially distressed, and under threat of permanent deprivation of essential business assets.

121.  The Agreement does not contain a general release of claims, as Plaintiff explicitly refused to sign such a release during the negotiation process.

122.  Defendants have not disclaimed the Agreement's legal effect and may, in future proceedings, assert that it bars or limits Plaintiff's claims for damages, injunctive relief, or public redress.

123.  An actual and justiciable controversy exists between the parties as to the legal effect, enforceability, and scope of the Agreement.

124.  Plaintiff seeks a federal declaratory judgment pursuant to 28 U.S.C. §2201 that:

- **The Agreement does not constitute a general release of claims against any Defendant;**

- **The Agreement was executed under economic duress and is voidable in whole or in part;**

- **The non-disparagement clause is unenforceable as a matter of public policy and violates NYC Admin. Code § 22-902(a)(10);** and

- **The Agreement does not bar Plaintiff's claims under 42 U.S.C. § 1983, the FDCPA, New York Real Property Law, or any other statutory or common-law theory.**

125.  A federal declaratory judgment pursuant to 28 U.S.C. § 2201 is necessary to resolve uncertainty and prevent future prejudice to Plaintiff's rights.

126.  Plaintiff respectfully requests that this Court enter judgment declaring the August 6, 2024, Settlement Agreement invalid in whole or in part, or in the alternative, clarifying that it does not bar Plaintiff's claims or remedies in this action, and awarding such other and further relief as the Court deems just and proper.

**COUNT THREE:**
**Fraudulent Inducement**
**(Against J&M Realty, Jerry Edelman, and David Edelman)**

127.    Plaintiff realleges and incorporates by reference all prior paragraphs.

128.    Plaintiff was induced into signing a commercial lease based on material
misrepresentations and omissions regarding the Premises' operational status and legal
compliance, which Defendants J&M REALTY, JERRY EDELMAN, and DAVID
EDELMAN knew to be false or recklessly disregarded. Specifically, despite representing
the space as a "turn-key restaurant," Defendants knowingly concealed that it lacked
required permits, the rooftop exhaust system was non-compliant, and, critically, that the
gas line was subject to imminent disconnection due to unpaid arrears, for which
Defendants had received multiple turnoff notices prior to Plaintiff signing the lease and to
which Con Edison's policy prevented Plaintiff from establishing an account.

129.    Defendants' concealment of these known hazards and regulatory deficiencies, coupled
with their exclusive knowledge of the building's true condition and attempt to saddle
Plaintiff with another tenant's unpaid bills, constituted a deliberate and material deception
intended to induce Plaintiff's reliance. Plaintiff justifiably relied on Defendants'
misrepresentations and omissions to his detriment.

130.    This inducement led Plaintiff to enter into a lease that proved financially ruinous. But for
these misrepresentations and material omissions, Plaintiff would not have signed the
lease, invested in the Premises, or suffered the resulting financial harm.

## COUNT FOUR:
## Commercial Tenant Harassment (NYC Admin. Code § 22-902)
### (Against J&M Realty, Jerry Edelman, and David Edelman)

131. Plaintiff realleges and incorporates by reference all prior paragraphs.

132. Following Plaintiff's eviction, Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN engaged in a pattern of commercial tenant harassment in violation of New York City Administrative Code § 22-902(a), including but not limited to subsections (6), (8), and (10).

133. Immediately after the Marshal's eviction on July 18, 2024, Defendants unlawfully withheld access to Plaintiff's valuable business property, which included federally trademarked recipe books, custom signage, leased kitchen equipment, and confidential business records. This conduct constitutes harassment under § 22-902(a)(6) (*"Removing personal property belonging to a commercial tenant"*) and § 22-902(a)(8) (*"Preventing a commercial tenant from entering the premises"*).

