UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD B. HUBBUCH,<br><br>Plaintiff,<br><br>v.<br><br>J&M REALTY SERVICES CORP.,<br>JERRY EDELMAN, DAVID EDELMAN,<br>DAVIDOFF HUTCHER & CITRON LLP,<br>BENJAMIN NOREN,<br>THE CITY OF NEW YORK, and<br>GEORGE ESSOCK JR., in his individual and<br>official capacity as a New York City Marshal,<br><br>Defendants. | Case No. 25-CV-7642 (JPO) (GS)<br><br><br><br>**AMENDED COMPLAINT**<br><br><br><br>**[ TRIAL BY JURY DEMANDED ]** |

Plaintiff Edward B. Hubbuch brings this First Amended Complaint for actual, punitive, declaratory, injunctive, and equitable relief arising from violations of the Civil Rights Act of 1871, 42 U.S.C. § 1983, including claims for both individual liability and municipal liability under *Monell*, all of which prohibit the deprivation of property and liberty interests without due process of law; and from related violations of New York State and New York City law, including fraudulent inducement, conversion, commercial tenant harassment under NYC Admin. Code § 22–902, deceptive business practices under New York General Business Law § 349, breach of the implied covenant of good faith and fair dealing, and tortious interference with prospective economic advantage:

## I. INTRODUCTION

1. This action seeks redress for a comprehensive and coordinated scheme by Defendants J&M REALTY SERVICES CORP. ("J&M REALTY"), JERRY EDELMAN, DAVID EDELMAN, DAVIDOFF HUTCHER & CITRON LLP ("DHC LLP"), BENJAMIN

NOREN, THE CITY OF NEW YORK, and New York City Marshal GEORGE ESSOCK JR. (in both his individual and official capacities).

2. This scheme was executed by the individual and private Defendants acting jointly and under color of state law, and was allowed to persist due to the unconstitutional customs and deliberate indifference of THE CITY OF NEW YORK. The Defendants collectively orchestrated a fraudulent lease, sabotaged Plaintiff's business through utility manipulation, and then used coercive legal process to seize Plaintiff's property. This systematic deprivation of property, coupled with egregious and discriminatory disparate treatment (providing a successor tenant with all the repairs deliberately withheld from Plaintiff), proves the Defendants' bad faith and malicious intent designed to destroy Plaintiff's viable restaurant venture.

3. The strength of Defendants' malicious intent is proven by their post-eviction conduct: within months of forcing Plaintiff out, Defendants J&M REALTY, JERRY EDELMAN, and DAVID EDELMAN (collectively, "the EDELMAN DEFENDANTS") provided immediate successor tenant Compton's Sandwich Shop with free rent, full gas restoration, complete exhaust system repairs, and building code compliance—the very accommodations they refused to provide Plaintiff despite his repeated requests and substantial out-of-pocket expenditures exceeding $200,000.

4. This side-by-side comparison reveals that Plaintiff's business was always viable, the Premises were always repairable, and the EDELMAN DEFENDANTS always possessed the resources and capability to remedy all defects. Their refusal to assist Plaintiff while later providing identical services free to a successor tenant constitutes textbook bad faith,

commercial tenant harassment, and tortious interference with prospective economic advantage.

## II.  JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 42 U.S.C. §1983, as Plaintiff asserts claims arising under the Constitution and laws of the United States. These claims include the deprivation of property without due process of law against the individual defendants and claims for municipal liability against Defendant THE CITY OF NEW YORK pursuant to *Monell v. Department of Social Services*.

6.  This Court has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. §1367(a), as those claims form part of the same case or controversy and arise from a common nucleus of operative fact as Plaintiff's federal civil rights claims.

7.  Jurisdiction is not based on diversity of citizenship under 28 U.S.C. §1332, as all parties are residents of the State of New York or domiciled therein.

## III.  THE PARTIES

8.  Plaintiff Edward B. Hubbuch is an individual residing in Brooklyn, New York. He is the founder and sole proprietor[1] of the hospitality company Memphis Seoul and brings this action in his individual capacity as the party directly harmed by Defendants' conduct, and as the personal guarantor of the commercial lease that forms the basis of this dispute. The

---

[1] See *Dkt. 23*, *23-1*, *23-2*, and *23-3*, which include Plaintiff's sworn declaration, IRS Schedule C filings for 2022–2024, the operative Brooklyn commercial lease executed in Plaintiff's individual capacity, and the SBA loan dashboard confirming Plaintiff's personal liability—all of which establish Plaintiff's standing as the real party in interest.

commercial lease was initially executed in the name of "Tasteland Holdings LLC d/b/a MEMPHIS SEOUL," an entity formed by Plaintiff solely as a vehicle for the expansion of his existing sole proprietorship. Pursuant to an allowance for one name change in the lease, Plaintiff subsequently changed the named entity to "Memphis Seoul No. 2 LLC," for which Plaintiff remains the sole member and personal guarantor. Upon information and belief, "Memphis Seoul No. 2 LLC" is now a dissolved and defunct entity, further establishing Plaintiff's individual standing to recover damages arising from the conduct of Defendants.

9. Defendant J&M REALTY SERVICES CORP. is a New York corporation with its principal place of business located in New York City. The Lease Agreement at issue in this complaint identified "Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC" as the Owner, but explicitly directed all owner communications to J&M REALTY SERVICES CORP. as the designated "c/o" address at 343 St. Nicholas Avenue, New York, New York 10027. Throughout Plaintiff's tenancy, J&M REALTY also functioned as the property's on-site manager and leasing agent.

10. Defendant JERRY EDELMAN, upon information and belief, is the principal owner of J&M REALTY SERVICES CORP. and resides in the Greater New York City Area. He personally participated in the lease negotiations, property management, and post-eviction conduct at issue in this case.

11. Defendant DAVID EDELMAN is the son and agent of Defendant JERRY EDELMAN and resides in the Greater New York City Area. DAVID EDELMAN participated directly in the post-eviction seizure and withholding of Plaintiff's business property.

12.  Defendant DAVIDOFF HUTCHER & CITRON LLP is a law firm organized under the laws of New York, with its principal office located in New York, New York. At all relevant times, DHC LLP acted through its attorney, Defendant BENJAMIN NOREN, who was acting within the scope of his employment.

13.  Defendant BENJAMIN NOREN, upon information and belief, resides in the Greater New York City Area and, according to the firm's website, was elevated to partner at Defendant DAVIDOFF HUTCHER & CITRON LLP in January 2025. NOREN is sued in his individual capacity for his direct participation in the unlawful seizure, conversion, and coercion of Plaintiff's property.

14.  Defendant THE CITY OF NEW YORK is a municipal entity sued under 42 U.S.C. §1983 and _Monell v. Department of Social Services_ based on its customs, policies, and failure to train and supervise City Marshals, all of which caused Plaintiff's constitutional deprivation.

15.  Defendant GEORGE ESSOCK JR. is a New York City Marshal (Badge No. 71) appointed pursuant to § 1601 of the New York City Civil Court Act. He executed the commercial eviction of Plaintiff on July 18, 2024, and is sued in both his individual and official capacities for actions taken under color of state law.

## IV.  FACTUAL BACKGROUND
## AND LEGAL ARGUMENTS

### A.  Formation of the Lease and
### Defendants' Control Over the Premises

16.  Plaintiff is the founder and sole proprietor of Memphis Seoul, a restaurant and catering company known for its distinctive fusion of Southern and Korean cuisine. Plaintiff launched the business in Crown Heights, Brooklyn, in 2018 and, by 2022, sought to expand into Manhattan's East Village.

17.  After evaluating several locations, Plaintiff selected the ground floor and a portion of the basement at 123 First Avenue in New York, New York (the "Premises") as the site for Memphis Seoul's second location. On or about October 15, 2022, Plaintiff executed a commercial Lease Agreement, Lease Rider and signed Personal Guaranty for the Premises. (*See **Exhibit A**.*) The Lease identified "Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC" as the Owner, and explicitly directed all owner communications to Defendant J&M REALTY.

18.  Upon information and belief, Lunar Estates LLC d/b/a Lunar Estates of CA is owned by Won Moon, an absentee landlord who resides full-time in Southern California and is not involved in the day-to-day management of the property. (*See **Exhibit B**.*) Because the Lease explicitly designated Defendant J&M REALTY as the owner's primary contact and administrative agent, the EDELMAN DEFENDANTS effectively served as the property's on-site manager and leasing agent throughout Plaintiff's tenancy.

19.  Throughout the negotiation, execution, and duration of Plaintiff's lease, the EDELMAN DEFENDANTS acted as the *de facto* landlords. They managed all aspects of the tenancy,

including lease negotiations, maintenance, repairs, and communications. Both JERRY EDELMAN and DAVID EDELMAN also repeatedly referred to themselves as the "owners" of the Premises to Plaintiff, and Plaintiff never had any direct contact with Won Moon or with any representative of Lunar Estates LLC d/b/a Lunar Estates of CA.

20. Under New York law, a party who exercises dominion and control over leased property, manages the lease, and holds themselves out as the landlord may be deemed a *de facto* landlord and held liable for breaches of the lease or related torts.[2] Moreover, where multiple parties are named as lessors in a lease agreement, each may be independently liable for breach of contract or related misconduct, regardless of ownership status.[3]

21. Although Lunar Estates LLC d/b/a Lunar Estates of CA is the titled owner of the Premises and listed first on the Lease Agreement, it is not named as a defendant in this action due to a highly disputed Stipulation of Settlement executed in February 2024. (*See **Exhibit C**.*) That stipulation—entered into under pressure and without Plaintiff's informed consent—was negotiated in secret by Plaintiff's former counsel and permanently bars Plaintiff and any affiliated entity from asserting claims or counterclaims specifically against Won Moon or Lunar Estates LLC d/b/a Lunar Estates of CA relating to the Premises.