134. Defendants then unequivocally conditioned the return of Plaintiff's property on extrajudicial concessions, including demands for back rent, dismissal of Plaintiff's small-claims lawsuit, removal of a public Instagram post critical of J&M REALTY, and execution of legal waivers and non-disparagement agreements. Defendant DAVID EDELMAN explicitly stated to Plaintiff's operations director that J&M REALTY would be "*holding it until you give me something.*"

135.   This coercive conduct, which sought to pressure Plaintiff into surrendering legal rights and foreclosing public criticism through the illegal withholding of property, constitutes harassment under § 22-902(a)(10) (*"Engaging in any other repeated or enduring acts or omissions that substantially interfere with the operation of a commercial tenant's business,"* including *"conditioning the return of such property on the waiver of legal rights."*)

136.   Defendants' actions were designed to inflict severe financial and reputational harm on Plaintiff and to extract legal concessions entirely outside of authorized judicial process, demonstrating a willful disregard for Plaintiff's rights under the Administrative Code.

## COUNT FIVE:
## Conversion
### (Against J&M Realty, Jerry Edelman, and David Edelman)

137.  Plaintiff realleges and incorporates by reference all prior paragraphs.

138.  On July 18, 2024, Defendants J&M REALTY, JERRY EDELMAN, and DAVID
      EDELMAN intentionally and unlawfully took possession of Plaintiff's personal and
      business property, which included: trademarked proprietary recipe books, federally
      protected signage, leased cooking equipment, and confidential business records. This
      property was left in Defendants' exclusive custody following the Marshal's eviction due
      to the Marshal's failure to provide retrieval protocols or safeguards.

139.  Defendants, through DAVID EDELMAN, immediately refused to return this property,
      explicitly stating they would be *"holding it until you give me something"*—a clear
      reference to back rent or other monetary concessions.

140.  Thereafter, Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN
      continued to refuse the return of Plaintiff's property except on coercive conditions,
      including agreement to dismiss pending litigation, remove public criticism, and sign a
      non-disparagement agreement. No court order authorized this seizure or the conditioning
      of the property's return. Defendants' intentional interference with Plaintiff's property
      rights, without lawful justification, therefore constitutes an unauthorized and unlawful
      exercise of dominion and control over Plaintiff's property.

141.   As a direct and proximate result of Defendants' conversion, Plaintiff suffered damages, including the loss of proprietary business assets valued at more than $100,000, and delays in business operations that led to significant financial harm.

## COUNT SIX:

### Deceptive Business Practices (New York General Business Law § 349)
#### (Against J&M Realty, Jerry Edelman, and David Edelman)

142.   Plaintiff realleges and incorporates by reference all prior paragraphs.

143.   Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN engaged in consumer-oriented conduct by marketing and leasing the Premises to Plaintiff—an individual operating a small business—as a "turn-key" restaurant ready for immediate, gas-powered operation. This marketing included a large banner affixed to the building advertising the space as a *"RESTAURANT FOR LEASE."*

144.   These representations were materially misleading, as Defendants knew or should have known the Premises lacked fundamental operational and legal compliance to host a restaurant. Specifically, Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN knowingly failed to disclose:

- **That the commercial kitchen had never been legally permitted by the DOB, rendering it illegal for commercial use;**

- **That the rooftop exhaust system was dangerously non-compliant and posed a fire hazard due to years of grease accumulation;**

- **That the gas line was subject to imminent disconnection due to significant unpaid utility arrears left by the prior tenant, and that Defendants had received multiple turnoff notices from Con Edison regarding these balances prior to Plaintiff signing the lease;** and

- **That Con Edison's policy prevented Plaintiff from establishing an account or restoring gas service until the prior tenant's outstanding arrears were resolved.**

145. These omissions and misrepresentations were made during high-pressure lease negotiations and were part of a broader pattern of deceptive leasing practices aimed at inducing tenants to sign leases for non-compliant, non-functional spaces, and were an apparent attempt to saddle Plaintiff with another tenant's unpaid bills.

146. As a direct result of these deceptive acts and practices, Plaintiff was induced to enter into a financially ruinous lease and suffered substantial financial harm, including more than $200,000 in out-of-pocket expenses attempting to restore gas service and bring the Premises into compliance.