22. The disputed stipulation negotiated secretly by Plaintiff's former counsel was not favorable to Plaintiff. It was deliberately misrepresented to him by that former counsel, who did not inform Plaintiff that he would be required to waive all defenses and

---

[2] *Harlorn LLC v. Poy Ao Cheng*, 2018 NY Slip Op 50642(U) (Sup. Ct. N.Y. Cty. 2018)

[3] *DiBuono v. Abbey, LLC*, 83 A.D.3d 650 (2d Dep't 2011)

counterclaims, admit jurisdiction, and acknowledge more than $130,000 in alleged arrears, despite the ongoing disputes over utility access, habitability, and lease compliance that now form the basis of this Complaint. The stipulation agreement was executed under circumstances that raise serious concerns about the ineffective assistance of Plaintiff's former counsel and the material misrepresentations by both opposing counsel and Plaintiff's own former legal representatives.

23. This action is therefore brought against the EDELMAN DEFENDANTS (and their counsel, Defendant BENJAMIN NOREN) because the EDELMAN DEFENDANTS were not released by the February 2024 stipulation and are independently liable as the designated agent of the Owner, *de facto* landlords, and willful private actors in the joint scheme. Those three Defendants and their counsel exercised full control over the Premises and are directly responsible for the conduct and omissions alleged in this Complaint who were not released by the February 2024 stipulation and who are independently liable as the designated agent of the Owner and *de facto* landlords. The EDELMAN DEFENDANTS exercised full control over the Premises and are directly responsible for the conduct and omissions alleged in this Amended Complaint.

### B. Defendants' Material Misrepresentations and Deceptive Leasing Conduct

24. Plaintiff took possession of the Premises in October 2022 but quickly discovered that the EDELMAN DEFENDANTS had made numerous material misrepresentations and omissions during lease negotiations—effectively and intentionally renting Plaintiff a "lemon."

25. Prior to and during lease negotiations, Defendant J&M REALTY repeatedly represented through their commercial broker that the Premises constituted a turn-key restaurant that had been "*fully operational just six months earlier.*" They reinforced these claims with a large banner affixed to the building advertising the space as a "*RESTAURANT FOR LEASE.*" These representations were false. At the time of the lease signing, the EDELMAN DEFENDANTS knew or should have known that:

- **The kitchen had never been legally permitted as a commercial kitchen by the DOB;**

- **The rooftop extension of the commercial space's exhaust system was dangerously non-compliant and posed a fire hazard;**

- **The gas line was subject to imminent disconnection due to unpaid arrears left by prior tenant The Organic Grill;** and

- **Con Edison had both mailed and posted multiple disconnection notices to the space due to unpaid arrears during the summer of 2022, before Plaintiff's entity had signed its lease in October 2022.**

26. These omissions constituted material deception. The EDELMAN DEFENDANTS had exclusive knowledge of the building's numerous utility and code-compliance issues, yet concealed these highly relevant facts while soliciting Plaintiff to sign a lease at an above-market rent of $12,000 per month. Defendants' failure to disclose these known defects induced Plaintiff (through his entity, as a shell vehicle for his sole proprietorship) to enter into the lease under false pretenses and structure his limited budget and compressed timeline accordingly.

27. Under New York law, a fraudulent inducement claim is viable where a party makes a misrepresentation of present fact—rather than future intent—that is collateral to the

contract and induces the plaintiff to enter into the agreement.[4] Here, the EDELMAN DEFENDANTS' repeated statements about the Premises being "*turn-key*" and "*fully operational*" were misrepresentations of present fact, not mere puffery or future promises.

28.    Moreover, the conduct of the EDELMAN DEFENDANTS constitutes a deceptive business practice under New York General Business Law § 349 ("GBL § 349"), which prohibits materially misleading conduct directed at consumers and small business operators.[5] Plaintiff, as a small business owner leasing a commercial space marketed to the public, falls squarely within the class of protected parties.

29.    The misrepresentations and omissions by the EDELMAN DEFENDANTS therefore were not isolated or private—they were part of a broader pattern of deceptive leasing practices aimed at inducing a prospective tenant to sign a lease for a non-compliant, non-functional space. Such conduct is precisely what GBL § 349 was enacted to prevent.

### C.  Surprise Gas Disconnection in February 2023 and Defendants' Breach of Duty

30.    After obtaining the necessary permits from the DOB in November and December 2022, Plaintiff commenced physical renovations at the Premises in February 2023. On or about February 7, 2023, Plaintiff's general contractor began work on the First Floor, with plans to follow that by starting work on the designated basement area on February 22, 2023.

---

[4] *First Bank of the Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 291–92 (1st Dep't 1999)

[5] *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (1995)

31. However, on or about February 21, 2023, Plaintiff's general contractor discovered that the gas meter for Plaintiff's commercial space had been removed and the gas line for Plaintiff's commercial space had disconnected—both without notice. The general contractor also observed that the dedicated hot water line for Plaintiff's commercial space had been severed using a specialized tool. These discoveries were both unexpected and highly alarming.[6]

32. Upon inquiry, Plaintiff learned from Con Edison that the gas disconnection had occurred the previous day, executed with the express permission and assistance Defendant J&M REALTY's building superintendent (an employee known to Plaintiff as "Sean"). The disconnection was due to the combination of the unpaid arrears left by prior tenant The Organic Grill and Con Edison's policy of terminating dormant commercial gas lines after six months unless the property owner intervenes.

33. At no point before or after executing the Lease Agreement did the EDELMAN DEFENDANTS disclose that prior tenant The Organic Grill had left behind a substantial unpaid gas bill, or that Con Edison had issued multiple written disconnection notices that left the Premises at imminent risk of losing the gas service critical to Plaintiff's business model.

34. This deliberate omission of material facts—known exclusively to the EDELMAN DEFENDANTS—constitutes fraud by omission. Under New York law, a party with superior knowledge of material facts not reasonably discoverable by the other party has a

_____

[6] See the February 22, 2023, email from Plaintiff to his commercial broker contemporaneously describing the damage his general contractor had discovered annexed hereto as *__Exhibit D__*.

duty to disclose them.[7] Defendants' silence, in the face of known and imminent utility termination, was not mere nondisclosure—it was actionable concealment.

35. Moreover, this conduct violated GBL § 349, which prohibits deceptive acts and practices in the conduct of business. Courts have held that the deliberate concealment of critical financial liabilities—such as utility arrears or code violations—can support a GBL § 349 claim when directed at small business operators. (See *Oswego Laborers*.)

36. The EDELMAN DEFENDANTS have claimed that Plaintiff's failure to immediately establish a Con Edison account triggered the disconnection. However, the Lease Agreement and Rider contain no specific deadline or timeline for account setup, and Plaintiff had just begun a multi-month renovation. Plaintiff's architect and general contractor furthermore had advised against immediate account activation, warning that Plaintiff might be forced to assume the prior tenant's debt or incur unnecessary utility costs during construction.

37. Critically, Con Edison's own policy also prevents new commercial tenants from opening a utility account at a given service address until any arrears on the prior account have been resolved by the landlord. Thus, Plaintiff not only was under no contractual obligation to activate service immediately upon executing the lease, but he also would have been structurally barred from doing so until the prior tenant's outstanding balance was addressed—further undermining the later attempts by the EDELMAN DEFENDANTS to shift blame for the disconnection onto Plaintiff.

---

[7] *P.T. Bank Central Asia v. ABN AMRO Bank N.V.,* 301 A.D.2d 373, 378 (1st Dep't 2003)

38. Compounding the harm, the EDELMAN DEFENDANTS materially breached Paragraph 83 of the Lease Rider[8]—which requires at least 24 hours' notice before entering the Basement—when their building superintendent voluntarily granted Con Edison access to Plaintiff's designated area without prior notice of an emergency, or any directive from law enforcement, and without Plaintiff's notice or consultation. Unauthorized entry into leased commercial space constitutes a breach of contract under New York law.

39. The consequences were catastrophic. Restoring gas service in New York City is a notoriously complex, lengthy, and expensive process. Plaintiff ultimately spent more than a year and $125,000 attempting to replace outdated, leaking gas lines that were not up to code—another cumbersome condition for restoring gas service. Despite these extensive efforts, bureaucratic delays and mounting costs rendered restoration impossible. By April 2024, Plaintiff's financial reserves were exhausted, and the location at 123 First Avenue was no longer viable for his restaurant.

40. As a result, within just 14 days of beginning renovations in early 2023, Plaintiff's entire business model had been destroyed—not by market forces, but by the negligence, concealment, and breach of duty of the EDELMAN DEFENDANTS.

### D. Destruction of Business Viability and Lost Profits Due to Utility Sabotage

41. Fried food is central to Plaintiff's menu and business model. Operating a profitable restaurant in New York City that specializes in fried food requires a functioning gas line, as electric alternatives cannot meet the volume or cost-efficiency needed for commercial

---

[8] See a true and correct copy of the applicable paragraph in the Lease Rider annexed hereto as ***Exhibit E***.

viability. While electric fryers exist, they are prohibitively expensive to operate at the scale of Plaintiff's business model and were never contemplated as a long-term substitute or permanent replacement for gas service in the lease or in Plaintiff's business plan.

42. After months of delay and mounting costs in restoring gas service, Plaintiff attempted to salvage the venture by opening in August 2023—five months behind schedule—using only electric equipment. But without gas service, the kitchen operated at no more than one-quarter of its intended and expected capacity. Plaintiff as a result was forced to decline lucrative corporate catering contracts and therefore could not generate sufficient revenue to properly market his restaurant, cover the above-market rent or recoup his investment.