147. These deceptive acts harmed Plaintiff and fall squarely within the scope of GBL § 349 protections, which prohibit materially misleading conduct directed at consumers and small business operators.

## COUNT SEVEN:
## Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against J&M Realty, Jerry Edelman, and David Edelman)

148.    Plaintiff realleges and incorporates by reference all prior paragraphs.

149.    Under New York law, every contract—including commercial leases—contains an implied covenant of good faith and fair dealing, which obligates each party to act honestly and fairly in a manner that does not deprive the other party of the benefits of the agreement.

150.    Plaintiff entered into a Lease Agreement and Lease Rider with Defendants J&M REALTY and JERRY EDELMAN, who acted as *de facto* landlords throughout the tenancy. Defendant DAVID EDELMAN also participated in the management and enforcement of lease terms and was directly involved in operational decisions and post-eviction conduct.

151.    Defendants breached the implied covenant of good faith and fair dealing by:

- **Failing to disclose known material defects in the Premises, including the lack of a legal kitchen permit, a dangerously non-compliant exhaust system, and the imminent risk of gas disconnection due to prior unpaid utility bills;**

- **Permitting the disconnection of gas service without notifying Plaintiff, then refusing to assist in its restoration despite having done so for the successor tenant shortly thereafter;**

- **Repeatedly entering Plaintiff's designated space without notice in violation of Paragraph 83 of the Lease Rider;**

- **Severing Plaintiff's hot water line and obstructing access to other essential utilities necessary for restaurant operations;**

- **Refusing to offer rent abatement or any form of assistance even after it became clear the Premises were commercially unusable; and**

- **Engaging in coercive post-eviction tactics to extract legal concessions from Plaintiff in exchange for access to property and equipment needed to maintain his business and client relationships**

152.   These acts were not isolated breaches of contract, but part of a calculated and ongoing pattern of conduct designed to frustrate Plaintiff's ability to derive any benefit from the lease agreement. Defendants acted in bad faith, without transparency or fairness, and with the apparent goal of driving Plaintiff out of the Premises.

153.   As established, New York law prohibits landlords from intentionally undermining the rights of tenants under a lease. Moreover, under _Forman v. Guardian Life Ins. Co. of America_, 76 A.D.3d 886 (1st Dep't 2010), a claim for breach of the implied covenant of good faith and fair dealing may be asserted independently and survives even in the absence of a separately pled breach of contract cause of action.

154.   As a direct and proximate result of this breach of the implied covenant of good faith and fair dealing by Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN, Plaintiff suffered substantial financial losses, reputational harm, and the destruction of a viable business venture.

155.   Defendants' breach is proven definitively by their provision of free repairs, gas restoration, and rent abatement to successor tenant Compton's Sandwich Shop for the identical defects they refused to remedy for Plaintiff. This disparate treatment demonstrates deliberate frustration of Plaintiff's lease benefits while ensuring the successor tenant's success.

**COUNT EIGHT:**
**Tortious Interference with Prospective Economic Advantage**
**(Against J&M Realty, Jerry Edelman, and David Edelman)**

156.    Plaintiff realleges and incorporates by reference all prior paragraphs.

157.    At all relevant times, Plaintiff had valid business relationships and reasonable expectations of economic advantage with third parties, including existing and prospective catering clients, restaurant patrons, and media partners. These relationships were known or reasonably foreseeable to Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN.

158.    Plaintiff's business model for the Premises was built around a unique and market-tested restaurant concept, Memphis Seoul, which had already achieved success in Brooklyn and was poised for expansion into Manhattan. Plaintiff had secured several Fortune 500 catering clients and had begun targeted marketing efforts in anticipation of a high-profile launch.