43. This loss of business viability was not due to market forces or mismanagement—it was the direct and foreseeable result of the failure of the EDELMAN DEFENDANTS to disclose numerous material defects, their sabotage of the utility infrastructure, and their refusal to assist in restoring essential services. These actions frustrated the very purpose of the lease and rendered the Premises commercially unusable.

44. Under New York law, a tenant may recover lost profits as general damages where the loss flows directly from the breach and was within the contemplation of the parties at the time of contracting.[9] Moreover, the doctrine of frustration of purpose may excuse performance or support termination where an unforeseen event substantially undermines the principal purpose of the lease.[10] The EDELMAN DEFENDANTS also materially breached

---

[9] *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 805–06 (2014)

[10] *Jack Kelly Partners LLC v. Zegelstein*, 140 A.D.3d 79, 85 (1st Dep't 2016)

Paragraph 83 of the Lease Rider a second time in February 2023 by voluntarily ordering their representatives to enter the Basement and sever Plaintiff's designated hot water line —again without the required 24-hour notice to Plaintiff. Defendant DAVID EDELMAN later admitted to this unauthorized entry and sabotage, and even reimbursed Plaintiff $1,000 via Plaintiff's general contractor for a portion of the resulting damage.[11] This unauthorized entry and sabotage further impaired Plaintiff's ability to operate and constitutes an independent breach of contract. (See *Warshaw*.)

45.  As a direct and proximate result of the conduct by the EDELMAN DEFENDANTS, Plaintiff suffered substantial damages, including:

- **A five-month delay in opening;**

- **The loss of lucrative corporate catering contracts and seasonal revenue;**

- **Reputational harm to the Memphis Seoul brand;**

- **Repair and mitigation costs exceeding $125,000;** and

- **The effective destruction of a viable restaurant venture.**

46.  These damages are not speculative. They are supported by invoices, correspondence, and industry-standard projections, and theses damages will be proven at trial with reasonable certainty.

---

[11] See a true and correct copy of Defendant DAVID EDELMAN's payment by paper check to Plaintiff's general contractor annexed hereto as ***Exhibit F***.

**E.  Proof of Bad Faith:**
**Identical Problems, Opposite Treatment**
**For Successor Tenant Compton's Sandwich Shop**

47.    The discriminatory nature of the conduct by the EDELMAN DEFENDANTS is proven definitively by their treatment of  successor tenant Compton's Sandwich Shop, which upon information and belief opened at the Premises in April 2025—just nine months after Plaintiff's eviction.

48.    Despite having provided Plaintiff with a $35,000 tenant improvement allowance in October 2022 (demonstrating their initial investment in Plaintiff's tenancy), the EDELMAN DEFENDANTS thereafter deliberately sabotaged that same investment by refusing utility repairs, code compliance assistance, and basic landlord cooperation that would have ensured Plaintiff's success.

49.    In stark contrast, successor tenant Compton's Sandwich Shop, who upon information and belief received no tenant improvement allowance whatsoever, was instead provided with extensive free concessions, including:

- **Complete restoration of gas service and gas lines;**

- **Full repair of the non-compliant rooftop exhaust system;**

- **All necessary DOB permits and code compliance work;**

- **Free rent during the repair and opening period;** and

- **Full building access and cooperation from Defendants.**

50.    These are the identical defects that rendered Plaintiff's tenancy commercially impossible and that the EDELMAN DEFENDANTS had arrogantly dismissed as *"not their problem"*

or claimed were Plaintiff's sole responsibility under the lease, asserting that their $35,000 tenant improvement allowance absolved them of any further obligation. In stark contrast, these same defects and services were later provided by Defendants at no charge to successor tenant Compton's Sandwich Shop.

51. This disparate treatment proves that the Premises were always repairable and that the EDELMAN DEFENDANTS possessed the resources, expertise, and vendor relationships necessary to remedy all defects. Defendants' successful completion of gas restoration, exhaust repairs, and code compliance for the successor tenant demonstrates they could have provided identical assistance to Plaintiff but deliberately chose not to. Their earlier dismissive claims that utility issues were *"not their problem"* and entirely Plaintiff's responsibility are exposed as false by their willingness to handle these exact problems for the successor tenant.

52. No rational landlord destroys their own $35,000 investment in one tenant while simultaneously providing greater value free to another tenant with no corresponding obligation. This irrational conduct proves that the refusal by the EDELMAN DEFENDANTS to assist Plaintiff was discriminatory and retaliatory, not based on legitimate business concerns. Plaintiff's damages are quantifiable and provable based on the documented value of services Defendants provided free to the successor tenant, including repair costs, permit expenses, and rent abatement periods.

53. Under New York law, this evidence establishes breach of the implied covenant of good faith and fair dealing through deliberate frustration of lease benefits despite Defendants' own financial investment in Plaintiff's success. As established, landlords may not act in bad faith

to deprive tenants of the benefits of the lease[12], and a party breaches the implied covenant

when it acts in a way that deprives the other party of the fruits of the contract.[13]

54.   The conduct of the EDELMAN DEFENDANTS here—sabotaging their own $35,000
      investment in Plaintiff while providing superior accommodations free to a successor—
      exemplifies such bad-faith deprivation. This evidence also supports claims for tortious
      interference with prospective economic advantage, as no legitimate business justification
      exists for preferential treatment of a successor while sabotaging an existing tenant-investor
      relationship. Additionally, this conduct violates NYC Administrative Code § 22-902's
      prohibition on commercial tenant harassment, as it was specifically designed to force tenant
      departure despite landlord's own investment. Finally, Defendants' claims that defects were
      unresolvable constitute fraudulent misrepresentation, proven false when they later resolved
      identical issues easily and at their own expense.

55.   The chronology reveals a calculated pattern of bad faith that violates fundamental principles
      of landlord-tenant law. In October 2022, the EDELMAN DEFENDANTS invested $35,000
      in Plaintiff's tenancy, demonstrating apparent commitment to his success. By February
      2023, however, they began sabotaging their own investment by allowing utility
      disconnection and refusing all requests for restoration assistance. In July 2024, Defendants
      completed destruction of their $35,000 investment by orchestrating Plaintiff's eviction
      through property seizure and coercive demands. Then in April 2025, they provided
      successor tenant Compton's Sandwich Shop with repairs, utilities, and concessions worth

---

[12] *Kagan v. HMC-New York, Inc.*, 94 A.D.3d 67, 72 (1st Dep't 2012)

[13] *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004)

substantially more than their original investment in Plaintiff, proving their capability and resources were always available but deliberately withheld from Plaintiff.

56.   This conduct constitutes textbook bad faith dealing that is actionable under multiple theories of liability and warrants substantial compensatory and punitive damages. This pattern of conduct also constitutes constructive eviction under New York law. The deliberate refusal of the EDELMAN DEFENDANTS to remedy defects that rendered the Premises commercially unusable—combined with their later demonstration that these same defects were easily resolvable—shows they intentionally made continued occupancy untenable to force Plaintiff's departure.[14]

### F.  Abrupt Marshal's Eviction
### And Illegal Post-Eviction Conversion

57.   On July 18, 2024, following a Housing Court decision authorizing eviction, Defendant GEORGE ESSOCK JR., a New York City Marshal, executed a warrant of eviction at the Premises while accompanied by Defendant DAVID EDELMAN, acting on behalf of Defendants J&M REALTY and JERRY EDELMAN.

58.   Although Defendant GEORGE ESSOCK JR. had issued a written notice (*see* **_Exhibit G_**) dated July 3, 2024, stating that the "*earliest date of eviction*" would be July 18, 2024, Plaintiff was subsequently informed by ESSOCK's office during a phone call on July 15, 2024, that the eviction had been officially delayed to July 24, 2024.[15] Plaintiff reasonably

---

[14] *Barash v. Pennsylvania Terminal Real Estate Corp.*, 26 N.Y.2d 77 (1970)

[15] See a true and correct copy of Plaintiff's phone records from his provider AT&T Wireless showing a two-minute phone call to GEORGE ESSOCK JR.'s office on July 15 annexed hereto as **_Exhibit H_**.

relied on this representation from ESSOCK's office and therefore was not present at the Premises on July 18, 2024.

59.   At the time of the eviction, Plaintiff's staff—including his operations director—was actively preparing meals. Defendant GEORGE ESSOCK JR. ordered them to vacate the Premises immediately, allowing only approximately twenty (20) minutes to retrieve a handful of small items limited to what Plaintiff's shocked employees could carry by hand —a gesture ESSOCK described to Plaintiff's operations director as "*doing [Plaintiff] a favor*."

60.   While Defendant GEORGE ESSOCK JR. conducted a cursory and deficient inventory of the remaining property, failing to comply with requirements for a detailed itemization, and provided a copy to Plaintiff's operations director, that document was lost amid the confusion of the hurried eviction and was never provided to Plaintiff himself. Crucially, no retrieval protocol, schedule, or written instructions accompanied this deficient inventory, as required by Marshal procedures.

61.   When Plaintiff's on-site operations director asked Defendant DAVID EDELMAN how Plaintiff could retrieve the remaining business property, EDELMAN replied that Defendants J&M REALTY would be *"holding it until you give [us] something"*—a clear reference to back rent or other monetary concessions. This statement, made in the presence of a New York City Marshal and immediately following a state-assisted eviction, underscores the coercive and extrajudicial nature of Defendants' conduct.