159.    Defendants intentionally and wrongfully interfered with these prospective economic relationships by:

- **Misrepresenting the operational status of the Premises and inducing Plaintiff to sign a lease for a non-compliant, non-functional space;**

- **Failing to disclose prior utility arrears and knowingly permitting Con Edison to disconnect gas service after Plaintiff took possession;**

- **Refusing to assist in restoring gas or remedying severe code violations, rendering the Premises commercially unusable and significantly delaying opening;**

- **Engaging in coercive post-eviction conduct that deprived Plaintiff of access to critical property—including proprietary recipes, signage, and leased equipment—necessary to fulfill client orders and maintain brand continuity;**

- **Participating in a coordinated scheme with the Marshal's office, which executed the eviction with no warning to Plaintiff despite a phone call three days earlier in which the Marshal's office told Plaintiff the eviction would occur on a later date. This miscommunication, followed by Defendants' immediate and exclusive control over Plaintiff's property, prevented Plaintiff from mitigating damages or communicating with clients; and**

- **Providing preferential treatment and full utility restoration to a successor tenant, demonstrating that their refusal to accommodate Plaintiff was selective, retaliatory, and malicious**

160. Defendants' conduct was not justified by any legitimate business interest. Rather, it was driven by bad faith and a desire to displace Plaintiff in favor of a successor tenant viewed as more profitable or desirable.

161. As a direct and proximate result of the tortious interference by Defendants, Plaintiff suffered substantial and ongoing economic harm, including lost revenue, lost business opportunities, reputational damage, and the effective destruction of a viable restaurant expansion.

162. Defendants' conduct lacks any legitimate business justification, as proven by their immediate accommodation of successor tenant Compton's Sandwich Shop with free repairs, utilities, and rent concessions. The same landlord providing opposite treatment for identical circumstances proves malicious intent to destroy Plaintiff's business in favor of a preferred tenant.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(i) **Declare that Defendants' conduct violated Plaintiff's constitutional rights under 42 U.S.C. § 1983;**

(ii) **Declare pursuant to 28 U.S.C. § 2201 that the August 6, 2024, settlement agreement:**

- *Was executed under economic duress and without legal representation;*

- *Does not constitute a general release of claims;*

- *Is void or voidable in whole or in part;* and

- *Is unenforceable to the extent it violates public policy, including NYC Admin. Code § 22-902(a)(10);*

(iii) **Award compensatory damages in an amount to be determined at trial, but not less than $750,000, for:**

- *Out-of-pocket expenses;*

- *Lost revenue and business opportunities;*

- *Conversion of personal and business property;*

- *Reputational harm and emotional distress;*

- *Breach of contract and bad faith dealing;* and

- *Tortious interference with prospective economic advantage;*

(iv) **Award punitive damages against the individual Defendants for their willful, malicious, and reckless misconduct, including but not limited to:**

- *Fraudulent inducement;*

- *Commercial tenant harassment;*

- *Coercive post-eviction conduct;*

- *Misuse of legal process;* and

- *Constitutional violations under color of law;*

**(v)    Order injunctive and equitable relief, including:**

- *A declaration that the Lease Agreement was constructively terminated due to Defendants' breach of the implied covenant of good faith and fair dealing;*

- *A declaration that Defendants' conduct frustrated the essential purpose of the lease and deprived Plaintiff of its intended benefit;*

- *A declaration that the non-disparagement clause in the August 6, 2024, agreement is unenforceable;* and

- *An injunction prohibiting Defendants from engaging in further unlawful or retaliatory conduct;*

**(vi)    Award damages equal to the value of concessions provided free to successor tenant, including:**

- *Cost of gas line restoration and utility repairs;*

- *Value of rent abatement during repair period;*

- *Building code compliance and permit costs;* and

- *DOB violation remediation expenses.*

**(vii)    Award *pro se* legal fees and costs, including under 42 U.S.C. § 1988 for prevailing civil rights plaintiffs;** and

**(viii)    Grant such other and further relief as the Court deems just and proper, including leave to amend the Complaint to assert additional claims or name additional parties as discovery warrants.**

Plaintiff respectfully demands a trial by jury on all issues so triable.

Dated: September 14, 2025
Brooklyn, New York

Respectfully submitted,

EDWARD B. HUBBUCH
394 Lincoln Place #A5
Brooklyn, N.Y. 11238
(646) 544-7597
bhubbuch@gmail.com

*Pro se*