62. The EDELMAN DEFENDANTS thereafter seized and retained Plaintiff's property, including such assets essential to Plaintiff's sole proprietorship Memphis Seoul as trademarked proprietary recipe books, federally protected signage, leased cooking equipment, and confidential business records. No court order authorized this seizure, and DAVID EDELMAN made clear that the property would not be returned unless Plaintiff surrendered legal rights and paid disputed sums—conduct that on its face constituted unlawful self-help, conversion, and commercial tenant harassment under New York law.

63. Defendant BENJAMIN NOREN, acting as counsel for the EDELMAN DEFENDANTS and in his official capacity as an attorney for Defendant DHC LLP, directly participated in and formalized this illegal post-eviction seizure, conversion, and coercion, as detailed in the following section.

64. Rather than permitting retrieval, however, the EDELMAN DEFENDANTS demanded coercive concessions—including back rent, a general liability release, and a non-disparagement agreement—as strict conditions for the return of Plaintiff's property. No court order authorized such self-help actions, and under New York law, landlords may not unilaterally seize or condition access to tenant property without judicial authorization.[16]

65. The refusal by the EDELMAN DEFENDANTS to immediately return Plaintiff's property unless he relinquished legal rights constitutes both conversion and commercial tenant harassment. Under New York law, conversion occurs when a party intentionally interferes with another's property rights without lawful justification.[17]

---

[16] *Matter of 1414 Holdings, LLC v. BMS-PSO, LLC*, 202 A.D.3d 547 (1st Dep't 2022)

[17] *Pappas v. Tzolis*, 20 N.Y.3d 228, 234 (2012)

66.  Moreover, the EDELMAN DEFENDANTS' conduct violated New York City
Administrative Code § 22-902(a), which prohibits commercial tenant harassment. That
statute defines harassment to include:

- **Code § 22-902(a)(6)**: *Removing personal property belonging to a commercial tenant;*

- **Code § 22-902(a)(8)**: *Preventing a commercial tenant from entering the premises*; and

- **Code § 22-902(a)(10)**: *Engaging in any other repeated or enduring acts or omissions that substantially interfere with the operation of a commercial tenant's business.*

67.  Courts have recognized that conditioning the return of property on legal concessions—
especially after eviction—constitutes coercive conduct that violates both common law
and statutory protections. The EDELMAN DEFENDANTS' actions therefore were not
only unlawful—they were retaliatory and calculated to suppress Plaintiff's legal claims.
The property seized included not just physical assets, but the core intellectual property of
Plaintiff's business. The coercive conditions imposed for its return were designed to
extract waivers and silence Plaintiff under duress.

## G.  Defendants' Coercive Post-Eviction Conduct
## And Illegal Conversion

68.  Following the eviction, Defendant DAVID EDELMAN—acting on behalf of Defendants
J&M REALTY and JERRY EDELMAN—made multiple phone calls to Plaintiff in which
he issued a clear ultimatum that Plaintiff's business property would not be returned
unless Plaintiff agreed to:

- **Payment of back rent;**

- **Removal of Plaintiff's social-media post about the situation critical of Defendant J&M REALTY;** and

- **Dismissal of a small-claims lawsuit Plaintiff had filed in July 2024 against Defendant JERRY EDELMAN to compel the return of Plaintiff's property.**

69. This coercive scheme was directly participated in and formalized by attorney Defendant BENJAMIN NOREN, acting on behalf of Defendant DHC LLP and the EDELMAN DEFENDANTS. NOREN issued the same ultimatum through formal legal correspondence, conditioning the return of property on the waiver of legal rights and the execution of a settlement agreement containing false recitals.

70. Under well-established precedent, conversion occurs when a party intentionally interferes with another's property rights without lawful justification. (See *Pappas* and *Salatino*.) Here, the EDELMAN DEFENDANTS and Defendant BENJAMIN NOREN not only withheld Plaintiff's property—they used it as leverage to extract legal concessions under duress.

71. This conduct also violated New York City Administrative Code §22–902(a), which prohibits commercial tenant harassment. Specifically, §22–902(a)(10) defines harassment to include "removing, retaining, or disposing of personal property belonging to a commercial tenant" and "conditioning the return of such property on the waiver of legal rights." The actions of the EDELMAN DEFENDANTS and Defendant BENJAMIN NOREN fall squarely within this statutory prohibition.

72. Courts have consistently held that landlords may not engage in self-help or impose extrajudicial conditions for the return of tenant property. (See _Matter of 1414 Holdings_). The coercive demands of the EDELMAN DEFENDANTS and Defendant BENJAMIN NOREN—made after eviction, without legal authority, and under threat of permanent deprivation—therefore constitute not only conversion and harassment, but a deprivation of property without due process of law. These actions were not isolated missteps; they were part of a coordinated scheme to silence Plaintiff, suppress legal claims, and retain control over valuable business assets in violation of both state and federal law.

### H. State Actor Liability of Marshal GEORGE ESSOCK JR. For Unlawful Seizure and Deprivation of Property

73. Defendant GEORGE ESSOCK JR. is a licensed New York City Marshal (Badge No. 71) appointed pursuant to § 1601 of the New York City Civil Court Act. At all relevant times, ESSOCK acted under color of state law and was authorized to enforce Housing Court eviction orders within the City of New York.

74. On July 18, 2024, Defendant GEORGE ESSOCK JR. and his deputies executed a warrant of eviction at the Premises while accompanied by Defendant DAVID EDELMAN, acting on behalf of Defendants J&M REALTY and JERRY EDELMAN. Although ESSOCK had issued a written notice to Plaintiff dated July 3, 2024, stating that the earliest date of eviction would be July 18, 2024, Plaintiff was subsequently informed by ESSOCK's office—during a phone call on July 15, 2024—that the eviction had been delayed until July 24, 2024. Plaintiff reasonably relied on this representation by ESSOCK's office, and as a result was not present at the Premises on July 18, 2024.

75. The eviction was therefore carried out without meaningful notice. Plaintiff's staff, including his on-site operations director, was actively cooking at the time. Defendant GEORGE ESSOCK JR. ordered them to vacate immediately, allowing only approximately twenty (20) minutes to retrieve a handful of small items—a gesture ESSOCK described as *"doing [Plaintiff] a favor."* No advance warning, written instructions, or retrieval protocol was provided by ESSOCK or his deputies.

76. Although Defendant GEORGE ESSOCK JR. conducted a cursory inventory of the remaining property and gave a copy to Plaintiff's operations director, that document was lost amid the confusion of the unexpected eviction and never provided to Plaintiff himself. No follow-up communication, itemized list, or retrieval schedule was issued by ESSOCK's office regarding assets essential to Plaintiff's sole proprietorship Memphis Seoul, such as trademarked recipe books and other intellectual property, custom signage and marketing materials, leased kitchen equipment, perishable food, inventory, and catering files.

77. Although the Housing Court had authorized possession of the Premises to be returned to the landlord, no order authorized Defendant GEORGE ESSOCK JR. to seize, impound, or transfer custody of Plaintiff's personal property to the EDELMAN DEFENDANTS. Under well-settled law, a commercial eviction warrant does not entitle a Marshal or landlord to convert or condition access to a tenant's chattel. (See *Matter of 1414 Holdings*.)

78. Defendant GEORGE G. ESSOCK JR. executed the eviction with full knowledge that Plaintiff's valuable business property, comprising assets essential to his sole

proprietorship Memphis Seoul, remained on-site. Despite this, ESSOCK left that property in the exclusive custody of the evicting landlord—the EDELMAN DEFENDANTS—without providing any inventory to Plaintiff, retrieval schedule, or legal safeguards.

79. On information and belief, no such procedures were followed. Plaintiff received no itemized list, no retrieval protocol, and no supervision from Defendant GEORGE ESSOCK JR.'s office. This abdication of duty enabled the EDELMAN DEFENDANTS, and Defendants DHC LLP and BENJAMIN NOREN to extort Plaintiff's access to his own property by demanding legal concessions, including a liability waiver and dismissal of pending litigation.

80. By failing to safeguard Plaintiff's property and knowingly transferring control to private actors without judicial oversight, Defendant GEORGE ESSOCK JR. participated in a coordinated deprivation of due process under 42 U.S.C. § 1983.[18]

81. Defendant GEORGE ESSOCK JR.'s conduct also reflects deliberate indifference to Plaintiff's constitutional rights. ESSOCK knew the property was sensitive, valuable, and business-critical, yet failed to document, protect, or supervise its disposition. This conduct is the factual basis for the _Monell_ claim against Defendant THE CITY OF NEW YORK, as it demonstrates the existence of a pervasive and known custom of procedural failure.

82. Upon information and belief, Defendant GEORGE ESSOCK Jr. also has a documented history of failing to ensure proper procedures and protections during evictions. The New

---

[18] _Fuentes v. Shevin_, 407 U.S. 67 (1972) and _Lugar v. Edmondson Oil Co._, 457 U.S. 922 (1982)

York City Department of Investigation ("DOI") has cited ESSOCK twice since 2018 for failing to ensure required caseworkers were present during evictions of vulnerable tenants, with the department noting in particular his repeated disregard for official protocol.[19] This pattern of conduct further underscores ESSOCK's deliberate indifference to the rights of tenants during the execution of evictions.

83. As a direct and proximate result of Defendant GEORGE ESSOCK JR.'s failure to follow required procedures and his cooperation in the unlawful seizure, Plaintiff suffered financial loss, reputational harm, and emotional distress—all while being denied fair process of law.

## I.  Role of Defendants DAVIDOFF HUTCHER & CITRON LLP And BENJAMIN NOREN in Furthering the Coercive Scheme

84. Defendant DHP LLC is a prominent, well-connected New York law firm. At all relevant times, DHC LLP acted through its attorney, Defendant BENJAMIN NOREN, who was acting within the scope of his employment as counsel for DHC LLP while representing the EDELMAN DEFENDANTS in connection with Plaintiff's tenancy and post-eviction property dispute.

85. On August 1, 2024—two days after Plaintiff had filed a *pro se* small-claims action (*see **Exhibit J***) seeking the return of unlawfully withheld business property—Defendant DHC

---

[19] See ***Exhibit I***, *"City Marshals Cited for Unprofessionalism, Antisemitic Remarks or Other Misdeeds,"* THE CITY, (May 28, 2024), detailing DOI findings regarding Defendant GEORGE ESSOCK JR. and other New York City Marshals.

LLP, through Defendant BENJAMIN NOREN, initiated a willfully coercive negotiation via email.[20]

86. Acting on behalf of Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC, and Defendant J&M REALTY, Defendant DHC LLP—through Defendant BENJAMIN NOREN—conditioned the return of Plaintiff's federally trademarked recipe book, leased equipment, and branded materials on a series of legal concessions, including:

- **Dismissal with prejudice of the pending lawsuit;**

- **Removal of a social media post criticizing the EDELMAN DEFENDANTS' "gross negligence";**

- **Execution of a broad non-disparagement agreement;** and

- **A general release of all claims against Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC, and the EDELMAN DEFENDANTS.**

87. At the time of this conversation with Defendant DHC LLP and Defendant BENJAMIN NOREN, Plaintiff was unrepresented, financially distressed, and facing the permanent loss of proprietary business assets. The small-claims filing was not part of a broader litigation strategy but instead a last-ditch effort by a panicked small-business owner unaware of his rights at the time to compel the return of unlawfully retained property.

88. But rather than propose a lawful remedy—such as escrow, judicial intervention, or stipulation—Defendant DHC LLP, through Defendant BENJAMIN NOREN, instead escalated the illegal pressure campaign, falsely asserting that no property would be returned absent full compliance with their terms. Plaintiff explicitly refused to sign a

---

[20] See a true and correct copy of the entire email thread from August 1, 2024, to September 10, 2024, that was initiated by Defendants DHC LLP and BENJAMIN NOREN with Plaintiff annexed hereto as ***Exhibit K***.

general release, citing the unlawful retention of his intellectual property and detailing—at length—the EDELMAN DEFENDANTS' breaches of the lease and violations of New York City utility maintenance requirements.

89. Despite Plaintiff's objections and legal warnings, however, Defendant DHC LLP, through Defendant BENJAMIN NOREN, reiterated that property would not be returned unless Plaintiff signed a general release and non-disparagement agreement. This action by NOREN constituted a clear threat to withhold essential property unless Plaintiff relinquished his legal rights, in violation of NYC Admin. Code § 22-902(a)(10).

90. This position is captured most starkly in the email statement to Plaintiff from Defendant DHC LLP, through Defendant BENJAMIN NOREN, on August 2, 2024: ***"We need a general release and a non-disparagement agreement. If you are not amenable to that, we will await the outcome of your lawsuit."*** This is a direct admission that DHC LLP and NOREN were intentionally using Plaintiff's property as leverage. NOREN was making the return of the property itself the bargaining chip, which is the essence of unlawful self-help and conversion.

91. Moreover, this exchange refutes any claim that Defendants DHC LLP and BENJAMIN NOREN were merely engaged in standard settlement negotiations. Plaintiff repeatedly asserted that the property was being held illegally and that he was being deprived of federally protected intellectual property. Yet DHC LLP's position remained unchanged: the property would not be returned unless Plaintiff surrendered his legal rights. This conduct goes beyond negotiation—it is coercion.

92.    Ultimately, under extreme duress and unaware at the time of any viable alternative, Plaintiff agreed to remove the Instagram post and dismiss the small-claims action in exchange for access to his property. On August 6, 2024, Defendant DHC LLP, through Defendant BENJAMIN NOREN, transmitted a formal settlement agreement that falsely recited Plaintiff was ***"represented by counsel"*** and had executed the agreement ***"of [his] own free will."*** (*See* ***Exhibit L***.) These false recitals were materially misleading and constitute evidence of NOREN's bad faith.

93.    The agreement was not the product of mutual negotiation. It was a willfully coercive instrument drafted by Defendant BENJAMIN NOREN, transmitted on the official email letterhead of Defendant DHC LLP, and enforced under threat of continued deprivation. The agreement specifically and conditionally required Plaintiff to:

- **Waive litigation rights;**

- **Remove public criticism;**

- **Bear the full cost of property retrieval, including securing a $1 million insurance policy naming Defendant J&M REALTY and Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC, as additional insureds;** and

- **Leave the premises in broom-swept condition, despite having been evicted and denied access for weeks.**

94.    Even after execution, Defendant DHC LLP, through Defendant BENJAMIN NOREN, imposed arbitrary and restrictive retrieval conditions on behalf of the EDELMAN DEFENDANTS. Plaintiff was given narrow time windows to access the premises, often on short notice, and was required to coordinate with the EDELMAN DEFENDANTS' agents under surveillance.

95.  These actions by Defendant DHC LLP, through Defendant BENJAMIN NOREN,

violated multiple provisions of the New York Rules of Professional Conduct, including:

- **Rule 4.1 (Truthfulness in Statements to Others)**: *by formalizing a false legal premise that the property could lawfully be withheld and by inserting false recitals into the Settlement Agreement;*

- **Rule 8.4(d) (Conduct prejudicial to the administration of justice)**: *by using legal threats to subvert judicial process and by knowingly creating a false court record*; and

- **Rule 3.4(a) (Fairness to opposing party)**: *by advising clients to condition return of property on waiver of litigation rights*.

96.  While violations of the Rules of Professional Conduct do not, standing alone, create a

private cause of action, they are highly relevant to establishing bad faith, coercion, and

joint action under 42 U.S.C. § 1983. Moreover, attorneys, acting through their firms, are

not immune from § 1983 liability when they act as willful participants in joint activity

with state actors.

97.  Here, the eviction carried out by Defendant GEORGE ESSOCK JR.—a state actor—was

immediately followed less than two weeks later by the direct, individual participation of

Defendant BENJAMIN NOREN and Defendant DHC LLP in a scheme to extort legal

concessions in exchange for access to Plaintiff's property. The use of formal legal

correspondence and the drafting of the coercive agreement to enforce this scheme

transformed a private dispute into a state-assisted constitutional deprivation, satisfying

the "joint action" standard for § 1983 liability.

98.  Finally, under *Fuentes* and its progeny, a state-assisted seizure of property without prior

notice or hearing violates procedural due process. No judicial order authorized the

retention or conditioning of Plaintiff's property. The absence of a pre-deprivation hearing alone establishes a viable due process violation under prevailing federal standards.

## J. Deliberate Indifference and Unconstitutional Custom by Defendant THE CITY OF NEW YORK

99.    Defendant THE CITY OF NEW YORK is a municipal entity subject to liability under 42 U.S.C. § 1983 for constitutional violations caused by its official policies, customs, or practices. Under _Monell v. Department of Social Services_, 436 U.S. 658 (1978), a municipality may be held liable when a policy or custom is the moving force behind a constitutional deprivation.

100.   A pattern of similar constitutional violations by untrained or unsupervised employees is sufficient to establish a custom of deliberate indifference, particularly where the City had actual or constructive knowledge of the need for better training, supervision, or discipline but failed to act.

101.   Defendant THE CITY OF NEW YORK had actual and constructive knowledge of the substantial risk that its City Marshals—including Defendant GEORGE ESSOCK JR.— were failing to follow constitutional procedures during evictions, especially regarding the seizure, inventory, and disposition of tenant property. This knowledge is evidenced by Defendant ESSOCK's documented history of procedural violations, which are matters of public record.

102.   Specifically, upon information and belief, the New York City Department of Investigation ("DOI") cited Defendant ESSOCK twice since 2018 for failing to ensure required caseworkers were present during evictions of vulnerable tenants. The DOI specifically

noted ESSOCK's repeated disregard for official protocol. *(See **Exhibit I**, previous, detailing specific DOI findings regarding GEORGE ESSOCK JR.)*

103.    Despite these findings, Defendant THE CITY OF NEW YORK failed to suspend, retrain, or meaningfully discipline Defendant GEORGE ESSOCK JR. This failure to act reflects a municipal policy or custom of deliberate indifference to known procedural deficiencies and constitutional risks.

104.    This unconstitutional custom was the moving force behind the constitutional deprivation suffered by Plaintiff. It enabled Defendant GEORGE ESSOCK JR.'s pattern of misconduct to continue unchecked, culminating in the unlawful seizure of Plaintiff's business property without due process and in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

105.    Upon information and belief, Defendant THE CITY OF NEW YORK has declined to provide legal representation for Defendant GEORGE ESSOCK JR. in this action, a fact which supports the allegation that the City has deemed his conduct—including the failure to provide a proper inventory and retrieval protocol—to be outside the scope of official employment due to its willful and unconstitutional nature.

106.    Furthermore, Defendant GEORGE ESSOCK JR. is now represented by David B. Tendler of the law firm Cornicello, Tendler & Baumel-Cornicello, LLP. (See *Dkt. 29*.) This Court's records confirm that ***this same firm previously represented Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC—the property owner and primary beneficiary of the***

*eviction—in the related non-payment proceeding against Plaintiff in New York City*

*Civil Court (Index No. <u>LT-322987-23</u>).*[21]

107.    This representation of a state officer by the legal counsel for the opposing private party in the underlying dispute creates a compelling inference that Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC or its agents are funding GEORGE ESSOCK JR.'s defense. This arrangement strongly suggests a concerted effort to control his testimony and preserve a unified defense against Plaintiff's claims of joint activity, further evidencing the conspiracy alleged herein.

---

[21] Refer again to ***<u>Exhibit C</u>*** (a true and correct copy of the Stipulation of Settlement Agreement in <u>LT-322987-23</u>) showing Cornicello, Tendler & Baumel-Cornicello, LLP as counsel for building owner Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC.

## V. DAMAGES AND CAUSATION

108.  As a direct and proximate result of the collective and coordinated conduct described
above by all Defendants, Plaintiff suffered substantial and ongoing damages, including
but not limited to:

- **Out-of-pocket expenditures exceeding $200,000 for architectural plans, permitting, demolition, and partial renovation of the Premises;**

- **More than $125,000 in unreimbursed costs related to the failed restoration of gas service, including engineering reports, DOB filings, and contractor fees;**

- **The exhaustion of a $312,000 Economic Injury Disaster Loan ("EIDL") obtained from the U.S. Small Business Administration, for which Plaintiff is the sole personal guarantor. The full amount of this federally backed loan was invested in the buildout of the Premises. Due to the collapse of the venture, the loan remains outstanding, and the federal government has begun issuing formal notices demanding immediate repayment in full. Plaintiff has been advised that this debt is currently non-dischargeable in bankruptcy, leaving him personally liable for a six-figure obligation with no viable business revenue to satisfy it;**

- **Lost revenue and business opportunities estimated at more than $300,000, including:**

  - *Corporate catering contracts that could not be fulfilled due to insufficient kitchen capacity;*

  - *Delayed restaurant opening by six months, resulting in missed seasonal revenue and media exposure;* and

  - *Reputational harm to the Memphis Seoul brand due to the failed Manhattan expansion;*

- **The loss of proprietary business assets—including trademarked recipes, signage, and leased equipment—valued at more than $100,000, which were unlawfully withheld and only partially recovered under coercive conditions; and**

- **Emotional distress, reputational damage, and loss of goodwill, the full extent of which will be established at trial.**

109.   Importantly, the August 6, 2024, settlement agreement did not include a general release and does not bar Plaintiff's claims. Rather than mitigating harm, the agreement was a product of coercion and served to deepen Plaintiff's losses by delaying access to essential business assets and suppressing public accountability.

110.   But for the misrepresentations, omissions, _Monell_ custom, and coordinated post-eviction coercion by all Defendants, Plaintiff would have successfully opened and operated a profitable restaurant at the Premises. The successor tenant's full restoration of gas service and receipt of free rent and repairs—provided by the same Defendants—demonstrates that Plaintiff's business model was viable and that the harm he suffered was not only foreseeable but avoidable.

## VI. CAUSES OF ACTION

### COUNT ONE:
### Deprivation of Property Without Due Process
### (42 U.S.C. §1983)

**(Against GEORGE ESSOCK JR., J&M REALTY, JERRY EDELMAN, DAVID EDELMAN, DHC LLP, and BENJAMIN NOREN)**

111.  Plaintiff realleges and incorporates by reference all prior paragraphs.

112.  Defendant GEORGE ESSOCK JR., a New York City Marshal appointed pursuant to §
      1601 of the New York City Civil Court Act, is a state actor who, at all relevant times,
      acted under color of state law.

113.  On July 18, 2024, Defendant GEORGE ESSOCK JR. executed a warrant of eviction at
      the Premises. Although a cursory inventory was created and briefly provided to Plaintiff's
      operations manager, no retrieval protocol, schedule, or legal process was offered. The
      inventory was never provided to Plaintiff himself, and the property was left in the
      exclusive control of private parties who immediately conditioned its return on
      extrajudicial concessions.

114.  The EDELMAN DEFENDANTS—acting in concert with Defendant GEORGE ESSOCK
      JR.—seized Plaintiff's property and imposed coercive conditions for its return, including
      demands for back rent, legal waivers, and non-disparagement agreements. These actions
      were taken without a court order and in violation of Plaintiff's constitutional right to
      procedural due process under the Fourteenth Amendment.

115.  Defendant DHC LLP, through its attorney BENJAMIN NOREN, acting as legal counsel
      for the EDELMAN DEFENDANTS, participated in this deprivation by formalizing and

transmitting these coercive demands on official law firm letterhead, thereby furthering the unlawful scheme and transforming a private dispute into state-assisted deprivation.

116.   The conduct of all remaining Defendants constituted a joint action under color of state law—as defined by *Lugar* and *Dennis*—and resulted in the unlawful seizure and deprivation of Plaintiff's protected property interests without adequate pre-deprivation or post-deprivation process.

117.   As a direct and foreseeable result of Defendants' joint conduct under color of law, Plaintiff was deprived of valuable business property and suffered quantifiable economic losses, including the destruction of a viable restaurant venture and the loss of proprietary assets.

**COUNT TWO:**

**Municipal Liability (Under _Monell_)**

**(Against THE CITY OF NEW YORK)**

118.    Plaintiff realleges and incorporates by reference all prior paragraphs.

119.    Defendant THE CITY OF NEW YORK is a municipal entity subject to suit under 42
U.S.C. §1 983. Under _Monell v. Department of Social Services_, 436 U.S. 658 (1978), a
municipality may be held liable for constitutional violations resulting from its official
policies, customs, or practices.

120.    Defendant Marshal GEORGE ESSOCK JR.'s repeated failure to follow established
procedures for securing tenant property—culminating in the unlawful seizure and
deprivation of Plaintiff's business assets—was not an isolated incident. It was the direct
result of a persistent and widespread policy, custom, or practice of Defendant THE CITY
OF NEW YORK.

121.    Specifically, upon information and belief, the City maintained a custom of deliberate
indifference regarding the supervision, training, and discipline of City Marshals,
particularly concerning their duties related to inventorying and securing property during
and after eviction. This deliberate indifference is evidenced by the City's actual or
constructive knowledge of Defendant GEORGE ESSOCK JR.'s documented history of
procedural violations, including two citations issued by the New York City Department of
Investigation since 2018 for failing to follow required eviction protocols and disregarding
official procedures.

122.    Despite these findings, Defendant THE CITY OF NEW YORK failed to suspend, retrain, or meaningfully discipline Defendant GEORGE ESSOCK JR, thereby allowing his pattern of misconduct to continue unchecked. This failure to act reflects a municipal policy or custom that was the moving force behind the constitutional deprivation suffered by Plaintiff.

123.    The unlawful seizure of Plaintiff's property—including proprietary business records, leased equipment, and intellectual property—violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution. Defendant GEORGE ESSOCK JR.'s conduct was enabled and perpetuated by the City's systemic failure to supervise and correct known procedural deficiencies.

124.    Upon information and belief, Defendant THE CITY OF NEW YORK has declined to provide legal representation for Defendant GEORGE ESSOCK JR. in this action, signaling that it has deemed his conduct outside the scope of official duties due to its willful and extrajudicial nature. ESSOCK is now represented by private counsel affiliated with the property owner who benefited from the eviction, further suggesting coordinated defense strategy and institutional disavowal.

125.    As a result of this unconstitutional municipal custom, Plaintiff suffered substantial harm, including the loss of irreplaceable business assets, deprivation of property without due process, and coercive demands for legal concessions in exchange for property retrieval.

## COUNT THREE:
### Concerted Action / Conspiracy

### (Against J&M REALTY, JERRY EDELMAN, DAVID EDELMAN, DHC LLP, and BENJAMIN NOREN)

126.  Plaintiff realleges and incorporates by reference all prior paragraphs.

127.  Defendants J&M REALTY, JERRY EDELMAN, DAVID EDELMAN, BENJAMIN NOREN, and their agents and affiliates—including Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC—acted in concert with state actor Defendant GEORGE ESSOCK JR. to unlawfully deprive Plaintiff of his property and suppress evidence of their coordinated misconduct.

128.  Upon information and belief, these private defendants have funded or arranged the legal defense of Defendant GEORGE ESSOCK JR., who is now represented by counsel affiliated with the property owner that benefited from the eviction. This financial arrangement, combined with shared counsel and coordinated litigation strategy, demonstrates a continuing agreement to conceal the true nature of their collaboration during the eviction and subsequent illegal property seizure.

129.  This concerted action constitutes a civil conspiracy under 42 U.S.C. § 1983, as private actors may be held liable when they willfully participate in joint activity with a state actor to violate constitutional rights. Defendants' coordinated efforts to suppress evidence, obstruct retrieval of Plaintiff's property, and condition its return on legal concessions reflect a shared intent to deprive Plaintiff of his rights under the Fourth and Fourteenth Amendments.

130. Additionally, this conduct constitutes a civil conspiracy under New York common law to commit conversion and commercial tenant harassment. Defendants acted in concert to seize Plaintiff's property without judicial authorization, suppress his legal claims, and extract concessions under duress.

131. As a direct and proximate result of this conspiracy, Plaintiff has suffered ongoing harm, including delay, increased litigation costs, reputational damage, and continued deprivation of his property and legal rights.

**COUNT FOUR:**

**Declaratory Judgment Invalidating and Limiting the Effect of
The August 6, 2024, Settlement Agreement**

**(Against J&M REALTY, JERRY EDELMAN, DAVID EDELMAN,
DHC LLP, and BENJAMIN NOREN)**

132.   Plaintiff realleges and incorporates by reference all prior paragraphs.

133.   On August 6, 2024, Plaintiff executed a document titled "Settlement Agreement" (the "Agreement") under conditions of economic duress and coercion. The Agreement was drafted and transmitted by Defendant DHC LLP, through Defendant BENJAMIN NOREN, on behalf of the EDELMAN DEFENDANTS, and was transmitted via the official email letterhead of DHC LLP.

134.   The Agreement conditioned Plaintiff's access to his own business property—including a federally trademarked recipe book, leased equipment, and branded materials—on Plaintiff's agreement to dismiss a pending small-claims action, remove a public Instagram post critical of J&M REALTY, execute a non-disparagement clause, and bear the full cost and logistical burden of retrieving his property.

135.   The Agreement falsely recites that Plaintiff was *"represented by counsel"* and executed the document *"of [his] own free will,"* despite the fact that Defendant DHC LLP, through Defendant BENJAMIN NOREN, was fully aware that Plaintiff was unrepresented, financially distressed, and under threat of permanent deprivation of essential business assets.

136.   The Agreement does not contain a general release of claims, as Plaintiff explicitly refused to sign such a release during the negotiation process.

137. Defendants (including BENJAMIN NOREN) have not disclaimed the Agreement's legal effect and may, in future proceedings, assert that it bars or limits Plaintiff's claims for damages, injunctive relief, or public redress.

138. An actual and justiciable controversy exists between the parties as to the legal effect, enforceability, and scope of the Agreement.

139. Plaintiff seeks a federal declaratory judgment pursuant to 28 U.S.C. § 2201 that:

- **The Agreement does not constitute a general release of claims against any Defendant;**

- **The Agreement was executed under economic duress and is voidable in whole or in part;**

- **The non-disparagement clause is unenforceable as a matter of public policy and violates NYC Admin. Code § 22-902(a)(10); and**

- **The Agreement does not bar Plaintiff's claims under 42 U.S.C. § 1983, the FDCPA, New York Real Property Law, or any other statutory or common-law theory.**

140. A federal declaratory judgment pursuant to 28 U.S.C. § 2201 is necessary to resolve uncertainty and prevent future prejudice to Plaintiff's rights.

141. Plaintiff respectfully requests that this Court enter judgment declaring the August 6, 2024, Settlement Agreement invalid in whole or in part, or in the alternative, clarifying that it does not bar Plaintiff's claims or remedies in this action, and awarding such other and further relief as the Court deems just and proper.

**COUNT FIVE:**
**Fraudulent Inducement**

**(Against J&M REALTY, JERRY EDELMAN, DAVID EDELMAN,**
**DHC LLP, and BENJAMIN NOREN)**

142.    Plaintiff realleges and incorporates by reference all prior paragraphs.

143.    Plaintiff was induced into signing a commercial lease based on material misrepresentations and omissions regarding the Premises' operational status and legal compliance, which the EDELMAN DEFENDANTS knew to be false or recklessly disregarded. Specifically, despite representing the space as a *"turn-key restaurant,"* Defendants knowingly concealed that it lacked required permits, the rooftop exhaust system was non-compliant, and, critically, that the gas line was subject to imminent disconnection due to unpaid arrears, for which Defendants had received multiple turnoff notices prior to Plaintiff signing the lease and to which Con Edison's policy prevented Plaintiff from establishing an account.

144.    Plaintiff justifiably relied on Defendants' misrepresentations and omissions to his detriment. This inducement led Plaintiff to enter into a lease that proved financially ruinous. Defendants DAVIDOFF HUTCHER & CITRON LLP and BENJAMIN NOREN furthered the fraudulent scheme by knowingly enforcing the coerced settlement based on this underlying non-functional lease. But for these misrepresentations and material omissions, Plaintiff would not have signed the lease, invested in the Premises, or suffered the resulting financial harm.

**COUNT SIX:**
**Commercial Tenant Harassment**
**(NYC Admin. Code § 22-902)**

**(Against J&M REALTY, JERRY EDELMAN, DAVID EDELMAN,**
**DHC LLP, and BENJAMIN NOREN)**

145.  Plaintiff realleges and incorporates by reference all prior paragraphs.

146.  Following Plaintiff's eviction, the EDELMAN DEFENDANTS, acting in concert with their counsel, Defendant DAVIDOFF HUTCHER & CITRON LLP and Defendant BENJAMIN NOREN, engaged in a pattern of commercial tenant harassment in violation of New York City Administrative Code § 22–902(a), including but not limited to subsections (6), (8), and (10).

147.  Immediately after the Marshal's eviction on July 18, 2024, Defendants unlawfully withheld access to Plaintiff's valuable business property, which included federally trademarked recipe books, custom signage, leased kitchen equipment, and confidential business records. This conduct constitutes harassment under § 22-902(a)(6) ("Removing personal property belonging to a commercial tenant") and § 22-902(a)(8) ("Preventing a commercial tenant from entering the premises").

148.  Defendants then unequivocally conditioned the return of Plaintiff's property on extrajudicial concessions, including demands for back rent, dismissal of Plaintiff's small-claims lawsuit, removal of a public Instagram post critical of Defendant J&M REALTY, and execution of legal waivers and non-disparagement agreements. Defendant DAVID EDELMAN explicitly stated to Plaintiff's operations director that J&M REALTY would be "*holding it until you give [us] something.*"

149. This coercive conduct, which sought to pressure Plaintiff into surrendering legal rights and foreclosing public criticism through the illegal withholding of property, constitutes harassment under § 22-902(a)(10) ("Engaging in any other repeated or enduring acts or omissions that substantially interfere with the operation of a commercial tenant's business," including, as directly applied here, the actions of Defendants DHC LLP and BENJAMIN NOREN in "conditioning the return of such property on the waiver of legal rights.")

150. Defendants' actions were designed to inflict severe financial and reputational harm on Plaintiff and to extract legal concessions entirely outside of authorized judicial process, demonstrating a willful disregard for Plaintiff's rights under the Administrative Code.

**COUNT SEVEN:**
**Conversion**

**(Against J&M REALTY, JERRY EDELMAN, DAVID EDELMAN,**
**DHC LLP, and BENJAMIN NOREN)**

151. Plaintiff realleges and incorporates by reference all prior paragraphs.

152. On July 18, 2024, the EDELMAN DEFENDANTS intentionally and unlawfully took possession of Plaintiff's personal and business property, which included: trademarked proprietary recipe books, federally protected signage, leased cooking equipment, and confidential business records. This property was left in Defendants' exclusive custody following the Marshal's eviction due to Defendant GEORGE ESSOCK JR.'s failure to provide retrieval protocols or safeguards.

153. Defendants, through DAVID EDELMAN, immediately refused to return this property, explicitly stating they would be *"holding it until you give [us] something"*—a clear reference to back rent or other monetary concessions. Thereafter, the EDELMAN DEFENDANTS, acting in concert with Defendant DAVIDOFF HUTCHER & CITRON LLP and Defendant BENJAMIN NOREN, continued to refuse the return of Plaintiff's property except on coercive conditions, including agreement to dismiss pending litigation, remove public criticism, and sign a non-disparagement agreement. No court order authorized this seizure or the conditioning of the property's return.

154. The Defendants' (including BENJAMIN NOREN's) intentional interference with Plaintiff's property rights, without lawful justification, therefore constitutes an unauthorized and unlawful exercise of dominion and control over Plaintiff's property.

155.  As a direct and proximate result of Defendants' conversion, Plaintiff suffered damages, including the loss of proprietary business assets valued at more than $100,000, and delays in business operations that led to significant financial harm.

**COUNT EIGHT:**
**Deceptive Business Practices**
**(New York General Business Law § 349)**

**(Against J&M REALTY, JERRY EDELMAN, DAVID EDELMAN,
DHC LLP, and BENJAMIN NOREN)**

156.    Plaintiff realleges and incorporates by reference all prior paragraphs.

157.    The EDELMAN DEFENDANTS engaged in consumer-oriented conduct by marketing
and leasing the Premises to Plaintiff—an individual operating a small business—as a
*"turn-key"* restaurant ready for immediate, gas-powered operation. This marketing
included a large banner affixed to the building advertising the space as a *"RESTAURANT
FOR LEASE."*

158.    These representations were materially misleading, as Defendants knew or should have
known the Premises lacked fundamental operational and legal compliance to host a
restaurant. Specifically, the EDELMAN DEFENDANTS knowingly failed to disclose:

- **That the commercial kitchen had never been legally permitted by the DOB,
  rendering it illegal for commercial use;**

- **That the rooftop exhaust system was dangerously non-compliant and posed a
  fire hazard due to years of grease accumulation;**

- **That the gas line was subject to imminent disconnection due to significant
  unpaid utility arrears left by the prior tenant, and that Defendants had
  received multiple turnoff notices from Con Edison regarding these balances
  prior to Plaintiff signing the lease;** and

- **That Con Edison's policy prevented Plaintiff from establishing an account or
  restoring gas service until the prior tenant's outstanding arrears were
  resolved.**

159.  These omissions and misrepresentations were made during high-pressure lease negotiations and were part of a broader pattern of deceptive leasing practices aimed at inducing tenants to sign leases for non-compliant, non-functional spaces, and were an apparent attempt to saddle Plaintiff with another tenant's unpaid bills.

160.  Defendants DAVIDOFF HUTCHER & CITRON LLP and BENJAMIN NOREN furthered this deceptive scheme by subsequently enforcing the lease and conditioning the return of property on the waiver of claims arising directly from these initial misrepresentations.

161.  As a direct result of these deceptive acts and practices, Plaintiff was induced to enter into a financially ruinous lease and suffered substantial financial harm, including more than $200,000 in out-of-pocket expenses attempting to restore gas service and bring the Premises into compliance.

162.  These deceptive acts harmed Plaintiff and fall squarely within the scope of GBL § 349 protections, which prohibit materially misleading conduct directed at consumers and small business operators.

## COUNT NINE:

### Breach of the Implied Covenant of Good Faith and Fair Dealing

#### (Against J&M REALTY, JERRY EDELMAN, DAVID EDELMAN, DHC LLP, and BENJAMIN NOREN)

163.  Plaintiff realleges and incorporates by reference all prior paragraphs.

164.  Under New York law, every contract—including commercial leases—contains an implied covenant of good faith and fair dealing, which obligates each party to act honestly and fairly in a manner that does not deprive the other party of the benefits of the agreement.

165.  Plaintiff entered into a Lease Agreement and Lease Rider with Defendants J&M REALTY and JERRY EDELMAN, who acted as *de facto* landlords throughout the tenancy. Defendant DAVID EDELMAN also participated in the management and enforcement of lease terms and was directly involved in operational decisions and post-eviction conduct. Defendants DAVIDOFF HUTCHER & CITRON LLP and BENJAMIN NOREN acted as agents of the landlord in enforcing post-eviction terms and conditions.

166.  Defendants breached the implied covenant of good faith and fair dealing by:

- **Failing to disclose known material defects in the Premises, including the lack of a legal kitchen permit, a dangerously non-compliant exhaust system, and the imminent risk of gas disconnection due to prior unpaid utility bills;**

- **Permitting the disconnection of gas service without notifying Plaintiff, then refusing to assist in its restoration despite having done so for the successor tenant shortly thereafter;**

- **Repeatedly entering Plaintiff's designated space without notice in violation of Paragraph 83 of the Lease Rider;**

- **Severing Plaintiff's hot water line and obstructing access to other essential utilities necessary for restaurant operations;**

- **Refusing to offer rent abatement or any form of assistance even after it became clear the Premises were commercially unusable;** and

- **Engaging in coercive post-eviction tactics, formalized by Defendants DHC LLP and BENJAMIN NOREN, to extract legal concessions from Plaintiff in exchange for access to property and equipment needed to maintain his business and client relationships**.

167.    These acts were not isolated breaches of contract, but part of a calculated and ongoing pattern of conduct designed to frustrate Plaintiff's ability to derive any benefit from the lease agreement. Defendants acted in bad faith, without transparency or fairness, and with the apparent goal of driving Plaintiff out of the Premises.

168.    As established, New York law prohibits landlords from intentionally undermining the rights of tenants under a lease. Moreover, under _Forman v. Guardian Life Ins. Co. of America_, 76 A.D.3d 886 (1st Dep't 2010), a claim for breach of the implied covenant of good faith and fair dealing may be asserted independently and survives even in the absence of a separately pled breach of contract cause of action.

169.    As a direct and proximate result of this breach of the implied covenant of good faith and fair dealing by all named Defendants acting as agents and parties in interest, Plaintiff suffered substantial financial losses, reputational harm, and the destruction of a viable business venture.

170.    Defendants' breach is proven definitively by their provision of free repairs, gas restoration, and rent abatement to successor tenant Compton's Sandwich Shop for the identical defects they refused to remedy for Plaintiff. This disparate treatment demonstrates deliberate frustration of Plaintiff's lease benefits while ensuring the successor tenant's success.

## COUNT TEN:
### Tortious Interference
### With Prospective Economic Advantage

#### (Against J&M REALTY, JERRY EDELMAN, DAVID EDELMAN, DHC LLP, and BENJAMIN NOREN)

171.  Plaintiff realleges and incorporates by reference all prior paragraphs.

172.  At all relevant times, Plaintiff had valid business relationships and reasonable expectations of economic advantage with third parties, including existing and prospective catering clients, restaurant patrons, and media partners. These relationships were known or reasonably foreseeable to the EDELMAN DEFENDANTS and to Defendants DHC LLP and BENJAMIN NOREN.

173.  Plaintiff's business model for the Premises was built around a unique and market-tested restaurant concept, Memphis Seoul, which had already achieved success in Brooklyn and was poised for expansion into Manhattan. Plaintiff had secured several Fortune 500 catering clients and had begun targeted marketing efforts in anticipation of a high-profile launch.

174.  The EDELMAN DEFENDANTS and Defendants DHC LLP and BENJAMIN NOREN intentionally and wrongfully interfered with these prospective economic relationships by:

- **Misrepresenting the operational status of the Premises and inducing Plaintiff to sign a lease for a non-compliant, non-functional space;**

- **Failing to disclose prior utility arrears and knowingly permitting Con Edison to disconnect gas service after Plaintiff took possession;**

- **Refusing to assist in restoring gas or remedying severe code violations, rendering the Premises commercially unusable and significantly delaying opening;**

- **Engaging in willful and coercive post-eviction conduct that deprived Plaintiff of access to critical property—an act formalized by Defendant BENJAMIN NOREN—which was necessary to fulfill client orders and maintain brand continuity;**

- **Participating in a coordinated scheme with the Marshal's office, which executed the eviction with no warning to Plaintiff despite a phone call three days earlier in which the Marshal's office told Plaintiff the eviction would occur on a later date. This miscommunication, followed by Defendants' immediate and exclusive control over Plaintiff's property, prevented Plaintiff from mitigating damages or communicating with clients;** and

- **Providing preferential treatment and full utility restoration to a successor tenant, demonstrating that their refusal to accommodate Plaintiff was selective, retaliatory, and malicious**

175.    Defendants' conduct was not justified by any legitimate business interest. Rather, it was driven by bad faith and a desire to displace Plaintiff in favor of a successor tenant viewed as more profitable or desirable. As a direct and proximate result of the tortious interference by Defendants, Plaintiff suffered substantial and ongoing economic harm, including lost revenue, lost business opportunities, reputational damage, and the effective destruction of a viable restaurant expansion.

176.    Defendants' conduct lacks any legitimate business justification, as proven by their immediate accommodation of successor tenant Compton's Sandwich Shop with free repairs, utilities, and rent concessions. The same landlord providing opposite treatment for identical circumstances proves malicious intent to destroy Plaintiff's business in favor of a preferred tenant.

## VII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(i)    **Declare that Defendants' conduct violated Plaintiff's constitutional rights under 42 U.S.C. § 1983, including:**

- *Finding individual liability against Defendants J&M REALTY SERVICES CORP., JERRY EDELMAN, DAVID EDELMAN, DAVIDOFF HUTCHER & CITRON LLP, BENJAMIN NOREN, and GEORGE ESSOCK JR;* and

- *Finding municipal liability against Defendant THE CITY OF NEW YORK under <u>Monell</u>;*

(ii)   **Declare pursuant to 28 U.S.C. § 2201 that the August 6, 2024, settlement agreement:**

- *Was executed under economic duress and without legal representation;*

- *Does not constitute a general release of claims;*

- *Is void or voidable in whole or in part;* and

- *Is unenforceable to the extent it violates public policy, including NYC Admin. Code § 22-902(a)(10);*

(iii)  **Award compensatory damages in an amount to be determined at trial, but not less than $750,000, for:**

- *Out-of-pocket expenses;*

- *Lost revenue and business opportunities;*

- *Conversion of personal and business property;*

- *Emotional distress, reputational harm, and loss of goodwill;*

- *Breach of contract and bad faith dealing;* and

- *Tortious interference with prospective economic advantage;*

(iv)   **Award punitive damages against the individual Defendants for their willful, malicious, and reckless misconduct, including but not limited to:**

- *Fraudulent inducement;*

- *Commercial tenant harassment;*

- *Coercive post-eviction conduct;*

- *Misuse of legal process;* and

- *Constitutional violations under color of law;*

**(v)    Order injunctive and equitable relief, including:**

- *A declaration that the Lease Agreement was constructively terminated due to Defendants' breach of the implied covenant of good faith and fair dealing;*

- *A declaration that Defendants' conduct frustrated the essential purpose of the lease and deprived Plaintiff of its intended benefit;*

- *A declaration that the non-disparagement clause in the August 6, 2024, agreement is unenforceable;* and

- *An injunction prohibiting Defendants from engaging in further unlawful or retaliatory conduct;*

**(vi)   Award disgorgement damages equal to the value of concessions provided free to successor tenant, including:**

- *Cost of gas line restoration and utility repairs;*

- *Value of rent abatement during repair period;*

- *Building code compliance and permit costs;* and

- *DOB violation remediation expenses.*

**(vii)  Award *pro se* legal fees and costs, including under 42 U.S.C. § 1988 for prevailing civil rights plaintiffs;** and

**(viii) Grant such other and further relief as the Court deems just and proper, including leave to amend the Complaint to assert additional claims or name additional parties as discovery warrants.**

Plaintiff respectfully demands a trial by jury on all issues so triable.

Dated: November 6, 2025
Brooklyn, New York

Respectfully submitted,

EDWARD B. HUBBUCH
394 Lincoln Place #A5
Brooklyn, N.Y. 11238
(646) 544-7597
bhubbuch@gmail.com

*Pro se*

TO:    BENJAMIN NOREN, Esq.
Davidoff Hutcher & Citron LLP
605 Third Avenue
New York, New York 10158
(646) 428-3120
bn@dhclegal.com

*Counsel for Defendants* DHC LLP, J&M REALTY SERVICES CORP.,
JERRY EDELMAN, and DAVID EDELMAN

DAVID B. TENDLER, Esq.
Cornicello, Tendler & Baumel-Cornicello, LLP
29 Broadway, 25th Floor
New York, New York 10006
(212) 994-0260
dtendler@ctbclaw.com

*Counsel for Defendant* GEORGE ESSOCK JR.