# EXHIBIT A

7/04

## STANDARD FORM OF STORE LEASE
### The Real Estate Board of New York, Inc.

**Agreement of Lease**, made as of this _____ day of **October** in the year **2022** , between

**Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC,** having an address
c/o J&M Realty Services, Corp., 343 St. Nicholas Avenue, New York, NY 10027
party of the first part, hereinafter referred to as OWNER, and  **Tasteland Holdings LLC d/b/a MEMPHIS SEOUL**
**having an address at 394 Lincoln Place,**  A5  party of the second part, hereinafter referred to as TENANT,
**Brooklyn, NY 11238**

**Witnesseth:** Owner hereby leases to Tenant and Tenant hereby hires from Owner
**Ground Floor Store and portion of Basement below**

in the building known as  **123 First Avenue,**  City of New York,
in the Borough of **Manhattan** **for a term of ten (10) years fifteen (15) days.**

(or until such term shall sooner cease and expire as hereinafter provided) to commence on the

**15th** day of **October**  in the year  **2022**  , and to end on the
**31st** day of **October**  in the year  **2032**  , and
both dates inclusive, at the annual rental rate of

### as provided in Article 40

which Tenant agrees to pay in lawful money of the United States which shall be legal tender in payment of all debts and dues, public and private, at the time of payment, in equal monthly installments in advance on the first day of each month during said term, at the office of Owner or such other place as Owner may designate, without any setoff or deduction whatsoever, except that Tenant shall pay the first        monthly installment(s) on the execution hereof (unless this lease be a renewal).

In the event that, at the commencement of the term of this lease, or thereafter, Tenant shall be in default in the payment of rent to Owner pursuant to the terms of another lease with Owner or with Owner's predecessor in interest, Owner may at Owner's option and without notice to Tenant add the amount of such arrears to any monthly installment of rent payable hereunder and the same shall be payable to Owner as additional rent.

The parties hereto, for themselves, their heirs, distributes, executors, administrators, legal representative, successors and assigns, hereby covenant as follows:

**Rent:** **1.** Tenant shall pay the rent as above and as hereinafter provided.
**Occupancy:** **2.** Tenant shall use and occupy the demised premises for  **restaurant**

and for no other purpose. Tenant shall at all times conduct its business in a high grade and reputable manner, shall not violate Article 37 hereof, and shall keep show windows and signs in a neat and clean condition.

**Alterations:** **3.** Tenant shall make no changes in or to the demised premises of any nature without Owner's prior written consent. Subject to the prior written consent of Owner, and to the provisions of this article, Tenant, at Tenant's expense, may make alterations, installations, additions or improvements which are non-structural and which do not affect utility services or plumbing and electrical lines, in or to the interior of the demised premises by using contractors or mechanics first approved in each instance by Owner. Tenant shall, before making any alterations, additions, installations or improvements, at its expense, obtain all permits, approvals and certificates required by any governmental or quasi-governmental bodies and (upon completion) certificates of final approval thereof, and shall deliver promptly duplicates of all such permits, approvals and certificates to Owner, and Tenant agrees to carry, and will cause Tenant's contractors and sub-contractors to carry, such worker's compensation, commercial general liability, personal and property damage insurance as Owner may require. If an mechanic's lien is filed against the demised premises, or the building of which the same forms a part, for work claimed to have been done for, or materials furnished to, Tenant, whether or not done pursuant to this article, the same shall be discharged by Tenant within 30 days thereafter, at Tenant's expense, by payment or filing a bond as permitted by law. All fixtures and all paneling, partitions, railings and like installations, installed in the demised premises at any time, either by Tenant or by Owner on Tenant's behalf, shall, upon installation, become the property of Owner and shall remain upon and be surrendered with the demised premises unless Owner, by notice to Tenant no later than twenty days prior to the date fixed as the termination of this lease, elects to relinquish Owner's rights thereto and to have them removed by Tenant, in which event, the same shall be removed from the demised premises by Tenant prior to the expiration of the lease, at Tenant's expense. Nothing in this article shall be construed to give Owner title to, or to prevent Tenant's removal of, trade fixtures, moveable office furniture and equipment, but upon removal of same from the demised premises or upon removal of other installations as may be required by Owner, Tenant shall immediately and at its expense, repair and restore the condition existing prior to installation, reasonable wear and tear. Should Tenant fail to remove Tenant's fixtures, trade equipment or other installations prior to the expiration or earlier termination of this lease, then Tenant shall be deemed to have abandoned said fixtures, trade equipment or other installations and the same shall thereupon become the property of Owner and any such installations, and repair any damage to the demised premises or the building due to such removal. All property permitted or required to be removed by Tenant at the end of the term remaining in the demised premises after Tenant's removal shall be deemed abandoned and may, at the election of Owner, either be retained as Owner's property or may be removed from the demised premises by Owner at Tenant's expense.

**Repairs:** **4.** Owner shall maintain and repair the public portions of the building, both exterior and interior, except that if Owner allows Tenant to erect on the outside of the building a sign or signs, or a hoist, lift or sidewalk elevator for the exclusive use of Tenant, Tenant shall maintain such exterior installations in good appearance, shall cause the same to be operated in a good and workmanlike manner, shall make all repairs thereto necessary to keep same in good order and condition, at Tenant's own cost and expense, and shall cause the same to be covered by the insurance provided for hereafter in Article 8. Tenant shall, throughout the term of the lease, take good care of the demised premises (including, without limitation, the storefront) and

the fixtures and appurtenances therein, and the sidewalks adjacent thereto, and at its sole cost and expense, make all non-structural repairs thereto as and when needed to preserve them in good working order and condition, reasonable wear and tear, obsolescence and damage from the elements, fire or other casualty, excepted. If the demised premises be or become infested with vermin, Tenant shall at Tenant's expense, cause the same to be exterminated from time to time to the satisfaction of Owner. Except as specifically provided in Article 9 or elsewhere in this lease, there shall be no allowance to the Tenant for the diminution of rental value and no liability on the part of Owner by reason of inconvenience, annoyance or injury to business arising from Owner, Tenant or others, making or failing to make any repairs, alterations, additions or improvements in or to any portion of the building, including the erection or operation of any crane, derrick or sidewalk shed, or in or to the demised premises or the fixtures, appurtenances or equipment thereof. It is specifically agreed that Tenant shall be not entitled to any set off or reduction of rent by reason of any failure of Owner to comply with the covenants of this or any other article of this lease. Tenant agrees that Tenant's sole remedy at law in such instance will be by way of an action for damages for breach of contract. The provisions of this Article 4 with respect to the making of repairs shall not apply in the case of fire or other casualty, which are dealt with in Article 9 hereof.

**Window Cleaning:** **5.** Tenant will not clean nor require, permit, suffer or allow any window in the demised premises to be cleaned from the outside in violation of Section 202 of the New York State Labor law or any other applicable law or of the Rules of the Board of Standards and Appeals, or of any other Board or body having or asserting jurisdiction.

**Requirements of Law, Fire Insurance:** **6.** Prior to the commencement of the lease term, if Tenant is then in possession, and at all times thereafter, Tenant, at Tenant's sole cost and expense, shall promptly comply with all present and future laws, orders and regulations of all state, federal, municipal and local governments, departments, commissions and boards and any direction of any public officer pursuant to law, and all orders, rules and regulations of the New York Board of Fire Underwriters or the Insurance Services Office, or any similar body which shall impose any violations, order or duty upon Owner or Tenant with respect to the demised premises, and with respect to the portion of the sidewalk adjacent to the demised premises, if the demised premises are on the street level, whether or not arising out of Tenant's use or manner of use thereof, or with respect to the building, if arising out of Tenant's use or manner of use of the demised premises or the building (including the use permitted under the lease). Except as provided in Article 29 hereof, nothing herein shall require Tenant to make structural repairs or alterations unless Tenant has by its manner of use of the demised premises or method of operation therein, violated any such laws, ordinances, orders, rules, regulations or requirements with respect thereto. Tenant shall not do or permit any act or thing to be done in or to the demised premises which is contrary to law, or which will invalidate or be in conflict with public liability, fire or other policies of insurance at any time carried by or for the benefit of Owner, or

which shall or might subject Owner to any liability or responsibility to any person, or for property damage. Tenant shall pay all costs, expenses, fines, penalties or damages, which may be imposed upon Owner by reason of Tenant's failure to comply with the provisions of this article. If the fire insurance rate shall, at the beginning of the lease, or at any time thereafter, be higher than it otherwise would be, then Tenant shall reimburse Owner, as additional rent hereunder, for that portion of all fire insurance premiums thereafter paid by Owner which shall have been charged because of such failure by Tenant, to comply with the terms of this article. In any action or proceeding wherein Owner and Tenant are parties, a schedule or "make-up" of rate for the building or the demised premises issued by a body making fire insurance rates applicable to said demised premises shall be conclusive evidence of the facts therein stated and of the several items and charges in the fire insurance rate than applicable to said demised premises.

**Sub-ordination:**   **7.**   This lease is subject and subordinate to all ground or underlying leases and to all mortgages which may now or hereafter affect such leases or the real property of which the demised premises are a part, and to all renewals, modifications, consolidations, replacements and extensions of any such underlying leases and mortgages. This clause shall be self-operative and no further instrument of subordination shall be required by any ground or underlying lessor or by any mortgagee, affecting any lease or the real property of which the demised premises are a part. In confirmation of such subordination, Tenant shall from time to time execute promptly any certificate that Owner may request.

**Tenant's Liability Insurance Property Loss, Damage, Indemnity:**   **8.**   Owner or its agents shall not be liable for any damage to property of Tenant or of others entrusted to employees of the building, nor for loss of, or damage to, any property of Tenant by theft or other wise, nor for any injury or damage to persons or property resulting from any cause of whatsoever nature, unless caused by or due to the negligence of Owner, its agents, servants or employees. Owner or its agents will not be liable for any such damage caused by other tenants or persons in, upon or about said building, or caused by operations in construction of any private, public or quasi public work. Tenant agrees, at Tenant's sole cost and expense, to maintain commercial general liability insurance in standard form in favor of Owner and Tenant against claims for bodily injury or death or property damage occurring in or upon the demised premises, effective from the date Tenant enters into possession of the demised premises and during the term of this lease. Such insurance shall be in an amount and with carriers acceptable to the Owner. Such policy or policies shall be delivered to the Owner. On Tenant's default in obtaining or delivering any such policy or policies or failure to pay the charges therefore, Owner may secure or pay the charges for any such policy or policies and charge the Tenant as additional rent therefore. Tenant shall indemnify and save harmless Owner against and from all liabilities, obligations, damages, penalties, claims, costs and expenses for which Owner shall not be reimbursed by insurance, including reasonable attorneys' fees, paid, suffered or incurred as a result of any breach by Tenant, Tenant's agent, contractors, employees, invitees, or licensees, of any covenant on condition of this lease or by the carelessness, negligence or improper conduct of the Tenant, Tenant's agents, contractors, employees, invitees or licensees. Tenant's liability under this lease extends to the acts and omissions of any subtenant, and any agent, contractor, employee, invitee or licensee of any subtenant. In case any action or proceeding is brought against Owner by reason of any such claim, Tenant, upon written notice from Owner, will, at Tenant's expense, resist or defend such action or proceeding by counsel approved by Owner in writing, such approval not to be unreasonably withheld.

**Destruction, Fire, and Other Casualty:**   **9.**   (a) If the demised premises or any part thereof shall be damaged by fire or other casualty, Tenant shall give immediate notice thereof to Owner and this lease shall continue in full force and effect except as hereinafter set forth. (b) If the demised premises are partially damaged or rendered partially unusable by fire or other casualty, the damages thereto shall be repaired by and at the expense of Owner, and the rent and other items of additional rent, until such repair shall be substantially completed, shall be apportioned from the day following the casualty according to the part of the demised premises which is usable. (c) If the demised premises are totally damaged or rendered wholly unusable by fire or other casualty, then the rent and other items of additional rent as hereinafter expressly provided shall be proportionately paid up to the time of the casualty and thenceforth shall cease until the date when the demised premises shall have been repaired and restored by Owner (or sooner reoccupied in part by the Tenant then rent shall be apportioned as provided in subsection (b) above), subject to Owner's right to elect not to restore the same as hereinafter provided. (d) If the demised premises are rendered wholly unusable or (whether or not the demised premises are damaged in whole or in part) if the building shall be so damaged that Owner shall decide to demolish it or to rebuild it, then, in any of such events, Owner may elect to terminate this lease by written notice to Tenant given within 90 days after such fire or casualty or 30 days after adjustment of the insurance claim for such fire or casualty, whichever is sooner, specifying a date for the expiration of the lease, which date shall not be more than 60 days after the giving of such notice, and upon the date specified in such notice the term of this lease shall expire as fully and completely as if such date were the date set forth above for the termination of this lease and Tenant shall forthwith quit, surrender and vacate the demised premises without prejudice however, to Owner's rights and remedies against Tenant under the lease provisions in effect prior to such termination, and any rent owing shall be paid up to such date and any payments of rent made by Tenant which were on account of any period subsequent to such date shall be returned to Tenant. Unless Owner shall serve a termination notice as provided for herein, Owner shall make the repairs and restorations under the conditions of (b) and (c) hereof, with all reasonable expedition subject to delays due to adjustment of insurance claims, labor troubles and causes beyond Owner's control. After any such casualty, Tenant shall cooperate with Owner's restoration by removing from the premises as promptly as reasonably possible, all of Tenant's salvageable inventory and movable equipment, furniture, and other property. Tenant's liability for rent shall resume five (5) days after written notice from Owner that the demised premises are substantially ready for Tenant's occupancy. (e) Nothing contained hereinabove shall relieve Tenant from liability that may exist as a result of damage from fire or other

casualty. Notwithstanding anything contained to the contrary in subdivisions (a) through (e) hereof, including Owner's obligation to restore under subparagraph (b) above, each party shall look first to any insurance in its favor before making any claim against the other party for recovery for loss or damage resulting from fire or other casualty, and to the extent that such insurance is in force and collectible, and to the extent permitted by law, Owner and Tenant each hereby releases and waives all right of recovery with respect to subparagraphs (b), (d) and (e) above, against the other, or any one claiming through or under each of them by way of subrogation or otherwise. The release and waiver herein referred to shall be deemed to include any loss or damage to the demised premises and/or to any personal property, equipment, trade fixtures, goods and merchandise located therein. The foregoing release and waiver shall be in force only if both releasors' insurance policies contain a clause providing that such a release or waiver shall not invalidate the insurance. Tenant acknowledges that Owner will not carry insurance on Tenant's furniture and/or furnishings or any fixtures or equipment, improvements, or appurtenances removable by Tenant, and agrees that Owner will not be obligated to repair any damage thereto or replace the same. (f) Tenant hereby waives the provisions of Section 227 of the Real Property Law and agrees that the provisions of this article shall govern and control in lieu thereof.

**Eminent Domain:**   **10.**   If the whole or any part of the demised premises shall be acquired or condemned by Eminent Domain for any public or quasi public use or purpose, then and in that event, the term of this lease shall cease and terminate from the date of title vesting in such proceeding, and Tenant shall have no claim for the value of any unexpired term of said lease. Tenant shall have the right to make an independent claim to the condemning authority for the value of Tenant's moving expenses and personal property, trade fixtures and equipment, provided Tenant is entitled pursuant to the terms of the lease to remove such property, trade fixtures and equipment at the end of the term, and provided further such claim does not reduce Owner's award.

**Assignment, Mortgage, Etc.:**   **11.**   Tenant, for itself, its heirs, distributes, executors, administrators, legal representatives, successors and assigns expressly covenants that it shall not assign, mortgage or encumber this agreement, nor underlet, or suffer or permit the demised premises or any part thereof to be used by others, without the prior written consent of Owner in each instance. Transfer of the majority of the stock of a corporate tenant or the majority interest in any partnership or other legal entity which is tenant shall be deemed an assignment. If this lease be assigned, or if the demised premises or any part thereof be underlet or occupied by anybody other than Tenant, Owner may, after default by Tenant, collect rent from the assignee, under-tenant or occupant, and apply the net amount collected to the rent herein reserved, but no such assignment, underletting occupancy or collection shall be deemed a waiver of the covenant, or the acceptance of the assignee, under-tenant or occupant as tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained. The consent by Owner to an assignment or underletting shall not in any way be construed to relieve Tenant from obtaining the express consent in writing of Owner to any further assignment or underletting.

**Electric Current:**   **12.**   Rates and conditions in respect to submetering or rent inclusion, as the case may be, to be added in RIDER attached hereto. Tenant covenants and agrees that at all times its use of electric current shall not exceed the capacity of existing feeders to the building or the risers or wiring installation, and Tenant may not use any electrical equipment which, in Owner's opinion, reasonable exercised, will overload such installations or interfere with the use thereof by other tenants of the building. The change at any time of the character of electric service shall in no way make Owner liable or responsible to Tenant, for any loss, damages or expenses which Tenant may sustain.

**Access to Premises:**   **13.**   Owner or Owner's agents shall have the right (but shall not be obligated) to enter the demised premises in any emergency at any time, and, at other reasonable times, to examine the same and to make such repairs, replacements and improvements as Owner may deem necessary and reasonably desirable to any portion of the building or which Owner may elect to perform, in the demised premises, following Tenant's failure to make repairs or perform any work which Tenant is obligated to perform under this lease, or for the purpose of complying with laws, regulations and other directions of governmental authorities. Tenant shall permit Owner to use and maintain and replace pipes and conduits in and through the demised premises and to erect new pipes, ducts, and conduits therein, provided they are concealed within the walls, floors or ceiling, wherever practicable. Owner may, during the progress of any work in the demised premises, take all necessary materials and equipment into said premises without the same constituting an eviction, nor shall the Tenant be entitled to any abatement of rent while such work is in progress, nor to any damages by reason of loss or interruption of business or otherwise.Throughout the term hereof Owner shall have the right to enter the demised premises at reasonable hours for the purpose of showing the same to prospective purchasers or mortgagees of the building, and during the last six months of the term for the purpose of showing the same to prospective tenants and may, during said six months period, place upon the demised premises the usual notice "to Let" and "For Sale", which notices Tenant shall permit to remain thereon without molestation. If Tenant is not present to open and permit an entry into the demised premises, Owner or Owner's agents may enter the same whenever such entry may be necessary or permissible, by master key or forcibly, and provided reasonable care is exercised to safeguard Tenant's property, such entry shall not render owner or its agents liable therefore, nor in any event shall the obligations of Tenant hereunder be affected. If during the last month of the term Tenant shall have removed all or substantially all of Tenant's property therefrom, Owner may immediately enter, alter, renovate or redecorate the demised premises without limitation or abatement of rent, or incurring liability to Tenant for any compensation, and such act shall have no effect on this lease or Tenant's obligations hereunder. Owner shall have the right at any time, without the same constituting an eviction and without incurring liability to Tenant therefore, to change the arrangement and/or location of public entrances, passageways, doors, doorways, corridors, elevators, stairs, toilets, or other

Rider to be added if necessary

public parts of the building, and to change the name, number or designation by which the building may be known.

**Vault, Vault Space, Area:**

**14.** No vaults, vault space or area, whether or not enclosed or covered, not within the property line of the building, is leased hereunder, anything contained in or indicated on any sketch, blue print or plan, or anything contained elsewhere in this lease to the contrary notwithstanding. Owner makes no representation as to the location of the property line of the building. All vaults and vault space and all such areas not within the property line of the building, which Tenant may be permitted to use and/or occupy, is to be used and/or occupied under a revocable license, and if any such license be revoked, or if the amount of such space or area be diminished or required by any federal, state or municipal authority or public utility, Owner shall not be subject to any liability, nor shall Tenant be entitled to any compensation or diminution or abatement of rent, nor shall such revocation, diminution or requisition be deemed constructive or actual eviction. Any tax, fee or charge of municipal authorities for such vault area shall be paid by Tenant.

**Occupancy:**

**15.** Tenant will not at any time use or occupy the demised premises in violation of Articles 2 or 37 hereof, or of the certificate of occupancy issued for the building which the demised premises are a part. Tenant has inspected the demised premises and accepts them "as-is", subject to the riders annexed hereto with respect to Owner's work, if any. In any event, Owner makes no representation as to the condition of the demised premises, and Tenant agrees to accept the same subject to violations, whether or not of record.

**Bankruptcy:**

**16.** (a) Anything elsewhere in this lease to the contrary notwithstanding, this lease may be cancelled by Landlord by the sending of a written notice to Tenant within a reasonable time after the happening of any one or more of the following events: (1) the commencement of a case in bankruptcy or under the laws of any state naming Tenant (or a guarantor of any of Tenant's obligations under this lease) as the debtor; or (2) the making by Tenant (or a guarantor of any of Tenant's obligations under this lease) of an assignment or any other arrangement for the benefit of creditors under any state statute. Neither Tenant nor any person claiming through or under Tenant, or by reason of any statute or order of court, shall thereafter be entitled to possession of the premises demised but shall forthwith quit and surrender the demised premises. If this lease shall be assigned in accordance with its terms, the provisions of this Article 16 shall be applicable only to the party then owning Tenant's interest in this lease.

(b) It is stipulated and agreed that in the event of the termination of this lease pursuant to (a) hereof, Owner shall forthwith, notwithstanding any other provisions of this lease to the contrary, be entitled to recover from Tenant, as and for liquidated damages, an amount equal to the difference between the rent reserved hereunder for the unexpired portion of the term demised and the fair and reasonable rental value of the demised premises for the same period. In the computation of such damages the difference between any installment of rent becoming due hereunder after the date of termination and the fair and reasonable rental value of the demised premises for the period for which such installment was payable shall be discounted to the date of termination at the rate of four percent (4%) per annum. If the demised premises, or any part thereof, be re-let by the Owner for the unexpired term of said lease, or any part thereof, before presentation of proof of such liquidated damages to any court, commission or tribunal, the amount of rent reserved upon such re-letting shall be deemed to be the fair and reasonable rental value for the part or the whole of the demised premises so re-let during the term of the re-letting. Nothing herein contained shall limit or prejudice the right of the Owner to prove for and obtain as liquidated damages, by reason of such termination, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved, whether or not such amount be greater, equal to, or less than the amount of the difference referred to above.

**Default:**

**17.** (1) If Tenant defaults in fulfilling any of the covenants of this lease other than the covenants for the payment of rent or additional rent; or if the demised premises become vacant or deserted; or if any execution or attachment shall be issued against Tenant or any of Tenant's property, whereupon the demised premises shall be taken or occupied by someone other than Tenant; or if this lease be rejected under Section 365 of Title 11 of the U.S. Code (Bankruptcy Code); or if Tenant shall have failed, after five (5) days written notice, to redeposit with Owner any portion of the security deposit hereunder which Owner has applied to the payment of any rent and additional rent due and payable hereunder, or if Tenant shall be in default with respect to any other lease between Owner and tenant; or if Tenant shall fail to move into or take possession of the demised premises within thirty (30) days after the commencement of the term of this lease, of which fact Owner shall be the sole judge; then, in any one or more of such events, upon Owner serving a written fifteen (15) day notice upon Tenant specifying the nature of said default, and upon the expiration of said fifteen (15) days, if Tenant shall have failed to comply with or remedy such default, or if the said default or omission complained of shall be of a nature that the same cannot be completely cured or remedied within said fifteen (15) day period, and if Tenant shall not have diligently commenced curing such default within such fifteen (15) day period, and shall not thereafter with reasonable diligence and in good faith proceed to remedy or cure such default, then Owner may serve a written five (5) days notice of cancellation of this lease upon Tenant, and upon the expiration of said five (5) days, this lease and the term thereunder shall end and expire as fully and completely as if the expiration of such five (5) day period were the day herein definitely fixed for the end and expiration of this lease and the term thereof and Tenant shall then quit and surrender the demised premises to Owner, but Tenant shall remain liable as hereinafter provided.

(2) If the notice provided for in (1) hereof shall have been given, and the term shall expire as aforesaid; or if Tenant shall make default in the payment of the rent reserved herein, or any item of additional rent herein mentioned, or any part of either, or in making any other payment herein required; then, and in any of such events, Owner may without notice, re-enter the demised premises either by force or otherwise, and dispossess Tenant by summary proceedings or otherwise, and the legal representative of Tenant or other occupant of the demised premises, and remove their effects and hold the demised premises as if this lease had not been made, and Tenant hereby waives the service of notice of intention to re-enter or to institute legal proceedings to that end.

**Remedies of Owner and Waiver of Redemption:**

**18.** In case of any such default, re-entry, expiration and/or dispossess by summary proceedings or otherwise, (a) the rent, and additional rent, shall become due thereupon and be paid up to the time of such re-entry, dispossess and/or expiration, (b) Owner may re-let the demised premises or any part or parts thereof, either in the name of Owner or otherwise, for a term or terms, which may at Owner's option be less than or exceed the period which would otherwise have constituted the balance of the term of this lease, and may grant concessions or free rent or charge a higher rental than that in this lease, and (c) Tenant or the legal representatives of Tenant shall also pay Owner, as liquidated damages, for the failure of Tenant to observe and perform said Tenant's covenants herein contained, any deficiency between the rent hereby reserved and/or covenanted to be paid and the net amount, if any, of the rents collected on account of the subsequent lease or leases of the demised premises for each month of the period which would otherwise have constituted the balance of the term of this lease. The failure of Owner to re-let the demised premises or any part or parts thereof shall not release or affect Tenant's liability for damages. In computing such liquidated damages there shall be added to the said deficiency such expenses as Owner may incur in connection with re-letting, such as legal expenses, reasonable attorney's fees, brokerage, advertising and for keeping the demised premises in good order, or for preparing the same for re-letting. Any such liquidated damages shall be paid in monthly installments by Tenant on the rent day specified in this lease. Owner, in putting the demised premises in good order or preparing the same for re-rental may, at Owner's option, make such alterations, repairs, replacements, and/or decorations in the demised premises as Owner, in Owner's sole judgment, considers advisable and necessary for the purpose of re-letting the demised premises, and the making of such alterations, repairs, replacements, and/or decorations shall not operate or be construed to release Tenant from liability. Owner shall in no event be liable, in any way whatsoever, for failure to re-let the demised premises, or in the event that the demised premises are re-let, for failure to collect the rent thereof under such re-letting, and in no event shall Tenant be entitled to receive any excess, if any, of such net rent collected over the sums payable by Tenant to Owner hereunder. In the event of a breach or threatened breach by Tenant of any of the covenants or provisions hereof, Owner shall have the right of injunction and the right to invoke any remedy allowed at law or in equity as if re-entry, summary proceedings and other remedies were not herein provided for. Mention in this lease of any particular remedy, shall not preclude Owner from any other remedy, in law or in equity. Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws.

**Fees and Expenses:**

**19.** If Tenant shall default in the observance or performance of any term or covenant on Tenant's part to be observed or performed under, or by virtue of, any of the terms or provisions in any article of this lease, after notice if required, and upon expiration of any applicable grace period if any, (except in an emergency), then, unless otherwise provided elsewhere in this lease, Owner may immediately, or at any time thereafter, and without notice, perform the obligation of Tenant thereunder, and if Owner, in connection therewith or in connection with any default by Tenant in the covenant to pay rent hereunder, makes any expenditures or incurs any obligations for the payment of money, including but not limited to reasonable attorney's fees, in instituting, prosecuting or defending any actions or proceeding, and prevails in any such action or proceeding, such sums so paid or obligations incurred with interest and costs shall be deemed to be additional rent hereunder and shall be paid by Tenant to Owner within ten (10) days of rendition of any bill or statement to Tenant therefore, and if Tenant's lease term shall have expired at the time of making of such expenditures or incurring of such obligations, such sums shall be recoverable by Owner as damages.

**No Representations by Owner:**

**20.** Neither Owner nor Owner's agent have made any representations or promises with respect to the physical condition of the building, the land upon which it is erected or the demised premises, the rents, leases, expenses of operation, or any other matter or thing affecting or related to the demised premises, except as herein expressly set forth, and no rights, easements or licenses are acquired by Tenant by implication or otherwise, except as expressly set forth in the provisions of this lease. Tenant has inspected the building and the demised premises and is thoroughly acquainted with their condition, and agrees to take the same "as-is," and acknowledges that the taking of possession of the demised premises by Tenant shall be conclusive evidence that the said premises and the building of which the same form a part were in good and satisfactory condition at the time such possession was so taken, except as to latent defects. All understandings and agreements heretofore made between the parties hereto are merged in this contract, which alone fully and completely expresses the agreement between Owner and Tenant, and any executory agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of it in whole or in part, unless such executory agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought.

**End of Term:**

**21.** Upon the expiration or other termination of the term of this lease, Tenant shall quit and surrender to Owner the demised premises, "broom-clean", in good order and condition, ordinary wear excepted, and Tenant shall remove all its property. Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of this lease. If the last day of the term of this lease or any renewal thereof, falls on Sunday, this lease shall expire at noon on the preceding Saturday, unless it be a legal holiday, in which case it shall expire at noon on the preceding business day.

**Quiet Enjoyment:**

**22.** Owner covenants and agrees with Tenant that upon Tenant paying the rent and additional rent and observing and performing all the terms, covenants and conditions, on Tenant's part to be observed and performed, Tenant may peaceable and quietly enjoy the premises hereby demised, subject, nevertheless, to the terms and conditions of this lease including,

but not limited to, Article 33 hereof and to the ground leases, underlying leases and mortgages hereinbefore mentioned.

**Failure to Give Possession:**    **23.** If Owner is unable to give possession of the demised premises on the date of the commencement of the term hereof, because of the holding-over or retention of possession of any tenant, undertenant or occupants, or if the demised premises are located in a building being constructed, because such building has not been sufficiently completed to make the demised premises ready for occupancy, or because of the fact that a certificate of occupancy has not been procured, or for any other reason, Owner shall not be subject to any liability for failure to give possession on said date and the validity of the lease shall not be impaired under such circumstances, nor shall the same be construed in any way to extend the term of this lease, but the rent payable hereunder shall be abated (provided Tenant is not responsible for the inability to obtain possession or complete construction) until after Owner shall have given Tenant written notice that the Owner is able to deliver possession in the condition required by this lease. If permission is given to Tenant to enter into the possession of the demised premises or to occupy premises other than the demised premises prior to the date specified as the commencement of the term of this lease, Tenant covenants and agrees that such possession and/or occupancy shall be deemed to be under all the terms, covenants, conditions and provisions of this lease, except the obligation to pay the fixed annual rent set forth in page one of this lease. The provisions of this article are intended to constitute "an express provision to the contrary" within the meaning of Section 223-a of the New York Real Property Law.

**No Waiver:**    **24.** The failure of Owner to seek redress for violation of, or to insist upon the strict performance of any covenant or condition of this lease or of any of the Rules or Regulations set forth or hereafter adopted by Owner, shall not prevent a subsequent act which would have originally constituted a violation from having all the force and effect of an original violation. The receipt by Owner of rent and/or additional rent with knowledge of the breach of any covenant of this lease shall not be deemed a waiver of such breach, and no provision of this lease shall be deemed to have been waived by Owner unless such waiver be in writing signed by Owner. No payment by Tenant or receipt by Owner of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement of any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Owner may accept such check or payment without prejudice to Owner's right to recover the balance of such rent or pursue any other remedy in this lease provided. No act or thing done by Owner or Owner's agents during the term hereby demised shall be deemed in acceptance of a surrender of the demised premises and no agreement to accept such surrender shall be valid unless in writing signed by Owner. No employee of Owner or Owner's agent shall have any power to accept the keys of the demised premises prior to the termination of the lease, and the delivery of keys to any such agent or employee shall not operate as a termination of the lease or a surrender of the demised premises.

**Waiver of Trial by Jury:**    **25.** It is mutually agreed by and between Owner and Tenant that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other (except for personal injury or property damage) on any matters whatsoever arising out of, or in any way connected with, this lease, the relationship of Owner and Tenant, Tenant's use or of occupancy of the demised premises, and any emergency statutory or any other statutory remedy. It is further mutually agreed that in the event Owner commence any proceeding or action for possession, including a summary proceeding for possession of the demised premises, Tenant will not interpose any counterclaim of whatever nature or description in any such proceeding, including a counterclaim under Article 4, except for statutory mandatory counterclaims.

**Inability to Perform:**    **26.** This lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in no way be affected, impaired or excused because Owner is unable to fulfill any of its obligations under this lease, or to supply, or is delayed in supplying, any service expressly or impliedly to be supplied, or is unable to make, or is delayed in making, any repair, additions, alterations or decorations, or is unable to supply, or is delayed in supplying, any equipment, fixtures or other materials, if Owner is prevented or delayed from so doing by reason of strike or labor troubles, government preemption or restrictions, or by reason of any rule, order or regulation of any department or subdivision thereof of any government agency, or by reason of the conditions of which have been or are affected, either directly or indirectly, by war or other emergency, or when, in the judgment of Owner, temporary interruption of such services is necessary by reason of accident, mechanical breakdown, or to make repairs, alterations or improvements.

**Bills and Notices:**    **27.** Except as otherwise in this lease provided, any notice, statement, demand or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this lease or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this lease) and shall be deemed to have been properly given, rendered or made, if sent by registered or certified mail (express mail, if available), return receipt requested, or by courier guaranteeing overnight delivery and furnishing a receipt in evidence thereof, addressed to the other party at the address hereinabove set forth (except that after the date specified as the commencement of the term of this lease, Tenant's address, unless Tenant shall give notice to the contrary, shall be the building), and shall be deemed to have been given, rendered or made (a) on the date delivered, if delivered to Tenant personally, (b) on the date delivered, if delivered by overnight courier or (c) on the date which is two (2) days after being mailed. Either party may, by notice as aforesaid, designate a different address or addresses for notices, statements, demand or other communications intended for it. Notices given by Owner's managing agent shall be deemed a valid notice if addressed and set in accordance with the provisions of this

    **Space to be filled in or deleted**

Article. At Owner's option, notices and bills to Tenant may be sent by hand delivery.

**Water Charges:**    **28.** If Tenant requires, uses or consumes water for any purpose in addition to ordinary lavatory purposes (of which fact Tenant constitutes Owner to be the sole judge) Owner may install a water meter and thereby measure Tenant's water consumption for all purposes. Tenant shall pay Owner for the cost of the meter and the cost of the installation thereof, and throughout the duration of the Tenant's occupancy Tenant shall keep said meter and installation equipment in good working order and repair at Tenant's own cost and expense. Tenant agrees to pay for water consumed, as shown on said meter, as and when bills are rendered. Tenant covenants and agrees to pay the sewer rent, charge or any other tax, rent, levy or charge which now or hereafter is assessed, imposed or a lien upon the demised premises or the realty of which they are part pursuant to law, order or regulation made or issued in connection with the use, consumption, maintenance or supply of water, water system or sewage or sewage connection or system. The bill rendered by Owner shall be payable by Tenant as additional rent. If the building or the demised premises, or any part thereof, be supplied with water through a meter through which water is also supplied to other premises, Tenant shall pay to Owner as additional rent, on the first day of each month.

     _____%     ($                 )_ of the total meter charges, as Tenant's portion. Independently of, and in addition to, any of the remedies reserved to Owner hereinabove or elsewhere in this lease, Owner may sue for and collect any monies to be paid by Tenant or paid by Owner for any of the reasons or purposes hereinabove set forth.

**Sprinklers:**    **29.** Anything elsewhere in this lease to the contrary notwithstanding, if the New York Board of Fire Underwriters or the Insurance Services Office, or any bureau, department or official of the federal, state or city government, require or recommend the installation of a sprinkler system or that any changes, modifications, alterations, or additional sprinkler heads or other equipment be made or supplied in an existing sprinkler system by reason of Tenant's business, or the location of partitions, trade fixtures, or other contents of the demised premises, or for any other reason, or if any such sprinkler system installations, changes, modifications, alterations, additional sprinkler heads or other such equipment, become necessary to prevent the imposition of a penalty or charge against the full allowance for a sprinkler system in the fire insurance rate set by any said Exchange or by any fire insurance company, Tenant shall, at Tenant's expense, promptly make such sprinkler system installations, changes, modifications, alterations, and supply additional sprinkler heads or other equipment as required, whether the work involved shall be structural or non-structural in nature. Tenant shall pay to Owner as additional rent the sum of $ _____ on the first day of each month during the term of this lease, as Tenant's portion of the contract price for sprinkler supervisory service.

**Elevators, Heat, Cleaning:**    **30.** As long as Tenant is not in default under any of the covenants of this lease beyond the applicable grace period provided in this lease for the curing of such defaults, Owner shall, if and insofar as existing facilities permit, furnish heat to the demised premises, when and as required by law, on business days from 8:00 a.m. to 6:00 pm. and on Saturdays from 8:00 a.m. to 1:00 pm. Tenant shall at Tenant's expense, keep the demised premises clean and in order, to the satisfaction of Owner, and if the demised premises are situated on the street floor, Tenant shall, at Tenant's own expense, make all repairs and replacements to the sidewalks and curbs adjacent thereto, keep said sidewalks and curbs free from snow, ice, dirt and rubbish and maintain said sidewalks in a reasonably safe condition in compliance with requirements of law. Tenant shall pay to Owner the cost of removal of any of Tenant's refuse and rubbish from the building. Bills for the same shall be rendered by Owner to Tenant at such times as Owner may elect, and shall be due and payable when rendered, and the amount of such bills shall be deemed to be, and be paid as, additional rent. Tenant shall, however, have the option of independently contracting for the removal of such rubbish and refuse in the event that Tenant does not wish to have same done by employees of Owner. Under such circumstances, however, the removal of such refuse and rubbish by others shall be subject to such rules and regulations as, in the judgment of Owner, are necessary for the proper operation of the building.

**Security:**    **31.** Tenant has deposited with Owner the sum of **$36,000.00** as security for the faithful performance and observance by Tenant of the terms, provisions and conditions of this lease; it is agreed that in the event Tenant defaults in respect of any of the terms, provisions and conditions of this lease, including, but not limited to, the payment of rent and additional rent, Owner may use, apply or retain the whole or any part of the security so deposited to the extent required for the payment of any rent and additional rent, or any other sum as to which Tenant is in default, or for any sum which Owner may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, covenants and conditions of this lease, including but not limited to, any damages or deficiency in the reletting of the demised premises, whether such damages or deficiency accrued before or after summary proceedings or other re-entry by Owner. In the case of every such use, application or retention, Tenant shall, within five (5) days after demand, pay to Owner the sum so used, applied or retained which shall be added to the security deposit so that the same shall be replenished to its former amount. In the event that Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this lease, the security shall be returned to Tenant after the date fixed as the end of the lease and after delivery of entire possession of the demised premises to Owner. In the event of a sale of the land and building or leasing of the building, of which the demised premises form a part, Owner shall have the right to transfer the security to the vendee or lessee and Owner shall thereupon be released by Tenant from all liability for the return of such security, and Tenant agrees to look to the new Owner solely for the return of said security; and it is agreed that the provisions hereof shall apply to every transfer or assignment made of the security to a new Owner. Tenant further covenants that it will not assign or encumber or attempt to assign or encumber the monies deposited herein as security, and that neither Owner nor its successors

or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance.

**Captions:** **32.** The Captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this lease nor the intent of any provision thereof.

**Definitions:** **33.** The term "Owner" as used in this lease means only the Owner, or the mortgagee in possession, for the time being of the land and building (or the Owner of a lease of the building or of the land and building) of which the demised premises form a part, so that in the event of any sale or sales or conveyance, assignment or transfer of said land and building or of said lease, or in the event of a lease of said building, or of the land and building, the said Owner shall be and hereby is entirely freed and relieved of all covenants and obligations of Owner hereunder, and it shall be deemed and construed without further agreement between the parties or their successors in interest, or between the parties and the purchaser, grantee, assignee or transferee at any such sale, or the said lessee of the building, or of the land and building, that the purchaser, grantee, assignee or transferee at any such sale, or the said lessee of the building has assumed and agreed to carry out any and all covenants and obligations of Owner hereunder. The words "re-enter" and "re-entry" as used in this lease are not restricted to their technical legal meaning. The term "business days" as used in this lease shall exclude Saturdays, Sundays and all days designated as holidays by the applicable building service union employees service contract or by the applicable Operating Engineers contract with respect to HVAC service. Wherever it is expressly provided in this lease that consent shall not be unreasonably withheld, such consent shall not be unreasonable delayed.

**Adjacent Excavation-Shoring:** **34.** If an excavation shall be made upon land adjacent to the demised premises, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, a license to enter upon the demised premises for the purpose of doing such work, as said person shall deem necessary, to preserve the wall or the building of which the demised premises form a part from injury or damage and to support the same by proper foundations, without any claim for damages or indemnity against Owner, or diminution or abatement of rent.

**Rules and Regulations:** **35.** Tenant and Tenant's servants, employees, agents, visitors, and licensees shall observe faithfully, and comply strictly with the Rules and Regulations and such other and further reasonable Rules and Regulations as Owner or Owner's agents may from time to time adopt. Notice of any additional rules or regulations shall be given in such manner as Owner may elect. In case Tenant disputes the reasonableness of any additional Rule or Regulation hereafter made or adopted by Owner or Owner's agents, the parties hereto agree to submit the question of the reasonableness of such Rule or Regulation for decision to the New York office of the American Arbitration Association, whose determination shall be final and conclusive upon the parties hereto. The right to dispute the reasonableness of any additional Rule or Regulation upon Tenant's part shall be deemed waived unless the same shall be asserted by service of a notice, in writing, upon Owner, within fifteen (15) days after giving of notice thereof. Nothing in this lease contained shall be construed to impose upon Owner any duty or obligation to enforce the Rules and Regulations

or terms, covenants or conditions in any other lease, as against any other tenant, and Owner shall not be liable to Tenant for violation of the same by any other tenant, its servants, employees, agents, visitors or licensees.

**Glass:** **36.** Owner shall replace, at the expense of Tenant, any and all plate and other glass damaged or broken from any cause whatsoever in and about the demised premises. Owner may insure, and keep insured, at Tenant's expense, all plate and other glass in the demised premises for and in the name of Owner. Bills for the premiums therefore shall be rendered by Owner to Tenant at such times as Owner may elect, and shall be due from, and payable by, Tenant when rendered, and the amount thereof shall be deemed to be, and be paid as, additional rent.

**Pornographic Uses Prohibited:** **37.** Tenant agrees that the value of the demised premises and the reputation of the Owner will be seriously injured if the demised premises are used for any obscene or pornographic purposes or any sort of commercial sex establishment. Tenant agrees that Tenant will not bring or permit any obscene or pornographic material on the demised premises, and shall not permit or conduct any obscene, nude, or semi-nude live performances on the demised premises, nor permit use of the demised premises for nude modeling, rap sessions, or as a so called rubber goods shop, or as a sex club of any sort, or as a "massage parlor." Tenant agrees further that Tenant will not permit any of these uses by any sublessee or assignee of the demised premises. This Article shall directly bind any successors in interest to the Tenant. Tenant agrees that if at any time Tenant violates any of the provisions of this Article, such violation shall be deemed a breach of a substantial obligation of the terms of this lease and objectionable conduct. Pornographic material is defined for purposes of this Article as any written or pictorial matter with prurient appeal, or any objects of instrument that are primarily concerned with lewd or prurient sexual activity. Obscene material is defined here as it is in Penal Law §235.00.

**Estoppel Certificate:** **38.** Tenant, at any time, and from time to time, shall execute, acknowledge and deliver to Owner, and/or to any other person, firm or corporation specified by Owner, a statement certifying that this lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), stating the dates which the rent and additional rent have been paid, stating whether or not there exists any defaults by owner under this lease, and, if so, specifying each such default and such other information as shall be required of Tenant.

**Successors and Assigns:** **39.** The covenants, conditions and agreements contained in this lease shall bind and inure to the benefit of Owner and Tenant and their respective heirs, distributes, executors, administrators, successors, and except as otherwise provided in this lease, their assigns. Tenant shall look only to Owner's estate and interest in the land and building for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) against Owner in the event of any default by Owner hereunder, and no other property or assets of such Owner (or any partner, member, officer or director thereof, disclosed or undisclosed), shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under, or with respect to, this lease, the relationship of Owner and Tenant hereunder, or Tenant's use and occupancy of the demised premises.

**𝔍𝔫 𝔚𝔦𝔱𝔫𝔢𝔰𝔰 𝔚𝔥𝔢𝔯𝔢𝔬𝔣,** Owner and Tenant have respectively signed and sealed this lease as of the day and year first above written.

**Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC**

Witness for Owner: _____

By: _____

**Won Moon, Member**

**Tasteland Holdings LLC**

Witness for Tenant: _____

By: *Edward B. Hubbuch*

**Edward B. Hubbuch**


## ACKNOWLEDGEMENT


**STATE OF NEW YORK,**

**SS.:**

**COUNTY OF KINGS**

On the _____ day of _____ in the year _____, before me, the undersigned, a Notary Public in and for said State, personally appeared _____ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____

**NOTARY PUBLIC**

## GUARANTY

The undersigned Guarantor guarantees to Owner, Owner's successors and assigns, the full performance and observance of all the agreements to be performed and observed by Tenant in the attached lease, including the "Rules and Regulations" as therein provided, without requiring any notice to Guarantor of nonpayment, or nonperformance, or proof, or notice of demand, to hold the undersigned responsible under this guaranty, all of which the undersigned hereby expressly waives, and expressly agrees that the legality of this agreement and the agreements of the Guarantor under this agreement, shall not be ended, or changed by reason of the claims to Owner against Tenant of any of the rights or remedies given to Owner as agreed in the attached lease. The Guarantor further agrees that this guaranty shall remain and continue in full force and effect as to any renewal, change or extension of the lease. As a further inducement to Owner to make the lease, Owner and Guarantor agree that in any action or proceeding brought by either Owner or the Guarantor against the other on any matters concerning the lease or of this guaranty, that Owner and the undersigned shall and do waive trial by jury.

Dated:. . . . . . . . . . . . . . . . . . . . . . . . . . in the year . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Guarantor

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Witness

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Guarantor's Residence

Business Address

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Firm Name

STATE OF NEW YORK ) ss.:

COUNTY OF )

On the        day of            in the year
before me, the undersigned, a Notary Public in and for said State, personally appeared
personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Notary

 **IMPORTANT – PLEASE READ** 

### RULES AND REGULATIONS ATTACHED TO AND
### MADE A PART OF THIS LEASE
### IN ACCORDANCE WITH ARTICLE 35.

1.   The sidewalks, entrances, driveways, passages, courts, elevators, vestibules, stairways, corridors or halls shall not be obstructed or encumbered by any Tenant or used for any purpose other than for ingress to and egress from the demised premises and for delivery of merchandise and equipment in a prompt and efficient manner using elevators and passageways designated for such delivery by Owner.  There shall not be used in any space, or in the public hall of the building, either by any tenant or by jobbers, or others in the delivery or receipt of merchandise, any hand trucks except those equipped with rubber tires and safeguards.

2.   If the demised premises are situated on the ground floor of the building, Tenant thereof shall further, at Tenant's expense, keep the sidewalks and curb in front of said premises clean and free from ice, snow, etc.

3.   The water and wash closets and plumbing fixtures shall not be used for any purposes other than those for which they were designed or constructed.

4.   Tenant shall not use, keep or permit to be used or kept, any foul or noxious gas or substance in the demised premises, or permit or suffer the demised premises to be occupied or used in a manner offensive or objectionable to Owner or other occupants of the building by reason of noise, odors and/or vibrations, or interfere in any way with other tenants or those having business therein.

5.   No sign, advertisement, notice or other lettering shall be exhibited, inscribed, painted or fixed by Tenant on any part of the outside of the demised premises or the building, or on the inside of the demised premises if the same is visible from the outside of the demised premises, without the prior written consent of Owner, except that the name of Tenant may appear on the entrance door of the demised premises. In the event of the violation of the foregoing by Tenant, Owner may remove same without any liability and may charge the expense incurred by such removal to Tenant. Signs on interior doors and directory tablet shall be inscribed, painted or affixed for Tenant by Owner at the expense of Tenant, and shall be of a size, color and style acceptable to Owner.

6.   Tenant shall not mark, paint, drill into, or in any way deface any part of the demised premises or the building of which they form a part.  No boring, cutting or stringing of wires shall be permitted, except with the prior written consent of Owner, and as Owner may direct.  Tenant shall not lay linoleum, or other similar floor covering, so that the same shall come in direct contact with the floor of the demised premises, and, if linoleum or other similar floor covering is desired to be used, an interlining of builder's deadening felt shall

be first affixed to the floor, by a paste or other material, soluble in water, the use of cement or other similar adhesive material being expressly prohibited.

7.   Freight, furniture, business equipment, merchandise and bulky matter of any description shall be delivered to and removed from the demised premises only on the freight elevators and through the service entrances and corridors, and only during hours and in a manner approved by Owner. Owner reserves the right to inspect all freight to be brought into the building and to exclude from the building all freight which violates any of these Rules and Regulations or the lease of which these Rules and Regulations are a part.

8.   Owner reserves the right to exclude from the building between the hours of 6 P.M. and 8 A.M. and at all hours on Sundays and holidays all persons who do not present a pass to the building signed by Owner. Owner will furnish passes to persons for whom Tenant requests same in writing. Tenant shall be responsible for all persons for whom it requests such pass, and shall be liable to Owner for all acts of such person.

9.   Owner shall have the right to prohibit any advertising by Tenant which, in Owner's opinion, tends to impair the reputation of Owner or the building's desirability as a building for stores or offices, and upon written notice from Owner, Tenant shall refrain from or discontinue such advertising.

10.   Tenant shall not bring or permit to be brought or kept in or on the demised premises, any inflammable, combustible, or explosive, or hazardous fluid, material, chemical or substance, or cause or permit any odors of cooking or other processes, or any unusual or other objectionable odors, to permeate in or emanate from the demised premises.

11.   Tenant shall not place a load on any floor of the demised premises exceeding the floor load per square foot area which was designated to carry and which is allowed by law. Owner reserves the right to prescribe the weight and position of all safes, business machines and mechanical equipment. Such installations shall be placed and maintained by Tenant at Tenant's expense in such setting sufficient in Owner's judgment to absorb and prevent vibration, noise and annoyance.

12.   Refuse and Trash – Tenant covenants and agrees, at its sole cost and expense, to comply with all present and future laws, orders and regulations of all state, federal, municipal and local governments, departments, commissions and boards regarding the collection, sorting, separation and recycling of waste products, garbage, refuse and trash. Tenant shall pay all costs, expenses, fines, penalties or damages that may be imposed on Owner or Tenant by reason of Tenant's failure to comply with the provisions of this Building Rule 12, and, at Tenant's sole cost and expense, shall indemnify, defend and hold Owner harmless (including reasonable legal fees and expenses) from and against any actions, claims and suits arising from such non-compliance, utilizing counsel reasonably satisfactory to Owner.

Address

Premises

TO

STANDARD FORM OF

*Store Lease*

The Real Estate Board of New York, Inc.
Copyright 2004. All rights Reserved.
Reproduction in whole or in part prohibited.

Dated

Rent Per Year

Rent Per Month

Term
From
To

in the year

Drawn by . . . . . . . . . . . . . . . . . .

Checked by . . . . . . . . . . . . . . . . . .

Entered by. . . . . . . . . . . . . . . . . .

Approved by . . . . . . . . . . . . . . . . . .

RIDER TO AGREEMENT OF LEASE DATED AS OF OCTOBER ___, 2022
BETWEEN
LUNAR ESTATES, LLC D/B/A LUNAR ESTATES OF CA, LLC,
HAVING AN ADDRESS AT
C/O J&M REALTY SERVICES CORP.
343 ST. NICHOLAS AVENUE, #1, NEW YORK, NEW YORK 10027
AS LANDLORD
AND
TASTELAND HOLDINGS LLC D/B/A MEMPHIS SEOUL, HAVING AN ADDRESS AT
394 LINCOLN PLACE, APT. A5, BROOKLYN, NY 11238
AS TENANT
FOR
GROUND FLOOR STORE AND PORTION OF BASEMENT (AS DEPICTED ON FLOOR
PLAN ATTACHED HERETO)
123 FIRST AVENUE
NEW YORK, NEW YORK 10003

---

THE TERMS **"OWNER"** AND **"LANDLORD"** ARE USED INTERCHANGEABLY AND OWNER SHALL MEAN LANDLORD AND LANDLORD SHALL MEAN OWNER.

---

THE TERMS **"DEMISED PREMISES"** AND **"PREMISES"** ARE USED INTERCHANGEABLY AND SHALL MEAN THE GROUND FLOOR STORE AND PORTION OF BASEMENT BELOW IN THE BUILDING LOCATED AT AND COMMONLY KNOWN AS 123 FIRST AVENUE, NEW YORK, NEW YORK 10003.

---

THE TERM **"THIS LEASE"** MEANS THE PRINTED PORTION OF THIS LEASE, THIS RIDER, AND ALL OTHER RIDERS, EXHIBITS AND SCHEDULES ANNEXED HERETO.

---

IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY BETWEEN ANY PROVISION OF THIS RIDER AND ANY PROVISION OF THE MAIN BODY OF THIS LEASE, THE PROVISION OF THIS RIDER SHALL GOVERN.

---

40.   Definitions; Rent.  The following capitalized terms shall have the meanings set forth in this Article 40 whenever used in this Lease:

A.      **"Effective Date"** shall mean the date that a fully-executed counterpart of this Lease is delivered to Tenant; the terms and provisions hereof shall be fully binding on Landlord and Tenant on the Effective Date.

B.      The term of this Lease (the **"Term"**) shall (i) commence on October 15, 2022 (the **"Commencement Date"**), and (ii) end on the date (the **"Expiration Date"**) which is the last day of the month in which the tenth (10th) anniversary of the Commencement Date occurs at 5:00 p.m. unless such term is renewed in accordance with the terms of this Lease or sooner terminated pursuant to any of the conditions or covenants of this Lease or pursuant to law.

C.      **[Intentionally Omitted]**

D.      "**Rent**":

(i)      During the Term, Tenant shall pay to Landlord the fixed annual rent (the "**Fixed Annual Rent**" or "**fixed annual rent**" and **"fixed monthly rent"),** as follows:

-1-

| Lease Year | Monthly Rent | Annual Rent | Annual Increase |
|---|---|---|---|
| October 15, 2022 – October 31, 2022 | $6,000.00 | N/A | N/A |
| November 1, 2022 – October 31, 2023 | $12,000.00 | $144,000.00 | |
| November 1, 2023 – October 31, 2024 | $12,360.00 | $148,320.00 | 3% |
| November 1, 2024 – October 31, 2025 | $12,730.80 | $152,769.60 | 3% |
| November 1, 2025 – October 31, 2026 | $13,112.73 | $157,352.76 | 3% |
| November 1, 2026 – October 31, 2027 | $13,506.11 | $162,073.28 | 3% |
| November 1, 2027 – October 31, 2028 | $13,911.29 | $166,935.48 | 3% |
| November 1, 2028 – October 31, 2029 | $14,328.63 | $171,943.56 | 3% |
| November 1, 2029 – October 31, 2030 | $14,758.49 | $177,101.88 | 3% |
| November 1, 2030 – October 31, 2031 | $15,201.25 | $182,415.00 | 3% |
| November 1, 2031 – October 31, 2032 | $15,657.29 | $187,887.48 | 3% |

(ii)  In addition to the fixed annual rent payable pursuant to Section 40(D)(i) above, Tenant shall pay additional rent ("**Additional Rent**" or "**additional rent**") consisting of all other sums of money, if any, as shall become due and payable by Tenant to Landlord hereunder (for default in the payment of which Landlord shall have all rights and remedies provided herein or by law as for a default in the payment of Fixed Annual Rent, notwithstanding the fact that Tenant may not then also be in default in the payment of Fixed Annual Rent), all to be paid in lawful money of the United States of America to Landlord at its office, or such other place, or to such agent, and at such place, as Landlord may from time to time designate by notice to Tenant, on the first day of each and every calendar month during the Term, except that the first monthly installment of Fixed Annual Rent shall be payable by Tenant upon execution of this Lease but applied to the first month after the Free Fixed Rent Period (defined below). Tenant covenants and agrees to pay Fixed Annual Rent and Additional Rent promptly when due without notice or demand therefor and without any abatement, deduction, or setoff for any reason whatsoever, except as may be expressly provided in this Lease.  Such payment of rent (the fixed annual rent and the additional rent are sometimes herein collectively called the "**rent**" or "**Rent**") shall be in cash, by wire transfer, or by check (drawn upon a bank or trust company which is a member of the New York Clearing House Association) subject to collection. If the Commencement Date or the Expiration Date occurs on a day other than the first day of a calendar month (in the case of the Commencement Date) or the last day of a calendar month (in the case of the Expiration Date), the Rent for the partial calendar month in which the Commencement Date or the Expiration Date, as the case may be, occurs shall be prorated.  The Rent for any partial calendar month in which the Commencement Date occurs shall be paid on the Commencement Date.

(iii)     Provided Tenant is not in default under the terms, covenants, and conditions of this Lease beyond the expiration of any applicable notice or cure periods and is current in all its monetary obligations, Tenant shall have the one-time right to use and occupy the Premises free solely of Fixed Annual Rent for the five (5) month period beginning October 15, 2022 and ending March 14, 2023 and for the month of December 2023 (the "**Free Fixed Rent Period**"); except that Tenant shall nevertheless be obligated, from and after the Commencement Date and at all times during the Term, including, without limitation, during the Free Fixed Rent Period, to pay all Additional Rent and other charges hereunder and to pay for all utilities utilized in or furnished to the Premises.

Initials: Landlord _____ Tenant EBH

(iv)     No payment by Tenant or receipt or acceptance by Landlord of a lesser amount than the correct Fixed Annual Rent or Additional Rent shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance or pursue any other remedy in this Lease or at law provided.

E.     "**Building**" shall mean the building known as and located at 123 First Avenue, New York, New York 10003.

F.     "**Land**" shall mean the plot of land on which the Building stands and its immediate curtilage.

G.     "**Property**" shall mean the Land and the Building.

41.     Real Estate Tax Escalation.

(a)     Definitions:  For the purposes of this Article, the following definitions shall apply:

(i)     The Term "**Base Tax Year**" shall mean real estate taxes assessed for New York City real estate tax year, commencing July 1, 2022 and ending June 30, 2023, for purposes of calculating real estate tax escalations throughout the entire Term.

(ii)     The Term "Tax Percentage," for purposes of computing real estate tax escalations shall mean twenty-five percent (25%).

(iii)     The Term "**Comparative Year**" shall mean the twelve (12) months of the New York City real estate tax year (i.e., July 1 through the following June 30) following the base tax year, and each subsequent period of twelve (12) months (or such other period of twelve (12) months occurring during the Term of this Lease as hereafter may be duly adopted as the fiscal year for real estate tax purposes by the City of New York).

(iv)     The Term "**Real Estate Taxes**" shall mean the total of all taxes and special or other assessments levied, assessed or imposed at any time by any governmental authority or quasi/governmental authority upon or against the Building, and also any tax or assessment levied, assessed or imposed at any time by any governmental or quasi-governmental authority in connection with the receipt of income or rents from the Building to the extent that same shall be in lieu of all or a portion of any of the aforesaid taxes or assessments, or in lieu of additions or increases thereof, upon or against the Building.  As to special assessments which are payable over a period of time extending beyond the Term of this Lease, only a pro rata portion thereof, covering the portion of the Term of this Lease unexpired at the time of the imposition of such assessment, shall be included in "real estate taxes".  If, by law, any assessment may be paid in installments, then for the purposes hereof (A) such assessment shall be deemed to have been payable in the maximum number of installments permitted by law, and (B) there shall be included in real estate taxes, for each comparative year in which such installments may be paid, the installments of such assessment so becoming payable during such comparative year.

(v)     Where a "**Transition Assessment**" is imposed by the City of New York for any tax (fiscal) year, then the phrases "assessed value" and "assessments" shall mean the transition assessment for that tax (fiscal) year.

(vi)     The phrase "**Real Estate Taxes Payable During the Base Tax Year**" shall mean that amount obtained by multiplying the assessed value of the Property for the base tax year by the tax rate for the base tax year for each $100 of such assessed value.

(b)     In the event that the real estate taxes payable for any comparative year shall exceed the amount of the real estate taxes payable during the base tax year, Tenant shall pay to Owner, as Additional Rent for such comparative year, an amount equal to the Tax Percentage of the excess.

Initials: Landlord _____ Tenant __EBH__

(c)     Before or after the start of each comparative year, Owner shall furnish to Tenant a statement of the real estate taxes payable for such comparative year, and a statement of the real estate taxes payable during the base tax year (the "**Tax Statement**").  Any Additional Rent on account of real estate taxes pursuant to subsection (b) above shall be payable by Tenant to Owner within ten (10) days after receipt of the Tax Statement.  The benefit of any discount for any earlier payment or prepayment of real estate taxes shall accrue solely to the benefit of Owner, and such discount shall not be subtracted from the real estate taxes payable for any comparative year.

(d)     Should the real estate taxes payable during the base tax year be reduced or increased by final determination of legal proceedings, settlement or otherwise, then, the real estate taxes payable during the base tax year shall be correspondingly revised, the Additional Rent theretofore paid or payable hereunder for all comparative years shall be recomputed on the basis of such reduction, or increase, as the case may be, and Tenant shall pay to Owner as Additional Rent, within ten (10) days after being billed therefore, any deficiency between the amount of such Additional Rent as theretofore computed and the amount thereof due as the result of such recomputations, or, if applicable, the Tenant shall be entitled to a credit against the next month's rent for any overpayment, if the base tax year taxes are increased.

(e)     If, after Tenant shall have made a payment of Additional Rent under subsection (b), Owner shall receive a refund of any portion of the real estate taxes payable for any comparative year after the base tax year on which such payment of Additional Rent have been based, as a result of a reduction of such real estate taxes by final determination of legal proceedings, settlement or otherwise, Owner shall, at Owner's discretion, either (i) within twenty (20) days after receiving the refund, pay to Tenant the Tax Percentage of the refund of real estate taxes less such Tax Percentage of expenses (including reasonable attorneys', appraisers' and other professional fees) incurred by Owner in connection with any such application or proceeding (such net refund being hereinafter referred to as the "Net Refund") or (ii) credit Tenant such Net Refund against the next payment of Additional Rent on account of real estate taxes due under this Lease. If, prior to the payment of real estate taxes for any comparative year, Owner shall have obtained a reduction of that comparative year's assessed valuation of the Building and underlying land, and therefore of said taxes, then the Term "real estate taxes" for that comparative year shall be deemed to include the amount of Owner's expenses in obtaining such reduction in assessed valuation, including reasonable attorneys' and appraisers' and other professional fees, such reasonable expenses not to exceed the real estate tax savings.

(f)     The Tax Statement to be furnished by Owner as provided above, together with copies of real estate tax bills, shall constitute a final determination as between Owner and Tenant of the real estate taxes for the periods represented thereby absent manifest error.

(g)     In no event shall the Base Rent under this Lease (exclusive of the Additional Rents under this Article) be reduced by virtue of this Article.

(h)     Upon the date of any expiration or Termination of this Lease (except Termination because of Tenant's default) whether the same be the date hereinabove set forth for the expiration of the Term or any prior or subsequent date a proportionate share of said Additional Rent for the comparative year during which such expiration or Termination occurs shall immediately become due and payable by Tenant to Owner within ten (10) days after demand, if it was not theretofore already billed and paid.  The said proportionate share shall be based upon the length of time that this Lease shall have been in existence during such comparative year.  Owner shall promptly cause statements of said Additional Rent for that comparative year to be prepared and furnished to Tenant.  Owner and Tenant shall thereupon make appropriate adjustments of amounts then owing.  Likewise, if Owner shall be obligated to refund any sum to Tenant, then the proportionate share of such refund shall be made to Tenant within ten (10) days following such expiration or Termination.

(i)     Owner's and Tenant's obligations to make the adjustments referred to in subsection (e) above shall survive any expiration or Termination of this Lease.

-4-

Initials: Landlord _____ Tenant __EBH__

(j)      Any delay or failure of Owner in billing any tax escalation hereinabove provided shall not constitute a waiver of or in any way impair the continuing obligation of Tenant to pay such tax escalation hereunder.

(k)      If the Property shall become subject to the jurisdiction of a business improvement district or similar organization and said business improvement district shall be authorized by applicable law to levy assessments on the Property to be paid by the Owner, then Tenant shall pay as Additional Rent an amount equal to the amount of each such assessment times the Tax Percentage.

(l)      If the building size should increase after the expiration of the Free Rent Period, the Tax Percentage under this Lease shall be proportionately adjusted.

(m)      Notwithstanding the foregoing, Real Estate Taxes shall not include:

(i)      any inheritance, estate, succession transfer, gift, franchise, or capital stock tax;

(ii)      any income taxes arising out of or related to ownership and operation of income-producing real estate; or

(iii)      any excise taxes imposed upon Owner based upon gross or net rentals or other income received by it.

42.      <u>Utilities</u>.  Landlord shall not provide any utilities or services of any kind with respect to the Premises; except, however, Landlord shall cooperate in a commercially reasonable manner with any utility or service provider in furnishing said service onto the Premises.

A.      <u>Electricity</u>.  (a)  If an electric meter does not currently exist to service the Premises exclusively, Tenant, subject to the terms and provisions of this Lease, shall furnish and install the same at Tenant's sole cost and expense.  Tenant shall arrange for and obtain electric energy for all of Tenant's electrical needs in or with respect to the Premises directly from Consolidated Edison Company of New York Inc. (**"Con-Ed"**) or other reputable utility provider furnishing electric service to the Building and shall promptly pay, directly to Con-Ed or such other provider, when due, all amounts and charges therefor (including the cost of reading any meter as well as all usage costs, surcharges and taxes); and Landlord shall have no obligation to provide electric current to the Premises except to cooperate if required.  Tenant shall at all times comply with all rules and regulations of such public utility, to the extent the same are applicable to Tenant's use of electric energy. Tenant covenants that at no time shall the use of electrical energy in the Premises exceed the capacity of the existing feeders to the Building or the risers and wiring installations then serving the Premises.  In furtherance of the foregoing and to avert possible adverse effects upon the Building electrical system, Tenant shall not connect any electrical equipment to the Building electrical system that exceeds the capacity of the Building to provide same.

(b)      Tenant, at its expense, shall maintain in good working order and condition said meter and all electrical boxes, circuit panels, equipment, feeders and wiring serving the Premises (collectively, "**electric equipment**") and shall maintain and repair (or permit such public utility to maintain and repair) the same at Tenant's sole cost and expense, in default of which and after 15 days written notice to cure, Landlord may cause such meter and electric equipment to be repaired or replaced and collect from Tenant, as Additional Rent payable upon demand, the full cost thereof and interest thereon at the rate of interest set forth in Article 75 hereof.  If the meter and electric equipment presently exclusively serving or to be installed at the Premises are not adequate for Tenant's requirements, any additional or replacement electric equipment required by Tenant shall be installed by Tenant, in accordance with and subject to the provisions of this Lease, at its sole cost and expense.  Tenant shall not make or perform or permit the making or performing of any alterations to wiring installations or other electrical facilities in or serving the Premises without the prior consent of Landlord, which consent shall not be unreasonably withheld, in each instance.

(c)      Nothing herein shall be deemed an assurance of the continued availability of sufficient current to the Premises or that the quantity or type of current is adequate for Tenant's use.  Landlord shall not be liable in any way to Tenant for any failure or defect in the supply or

-5-

character of electric energy furnished to the Premises by reason of any requirement, act or omission of the public utility serving the Building with electricity.

B.    <u>Water</u>.  Tenant shall be responsible for the installation of a water meter, Tenant shall secure its own account for water consumption with the City of New York and promptly pay, when due, all amounts and charges therefor, and Landlord shall have no obligation to provide water to the Premises. Tenant shall provide Landlord with copies of all water bills and proof of payment within twenty (20) days of receipt of bills.  If Tenant is unable to establish its own account for water consumption with the City of New York, Landlord shall furnish and install a submeter to measure water consumption at the Premises at Tenant's sole cost and expense. Landlord shall cause such submeter to be read no less frequently than quarterly and Tenant shall pay to Landlord, as Additional Rent, the amount due pursuant to such submeter reading plus the cost of such reading within ten (10) days of demand. Tenant shall install its own, separate hot water heater and shall, at Tenant's sole cost and expense, maintain, repair and make all replacements thereto as and when necessary.  Tenant shall pay and be solely responsible for the full cost of heating such water as well as of piping and supplying such water to the Premises together with any and all utility costs and/or other charges in connection therewith. Landlord shall be responsible for maintaining all plumbing in the Building in good working order. Tenant shall be responsible for maintaining all plumbing in the Premises in good working order.

C.    <u>Gas Service</u>.  If a gas meter does not currently exist to service the Premises exclusively, Tenant shall install the same at Tenant's sole cost and expense.  Tenant shall arrange for and obtain gas service for all of Tenant's gas needs in or with respect to the Premises directly from Con-Ed or other reputable utility provider serving the Building and shall promptly pay to Con-Ed, or such other provider, when due, all amounts and charges therefor, and Landlord shall have no obligation to provide gas to the Premises. Tenant shall keep said meter and any equipment related thereto in good working order and repair at Tenant's sole cost and expense, in default of which and after 15 days written notice to cure, Landlord may cause such meter to be repaired or replaced and collect from Tenant, as Additional Rent payable upon demand, the full cost thereof and interest thereon at the rate of interest set forth in Article 75 hereof.  If the gas line, if any, presently serving the Premises is not adequate for Tenant's requirements, any additional, new or replacement gas line or equipment required by Tenant shall be installed by Tenant, in accordance with and subject to the provisions of this Lease, at its sole cost and expense.  Tenant shall be responsible for maintaining all gas in the Premises in good working order. Nothing herein shall be deemed an assurance of the availability of gas service to the Premises or the continued availability of sufficient gas to the Premises or that the quantity or type of gas service is adequate for Tenant's use.  Tenant shall at all times comply with all rules and regulations of such public utility, to the extent the same are applicable to Tenant's use of gas in the Premises.  Tenant shall not make or perform or permit the making or performing of any alterations to the gas lines or other facilities and equipment in or serving the Premises without the prior consent of Landlord, which consent shall not be unreasonably withheld, in each instance.

D.    Tenant shall at all times during the Term be responsible for the maintenance, repair and/or replacement of all plumbing lines, electrical lines and equipment, and gas lines, if any, which exclusively service the Premises, in default of which and after 15 days written notice to cure, Landlord may cause the same to be performed and collect from Tenant, as Additional Rent payable upon demand, the cost thereof and interest thereon at the rate of interest set forth in Article 75 hereof.  Notwithstanding the foregoing, if, in Landlord's commercially reasonable judgment, Tenant's electrical and/or gas requirements necessitate installation of any additional feeders, risers or other necessary equipment, the same shall be installed by Tenant at the sole cost and expense of Tenant in default in which and after 15 days written notice to cure, Landlord may cause same to be performed and collected from Tenant as Additional Rent payable upon demand, the cost thereof and interest thereon at the rate of interest set forth in Article 75 herein.

E.    Landlord shall have no responsibility or liability for interruption, curtailment or failure to supply or the furnishing of such service or utility when prevented by strikes, labor troubles or accidents or by any cause whatsoever beyond Landlord's control, or by failure of independent contractors, contractors of other tenants or otherwise to perform, or by laws, orders, rules or regulations of any federal, state, county or municipal authority, or by failure of suitable supply, or by reason of governmental preemption in connection with a national emergency or by

-6-

reason of the conditions of supply and demand which have been or are affected by war or other emergency. Except as otherwise stated herein, Landlord shall have no liability to Tenant for any loss, damage or expense which Tenant may sustain or incur by reason of any change, failure, inadequacy or defect in the supply or character of the electrical energy, gas, water and/or any other service or utility furnished to the Premises or if the quantity or character of any such utility or service is no longer available or suitable for Tenant's requirements, except for any actual damage suffered by reason of Landlord's gross negligence or willful misconduct.

43.     HVAC.  A.  Notwithstanding the provisions of this Lease, Landlord shall not furnish any heat, ventilation or air-conditioning to the Premises and shall have no obligation, responsibility or liability whatsoever with respect to same.  Tenant acknowledges that Landlord is not required to furnish any such services at, for or to the Premises.

        B.      Tenant shall, at its sole cost and expense, install, maintain, and repair the separate heating, ventilation and/or air-conditioning system (together with all equipment appurtenant thereto and components thereof hereinafter collectively referred to as the "**HVAC System**") Tenant, at its sole cost and expense, shall obtain and keep in full force and effect at all times during the Term a service contract with a reputable HVAC firm approved by Landlord (approval shall not be unreasonably withheld) to maintain and make all repairs required to maintain the HVAC System and any exhaust systems and components thereof located in the Premises or otherwise servicing such system. Tenant shall deliver to Landlord a duplicate copy of each such service contract within ten (10) days of obtaining same, and shall renew each such contract, and deliver a duplicate copy of such renewal to Landlord, no later than ten (10) days prior to the expiration of the term of each contract.  If Tenant shall fail to obtain or maintain the service contracts required pursuant to this Article after 15 days written notice to cure, Landlord may obtain and maintain the same, and the full cost thereof shall be payable by Tenant upon demand as Additional Rent together with interest thereon at the rate set forth in Article 75 hereof.  Tenant shall be required to pay for any and all electricity and other utilities required for the operation of such HVAC System exclusively servicing the Premises.

        C.      [Intentionally Omitted]

        D.      Tenant covenants and agrees that any and all HVAC Systems presently existing and/or hereinafter installed in or at the Premises are and shall at all times remain the property of Landlord and, at the expiration or sooner termination of this Lease, the same shall be surrendered with the Premises to Landlord in good working condition (subject to normal wear and tear).

        E.      No diminution or abatement of Fixed Annual Rent or Additional Rent or other compensation or claim of constructive eviction shall or will be claimed by Tenant as a result of any interruption, suspension, or curtailment of the HVAC System, nor shall this Lease or any of the obligations of Tenant be affected or reduced by reason of such interruption, suspension, or curtailment.

        F.      Tenant covenants and agrees that any and all HVAC Systems installed in or at the Premises by Tenant or by its agents, servants, employees, or contractors, shall at all times comply with all laws, statutes, and ordinances (including building codes and zoning regulations and ordinances) and the orders, rules, regulations, directives, and requirements of all federal, state, local, county, city, and borough departments, bureaus, boards, agencies, offices, commissions, and other subdivisions thereof, or of any official thereof, or of any other governmental public or quasi-public authority, whether now or hereafter in force, which may be applicable to the Building or the Premises or any part thereof.

        G.      Tenant shall make no alterations, additions, or other changes to the HVAC System, including, without limitation, the ducts and vents, nor shall Tenant install or permit to be installed any supplemental air conditioning units or exhaust vents in the Premises, without first obtaining Landlord's written consent which shall not be unreasonably withheld in each instance in accordance with the provisions of this Lease (including, without limitation, Articles 3 and 44 hereof).

-7-

Initials: Landlord _____ Tenant __EBH__

44.    Delivery of the Demised Premises and Tenant's Alterations

A.    Condition and Acceptance. Tenant acknowledges that neither Landlord nor any agent, representative or employee of Landlord has made any representation or warranty whatsoever with respect to the Premises except as may be expressly set forth herein. Tenant agrees to accept the Premises "as is" in their condition on the Commencement Date. Landlord shall have no obligation to make any alterations, improvements, or decorations to the Premises in order to prepare the Premises for Tenant's occupancy and as otherwise stated on Exhibit "A." The taking of possession of the whole or any part of the Premises by Tenant shall be conclusive evidence that Tenant accepts possession of the Premises and that the Premises and the Building were in good and satisfactory condition at that time. Tenant does hereby acknowledge that no representations have been made by Landlord or anyone acting on behalf of Landlord as to the amount of square footage in the Premises. Tenant has inspected the Premises and relies upon its own judgment in computing the square footage.

B.    [Intentionally Omitted]

C.    [Intentionally Omitted]

D.    [Intentionally Omitted]

E.    Tenant's Initial Work and Alterations.

1.    Any work, alterations, decorations, installations, additions, improvements, or other physical changes to be performed in or at the Premises by or on behalf of Tenant in connection with Tenant's use or occupancy of the Premises or otherwise shall be hereinafter referred to as the "**Tenant's Initial Work.**" Tenant's Initial Work shall include all work necessary to render the Premises suitable for Tenant's use as set forth in Exhibit "B" attached hereto and made a part hereof. Tenant shall promptly cause Tenant's Initial Work to be performed in a first-class manner by licensed and insured contractors reasonably approved in advance by Landlord in writing in compliance with all rules and regulations issued by the City of New York and all applicable requirements of governmental agencies having jurisdiction over the Building and in conformity with plans and specifications therefor to be submitted to the DOB and the provisions of Articles 3 and 44(E) hereof.  Tenant's Initial Work and any subsequent work, alterations, installations, additions, improvements, or other physical changes in or at the Premises (hereinafter, "**Alterations**") shall be performed only between the hours of 8:00 a.m. and 5:00 p.m. Monday through Friday, unless otherwise required by local law or regulation, and subject to local laws and ordinances, and shall be promptly commenced and expeditiously completed and shall be performed in such manner as not to unreasonably disturb other tenants in or occupants of the Building or interfere with, delay, or impose any additional expense upon Landlord in the maintenance or operation of the Building. Tenant shall commence the performance of Tenant's Initial Work as soon as practicable after the Commencement Date and after Landlord has approved Tenant's Plans (as hereinafter defined) and Tenant has obtained all required permits and shall use best efforts to prosecute Tenant's Initial Work to completion in order to enable Tenant to be fully open for business in the Premises as soon as possible. Failure to perform the initial work shall be deemed a material default and shall allow Landlord to exercise any remedy for default contained herein. It is expressly acknowledged and agreed that any and all costs and expenses incurred in connection with Tenant's Initial Work and the plans and approvals thereof are to be borne solely by Tenant. ~~Tenant, in performing Tenant's Initial Work, shall not interfere with Base Building Work being performed by Landlord.~~

2.    Supplementing the provisions of Article 3 hereof, prior to making any structural, mechanical, or electrical Alterations, and prior to commencing any Tenant's Initial Work, Tenant shall (i) submit to Landlord and shall obtain Landlord's written approval, such approval shall not be unreasonably withheld or delayed, of detailed plans and specifications including layout, architectural, mechanical, electrical, and structural drawings and facade rendering ("**Tenant's Plans**") for each proposed Alteration, as applicable, and if such Alterations require a filing with governmental authority or require the consent of such governmental authority, then such plans and specifications shall be prepared and certified by a registered architect or licensed engineer, to the extent necessary for such governmental filing or consent, (ii) supply such

-8-

Initials: Landlord _____ Tenant **EBH**

additional information regarding the Alteration as Landlord shall reasonably request, (iii) at Tenant's expense, obtain and deliver to Landlord true copies of all permits, approvals, and certificates required by any governmental authorities upon request, and (iv) furnish to Landlord an endorsement of Tenant's and Tenant's contractor's policy of comprehensive general liability insurance in such form, with such companies and in such amounts as referred to in Article 45 of this Lease, covering the risk during the course of performance of such Tenant's work (including, without limitation, Tenant's Initial Work), together with proof of payment of such policies and endorsements, which policies as endorsed shall protect Landlord and Landlord's managing agent ("**Managing Agent**"), if any, in the same amounts against any claims or liability arising out of such Tenant's work, and Tenant and Tenant's contractors shall obtain workers' compensation insurance to cover all persons engaged in such Tenant's work and liability insurance covering all Tenant's work in the Premises with such limits as referred to in Article 45 of this Lease, and a certificate thereof shall be furnished to Landlord at least five (5) business days prior to the commencement of any work by any contractor, subcontractor, their agents, servants, or employees. Tenant's and Tenant's contractor's policies shall name Landlord, Managing Agent and such others as Landlord shall reasonably designate from time to time as additional insureds under said insurance policies. Upon completion of any Alteration, Tenant, at Tenant's sole cost and expense, shall promptly obtain all certificates of final approval of such Alteration as may be required by any governmental agency and shall promptly furnish to Landlord copies thereof upon request, together with the "as-built" plans and specifications for all such Alterations.

        3.      Except as otherwise provided in this Article, Tenant shall not make any Alterations without Landlord's prior consent in each instance, such consent shall not be unreasonably withheld or delayed.  Landlord's consent shall not be required for any Alterations that are (i) decorative or cosmetic Alterations such as painting, wall coverings and floor coverings or the installation of movable fixtures and equipment or other non-structural Alterations which shall not affect any Building system(s) and which shall not require a building permit or other approval from any governmental agency (hereinafter referred to as "**Decorative Changes**"), or (ii) are not Material Alterations and do not for any one project cost in excess of  Thirty Thousand Dollars ($30,000.00) (the "**Alteration Threshold**"), provided that with respect to any such Alteration, such Alteration complies with all Legal Requirements.  For purposes of this Article, "**Material Alterations**" means Alterations which would (i) affect any part of the Building outside of the Premises (including the outside appearance of the Building) or the structural integrity of the Building, including the structural elements of the walls, floors, ceiling or columns of the Building, (ii) physically affect any components of the exterior of the Building, (iii) adversely affect any of the mechanical, electrical, sanitary, or other service systems of the Building, (iv) adversely affect the provision of services to other Building tenants, (v) include work which requires the removal of a portion of the floor slab in any portion of the Premises, or access to, or penetration of the floor slab adjacent to, any space occupied by any other tenant or occupant of the Building, (vi) require filing of any plans with any governmental agency or department, or (vii) affect the certificate of occupancy issued for the Building or the Premises (or would require the issuance of a certificate of occupancy, if none).  Landlord's consent shall not be unreasonably withheld, conditioned or delayed with respect to Alterations that constitute Material Alterations, the hard and soft costs of which do not exceed the Alteration Threshold.  With respect to Alterations that require that a governmental permit be filed in connection therewith, Tenant shall submit any such filing to Landlord prior to such filing with the appropriate governmental authority.  Landlord agrees to reasonably cooperate with Tenant, at Tenant's sole cost and expense, in connection with the event that Landlord is required by any governmental agency to be the applicant for the approval by such agency of any permit or approval. Landlord may withhold consent to any alteration which would require the issuance of a new certificate of occupancy for the Building.

        4.      Tenant shall inform Landlord in writing of the names of any contractor and/or subcontractors Tenant proposes to use in the Premises at least five (5) business days prior to the commencement of work by such contractor and/or subcontractors.

        5.      If Tenant intends to perform Alterations for which Tenant believes Landlord's consent is not required hereunder, Tenant shall be required to give Landlord prior notice of such intention and belief and reasonable information concerning the nature of such proposed Alterations, and Tenant shall be permitted to perform such Alterations so long as Tenant otherwise complies with the requirements, terms and provisions of this Lease.

-9-

6.      No approval of any Tenant's Plans by Landlord or consent by Landlord to any Tenant's Initial Work or any other Alteration or any inspection of Tenant's Initial Work or any other work, improvement, alteration, renovation, decoration, or the plans therefor made by or for Landlord shall in any way be deemed to be an agreement by Landlord that the contemplated improvements comply with any Legal Requirements (as hereinafter defined) and/or any insurance requirements; nor shall such approval or consent be deemed to be a waiver by Landlord, Landlord's architects, attorneys, or engineers of the compliance by Tenant with any provision of this Lease.

7.      Tenant shall pay to Landlord, as Additional Rent hereunder, all reasonable costs incurred by Landlord in connection with the review of any request for consent to Alterations by Landlord's architects or engineers.

45.     Insurance.

A.      Tenant shall obtain, and shall keep in full force and effect during the Term of this Lease, at its own cost and expense, the following policies of insurance:

(1)      commercial general liability insurance, including a broad form contractual indemnity endorsement, with a limit in an amount not less than TWO MILLION AND 00/100 ($2,000,000.00) DOLLARS combined single limit for bodily injury and property damage liability in any one occurrence per and umbrella liability coverage in the minimum amount of TWO MILLION ($2,000,000.00) Dollars per occurrence;

(2)      fire and extended coverage on an "all-risk" basis, on the contents of the Premises, including, but not limited to, all personal property, inventory, equipment, furnishings, furniture and trade fixtures installed therein by Tenant, with a limit in an amount not less than the full "replacement cost" thereof with a deductible of not more than Ten Thousand and 00/100 ($10,000.00) Dollars;

(3)      "betterments and improvements" coverage on any and all changes, improvements, alterations, betterments and installations made or paid for by Tenant in or to the Premises, with a limit in an amount not less than the full "replacement cost" thereof with a deductible of not more than Ten Thousand and 00/100 ($10,000.00) Dollars;

(4)      workers' compensation insurance at statutory limits, and otherwise in accordance with all applicable laws;

(5)      if at any time any alcoholic beverage, wine, beer, or liquor is to be sold, distributed, served and/or consumed in, at or from the Premises, liquor liability insurance in an amount not less than ONE MILLION AND 00/100 ($1,000,000.00) DOLLARS, written on a combined single limit per occurrence basis, so as to protect Landlord from all claims arising from or in connection with the sale, distribution, service and/or consumption of alcoholic beverages; and

(6)      such other insurance and in such reasonable amounts as may, from time to time, be reasonably required by Landlord, or any fee owners or lessors under any ground or underlying leases, or the holder or holders of any mortgages to which this Lease is or shall be subordinate (but only if such other insurance is of a type which is then generally required of similarly-situated tenants in comparable buildings in the vicinity of the Building).

All policies of insurance provided for in this Article 45 shall: (i) be written by one or more good and solvent insurance companies of recognized standing admitted to do business in the State of New York, rated by A.M. Best Co., Inc., or any successor thereto (or if there be none, an organization having a national reputation) as having a "Best's Rating" of at least "A" and a financial size of at least "Class XIII"; (ii) be written without the inclusion of any defense costs within the limit of liability and without aggregation of other premises with the Premises; (iii) under no circumstances be considered anything other than primary insurance; (iv) name Landlord, Managing Agent, any fee owners, mortgagees, or lessors under any ground or underlying leases, and such others as Landlord shall designate from time to time as having an interest in the Building, as additional insureds and shall insure against any and all claims for bodily injury (including death), personal injury, or property damage occurring in, on, upon, adjacent to, about or connected

-10-

with or arising out of the maintenance, use or occupancy of the Premises or any part thereof; and (v) contain a provision that no act or omission of Tenant shall affect or limit the obligation of the insurer to pay the amount of any loss sustained.

B.  Tenant shall deliver to Landlord an Acord Form 25-S (Certificate of Insurance) and an Acord Form 28 (Evidence of Property Insurance), each in form and substance satisfactory to Landlord, together with any endorsements thereto, on or before ~~the fifteenth day following~~ the Commencement Date and at least fifteen (15) days prior to the expiration of any expiring policy. The complete policy is to be provided to Landlord within thirty (30) days. Such insurance policies or certificates shall contain a provision that no act or omission of Tenant will affect or limit the obligation of the insurance company to pay the amount of any loss sustained and that the insurance afforded thereunder shall not be cancelled or coverage thereunder reduced except upon thirty (30) days' prior written notice to Landlord. Any certificate delivered to Landlord shall also specifically reflect coverage of Tenant's aforementioned indemnification obligation.

C.  Tenant shall not violate or permit to be violated any of the conditions or provisions of any such policies, and Tenant shall so perform and satisfy the requirements of the companies writing such policies so that, at all times, companies of good standing, satisfactory to Landlord or any mortgagees designated by Landlord, shall be willing to write and/or continue such insurance.

D.  Tenant and Landlord shall reasonably cooperate in connection with the collection of any insurance monies that may be due in the event of loss, and Tenant shall execute and deliver to Landlord such proofs of loss and other instruments which may be reasonably required for the purpose of obtaining the recovery of any such insurance monies.

E.  In the event of Tenant's failure to comply with the provisions of this Article 45 after fifteen (15) days written notice to cure, Landlord may, but shall not be obligated to, cause the same to be done for Tenant's account and the cost thereof shall be deemed payable to Landlord by Tenant on demand as Additional Rent without set-off or deduction. Supplementing the foregoing, but not in limitation thereof, Landlord may recover from Tenant, and Tenant agrees to pay, any and all reasonable damages which Landlord may sustain by reason of Tenant's failure to obtain and keep in force any insurance which Tenant is required to obtain and keep in force under this Article 45 and this Lease (it being understood and agreed by Tenant that the damages of Landlord shall not be limited to the amount of the premiums thereon).

F.  Tenant hereby releases Landlord with respect to any claim (excluding a claim directly or indirectly arising from the gross negligence or intentional acts of Landlord, its officers, agents, employees, or contractors) which it might otherwise have against Landlord, for loss, damage, or destruction with respect to its property occurring during the Term. Nothing contained in this Article shall be deemed to relieve either party of any duty imposed elsewhere in this Lease to repair, restore, or rebuild, if any. The provisions of this Article 45(F) shall also apply to each permitted assignee, if any, and each permitted subtenant, if any, at any time occupying the Premises, or any part thereof.

G.  Tenant hereby releases Landlord, and its respective officers, directors, shareholders, partners, members, managers, agents, and employees with respect to any claim which Tenant might otherwise have against any of them for loss, damage or destruction with respect to Tenant's property (including rental value or business interruption) occurring during the Term, unless caused by the gross negligence or willful misconduct of Landlord, its officers, agents, employees, or contractors.

H.  Tenant understands and agrees that Landlord will not provide any insurance coverage on the contents of the Premises, and Landlord will not be obligated to carry insurance of any kind, on any personal property in, on or about the Premises (regardless of whether such property shall be owned by Tenant) including, but not limited to, Tenant's goods, supplies, furnishings, furniture, fixtures, equipment, improvements, betterments, installations, or appurtenances. Landlord shall be required to carry all risk insurance coverage for full replacement value of the Building and general liability insurance on the Building at levels commonly carried on other buildings in the immediate metropolitan area.

46.  <u>Indemnification of Landlord</u>.

Initials: Landlord \_\_\_\_\_ Tenant <u>EBH</u>

A.     Neither Landlord, Managing Agent, any Superior Lessor, or any Superior Mortgagee (in each case, as herein after defined), nor any partner, director, officer, shareholder, principal, agent, servant, or employee of Landlord, Managing Agent, any Superior Lessor, or any Superior Mortgagee (in any case whether disclosed or undisclosed), shall be liable to Tenant for any loss, injury, or damage to Tenant or to any other person, or to its or their property, irrespective of the cause of such injury, damage, or loss, nor shall the aforesaid parties be liable for any damage to property of Tenant or of others, nor for loss of or damage to any such property by theft or otherwise*; provided, however,* that subject to the provisions of Article 48 hereof, nothing contained in this Article 46 shall be construed to exculpate Landlord for loss, injury, or damage to the extent caused by or resulting directly or indirectly from the gross negligence or willful misconduct of Landlord or Managing Agent, their agents, servants, and/or employees in the operation or maintenance of the Premises or the Property.  Further, neither Landlord, Managing Agent, any Superior Lessor, or any Superior Mortgagee, nor any partner, director, officer, principal, shareholder, agent, servant, or employee of any of them, shall be liable (a) for any such damage caused by other tenants or persons in, upon or about the Building or the Property, or caused by operations in construction of any private, public, or quasi-public work.

B.     Tenant shall indemnify and hold harmless Landlord, Managing Agent, and all Superior Lessors and Superior Mortgagees, and its and their respective partners, directors, officers, principals, shareholders, agents, and employees from and against any and all liabilities and/or claims of any nature arising from or in connection with (a) any act, omission, or negligence of Tenant or any of its subtenants or licensees or its or their partners, directors, principals, shareholders, officers, agents, employees, or contractors; (b) any accident  injury, (except to the extent caused by Landlord's gross negligence or willful misconduct or the gross negligence or willful misconduct of Landlord's agents, employees, or contractors) occurring in, at, or upon the Premises; and (c) any breach or default by Tenant in the full and prompt payment and performance of Tenant's obligations under this Lease; together with all reasonable costs, expenses, and liabilities incurred in or in connection with each such claim or action or proceeding brought thereon, including without limitation all reasonable attorneys' fees and expenses.  In case any action or proceeding is brought against Landlord, Managing Agent, and/or any superior Lessor or Superior Mortgagee and/or its or their partners, directors, officers, principals, shareholders, agents, and/or employees by reason of any claim for which Tenant is required hereunder to indemnify and hold Landlord harmless, Tenant, upon notice from Landlord, Managing Agent, or such Superior Lessor or Superior Mortgagee, shall resist and defend such action or proceeding (by counsel reasonably satisfactory to Landlord).  The provisions of this Article 46 shall survive the expiration or termination of this Lease.

47.     Late Charges.  In every case in which Tenant is required by the terms of this Lease to pay to Landlord a sum of money and full payment is not made within ten (10) days after the same becomes due, Tenant shall pay, as Additional Rent, a late charge equal to five (5%) percent of such sum.  Notwithstanding the imposition of such charges, Tenant shall be in default under this Lease if any payment required to be made by Tenant is not made in full within ten (10) days after the same becomes due.

48.     Liability of Landlord.  Tenant shall look only to Landlord's estate and property in the Land and the Building for the satisfaction of Tenant's remedies, for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord in the event of any default by Landlord hereunder, and no other property or assets of Landlord or its partners, officers, directors, shareholders, or principals, disclosed or undisclosed, shall be subject to levy, execution, or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease, the relationship of Landlord and Tenant hereunder, or Tenant's use or occupancy of the Premises.

49.     Additional Default Provisions; End of Term.  Should Tenant remain in possession of the Premises after the Expiration Date, then, regardless of whether or not Landlord accepts rent from Tenant for a period beyond the Expiration Date, the parties hereby agree that Tenant's occupancy of the Premises after the Expiration Date shall be as an unpermitted holdover tenant, which holdover tenancy shall be upon all of the terms set forth in this Lease except those that are inapplicable by their nature and except that Tenant shall pay to Landlord on the first day of each month of the holdover period as liquidated damages, for each month or portion of a month during which Tenant holds over in the Premises after the Expiration Date, a sum equal to two (2) times

Initials: Landlord _____ Tenant __EBH__

of one-twelfth (1/12th) of the sum of the Fixed Annual Rent and Additional Rent payable by Tenant during the last year of the Term of this Lease ("Holdover Rent") (*i.e.*, the year immediately prior to the holdover period). Tenant recognizes and agrees that the damage to Landlord resulting from any failure by Tenant to timely surrender the Premises upon the Expiration Date will be substantial, will exceed the amount of Fixed Annual Rent and Additional Rent theretofore payable hereunder, and will be impossible to accurately measure; accordingly, the aforesaid liquidated damages is agreed by each of the parties to be a reasonable approximation thereof. Further, it is agreed that Landlord shall not be required to perform any work, or furnish any materials within the Premises during the holdover period. It is further stipulated and agreed that if Landlord shall, at any time after the expiration of the original Term or after the expiration of any term created thereafter, proceed to remove Tenant from the Premises as a holdover, the Fixed Annual Rent for the use and occupancy of the Premises during any holdover period shall be calculated in the same manner as set forth above. Nothing herein contained shall be deemed to permit Tenant to retain possession of the Premises after the Expiration Date or to limit in any manner Landlord's right to regain possession of the Premises through summary proceedings, by force, or otherwise, and no acceptance by Landlord of payments from Tenant after the Expiration Date shall be deemed to be other than on account of the amount to be paid by Tenant in accordance with the provisions of this Article 49 or preclude Landlord from recovering possession by means of peaceable self-help or from commencing and prosecuting a holdover or summary eviction proceeding, and the preceding sentence shall be deemed to be an "agreement expressly providing otherwise" within the meaning of Section 232-c of the Real Property Law of the State of New York. Tenant agrees to indemnify and save Landlord harmless from all costs, claims, losses, or liability resulting from delay by Tenant in surrendering the Premises, including, without limitation, any claims made by any succeeding owner and/or succeeding tenant founded on such delay. Notwithstanding the foregoing, in the event the Landlord and Tenant are negotiating in good faith an extension of this Lease, Tenant shall not be obligated to pay the Holdover Rent until five (5) business days after written notice is provided to Tenant that negotiations have ended.

50.     <u>Brokerage</u>.  Tenant covenants, warrants, and represents that no broker was instrumental in bringing about or consummating this Lease and that Tenant had no conversations or negotiations with any broker other than Meridian Capital Group, LLC and Silverline Realty Group NY LLC (collectively "Broker") concerning the leasing of the Premises. Tenant agrees to indemnify and hold harmless Landlord against and from any claims for any brokerage commissions and all costs, expenses and liabilities in connection therewith, including without limitation reasonable attorneys' fees and expenses, arising out of any conversations or negotiations had by Tenant with any broker aside from Broker. Landlord shall pay Broker pursuant to separate agreement. The provisions of this Article 50 shall survive the expiration or sooner termination of this Lease.

51.     <u>Miscellaneous</u>.

        A.      In the event the use of any contractor, subcontractor, mechanic, laborer, or materials (whether or not approved by Landlord) creates any difficulty, work slowdown, sabotage, strike, picketing, or jurisdictional dispute with other contractors, subcontractors, mechanics, and/or laborers engaged by Tenant or Landlord or others, or in any way disturbs the peaceful and harmonious construction, maintenance, cleaning, repair, management, security, or operation of the Building or any part thereof or in any other building owned by Landlord (or an affiliate of Landlord or co-venturer of Landlord), Tenant shall, following Landlord's written demand, immediately cease using such contractor, subcontractor, mechanic, laborer, or materials and cause such contractor, subcontractor, mechanic, laborer, or materials to leave or be removed from the Building immediately. Tenant does hereby agree to defend, save and hold Landlord harmless from any and all loss, including, without limitation, any reasonable attorneys' fees and disbursements for any claims made by any of Tenant's contractors, subcontractors, mechanics, and/or laborers so precluded from having access to the Building.

        B.      If more than one person executes this Lease as Tenant, the obligations of each of them under this Lease are and shall be joint and several, and the term **"Tenant"** as used in this Lease shall mean and include each of them jointly and severally, and the act of or notice from, or notice or refund to, or the signature of any one or more of them with respect to the tenancy of this Lease, including, but not limited to, any renewal, extension, expiration, termination, or modification of this Lease, shall be binding upon each and all of the persons executing this Lease as Tenant with

-13-

the same force and effect as if each and all of the persons executing this Lease had so acted or so given or received such notice or refund or so signed.

C.    This Lease may not be extended, renewed, terminated, or otherwise modified except by an instrument in writing signed by the party against whom enforcement of any such modification is sought.

D.    Supplementing Article 16 hereof, the amount of all reasonable attorneys' fees, costs and disbursements incurred by Landlord in connection with any bankruptcy or similar proceeding relating to Tenant shall be Additional Rent, payable within ten (10) business days after demand therefor by Landlord.

E.    Supplementing Article 4 hereof, Landlord shall maintain and repair (1) the structural portions of the Premises and the Building, excluding doors, storefronts, stairs from sidewalk hatch to basement, skylights, and the floors of the Premises; and (2) all plumbing, electrical, and gas systems in the Building which service portions of the Building other than the Premises. Tenant shall be responsible for all non-structural repairs, maintenance, and replacements to the interior of the Premises, ordinary and extraordinary, foreseen or unforeseen, in and to the Premises (including without limitation, all glass, including, without limitation, any plate glass). All repairs to the structural portions of the Premises and all repairs (whether structural or non-structural) to the Building as shall be required by reason of (i) the performance of any work to the Premises by or on behalf of Tenant, regardless of the fact that such work may have been approved by Landlord, (ii) the installation or moving of any property of Tenant's or of any property being delivered to or by Tenant in or out of the Building, or (iii) acts, omissions, misuses, or neglect by Tenant or any of its subtenants or assignees or its or their employees, agents, invitees, contractors, customers, or guests, shall be the responsibility of Tenant.

F.    This Lease is offered to Tenant for signature with the understanding that it shall not be binding upon Landlord unless and until Landlord shall have executed and unconditionally delivered to Tenant a fully executed copy of this Lease.

G.    Supplementing Article 9 hereof and except as otherwise stated in the Lease, Landlord shall not be obligated to commence any repairs or restorations to the Premises or the Building as may be required hereunder unless and until Landlord has received the proceeds of all applicable insurance policies. Landlord shall notify Tenant within ten business days of their receipt of such insurance proceeds.  In the event the insurance proceeds received by Landlord are sufficient to repair the damages resulting from a casualty, Landlord agrees to commence those repairs in a commercially reasonable manner.   Landlord shall not be required to repair or replace any alterations or betterments within the Premises (which shall be promptly and with due diligence repaired and restored by Tenant at Tenant's sole cost and expense) or any furniture, equipment, trade fixtures or personal property of Tenant or others in the Premises or the Building, and Landlord's obligation to repair or restore the structural portions of the Premises shall be limited to the extent of the insurance proceeds actually received by Landlord for the casualty in question. If the Premises are damaged by casualty, Fixed Annual Rent and Additional Rent for the portion of the Premises rendered untenantable by the damage shall be abated on a reasonable basis from the date of damage until the completion of Landlord's repairs and the tendering of the Premises for Tenant's occupancy (or until the date of termination of this Lease by Landlord or Tenant as provided in this Lease), unless Tenant, any assignee claiming by, through or under Tenant, any subtenant claiming by, through or under Tenant or any of their respective agents, contractors, employees, licensees, guests or invitees caused such damage, in which case, Tenant shall continue to pay Rent without abatement.

H.    Tenant acknowledges that the Building contains, and the Premises are located adjacent to, residential units.  Tenant covenants and agrees that it shall not create a nuisance or adversely interfere with the privacy or habitability of residential tenants and other tenants or occupants of the Building.

I.    If Tenant signs this Lease as a corporation, limited liability company, limited liability partnership, limited partnership, or partnership, each of the persons executing this Lease

-14-

Initials: Landlord _____ Tenant __EBH__

on behalf of Tenant warrants to Landlord that Tenant is a duly incorporated or authorized and validly existing entity, that Tenant is in good standing and qualified to do business in the State of New York, that Tenant has full right and authority to enter into this Lease, and that each and every person signing on behalf of Tenant is authorized to do so. Upon Landlord's request, Tenant will provide evidence reasonably satisfactory to Landlord confirming these representations.

J.      Tenant expressly acknowledges and agrees that Landlord and Landlord's agents have not made and are not making, and Tenant, in executing and delivering this Lease, is not relying upon, any warranties, representations, promises, or statements with respect to the Property or the Premises, except to the extent that the same are expressly set forth in this Lease.  Tenant shall accept possession of the Premises, including, without limitation, any and all fixtures, systems, equipment and appurtenances therein or servicing the same to the extent the same exist, in their "AS IS", "WHERE IS" condition, "WITH ALL FAULTS," as of the Commencement Date, and Landlord shall have no obligation to perform any work or make any installations in order to prepare the Premises for Tenant's use or occupancy, except for Landlord's Base Building Work and as may be set forth on Exhibit "B" hereto. The taking of occupancy of the whole or any part of the Premises by Tenant shall be conclusive evidence, as against Tenant, that Tenant accepts possession of the same and that the Premises and the Building were in good and satisfactory condition at the time such occupancy was so taken.  All references in this Lease to the consent or approval of Landlord shall be deemed to mean the written consent or approval by Landlord and no other consent or approval of Landlord shall be effective for any purpose whatsoever.

K.      All understandings and agreements heretofore had between the parties are merged in this Lease, which alone fully and completely express the agreement of the parties and which is entered into after full investigation, with neither party relying upon any statement or representation not embodied in this Lease.

L.      Tenant shall not place a load upon any floor of the Premises which violates applicable law or the certificate of occupancy of the Building or which exceeds the floor load per square foot which such floor was designed to carry.  All heavy material and/or equipment must be placed by Tenant, at Tenant's expense, so as to distribute the weight.  Machines, material and/or mechanical equipment shall be placed and maintained by Tenant, at Tenant's expense, in settings sufficient in Landlord's reasonable judgment to absorb and prevent vibration, noise, and annoyance.

M.      In the event that at any time during the Term of this Lease and any renewals or extensions thereof, Landlord shall be required, by any law, code, rule, or regulation of any governmental authority having jurisdiction, to perform any capital improvement(s) to the Premises or any portion of the Building as a result of or in connection with Tenant's use or manner of use of the Premises, Tenant shall pay to Landlord, as additional rent hereunder within ten (10) days after demand, any and all costs incurred by Landlord in connection with the performance of such capital improvement(s).  For purposes of this Article, the costs of any capital improvements so performed by Landlord shall be deemed to include the costs of preparing any necessary plans and obtaining any licenses or permits in connection therewith, and the reasonable fees for filing of such plans and permits.

N.      Regardless of the place of execution or performance, this Lease shall be governed by and construed in accordance with the laws of the State of New York, without regard for its choice-of-law principles.  In the event any provision of this Lease or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable under any applicable statute, regulation, or rule of law by any arbitrator or court of competent jurisdiction, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute, regulation, or rule of law, and the remainder of this Lease and the application of any such invalid or unenforceable provisions to other parties, jurisdictions, or circumstances, other than to whom or to which it is held invalid or unenforceable, shall not be affected thereby, but rather shall be enforced, nor shall the same affect the validity or enforceability of any other provision of this Agreement to the extent permitted by law.

Initials: Landlord _____ Tenant **EBH**

52.    <u>Legal Rent Restrictions</u>.  If any sums payable under the terms of this Lease shall be or become uncollectible, reduced or required to be refunded because of any applicable law, ordinance, order, rule, requirement or regulation, Tenant shall enter into such agreement(s) and take such other steps as Landlord may reasonably request and as may be legally permissible to permit Landlord to collect the maximum amounts which from time to time during the continuance of such legal restriction may be legally permissible (and not in excess of the amounts reserved therefor under this Lease).

53.    <u>Right to Cure Defaults</u>.  If Tenant shall fail to comply fully with any of its obligations under this Lease, Landlord, without thereby waiving such default and without incurring liability to Tenant, may, but shall not be obligated to, perform the same for the account and at the expense of Tenant without notice in case of emergency and upon ten (10) business days' prior notice in all other cases. Bills for expenses incurred by Landlord in connection with any such performance or involved in collecting or endeavoring to collect rent or enforcing or endeavoring to enforce any rights against Tenant under or in connection with this Lease or pursuant to law, including any costs, expenses and disbursements involved in instituting and prosecuting summary proceedings, as well as bills for any property, material, labor, or services provided, furnished, or rendered, including reasonable attorneys' fees and disbursements, together with interest on the amount of such costs, expenses, and disbursements at the rate set forth in Article 75 hereof, shall be paid by Tenant as Additional Rent on demand.

54.    <u>Assignment and Subletting</u>.  Supplementing and modifying Article 11 hereof:

A.    Except as expressly set forth herein, neither this Lease nor any part hereof nor the interest of Tenant herein or in any sublease or the rentals thereunder, shall, by operation of law or otherwise, be assigned, mortgaged, pledged, encumbered, or otherwise transferred by Tenant, Tenant's heirs, distributees, executors, administrators, legal representatives, successors, or assigns and neither this Lease nor the Premises, nor any part thereof, shall be encumbered in any manner by reason of any act or omission on the part of Tenant or anyone claiming under or through Tenant, or shall be sublet or used, occupied or utilized for any purpose by anyone other than Tenant, without the prior written consent of Landlord in each instance, which consent may not unreasonably be withheld or delayed, *provided* that Landlord is first supplied with the documentation, agreements, and payments set forth in this Article. For the purposes of this Article, (i) unless Tenant is a corporation with more than five hundred (500) shareholders, the issuance of interests in Tenant, or any subtenant (whether stock, partnership or membership interests or otherwise) to any person, persons or entities, whether in a single transaction or a series of related or unrelated transactions, in such quantities that after such issuance, such person, persons, or entities shall have control of Tenant, or such subtenant, shall be deemed an assignment of this Lease or such sublease, as the case may be, (ii) a transfer of a twenty-five (25%) percent or more interest in Tenant or any subtenant (whether stock, partnership, or membership interests or otherwise) by any party or parties in interest whether in a single transaction or a series of related or unrelated transactions shall be deemed an assignment of this Lease, or of such sublease, as the case may be, (iii) a take-over agreement shall be deemed an assignment of this Lease, and  (iv) any person or legal representative of Tenant, to whom Tenant's interest under this Lease passes by operation of law, or otherwise, shall be bound by the provisions of this Article, shall be deemed a sublease.  Any assignment, sublease, mortgage, pledge, encumbrance, or transfer by Tenant in contravention of this Article shall be void.  For the purposes of this Article, stock ownership shall be determined in accordance with the principles set forth in Section 544 of the Internal Revenue Code of 1986, as amended, or the corresponding provisions of any subsequent law.  For purposes of this Article, the term **"control"** shall mean the power to direct the management and policies of such entity, directly or indirectly, whether through the ownership of securities, by contract, or otherwise.

B.    Provided Tenant is not in default under this Lease, no consent shall be required if Tenant assigns this Lease or sublets the entire Premises to an affiliate. Tenant shall provide Landlord with thirty (30) days advance notice of any such assignment or sublet along with a copy of such assignment and/or sublease and shall promptly provide Landlord with copies of Tenant's and such affiliates organizational documents, organizational chart, and such other information as Landlord may request to establish that such assignee or subtenant is an affiliate.

Initials: Landlord _____ Tenant <u>EBH</u>

C.      If this Lease is assigned, whether or not in violation of the terms of this Lease, Landlord may collect rent from the assignee.  If the Premises or any part of the Premises is sublet or is used or occupied by anybody other than Tenant, whether or not in violation of this Lease, Landlord may, after default by Tenant, collect rent from the subtenant or occupant.  In either event, Landlord may apply the net amount collected to the rent herein reserved.  The consent by Landlord to an assignment, transfer, encumbering, or subletting pursuant to any provision of this Lease shall not in any way be considered to relieve Tenant from obtaining the express prior written consent of Landlord to any other or further assignment, transfer, encumbering, or subletting.  References in this Lease to use or occupancy by anyone other than Tenant shall not be construed as limited to subtenants and those claiming under or through subtenants but as including also licensees and others claiming under Tenant, immediately or remotely.  Tenant agrees to pay upon demand to Landlord all reasonable attorney's fees and disbursements and any other reasonable and customary costs or expenses which Landlord may incur in connection with any proposed assignment or other transfer of this Lease or any proposed subletting of the Premises or any part thereof.  Tenant agrees to and shall indemnify and hold harmless Landlord from any and all losses, costs, damages, and expenses arising out of or in connection with any claims for brokerage commissions or similar charges with respect to (x) any sublease of all or any portion of the Premises, and (y) any assignment of this Lease. Neither any assignment of this Lease nor any subletting, occupancy, or use of the Premises or any part thereof by any person or entity other than Tenant, nor any collection of rent by Landlord from any person or entity other than Tenant, nor any application of any such rent as provided in this Article shall, under any circumstances, be deemed a waiver of any of the provisions of this Article or the acceptance of the assignee, sublessee, or occupant, or relieve, impair, release, or discharge Tenant of its obligations to fully perform the terms, covenants and conditions of this Lease (as same may be amended or modified from time to time) on Tenant's part to be performed and Tenant shall remain fully and primarily liable therefor.

D.      (1)      In the event that at any time Tenant desires to sublet all or a portion of the Premises to a subtenant, or to assign its interest in this Lease to an assignee, Tenant  (a "Proposed Transfer"), Tenant shall give notice thereof to Landlord, which notice shall be accompanied by (a) if the Proposed Transfer is an assignment, a duplicate original, or photocopy of the executed proposed assignment agreement and a term sheet containing the monetary and other material terms thereof (a "Term Sheet"), (b) if the Proposed Transfer is a subletting, a duplicate original, or photocopy of the executed sublease agreement and a Term Sheet along with a description of the space to be sublet which, if less than the entire Demised Premises, must constitute a commercially viable and legally permissible separate rental unit from the remainder of the Demised Premises, (c) a statement setting forth in reasonable detail the identity of the proposed assignee or subtenant (in either event, the "Proposed Transferee"), the nature of its business, and its proposed use of the Demised Premises, (d) current financial information with respect to the Proposed Transferee, including three (3) years of its most recent financial data, including certified accountant financial reports prepared by a certified public accountant, (e) a written agreement by Tenant agreeing to indemnify Landlord against liability resulting from any claims that may be made against Landlord by the proposed assignee or sublessee or by any brokers or other persons claiming a commission or similar compensation in connection with the proposed assignment or sublease, unless such liability is due to the gross negligence or intentional misconduct of Landlord or its agents, employees, or contractors, and (f) a certification by Tenant that this Lease and Tenant's fixtures and equipment are free of all liens and encumbrances (excepting security agreements pursuant to a Small Business Administration or similar business loan) and any other information reasonably requested by Landlord. In any event, the effective date of a proposed assignment or commencement date of a proposed subletting (in either event, the "Effective Date") shall be not less than thirty (30) nor more than one hundred eighty (180) days after the giving of such notice. If Tenant shall give any notice to Landlord of Tenant's desire to assign this Lease or sublet all or part of the Demised Premises, including a proposed assignment or sublet pursuant to Section B of this Article 54 then Tenant shall reimburse Landlord on demand for any reasonable out-of-pocket costs that are incurred by Landlord in connection with said assignment or sublease, including the reasonable out-of-pocket costs of making investigations as to the acceptability of the Proposed Transferee, and reasonable legal costs incurred in connection with the granting of any requested consent, and such reimbursement shall be required whether or not (i) the Proposed Transfer is consummated, and (ii) whether or not Landlord's consent is required or granted.

-17-

(2)     In the case of an assignment of this Lease, Tenant shall deliver to Landlord a duly executed unconditional guaranty of this Lease, made by the principals of the assignee whose credit is reasonably acceptable to Landlord, in favor of Landlord, substantially in the form attached hereto as Exhibit "D" (the "**Guaranty**") and in the case of a subletting of the Premises or a portion of the Premises, provide to Landlord a duly executed reaffirmation of any guaranty of this Lease in a form reasonably acceptable to Landlord;

(3)     Except as specifically provided herein, once the Lease has been assigned or the Premises have been subleased, there may not be any further assignment of the Lease or sublet of the Premises by such assignee or sublessee without again complying with all of the provisions of this Article 54 in connection with any assignment or subletting, as the case may be.

(4)     Notwithstanding anything contained in this Lease to the contrary, Landlord may withhold its consent to any assignment or subletting in its sole and absolute discretion if (y) any default under this Lease shall have occurred and be continuing at the time of Tenant's request for Landlord's consent or at the time that such assignment or subletting is to become effective, or (z) the use of the Premises by such proposed assignee or subtenant shall be for any purpose other than the specific purposes set forth in Article 63 hereof.

E.    In the event that Tenant fails to execute and deliver the assignment or sublease to which Landlord consented within ninety (90) days after the giving of such consent, then Tenant shall again comply with all of the provisions and conditions of this Article before assigning this Lease or subletting the Premises.

F.    In no event shall Tenant be entitled to make, nor shall Tenant make, any claim, and Tenant hereby waives any claim, for money damages, nor shall Tenant claim any money damages by way of set-off, counterclaim or defense, based upon any claim or assertion by Tenant that Landlord has unreasonably withheld or unreasonably conditioned or delayed any consent or approval to a proposed assignment or subletting as provided for above, but Tenant's sole remedy shall be an action or proceeding to enforce such provision, or for specific performance, injunction or declaratory judgment.

G.    [Intentionally Omitted]

H.    With respect to each and every sublease or subletting, it is further agreed that:

(i)     no subletting shall be for a term ending later than one day prior to the Expiration Date;

(ii)    no subletting shall be to any person or entity that is currently negotiating or has negotiated with Landlord or Landlord's representative or broker for space in the Building at any time within the immediately preceding two (2) years without written approval of the Landlord;

(iv)    no sublease shall be valid, and no subtenant shall take possession of the Premises or any part thereof, until an executed counterpart of such sublease in form and substance reasonably acceptable to Landlord has been delivered to Landlord;

(v)     each sublease shall provide that it is subject and subordinate to this Lease, and that, in the event of termination, reentry, or dispossess by Landlord under this Lease, Landlord may, at its option, take over all of the right, title, and interest of Tenant as sublandlord under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall not (1) be liable for any previous act or omission of Tenant under such sublease, (2) be subject to any offset, not expressly provided in such sublease, that theretofore accrued to such subtenant against Tenant, or (3) be bound by any previous modification of such sublease or by any previous prepayment of more than one month's Fixed Annual Rent or any Additional Rent;

(vi)    each sublease shall specifically state that (1) it is subject to all of the terms, covenants, agreements, provisions, and conditions of this Lease, (2) the subtenant will not have the right to a further sublease or to allow the Premises to be used by others, without the prior

-18-

written consent of Landlord in each instance, (3) a consent by Landlord thereto shall not be deemed or construed to modify, amend, or affect the terms and provisions of this Lease, or Tenant's obligations hereunder, which shall continue to apply to the Premises involved, and the occupants thereof, as if the sublease had not been made, (4) if subtenant defaults in the payment of any rent, Landlord is authorized to collect any rents due or accruing from any subtenant or other occupant of the Premises and to apply the net amounts collected to the Fixed Annual Rent and Additional Rent reserved herein, and (5) the receipt by Landlord of any amounts from a subtenant, or other occupant of any part of the Premises shall not be deemed or construed as releasing Tenant from Tenant's obligations hereunder or the acceptance of that party as a direct tenant; and

I.      The joint and several liability of Tenant and any immediate successor in interest to Tenant, and the due performance of the obligations of this Lease on Tenant's part to be performed or observed, shall not be discharged, released, or impaired in any respect by any agreement or stipulation made by Landlord extending the time of, or modifying any of the obligations of, this Lease, or by any waiver or failure of Landlord to enforce any of the obligations of this Lease.

J.      Notwithstanding anything to the contrary contained herein, upon Landlord's consent to an assignment of this Lease, Tenant and Guarantor shall be released from all liability under this Lease and Guaranty provided: (i) the assignee deposit with Landlord security as required by this Lease and additional security in the sum equal to the fixed monthly rent payable by Tenant due on the first day of the first day of the month in which the assignment is effective, to be held pursuant to the provisions of Article 67 of this Lease; and (ii) a substitute guaranty in the form attached hereto as Exhibit D, executed by an individual having good credit and a net worth equal to or greater than the Guarantor, is delivered to Landlord.

K.      [Intentionally Omitted)

L.      Tenant hereby assigns, transfers, and sets over to Landlord all of Tenant's right, title, and interest in and to each and every sublease now or hereafter executed and affecting the Premises or any part thereof, as well as all of the rents or other sums of money now or hereafter due and payable thereunder (hereinafter called "**Subrents**") and all security now held by or hereafter paid to Tenant which has been or may hereafter be deposited for the payment of Subrents or the performance of any of the terms of such subleases, upon the condition, however, that Landlord shall not enforce its rights and remedies under this Section M, except in the event Tenant is in default of its obligations under this Lease.

M.      Anything contained in this Lease to the contrary notwithstanding, the original named Tenant hereunder and any successor, assignee, or subtenant of Tenant shall only use the Premises for the Permitted Use set forth in Article 63 of this Lease and for no other purpose.

N.      Landlord hereby consents to the one time assignment of the Lease by Tenant to Memphis Seoul No.2 LLC, a corporation in which Tenant is a 100% shareholder.

55.   <u>Landlord's Work</u>.  Landlord has no obligation to perform any work, supply any materials, incur any expense, or make any alterations or improvements to prepare the Premises for Tenant's use or occupancy. Excepting Base Building Work, Landlord shall deliver possession to the Premises in their "AS IS", "WHERE IS" condition, "WITH ALL FAULTS", as of the Commencement Date.  If Landlord does not tender possession of the Premises to Tenant on or before any specified date for any reason whatsoever, Landlord shall not be liable for any damage thereby and this Lease shall not be void or voidable thereby; however, the obligation to pay rent shall not commence prior to delivery of the Premises, and in the event Landlord fails to deliver the Premises within thirty days of the Commencement Date, this Lease shall be voidable at the discretion of Tenant at any time prior to the delivery of the Premises.

56.   <u>Environmental Compliance</u>.  Throughout the Term, Tenant shall not undertake or permit any Environmental Activity (as such term is hereinafter defined) other than (i) in compliance with all applicable laws and ordinances and all rules, orders and regulations, present or future, ordinary or extraordinary, foreseen or unforeseen) of any federal, state, or local governmental authority (hereinafter collectively referred to as "**Legal Requirements**"), and (ii) in such a manner as shall keep the Premises, the Building and the Land free from any lien imposed in respect of such Environmental Activity.  Tenant shall take all necessary steps to ensure that any Environmental

-19-

Activity undertaken or permitted at the Premises is undertaken in a manner as to provide prudent safeguards against potential risks to human health or the environment. Tenant shall notify Landlord within 24 hours of Tenant's knowledge of the release of any Hazardous Materials (as such term is hereinafter defined) from or at the Premises which could form the basis of any claim, demand, or action by any party. In the event that Landlord shall reasonably suspect that any Environmental Activity has occurred in or at the Premises in violation of any Legal Requirement, Landlord shall have the right, from time to time, to conduct an environmental audit or such other examinations, tests, inspections and reviews of the premises as Landlord, in its sole discretion, shall deem necessary, appropriate or desirable and Tenant shall cooperate in the conduct of any such environmental audit, examination, test, inspection or review. If Tenant shall breach the covenants provided in this Article 56, then, in addition to any other rights and remedies which may be available to Landlord pursuant to this Lease or otherwise at law, Landlord may require Tenant to take all actions, or to reimburse Landlord for the costs of any and all actions taken by Landlord, as are necessary, appropriate, or desirable to cure such breach. For purposes of this Article 56, the term **"Environmental Activity"** means any use, storage, installation, release, threatened release, discharge, generation, abatement, removal, disposal, handling or transportation from, under, into or on the Premises of (a) any "hazardous substance" as defined in any federal statute (except for de minimis amounts which are incidental to or included within items used by Tenant in the ordinary course of its business (e.g. cleaning solutions) and which are used and stored in accordance with all applicable Legal Requirements), (b) petroleum, crude oil, or any fraction thereof, natural gas or synthetic gas used for fuel (excluding heating oil), (c) medical waste and (d) any additional substances or materials which at such time are classified or considered to be hazardous or toxic under the laws of the State of New York or any other Legal Requirements (the materials described in clauses (a) through (d) being collectively referred to as **"Hazardous Materials"**). The obligations of Tenant under this Article shall survive the Expiration Date. Tenant's indemnifications contained herein and Tenant's duties and obligations described above shall not extend to any Hazardous Materials: (i) existing in the Premises or the Building prior to the Effective Date; (ii) brought into the Premises or the Building by Landlord, including Landlord's agents, employees, or contractors; or (iii) brought into the Premises or the Building by any other tenants of the Building.

57.  Conditions of Limitation.

     A.  This Lease and the Term and estate hereby granted are subject to the limitation that whenever Tenant shall make an assignment of the property of Tenant for the benefit of creditors, or shall file a voluntary petition under any bankruptcy or insolvency law or any involuntary petition alleging an act of bankruptcy or insolvency shall be filed against Tenant under any bankruptcy or insolvency law, or whenever a petition shall be filed by or against Tenant under the reorganization provisions of the United States Bankruptcy Act or under the provisions of any law of like import, or whenever a petition shall be filed by Tenant under the arrangement provisions of the United States Bankruptcy Act or under the provisions of any law of like import, or whenever a permanent receiver of Tenant or of or for the property of Tenant shall be appointed, then, Landlord may, (a) at any time after receipt of notice of the occurrence of any such event, or (b) if such event occurs without the acquiescence of Tenant, at any time after the event continues undischarged for thirty (30) days, give Tenant a notice of intention to end the Term at the expiration of five (5) days from the date of service of such notice of intention, and upon the expiration of said five (5) day period this Lease and Term and estate hereby granted, whether or not the Term shall theretofore have commenced, shall terminate with the same effect as if that day were the Expiration Date, but Tenant shall remain liable for damages as provided in this Lease.

     B.  This Lease and the Term and estate hereby granted are subject to further limitations as follows:

          (a)  whenever Tenant shall default in the full payment of any installment of Fixed Annual Rent, or in the full payment of any Additional Rent or any other sum or charge due under this Lease, within fifteen (15) days after the date upon which the same shall be due, and such default shall continue for fifteen (15) days or more after Landlord shall have given to Tenant a written notice specifying such default, or

-20-

(b)     whenever Tenant shall, whether by action or inaction, be in default of any of its obligations under this Lease (other than a default in the payment of Fixed Annual Rent or Additional Rent) and if such default shall continue and shall not be remedied by Tenant within fifteen (15) days after Landlord shall have given to Tenant a written notice specifying the same (or within such other cure period as may be specified elsewhere in this Lease), or, in the case of a happening or default which cannot with due diligence be cured within a period of fifteen (15) days and the continuation of the period required for cure will not subject Landlord to the risk of criminal liability or subject the Property to lien or sale (without limiting the application of the above, Landlord shall be deemed subject to prosecution for a crime if Landlord, or Managing Agent, or any officer, director, partner, shareholder, or employee of Landlord or Managing Agent as an individual, is charged with a crime of any kind or degree whatever, whether by summons or otherwise) or termination of any superior lease or foreclosure of any superior mortgage, if Tenant shall not, (i) within said fifteen (15) day period advise Landlord of Tenant's intention to duly institute all steps necessary to remedy such situation, (ii) duly institute within said thirty (30) day period, and thereafter diligently and continuously prosecute to completion all steps necessary to remedy the same, and (iii) complete such remedy within such time after the date of the giving of said notice of Landlord as shall reasonably be necessary, or

(c)     whenever any event shall occur or any contingency shall arise whereby this Lease or the estate hereby granted or the unexpired balance of the Term hereof would, by operation of law or otherwise, devolve upon or pass to any person, firm, or corporation other than Tenant, or

(d)     whenever Tenant shall abandon the Premises (unless as a result of a casualty) or fails to operate its business within the Premises, fully stocked and staffed, for a period of thirty (30) consecutive days or more within any calendar year during the Term,

then, in any of said cases set forth in the foregoing subsections of this Article 57(B), Landlord at any time thereafter may give written notice to Tenant specifying such event or events of default and stating that this Lease and the Term and estate hereby demised, whether or not the Term shall theretofore have commenced, shall expire and terminate on a date that is at least fifteen (15) days thereafter with the same effect as if that date was the Expiration Date herein definitely fixed for the end and expiration of this Lease, and upon the date specified in such notice this Lease and the Term and estate hereby demised and all rights of Tenant under this Lease shall expire and terminate irrespective of whether or not such default has been cured, it being the express intention of the parties hereto to create hereby a conditional limitation, but Tenant shall remain liable for damages as provided in this Lease.

58.   <u>Repeated Defaults</u>.   Notwithstanding anything contained in this Lease to the contrary, and without limiting any of Landlord's other rights and remedies provided for in this Lease or at law or equity, if Tenant shall fail to pay in full any installment of Fixed Annual Rent, Additional Rent or any other sum or charge owing under this Lease within fifteen (15) days after the date upon which the same shall be due and Landlord shall have commenced proceedings in connection therewith, or Tenant shall have failed to pay in full any installment of Fixed Annual Rent, Additional Rent or any other sum or charge owing under this Lease three (3) times during any single year of the Term, then, irrespective of whether or not such defaults have been cured, upon any further failure within the twelve (12) month period immediately following Landlord's commencement of a summary proceeding, or upon any further failure within any period during the Term (i.e., a fourth (4th) failure to pay timely rent), on the part of Tenant to timely pay in full any installment of Fixed Annual Rent, Additional Rent or any other sum or charge within ten (10) days after the date upon which the same shall be due pursuant to the terms hereof, Landlord, at its sole election and in its sole and absolute discretion, may immediately do any one or more of the following (however, if Landlord shall choose option (i) below then Tenant shall not be obligated to (ii) or (iii)):

(i)     Terminate this Lease by giving Tenant a fifteen (15) days' written notice of termination in accordance with Article 57(B) hereof and upon the date specified in such notice this Lease and the Term and estate hereby demised and all rights of Tenant under this Lease shall expire and terminate irrespective of whether or not such default has been cured, but Tenant shall remain liable for damages as provided in this Lease and Landlord and/or its agents may immediately thereafter re-enter the Premises following summary proceedings or by any other

applicable action or proceeding, or by force or otherwise (without being liable to indictment, prosecution or damages therefor), and may repossess the Premises and dispossess Tenant and any other persons from the Premises and remove any and all of their property and effects therefrom;

(ii)     Require Tenant to have its bank automatically transfer on a monthly at Landlord's election, all Fixed Annual Rent, Additional Rent, and other charges due or to become due under this Lease for the remainder of the Term into a bank account chosen by Landlord.  Landlord, at its option, shall send Tenant written notice specifying the bank and bank account information necessary to effectuate such transfers; and

(iii)    Increase the Security Deposit by an amount that Landlord determines, in its reasonable discretion, is necessary or desirable to protect its interest; *provided* that such amount does not exceed six (6) months of the then-applicable monthly Fixed Annual Rent.  Such increase shall be paid by Tenant immediately upon demand by Landlord.

59.   <u>Additional Rent</u>.  All payments other than Fixed Annual Rent to be made by Tenant pursuant to this Lease shall be deemed Additional Rent and, in the event of any nonpayment thereof, Landlord shall have all rights and remedies provided for herein or by law for nonpayment of Fixed Annual Rent.  Tenant shall have ten (10) business days from its receipt of any Additional Rent statement to notify Landlord, by certified mail, return receipt requested, that Tenant disputes the correctness of such statement.  After the expiration of such ten (10) day period, such statement shall be binding and conclusive upon Tenant.  Any expense incurred or any sum of money reasonably paid by Landlord by reason of the failure of Tenant to comply with any provision of this Lease commencing or defending any action in connection with this Lease shall be deemed to be Additional Rent and shall be due and payable by Tenant to Landlord on the first day of the next following month or at the option of Landlord, of the first day of any succeeding month, provided that such due date shall not be less than ten business days after notice of such obligation is provided to Tenant.  The receipt by Landlord of any installment of the regular stipulated rent hereunder or any of such Additional Rent shall not be a waiver of any other Additional Rent then due.

60.   <u>Signage; Awning</u>.

A.   Tenant shall not, without the prior written consent of Landlord in each instance which consent shall not be unreasonably withheld or delayed, install or use any signs or plaques on or in the windows of the Premises, or on the outside or any exterior portion of the Building. Tenant shall submit to Landlord a rendering of any new proposed sign or plaque, which design shall comport with the character of the Building and with other signs or plaques in or on the Building.  If Landlord consents to a sign or plaque as provided for in this Article 60(A), Tenant, at Tenant's own cost and expense, shall keep said sign or plaque in good condition and repair.  All such sign(s) shall comply with all Legal Requirements pertaining thereto, and Tenant shall obtain and keep in effect all necessary permits and licenses with respect to such sign(s).  Upon the expiration or earlier termination of this Lease, Tenant shall remove any such sign(s) and shall immediately upon the removal of such sign(s), and at its sole cost and expense, repair and restore the exterior of the Building to the condition existing prior to installation of such sign(s) and repair any damage caused by such installation and removal, excepting ordinary wear and tear.  Notwithstanding the signage requirements contained herein, Landlord approves of Tenant's signage depicted on <u>Exhibit B-1</u> attached hereto.

B.   Tenant shall not, without the prior written consent of Landlord in each instance, which consent shall not be unreasonably withheld or delayed, install any awnings on the windows or doorways of the Premises.  Tenant shall submit to Landlord a rendering of any new proposed awning, which design shall comport with the character of the Building and with any other awnings on the Building.  If Landlord consents to an awning as provided for in this Article 60(B), Tenant, at Tenant's own cost and expense, shall keep said awning in good condition and repair.  Upon the expiration or earlier termination of this Lease, Tenant, at Landlord's request, shall remove any such awning(s) and shall immediately upon the removal of such awning(s), and at its sole cost and expense, repair and restore the exterior of the Building to the condition existing prior to installation of such awning(s) and repair any damage caused by such installation and removal, excepting ordinary wear and tear.

-22-

C.      Other than the signage and awning permitted by this Article 60, without first having obtained consent in accordance with this Article, Tenant shall not place or install or suffer to be placed or installed or maintain on the exterior of the Premises or the Building any banner, flag, pennant, sign board, decoration, advertising, or the like.  Landlord shall have the right, with at least ten (10) business days' prior written notice to Tenant, to remove any banner, flag, pennant, sign board, or decoration installed in violation of this Article 60 and to charge Tenant for the cost of such removal and any repairs necessitated thereby as provided in Article 4 hereof, provided however that if Tenant voluntarily removes such item or decoration prior to the expiration of the ten (10) business days' prior written notice, then Tenant shall have no liability to Landlord hereunder.  Landlord shall have no liability to Tenant or any other occupant of the Premises for any such removal pursuant to this Article 60(C).  Upon the expiration or earlier termination of this Lease, Tenant, at Landlord's request, shall remove any such item(s) and shall immediately upon the removal of the same, and at its sole cost and expense, repair and restore the exterior of the Building to the condition existing prior to installation of such item(s) and repair any damage caused by such installation and removal, excepting ordinary wear and tear.

D.      [Intentionally omitted]

61.     <u>Mechanic's Liens</u>.

A.      Notice is hereby given, and Tenant hereby agrees, that Landlord shall not, under any circumstances, be liable to pay for any work, labor, or services rendered or materials furnished to or for the account of Tenant upon or in connection with the Premises, and that no mechanic's or other liens for work, labor, or services rendered or material furnished to or for the account of Tenant shall under any circumstances attach to or affect the reversionary or other estate or interest of Landlord in or to the Premises or in or to any alterations, repairs, or improvements to be erected or made thereon. All contracts with any contractor, subcontractor, architect, engineer, or third-party regarding labor, work, or services by the subject person shall contain a provision that no mechanics lien may be filed against the Property.

B.      Tenant shall not suffer nor permit, during the Term, the creation of any mechanic's or other liens for work, labor services, or material rendered or furnished to or for the account of Tenant upon or in connection with the Premises or to any improvements erected or to be erected upon the same, or any portion thereof; and it is understood that Tenant shall obtain and deliver unconditional written final waivers of mechanic's liens, unless the underlying contract provides that no such mechanics' liens can be filed. Tenant shall also procure written releases of lien executed by all contractors, subcontractors, material suppliers, and/or laborers simultaneously upon payment in full for the labor performed or materials furnished by such contractors, material suppliers, and/or laborers.  Any failure or refusal on the part of Tenant to comply with the foregoing shall be deemed a default under this Lease.  Nevertheless, Tenant shall hold Landlord and the Premises harmless from all liens or charges, of whatever nature or description, arising from, or in consequence of, any alterations or improvements that Tenant shall make, or cause to be made, upon the Premises.

C.      Notwithstanding anything to the contrary in this Lease, Tenant, its successors and assigns, warrant and guarantee to Landlord, its successors and assigns, that, if any mechanic's lien is filed against the Premises for work done or claimed to have been done for, or materials furnished or claimed to have been furnished to, Tenant, the same shall be discharged by Tenant thirty (30) days after notice thereof, at Tenant's sole cost and expense, either by payment or by filing the bond required by law.

D.      In the event any mechanic's lien is not discharged timely, as aforesaid, Landlord may, but shall not be obligated to, discharge the same for the account of and at the expense of Tenant by payment, bonding or otherwise, without investigation as to the validity thereof or of any offsets or defenses thereto, and Tenant shall promptly reimburse Landlord, as Additional Rent, for all reasonable costs, disbursements, fees, and expenses, including, without limitation, reasonable legal fees and disbursements, incurred in connection with so discharging said mechanic's lien, together with interest thereon from the time or times of payment until reimbursement by Tenant.

62.  <u>Additional Default Remedies</u>.  If this Lease is terminated or if Landlord shall recover possession of the Premises under the provisions of this Lease, or in the event of the termination of this Lease, or of reentry, by or under any summary dispossess or other proceeding or action or any provision of law by reason of default hereunder on the part of Tenant, Tenant shall thereupon pay to Landlord the Fixed Annual Rent and Additional Rent payable up to the time of such termination of this Lease, or of such recovery of possession of the Premises by Landlord, as the case may be, and shall also pay to Landlord damages as provided herein. In the event of the termination of this Lease due to a Tenant default, then, supplementing the provisions of Article 18 hereof, Landlord shall, at Landlord's option, forthwith be entitled to recover from Tenant as and for liquidated damages with respect to any such Lease termination, an amount equal to the Rent reserved hereunder for the unexpired portion of the Term plus all costs of reletting the Premises, including brokers fees, minus any rent or payment Landlord receives from any subsequent tenant for the Premises. In the computation of such damages, all Rent payable hereunder after the date of termination shall be discounted from the date installments of Rent would be due hereunder if this Lease had not been terminated to the date of payment at the rate of four (4%) percent per annum. In the event that the Premises are relet after the date of such termination and the date of the collection of the aforesaid liquidated damages, then Landlord agrees to deduct from the damages due the Fixed Annual Rent actually paid Landlord (exclusive of any escalation payments,  tax payments, fuel payments, operating cost payments, percentage payments, and the like whether denominated as Rent or otherwise) from the date of such termination to the Expiration Date, less any and all expenses of any type, kind or nature incurred by Landlord in connection with reletting the Premises, whether foreseen or unforeseen, and whether ordinary or extraordinary, as conclusively determined by Landlord; *provided, however*, that such payment shall in no event exceed the amount of liquidated damages actually paid by Tenant as aforesaid.

63.  <u>Tenant's Use and Obligations</u>.

A.  Subject to Tenant obtaining all approvals and permits required by applicable Legal Requirements and all of the terms, covenants and provisions of this Lease, Tenant shall continuously use and occupy the Premises as a restaurant for on-premises dining and takeout ("**Permitted Use**") only, to the extent same is allowed by applicable law, and for no other use or purpose whatsoever, and shall conduct its business in the Premises during the entire Term under Tenant's trade name only, which Tenant represents it has the right to use. The provisions of this Article shall be binding upon Tenant's successors, assigns, subtenants, and licensees and shall not be waived by any consent to an assignment or subletting or otherwise except by written instrument executed and delivered by Landlord expressly referring to this Article.

B.  Tenant, as an additional inducement to Landlord to enter into this Lease, covenants and agrees that at all times (i) the business to be conducted in or from the Premises and the kind and quality of the merchandise and/or services offered in the conduct thereof will be of quality and reputable in every respect; (ii) the sales methods employed in said business, as well as all other elements of merchandising, will be in conformity with the highest standards of practice; (iii) the kind and quality of merchandise sold or services provided at, through or from the Premises by Tenant shall be of quality in all respects; (iv) Tenant shall not operate the Premises for any purpose or use except the specific use and purpose set forth above and in no event shall any use be permitted that would result in the cancellation of any of Landlord's insurance policies currently in effect (provided Tenant has advance notice of the terms of those insurance policies) or cause an increase to the premiums charged Landlord for any such insurance coverage, or any use that violates applicable law, or any use that threatens the structural integrity of the Building or the life, safety, or health of its tenants and occupants, or any use that could reasonably be considered an unreasonable interference with the peaceful possession or proper use of the Building by its other tenants or occupants; and (v) the appearance of the Premises (including the lighting and other appurtenances thereto) will be substantially consistent with the appearance thereof pursuant to renderings shown to Landlord in connection with Landlord's approval of Tenant's Initial Work.

In particular, but without limitation of the foregoing, Tenant shall (1) use commercially reasonable efforts and take all steps necessary to avoid and prevent or promptly abate and eliminate any and all offensive odors (except as otherwise agreed to and approved by Landlord herein), noises, vibrations, escaping effluents of every kind, and nuisances caused or resulting from the conduct of its business which may interfere with, or impair the rights and

-24-

interests of, or the use by, such other tenants or occupants of the Building or adjacent buildings; (2) not permit anything to be done or kept in or about the Premises which would in any way be deemed hazardous or which would interfere with the unrestricted passage of pedestrians along any part of the sidewalk in front of the Premises, or the unrestricted access to neighboring stores and other portions of the Building of which the Premises forms a part and shall cause the expeditious handling of deliveries of merchandise so as to keep the sidewalk free and clear at all times; (3) not permit any solid food, waste, oils, fats, or other foreign substance to be thrown or drawn into the waste pipes of the Premises, which pipes Tenant agrees to maintain in good order and repair and free from any debris or violation of applicable law, including, without limitation, the codes, rules, and regulations promulgated by the City of New York; (4) throughout its occupancy maintain an extermination contract to provide extermination services to the Premises so as to prevent any infestation of the Premises, or of the Building of which the Premises form a part, of rodents, insects, or other vermin, which service shall occur no less frequently than monthly during the Term; (5) throughout its occupancy maintain in the Premises chemical fire extinguishing devices approved by the Fire Insurance Rating organization, and shall keep such devices serviced and in good order; (6) install appropriate gas cut off devices within the Premises if necessary; (7) store all perishable foods and items permitted to be stored at, on or in the Premises in refrigeration equipment to be installed by Tenant at Tenant's expense prior to opening for business and thereafter to be maintained by Tenant in good working order and condition; and (8) not use or permit the Premises to be used for any habitation of any kind whatsoever; and (9) have its grease traps cleaned on a regular basis.

      C.     Tenant further covenants and agrees that, notwithstanding anything to the contrary contained in this Lease, it will:

            (i)     at Tenant's sole cost and expense, clean the interior and exterior of the windows and doors (including, in each case, the frames therefor) in the Premises and in the perimeter walls thereof whenever in the reasonable judgment of Landlord necessary but in no event less frequently than on a quarterly basis; not require, permit, suffer or allow any such window or door to be cleaned in violation of the Labor Law of the State of New York or of any other law or ordinance or of any rule, order or regulation of any governmental authority having jurisdiction thereover; and, at Tenant's sole cost and expense, clean and polish the inside and outside of the store fronts of the Premises whenever in the reasonable judgment of Landlord necessary but in no event less frequently than on a quarterly basis;

            (ii)     at Tenant's sole cost and expense, (1) maintain the Premises clean, and in a neat, sanitary, and attractive condition, and keep the display windows clean and attractively dressed and shall at no time cover or obstruct such windows or place any sign in such windows, except in connection with alterations or signs in the normal course of business, provided such signs are clear and in presentable, business-like condition, (2) thoroughly clean and maintain in good condition, at not less than quarterly intervals (and more frequently, upon Landlord's request), in accordance with all Legal Requirements by contractors reasonably approved by Landlord, any exhaust systems, including, but not limited to, all exhaust ducts within or serving the Premises, including the main vertical risers, and all air-conditioning units, if any, located within and exclusively serving the Premises, (3) keep all plumbing in the Premises and sanitary systems and installations serving the Premises in a good state of repair and operating condition to the points they connect with the main vertical risers and stacks of the Building and keep any drains, wastepipes, sewers and connections with the Building's main sewers, in or appurtenant to the Premises (collectively, the **"drainpipes"**) in good repair and free from obstructions and install grease traps where necessary to keep the drainpipes free from grease; Tenant promptly shall repair any leaks in the drainpipes, and shall also repair and maintain the drains, wastepipes, sewers, and connections with Building's main sewers not in the Premises, if any such repairs are made necessary due to the negligence of Tenant or Tenant's use of the Premises, (4) contract for the removal of all waste, rubbish, and refuse from the Premises with a qualified contractor unless reasonably disapproved by Landlord, (5) bag and remove all rubbish and refuse from the Premises daily but only between permitted hours, subject to such rules and regulations as, in the judgment of Landlord, are necessary for the proper operation of the Building, and (6) maintain and keep the sidewalks abutting and adjacent to the Premises is in free and clear of all ice and snow and clear of all dirt and debris and keep such sidewalks in good order, however Landlord shall be responsible for replacement of the sidewalk in the event replacement is necessary;

-25-

Initials: Landlord \_\_\_\_\_ Tenant **EBH**

(iii)    at Tenant's sole cost and expense, as soon as practicable and, in any event, within five (5) business days after any glass (including mirrors) in the Premises is broken or cracked, including a so-called "bullseye" break in the glass, replace any and all glass (including mirrors) in the Premises and in the perimeter walls thereof with glass of the same kind and quality, the frames for such glass, and any lettering and ornamentation on such glass, which may be broken or damaged, regardless of the cause of such damage;

(iv) [Intentionally Omitted]

(v)    not permit to be played live music in the Premises. Tenant shall be permitted to play recorded music in the premises during operational business hours provided such music does not disturb other tenants or residents of the Building. Tenant shall observe, comply with and adopt such reasonable means and precautions as Landlord may from time to time reasonably request in such connection, including, without limitation, installation of carpeting and adequate insulation and soundproofing so as not to unreasonably interfere with the use and occupancy of the remainder of the Building by its occupants and the respective premises of other tenants.

(vi)    at Tenant's sole cost and expense, use reasonable efforts to preserve the security and safety of the Building, and in the event that Landlord receives any complaints with respect to breaches of security or safety arising out of, or any nuisance with respect to, the conduct of Tenant, Tenant's employees or otherwise, Tenant shall take such measures as shall be reasonably sufficient to address any such complaint to the reasonable satisfaction of the Landlord or persons lodging such complaint, as the case may be;

(vii)    at Tenant's sole cost and expense, properly vent and exhaust odors from the Premises, and install any system or systems to accomplish the same in accordance and in compliance with all Legal Requirements governing the same now or hereafter in effect; it is intended that Tenant will install, vents within the Premises so as to cause all fumes, odors and gases to be exhausted from the Premises in such manner as shall not cause annoyance or discomfort to the other tenants or occupants of the Building; no fumes, odors or gases shall be exhausted to the Building corridors, street or sidewalk in front of or adjacent to the Premises;

(viii)    not use the Premises or permit anything to be done in or about the Premises that will in any way conflict with any law now in force or that may hereafter be enacted. Tenant shall at its cost promptly comply with all laws and with all requirements of any board of fire underwriters or other similar body;

(ix)    at Tenant's sole cost and expense, obtain and maintain all required government licenses and permits necessary or desirable for the conduct of Tenant's business; and

(x)    not, prior to Tenant's receipt of the liquor license pursuant to Section 81 hereof, sell or offer for sale any alcoholic beverage, wine, beer, or liquor in or from the Premises.

D.    Tenant acknowledges that the manner in which Tenant operates the Premises is a material consideration for Landlord's granting this Lease to Tenant and that any breach of any such covenants and agreements above shall be deemed to be a material breach of this Lease.

64.    <u>Notice of Accident, Loss or Damage</u>.  Tenant shall give prompt notice to Landlord of any accident, loss, or damage, or any dangerous or defective condition in, to or of the Premises or any part thereof or the fixtures or other property of Landlord therein of which Tenant has actual knowledge.  Such notice shall not, however, be deemed or construed to impose upon Landlord any obligation to perform any work to be performed by Tenant under this Lease.

65.    <u>Landlord's Expenses Due to Default by Tenant</u>.  Whenever any act, request, default, inaction, or other matter of any kind done, caused or initiated by or on behalf of Tenant which results in the occurrence of a default pursuant to the provisions of this Lease and causes Landlord to reasonably incur any expense, including, without limitation, reasonable attorneys' fees and

-26-

disbursements, Tenant shall and does agree to pay the same within fifteen (15) days after demand therefor as Additional Rent hereunder. Tenant shall pay, as Additional Rent, the sum of $100.00 for each and every check Tenant gives to Landlord which does not clear the bank and is returned for any reason.

Supplementing the foregoing, Tenant hereby agrees to pay, as Additional Rent, within ten (10) business days after demand therefor, all reasonable attorneys' fees and disbursements (and all other court costs or expenses of legal proceedings) which Landlord may incur or pay by reason of, or in connection with:

(a)    any successful action or proceeding by Landlord to terminate or enforce the provisions of this Lease;

(b)    any other successful action or proceeding by Landlord against Tenant (including, but not limited to, any arbitration proceeding);

(c)    any default by Tenant in the observance or performance of any obligation under this Lease (including, but not limited to, matters involving payment of rent and additional rent, computation of escalations, alterations or other Tenant's work and subletting or assignment), whether or not Landlord commences any action or proceeding against Tenant;

(d)    any successful action or proceeding brought by Tenant against Landlord (or any officer, partner or employee of Landlord) or any action brought against Landlord, alleging damages for the acts or omissions of Tenant;

Tenant's obligations under this Article 65 shall survive the expiration of the Term hereof or any earlier termination of this Lease.

66.    <u>Non-Binding on Landlord; Counterparts</u>.  Neither the submission of this Lease form to Tenant nor the execution of this Lease by Tenant shall constitute an offer by Landlord to lease the Premises to Tenant.  This Lease may be executed any number of counterparts, all of which together shall constitute one agreement binding on all parties hereto notwithstanding that all the parties have not signed the same counterpart.  All counterparts shall be construed together and shall constitute one instrument.  This Lease shall not be or become binding upon either party to any extent or for any purpose unless and until it is executed by both parties and a fully executed counterpart thereof is delivered to both. Electronically-transmitted and facsimile signatures shall be deemed originals for all purposes.

67.    <u>Security Deposit</u>.

A.    Upon execution of this Lease, Tenant shall deposit with Landlord $36,000.00 as security for the faithful performance and observance by Tenant of the terms, provisions, and conditions of this Lease.  Notwithstanding the foregoing, in the event Landlord shall consent to an assignment of this Lease and the assignee delivers an additional security deposit in the amount required pursuant to the provisions of Paragraph 54 K of this Lease,  such deposit in the form of an official bank check issued to Landlord by a New York based federally-insured banking institution acceptable to Landlord, which is a member of the New York Clearinghouse (the "**Security Deposit**") and the terms and provisions of this Article 67 and Article 31 of the printed portion of this Lease shall apply.  Landlord shall be under no obligation to deposit the Security Deposit in an interest-bearing account.

B.    If Tenant defaults beyond the expiration of any applicable cure period in respect of the full and prompt payment and performance of any of the terms, provisions, covenants and conditions of this Lease, including, without limitation, the payment of Fixed Annual Rent and/or Additional Rent, Landlord may, at its election, (but shall not be obligated to) draw down the entire Security Deposit or any portion thereof and use, apply, or retain the whole or any part of the Security Deposit to the extent required for the payment of: (a) Fixed Annual Rent, Additional Rent or any other sum as to which Tenant is in default, (b) any sum which Landlord may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, provisions,

-27-

covenants, and conditions of this Lease, including, without limitation, any reasonable reletting costs or expenses (including, without limitation, any free rent, tenant improvement allowance, leasing commissions, reasonable attorneys' fees, costs and expenses, and other fees, costs, and expenses relating to the reletting of all or any portion of the Premises), (c) any damages or deficiency in the reletting of the Premises, whether such damages or deficiency accrued before or after summary proceedings or other re-entry by Landlord, or (d) any damages awarded to Landlord pursuant to any of the terms and conditions hereof, it being understood that any use of the whole or any part of the Security Deposit shall not constitute a bar or defense to any of Landlord's other remedies under this Lease or any law, rule or regulation, including, without limitation, Landlord's right to assert a claim against Tenant under Title 11 U.S.C. §502(b)(6) or any other provision of Title 11 of the United States Code.

C.    If Tenant defaults beyond the expiration of any applicable cure period in respect of any of the terms, provisions, covenants, and conditions of this Lease and Landlord utilizes all or any part of the Security Deposit but does not terminate this Lease as provided in any provision of this Lease, Landlord may, in addition to exercising its rights as provided in Article 67(B) above, retain the unapplied and unused balance of the portion of the Security Deposit as security for the faithful performance and observance by Tenant thereafter of the terms, provisions, and conditions of this Lease, and may use, apply, or retain the whole or any part of the Security Deposit to the extent required for payment of Fixed Annual Rent, Additional Rent, or any other sum as to which Tenant is in default or for any sum which Landlord may expend or be required to expend by reason of Tenant's default in respect of any of the terms, covenants, and conditions of this Lease.  In the event Landlord uses, applies or retains any portion or all of the Security Deposit, Tenant shall forthwith restore the amount so used, applied or retained so that at all times the amount of the Security Deposit shall be not less than the security required by Article 67(A) hereof, failing which Tenant shall be in default of its obligations under this Article and Landlord shall have the same rights and remedies as for the non-payment of Fixed Annual Rent beyond the applicable grace period.

D.    If Tenant shall fully and faithfully comply with all of Tenant's covenants and obligations under this Lease, the Security Deposit, without interest, shall be returned to Tenant within sixty (60) days after both (i) the expiration or early termination of this Lease, and (ii) the delivery to Landlord of entire possession of the Premises as provided in this Lease.  In the event of any sale, transfer, or leasing of Landlord's interest in the Building whether or not in connection with a sale, transfer, or leasing of the Land to a vendee, transferee, or lessee, Landlord shall have the right to transfer the Security Deposit to the vendee, transferee, or lessee.  Upon such transfer, Landlord shall thereupon be released by Tenant from all liability for the return thereof, and Tenant shall look solely to the new landlord for the return of the same. The provisions of the preceding sentence shall apply to every subsequent sale, transfer, or leasing of the Building, and any successor of Landlord may, upon a sale, transfer, leasing, or other cessation of the interest of such successors in the Building, whether in whole or in part, transfer the Security Deposit to any vendee, transferee, or lessee of the Building and shall thereupon be relieved of all liability with respect thereto.  Except in connection with a permitted assignment of this Lease, Tenant shall not assign or encumber or attempt to assign or encumber the Security Deposit, and neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment, or attempted encumbrance.  In any event, in the absence of evidence satisfactory to Landlord of an assignment of the right to receive the Security Deposit, Landlord may return the Security Deposit to the original Tenant regardless of one or more assignments of this Lease.

E.    Neither the Security Deposit nor any proceeds therefrom, if any, shall be deemed an advance rent deposit or an advance payment of any other kind, or a measure or limitation of Landlord's damages or constitute a bar or defense to any of the Landlord's other remedies under this Lease or at law or in equity upon Tenant's default.

F.    As a material inducement to Landlord to enter into this Lease, Tenant hereby acknowledges and agrees that the Security Deposit and the proceeds thereof, if any, and the obligation to make available or pay to Landlord all or a portion thereof in satisfaction of any obligation of Tenant under this Lease, shall be deemed third-party obligations and not the obligation of Tenant hereunder and, accordingly, (a) shall not be subject to any limitation on damages contained in Section 502(b)(6) of Title 11 of the United States Code or any other

-28-

limitation on damages that may apply under any federal, state, or local law, rule, or regulation in connection with a bankruptcy, insolvency, or other similar proceeding by, against or on behalf of Tenant, (b) shall not diminish or be offset against any amounts that Landlord would be able to claim against Tenant pursuant to Title 11 U.S.C. §502(b)(6) as if no Security Deposit existed, and (c) may be relied on by Landlord in the event of an assignment of this Lease that is not expressly in accordance with the terms of this Lease even if such assignment has been authorized and approved by a court exercising jurisdiction in connection with a bankruptcy, insolvency, or other similar proceeding by, against or on behalf of Tenant.

68.     <u>No Recording</u>.  Neither party hereto shall record this Lease or any memorandum hereof, without the prior written consent of the other party.

69.     <u>Construction of Provisions</u>.  Each term, covenant, agreement, obligation, or other provision of this Lease on Tenant's part to be performed shall be deemed and construed as a separate and independent covenant of Tenant, not dependent upon any of the other terms of this Lease.  This Lease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Lease to be drafted.  In the event of any action, suit, arbitration, dispute, or proceeding affecting the terms of this Lease, no weight shall be given to any deletions or striking out of any of the terms of this Lease contained in any draft of this Lease and no such deletion or strike out shall be entered into evidence in any such action, suit, arbitration, dispute, or proceeding nor given any weight therein.

70.     <u>Sprinkler System</u>.  If a sprinkler system, or any modification of or supplement to any existing or subsequently installed sprinkler system, is at any time required by any law, rule, or ordinance applicable to the Premises, Tenant, at its sole cost and expense, shall install, modify and/or supplement and at all times maintain in good order and repair such sprinkler system in the Premises complying with the standards established or recommended by the New York Fire Insurance Exchange or any bureau, department or official of the federal, state, or city government having jurisdiction thereof during the Term. Tenant shall be responsible for retaining a third party to maintain and monitor the sprinkler system at the sole cost and expense of Tenant, in default of which Landlord may cause such sprinkler system to be maintained and monitored and collect from Tenant, as Additional Rent payable upon demand, the full cost thereof and interest thereon at the rate of interest set forth in Article 75 hereof.

71.     <u>Tenant's Property</u>.  In addition to the items specifically set forth in Article 3 of this Lease, except to the extent specifically provided herein to the contrary, all floor coverings and all heating, ventilating, air conditioning, plumbing, ducting, electrical and sprinkler systems, machinery and equipment exclusive of Tenant's Property or trade fixtures installed in the Premises at any time either by Tenant or by Landlord on Tenant's behalf shall, upon installation, become the property of Landlord and shall remain upon and be surrendered with the Premises on termination of this Lease. **"Tenant's Property"** shall be defined as all movable partitions, trade fixtures, machinery and equipment and other equipment and personalty which are not attached to or built into the Premises, which are installed in the Premises by or for the account of Tenant, without expense to Landlord, and can be removed without structural damage to the Premises, and all furniture, furnishings, and other articles of movable personal property owned by Tenant and located in the Premises, shall be and shall remain the property of Tenant and may be removed by Tenant at any time during the Term of this Lease; provided that if any of Tenant's Property is removed, Tenant shall promptly repair or pay the cost of repairing any damage to the Premises resulting from such removal, ordinary wear and tear excepted.

72.     <u>Compliance with Laws</u>.  Tenant shall not use or suffer or permit any person to use the Premises for any unlawful purposes.  Tenant shall comply with all Legal Requirements and applicable laws, resolutions, codes, rules, and regulations of any department, bureau, agency, or any governmental authority having jurisdiction over the operation, occupancy, maintenance, and use of the Premises for the purposes set forth herein.  Notwithstanding anything to the contrary in this Lease, Tenant shall be liable for all compliance in the Premises with The Americans with Disabilities Act of 1990 Public Law 101-336, 42 U.S.C.A. §§12102 et. Seq.  Tenant agrees to indemnify, defend, and save Landlord, its officers, directors, shareholders, members, and agents harmless from and against any claim, penalty, loss, damage, or expense (including, without limitation, reasonable attorneys' fees and disbursements) imposed by reason of a violation of any

-29-

applicable law or the rules and regulations of governmental authorities having jurisdiction related to Tenant's use and occupancy of the Premises, unless directly or indirectly arising from the gross negligence or intentional misconduct of Landlord, its agents, employees, or contractors. If Tenant receives written notice of any violation of Legal Requirements and/or insurance requirements applicable to the Premises, Tenant shall give prompt notice thereof to Landlord.

73.　　<u>Repairs and Maintenance</u>.　Tenant shall permit Landlord to erect, use, maintain, and repair pipes, ducts, cables, conduits, plumbing, vents, and wires in, to, and through the Premises and staging, scaffolding, protective sidewalk coverings, and the like in and around the exterior of the Building, including, without limitation, at or near the entrance to the Premises, in connection with interior and exterior renovations and repairs and construction by Landlord as and to the extent that Landlord may now or hereafter deem to be necessary or appropriate for the proper operation and maintenance of the Building and/or below grade garage or to the extent necessary to accommodate the requirements of other tenants.　All such work shall be done, so far as practicable in the judgment of Landlord, in such manner as to avoid unreasonable and unnecessary interference with Tenant's use or occupancy of the Premises.　Any repairs and maintenance by Landlord, pursuant to the provisions of this Lease shall not entitle Tenant to an abatement or damages.　Nothing herein shall imply any obligation on the part of Landlord to perform any maintenance, repairs, or other work with respect to the Premises.

74.　　<u>Non-Liability</u>.　(a)　Tenant and all those claiming by, through or under Tenant shall store their property in and shall occupy and use the Premises and any improvements therein and appurtenances thereto and, subject to the provisions hereof, the Basement Space, solely at their own risk and Tenant and all those claiming by, through or under Tenant, hereby release Landlord, Landlord's agents and any mortgagee(s) and superior lessor(s) to the full extent permitted by law from all claims of every kind, including loss of life, bodily or personal injury, damage to merchandise, equipment, fixtures or other property, or damage to business or for business interruption, arising directly or indirectly out of, from, or on account of such occupancy and use or resulting from any present or future condition or state of repair thereof attributable to Tenant, except for liability or claims arising from the gross negligence or willful misconduct of Landlord, its managers, agents, representatives, contractors, or employees.

　　　　　(b)　　Landlord shall not be responsible or liable for any damages at any time to Tenant, or to those claiming by, through or under Tenant, for any loss of life, bodily or personal injury, or damage to property or business, or for business interruption, that may be occasioned by or through the acts, omissions, or negligence of any other persons, any other tenants, or occupants of any portion of the Building, or caused by operations in construction of any private, public, or quasi-public work unless due to the gross negligence or willful misconduct of Landlord, its managers, agents, representatives, contractors, or employees.

　　　　　(c)　　Landlord makes no representations of any kind whatsoever with respect to any use of the Premises or legal compliance under any zoning laws, labor laws, the Department of Buildings of the City of New York regulations, fire laws, Americans with Disabilities Act, or any other laws relating to the use or manner of use of the Premises and Tenant shall indemnify and hold Landlord harmless from and against any claims, fines, penalties, or violations incurred in connection with Tenant's use and/or manner of use of the Premises.

75.　　<u>Interest</u>.　Without reducing or adversely affecting any of Landlord's rights and remedies under this Lease, any sums expended by Landlord in performing any of Tenant's obligations hereunder shall bear interest from the date of such expenditure until same is repaid to Landlord, at the then-prevailing prime rate of interest Published by The Wall Street Journal plus 5%; *provided, however*, in no event shall such interest be in excess of the highest rate of interest which shall from time to time be permitted under the laws of the State of New York.　In addition to any other remedy which Landlord may have pursuant to this Lease, or by law, and in addition to any late charge which may be assessed against Tenant pursuant to Article 47 of this Lease, Tenant shall pay interest on any payment of Fixed Annual Rent (as escalated) or Additional Rent which Landlord fails to receive by the fifteenth (15th) day of any month at the rate as hereinbefore provided in this Article.　All such interest shall accrue from and after the date when such payment first became due to and including the date paid in full and all such interest shall constitute Additional Rent unless otherwise provided elsewhere under this Lease.

-30-

76.     Notices.  Supplementing and modifying Article 27 of this Lease, any notice or other communication (other than any bill and/or Tax Statement, which may be hand delivered or sent by ordinary mail without the necessity of a receipt) which either party may desire or be required to give to the other under this Lease (each, a **"notice"**) shall be deemed sufficiently given or rendered if in writing and sent by nationally recognized overnight delivery service or by certified mail, return receipt requested, with a copy by email, as follows:  In the case of notice to Tenant, it shall be mailed to Tenant at the Premises and

With a copy in like manner to:

> Edward B. Hubbuch
>  394 Lincoln Place, #A5
>  Brooklyn, NY 11236
>
> Email: bart@getmemphisseoul.com

and in the case of the Landlord, as follows:

> c/o J&M Realty Services, Corp.
> 343 St. Nicholas Avenue
> New York, NY 10027
> Attn: Jerry Edelman

With a copy in like manner to:

> Cornicello, Tendler & Baumel-Cornicello, LLP
> 29 Broadway , 25th Floor
> New York, New York 10005
> Attn: Anthony J. Cornicello, Esq.
> Email: acornicello@ctbclaw.com

Any notice shall be deemed to have been rendered or given (x) on the second business day following the date when it shall have been mailed as provided in this Article 76, or (y) on the first business day following the day sent if sent by overnight delivery service.  Either party shall have the right to substitute addresses for such notices upon prior written notice to the other, given in the manner hereinabove set forth.  A notice given by a party's attorneys, or in the case of Landlord, by its Managing Agent, shall be deemed given by such party.

Notwithstanding any other provision of this Lease, in the bringing of a summary nonpayment proceeding under New York Real Property Actions and Proceedings Law, Sections 711(2) and 735, or any similar subsequent statute, the obligations of Landlord under this Lease shall in no way be expanded by this Lease beyond the statutory minimum standards for service of a demand, notice of petition, or petition.

77.     Consent to Jurisdiction.  Tenant irrevocably:  (i) submits to the jurisdiction of any federal or state court of competent jurisdiction sitting in the State of New York, City and County of New York with respect to any suit, action, or other proceeding arising out of or relating to this Lease; and (ii) waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the venue of any such suit, action, or other proceeding brought in any such court and any claim that any such suit, action or other proceeding has been brought in an inconvenient forum.  Final judgment in any such suit, action, or proceeding brought in any such court shall be conclusive and binding upon Tenant and may be enforced in any court to the jurisdiction of which Tenant is subject, by a suit upon such judgment.  Service may be made by any other means permitted by law.  Nothing in this Article shall limit the right of Landlord otherwise to bring proceedings against Tenant in the courts of any jurisdiction or jurisdictions or affect the right of Landlord to serve process in any manner otherwise permitted by the law of such jurisdiction or jurisdictions.  Notwithstanding anything to the contrary contained in this Lease, for purposes of New York State Real Property Actions and Proceedings Law Section 735, the principal place of business of Tenant is agreed and understood to be at the Premises which are the subject of this

-31-

Lease and service of process upon Tenant at any portion of the space demised by this Lease shall be deemed effective with regard to the same or any other space demised by this Lease.

78.   Subordination.

    A.   This Lease, and all rights of Tenant hereunder, are and shall be subject and subordinate to all ground leases, overriding leases, and underlying leases of the Land and/or the Building and/or that portion of the Building of which the Premises are a part, now or hereafter existing and to all mortgages which may now or hereafter affect the Land and/or the Building and/or that portion of the Building of which the Premises are a part and/or any of such leases, whether or not such mortgages shall also cover other lands and/or buildings and/or leases, to each and every advance made or hereafter to be made under such mortgages, and to all renewals, modifications, replacements, and extensions of such leases and such mortgages and spreaders and consolidations of such mortgages. This Article 78 shall be self-operative and no further instrument of subordination shall be required. In confirmation of such subordination, Tenant shall promptly execute, acknowledge, and deliver any instrument that Landlord, the lessor under any such lease or the holder of any such mortgage or any of their respective successors in interest may reasonably request to evidence such subordination. Any lease to which this Lease is, at the time referred to, subject and subordinate is herein called "**Superior Lease**" and the lessor of a Superior Lease or its successor in interest, at the time referred to, is herein called "**Superior Lessor**"; and any mortgage to which this Lease is, at the time referred to, subject and subordinate is herein called "**Superior Mortgage**" and the holder of a Superior Mortgage is herein called "**Superior Mortgagee.**"

    B.   If any act or omission of Landlord would give Tenant the right, immediately or after lapse of a period of time, to cancel or terminate this Lease, or to claim a partial or total eviction, Tenant shall not exercise such right (a) until it has given written notice of such act or omission to Landlord and each Superior Mortgagee and each Superior Lessor whose name and address have been furnished to Tenant in this Lease or subsequently by written notice, and (b) until a reasonable period for remedying such act or omission shall have elapsed following the giving of such notice and following the time when such Superior Mortgagee or Superior Lessor shall have become entitled under such Superior Mortgage or Superior Lease, as the case may be, to remedy the same (which reasonable period shall in no event be less than the period to which Landlord would be entitled under this Lease or otherwise, after similar notice, to effect such remedy), provided such Superior Mortgagee or Superior Lessor shall with due diligence give Tenant notice of intention to, and commence and continue to, remedy such act or omission.

    C.   Upon request by Tenant, Landlord will request that the holder of the existing mortgage secured by the Building, and any future mortgagee enter into a subordination, non-disturbance, and attornment agreement ("SNDA") with Tenant and will use commercially reasonable efforts to cause said lender to enter into an SNDA with Tenant. Landlord makes no representation that the holder of the mortgage or any future mortgagee will enter into a SNDA with Tenant. The failure of the holder of the existing mortgage or any future mortgagee to enter into an SNDA with Tenant shall not be a default by Landlord of its obligation under this Lease.

79. Fire Control and Detection.

    (a)   All work performed, Alterations, Tenant's Initial Alterations, or installations made by Tenant (or by Owner at Tenant's request and expense) in and to the Premises shall be in compliance with the requirements of Law as heretofore and hereafter amended. The foregoing shall include, without limitation, (i) compliance with fire detector/suppression requirements, (ii) installation or relocation of existing fire detection devices, if any, alarm signals and/or communication devices necessitated by the alteration of the Premises, and (iii) installation of such additional fire control or detection devices as may be required by applicable governmental or quasi-governmental rules, regulations or requirements (including, without limitation, any requirements of the New York Board of Fire Underwriters) as a result of Tenant's alterations or its specific use of the Premises.

    (b)   Owner shall not be responsible for any damage to any fire control or detection devices located within and exclusively serving the Premises.

(c)     Tenant must install and pay for a fire monitoring system. If Tenant fails to make payment of any charges in connection with fire monitoring, Landlord may pay same on Tenant's behalf and Tenant shall reimburse Landlord for such amounts expended with interest as provide for in Article 75.

80.     <u>Elevator.</u> [Intentionally Omitted]

81.     <u>Liquor License.</u>    Tenant may sell alcoholic beverages at the Premises. Tenant agrees to promptly apply to SLA for a liquor license and shall promptly provide SLA with all documents requested in connection therewith. Landlord shall cooperate with Tenant in connection with Tenant's application for a liquor license.

Tenant's obligations hereunder are not contingent upon obtaining a liquor license. If Tenant obtains a liquor license, liquor may be sold only in compliance with the terms of such liquor license and rules and regulations of the New York State Liquor Authority.

82.     <u>Tenant's Certificate.</u>    Tenant shall, without charge at any time and from time to time, within twenty (20) days after request by Landlord, certify by written instrument, duly executed, acknowledged and delivered and given with the express knowledge that any party may rely on the information set forth in said instrument, to any mortgagee, assignee of any mortgage, or to any purchaser, or any proposed mortgagee, assignee of any mortgage or purchaser, or any other person, firm or corporation specified by Landlord:

(a)     that this Lease is unmodified and in full force and effect (or, if there has been modification, that the Lease is in full force and effect as modified and stating the modifications) and that both the Landlord and the Tenant are not then in default under this Lease (or, if there has been a default, stating the default(s), if any);

(b)     whether or not there are then existing any setoffs or defenses against the enforcement of any of the agreements, terms, covenants, or conditions hereof upon the part of Tenant to be performed or complied with (and, if so, specifying the same);

(c)     the dates, if any, to which the rental, additional rental, and other charges hereunder have been paid in advance, and stating the rental, additional rent, and other charges provided for in the Lease;

(d)     the Commencement Date and Expiration Date of the Lease;

(e)     whether or not any rental has been paid more than thirty (30) days before the due date, and whether or not the Tenant has any unsatisfied claim against Landlord;

(f)     the Security Deposit (if any) deposited by Tenant under the Lease;

(g)     whether any actions, whether voluntary or otherwise, are pending against the Tenant under the bankruptcy laws of the United States or any state thereof; and

(h)     whether the Tenant has any option to renew or extend the Term or to expand the Premises, as the case may be, and whether the Tenant has any right of first refusal to purchase (or lease) the Premises or any part thereof or the Building in which the Premises are located.

In the event that Tenant fails to deliver to Landlord the aforesaid certificate within the time period described hereinabove, then Tenant herein unconditionally agrees that it shall be liable on demand to pay Landlord the sum of $100.00 for each day that Tenant is late in delivering the aforesaid certificate to Landlord, such sum to be as and for Landlord's full and complete liquidated and agreed monetary damages suffered by reason of Tenant's failure to timely deliver an estoppel certificate to Landlord.  In addition to the foregoing, Landlord reserves the right to exercise any further rights or remedies available to it under the Lease, at law or equity by reason of Tenant's default hereunder.

-33-

Initials: Landlord _____ Tenant <u>EBH</u>

83.     <u>Basement Space</u>. Tenant shall have full use of that portion of the basement in the Premises which has been demised to Tenant (exclusive of any meter and boiler rooms, the "**Basement Space**") and Landlord, throughout the Term, shall have free, unfettered access to all mechanical installations of Landlord, including but not limited to the meter and boiler rooms, and Tenant shall not construct partitions or other obstructions and shall not place or store or permit the storage or placement of any item(s) that may prevent or interfere with Landlord's free access thereto, or interfere with the moving of Landlord's equipment to and from the enclosures containing said installations. Landlord shall use commercially reasonable efforts not to disrupt Tenant's use of the Basement Space or the Premises while Landlord is exercising Landlord's right to enter the Basement Space and the Premises. In the event Landlord needs to enter the Basement Space to access the mechanical installations, Landlord shall provide Tenant with at least twenty-four (24) hours prior notice (which notice may be provided telephonically or via email) except in the case of an emergency.

84.     <u>Termination Option</u>. [Intentionally Omitted]

85.     <u>Force Majeure</u>. As used herein "**Force Majeure**" shall mean the occurrence of any strike, lockout, act of God, pandemic, enemy action, civil commotion, or similar event or any other cause beyond the Landlord's reasonable control, as the case may be, which prevents, hinders, or delays the performance by Landlord of any obligation imposed upon it hereunder. If either Landlord shall be delayed, hindered, or prevented in any manner from performance of any of its obligations hereunder by reason of Force Majeure, the time for performance of such obligation shall be extended accordingly for the period of such delay.

86.     <u>Consents and Approvals; Fees</u>. In all circumstances under this Lease where the prior consent or permission of Landlord is required before Tenant is authorized to take any particular type of action, such consent must be in writing and the determination of whether to grant such consent or permission shall be, except as expressly provided otherwise herein, within the reasonable judgment and discretion of Landlord. Wherever in this Lease Landlord's consent or approval is required, if Landlord shall delay or refuse such consent or approval, Tenant in no event shall be entitled to make, nor shall Tenant make, any claim, and Tenant hereby waives any claim for money damages (nor shall Tenant claim any money damages by way of set-off, counterclaim, or defense) based upon any claim or assertion by Tenant that Landlord unreasonably withheld or unreasonably delayed its consent or approval. Tenant's sole remedy shall be an action or proceeding to enforce any such provision, for specific performance, injunction, or declaratory judgment. Whenever Tenant requests Landlord to take any action not required of it hereunder or give any consent required or permitted under this Lease, Tenant shall reimburse Landlord for Landlord's reasonable, out-of-pocket costs payable to third parties and incurred by Landlord in reviewing the proposed action or consent, including reasonable attorneys', engineers' or architects' fees, within thirty (30) days after Landlord's delivery to Tenant of a statement of such costs.

87.     <u>Tenant Access</u>. Tenant shall have uninterrupted access to the Premises twenty-four (24) hours a day, seven (7) days a week.

88.     <u>Sidewalk Seating and Street Seating</u>. Subject to obtaining all required permits, Tenant may use the sidewalk adjacent to the Premises and street in front of the Premises for outdoor seating, subject further to Landlord's approval, which may not be unreasonably withheld or delayed.

89.     <u>Existing Fixtures and Equipment</u>. Tenant is aware that the Premises may contain fixtures and equipment installed by a prior Tenant. Landlord shall allow Tenant to use such fixtures and equipment. Tenant acknowledges and accepts such fixtures and equipment in as-is condition. Landlord makes no representation or warranty that any fixtures and equipment are in working order or are suitable for Tenant's use.

90.     <u>Option to Renew</u>.

90.1     Tenant shall have the right, at its option, to renew this Lease for all of the Premises, for a renewal term (the "Renewal Term") of five (5) years. The Renewal Term shall commence ("the Renewal Term Commencement Date") on the day after the Expiration Date and shall end on

Initials: Landlord \_\_\_\_\_ Tenant <u>EBH</u>

the fifth (5th) anniversary of the Expiration Date (the "Renewal Term Expiration Date"). Tenant shall exercise the option described herein by giving Owner written notice of such election to renew not later than three (3) months prior to the Expiration Date ("Tenant's Renewal Notice"), and, upon the giving of such Renewal Notice, this Lease shall thereupon be deemed renewed for the Renewal Term with the same force and effect as if the Renewal Term had originally been included in the Term. **TIME IS OF THE ESSENCE** with respect to Tenant's Renewal Notice. Tenant's option to renew this Lease shall be conditioned upon Tenant not being in default for any reason whatsoever beyond any applicable period of notice and/or grace under this Lease and upon the Lease being in full force and effect on the date of Owner's receipt of Tenant's Renewal Notice and on the Renewal Term Commencement Date. Any termination, cancellation, or surrender of the entire interest of Tenant under this Lease at any time during the Term (but not an assignment of this Lease) shall terminate any right of renewal of Tenant hereunder. In the event Tenant shall have exercised this renewal option, the terms "Commencement Date," "Expiration Date," and "Term" used in this lease shall be deemed to refer to the Renewal Term Commencement Date, the Renewal Term Expiration Date and the Renewal Term for all purposes hereunder, respectively.

90.2　All terms, covenants, and conditions of this Lease shall continue in full force and effect during the Renewal Term, except that Tenant shall have no right to further renew or extend the Term and the Base Rent for the Renewal Term shall be for the first year of such term an amount equal to the Base Annual Rent payable in the year in which the Expiration Date escalated by 3% , and shall thereafter increase each ensuing year of the Renewal Term each ensuing year of the Renewal Term by 3%. Owner shall not grant any free rent periods or other concessions, perform any work for Tenant in the Demised Premises or the Building, provide any services in addition to the services provided for herein or make any other contribution to Tenant in connection with the Renewal Term.

91.　<u>Landlord's Contribution.</u> Landlord shall contribute an amount up to $35,000.00 to reimburse Tenant for hard costs in connection with Tenant's Initial Work. Tenant shall submit to Landlord a written request for reimbursement along with a schedule of work completed, copies of bills from contractors/suppliers, and copies of cancelled checks (or other proof of payment satisfactory to Landlord) in payment of same. Provided Tenant is not in default of this Lease at the time of such request, Landlord shall reimburse Tenant by check payable to Tenant in an amount of up to $35,000.00 within thirty (30) days of such request.

<p align="center">*　　*　　*　　*　　*</p>

<p align="center">[The remainder of this page is left intentionally blank.]</p>

Initials: Landlord _____ Tenant EBH_

**IN WITNESS WHEREOF**, the parties hereto have signed this Lease as of the date first written above.

<u>LANDLORD</u>:

Lunar Estates, LLC d/b/a
Lunar Estates of CA, LLC


By: _____
      Won Moon, Member


<u>TENANT</u>:

TASTELAND HOLDINGS LLC


By: *Edward B. Hubbuch*
      Name: EDWARD B. HUBBUCH
      Title: Owner

EXHIBIT A

LANDLORD'S WORK

Landlord to deliver possession of Premises upon execution of Lease in as in condition.

EXHIBIT B

TENANT'S INITIAL WORK

(Tenant's Plans to be attached)


As a material inducement to procure this Lease, in addition to Tenant's other obligations as set forth in this Lease, Tenant shall, at its sole cost and expense, provide all materials and perform all work required to construct a first-class installation and open the Premises for business, subject in all respects to all the terms and conditions of this Lease.  It is specifically understood that Tenant's Initial Work shall include, but shall not be limited to, the following:

**Complete Renovation of Premises and full restaurant buildout.**


**ANY AND ALL TENANT'S WORK, INCLUDING TENANT'S INITIAL WORK, SHALL BE CONDUCTED IN A GOOD AND WORKMANLIKE MANNER SUBJECT IN EACH CASE TO ALL THE TERMS AND CONDITIONS OF THIS LEASE, INCLUDING, WITHOUT LIMITATION, LANDLORD'S PRIOR WRITTEN CONSENT.**

# EXHIBIT B-1

## TENANT'S SIGNAGE



EXHIBIT D

GUARANTY OF LEASE

**GUARANTY OF LEASE** (this "**Guaranty**") made as of the ____ day of October 2022 by Edward B. Hubbuch ("**Guarantor**"), having an address at 569 Lincoln Place, Apt. A5, Brooklyn, New York 11238 and the Social Security Number  xxx-xx-1806 for the benefit of Lunar Estates, LLC d/b/a Lunar Estates of CA, LLC having an address at c/o J&M Realty Services, Corp., 343 St. Nicholas Avenue, New York, New York 10027 ("**Landlord**").

W I T N E S S E T H:

**WHEREAS**, concurrently with the execution and delivery of this Guaranty, Landlord and Doner Haus LLC ("**Tenant**") have executed and delivered a lease (as the same may be amended, modified, extended and/or renewed from time to time, the "**Lease**") for certain premises (as more particularly described in the Lease, the "**Premises**") in the building located at 123 First Avenue, New York, New York 10003 (the "**Building**"); and

**WHEREAS**, as a specific and material inducement to Landlord to enter into the Lease with Tenant, Guarantor has agreed to execute and deliver this Guaranty, and by this Guaranty to guarantee Tenant's compliance with and performance of all of Tenant's obligations set forth in the Lease.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and as an inducement for Landlord to enter into the Lease with Tenant, Guarantor, for himself, his successors and assigns, covenants and agrees as follows:

1. Guarantor hereby, absolutely, unconditionally, and irrevocably guarantees to Landlord the full and faithful performance and observance of all obligations to be performed and observed by Tenant under the Lease, including, without limitation, the prompt and punctual payment of (a) all Annual Fixed Rent, Additional Rent and other charges, costs and expenses (including, without limitation, any sums expended on Tenant's behalf by Landlord, and all late charges, interest, and costs of collection and enforcement, including reasonable attorneys' fees), which shall at any time be or become payable by Tenant under the Lease and any amendments, modifications or renewals thereof and other instruments relating thereto from the date of any default beyond any cure period by Tenant thereunder for the twelve (12) month period beginning on October 1, 2022 and ending on September 30, 2023 and thereafter through and including the Surrender Date (as hereinafter defined) (collectively, "**Rent**"), (b) any sums due in connection with the use or occupancy of the Premises, including, without limitation, any month-to-month or other tenancy that may arise from and after the date of expiration or sooner termination of the Lease or any extension or renewal thereof, (c) all damages caused, and all costs and expenses incurred by Landlord, by reason of any act or omission of Tenant, including, without limitation, Tenant's alterations or improvements, the installation or removal of any of Tenant's property, the failure to maintain, repair or restore the Premises or the systems therein or the components thereof, or the failure to pay for work performed by or on behalf of Tenant at, and/or materials supplied to, the Premises including, without limitation, the failure to remove any mechanic's liens filed against the Building, and (d) the prompt and punctual payment of all costs and expenses incurred by Landlord which would have been covered by insurance policies to be maintained by Tenant but which sums were not paid as a result of any act or omission attributable to Tenant, including, without limitation, Tenant's failure to maintain such policies (the foregoing items (a) through (d) hereinafter being collectively referred to as "**Tenant's Accrued Liabilities**").  Guarantor covenants to Landlord that if Tenant shall at any time during the Term, or any extension or renewal thereof, default in the payment of any such Rent or other sums and charges payable with respect to the Premises, Guarantor shall, pay all such sums, and Guarantor shall pay all reasonable attorneys' fees and related disbursements incurred by Landlord resulting from any such default and/or the enforcement of this Guaranty.  Nothing herein shall in any way be deemed a limitation, modification, or waiver of Landlord's rights and remedies as against Tenant under the Lease including, without limitation, Landlord's right to retain and apply the Security Deposit deposited thereunder.

As used herein, the term "**Surrender Date**" shall mean the date that Tenant shall have (i) vacated and surrendered the Premises to Landlord free of all sublessees, licensees or other occupants, broom-clean and otherwise in the condition required for the surrender thereof at the end of the Term, or any extension or renewal thereof, as set forth in the Lease, (ii) delivered the keys to the Premises directly to Landlord, (iii) given to Landlord not less than one hundred twenty (120) days' prior written notice of its intention to vacate the Premises, and (iv) fully complied with all Tenant's Accrued Liabilities.

As used herein, the term "**Tenant**" shall mean all persons or entities at any time holding the tenant's interest in the Lease, including, without limitation, the Tenant named in the Lease, its successors, assigns and sublessees, a trustee of a Tenant's estate in any bankruptcy or insolvency proceeding, an assignee of Tenant's interest in the Lease by assignment pursuant to any bankruptcy or insolvency laws, and their respective successors and permitted assigns, notwithstanding that the Tenant named in the Lease may no longer be in possession and that the Landlord may not have consented to such assignment.

2. Aside from the Surrender Date provisions supra, this is an absolute and unconditional guaranty of payment and of performance, and Guarantor further waives any right to require that any action be brought against Tenant (or any other person or entity) to require that resort be had to any security deposit under the Lease or to any other security or to any balance of any deposit account or credit on the books of Landlord in favor of Tenant or any other person or entity. No invalidity, irregularity or unenforceability of all or any part of the Lease shall affect, impair or be a defense to this Guaranty. The validity of this Guaranty and the obligations of Guarantor hereunder shall not be terminated, affected, or impaired by reason of Landlord's assertion of, or failure to assert against Tenant (or any other party or entity), any of Landlord's rights or remedies pursuant to the provisions of the Lease or applicable law. Guarantor's liability under this Guaranty shall be primary and in any right of action which may accrue to Landlord under the Lease, Landlord may, at its option, proceed against Guarantor or Tenant, without having commenced any action against or having obtained any judgment against Tenant or Guarantor. Successive recoveries may be had hereunder.

3. All monies available to Landlord for application in payment or reduction of Tenant's Accrued Liabilities may be applied by Landlord, in such manner and in such amounts and at such time or times as Landlord may see fit, to the payment or reduction of such of Tenant's Accrued Liabilities as Landlord may elect. Guarantor hereby expressly waives: (a) notice of acceptance of this Guaranty; (b) presentment and demand for payment of any of Tenant's Accrued Liabilities; (c) protest and notice of dishonor or default to Guarantor or to any other party with respect to any of Tenant's Accrued Liabilities; (d) all other notices to which Guarantor might otherwise be entitled; and (e) any demand for payment under this Guaranty.

4. Notwithstanding any payments made by Guarantor hereunder, Guarantor shall not be subrogated to any of the rights of Landlord against Tenant for any payment, nor shall Guarantor seek any reimbursement from Tenant in respect of payments made by Guarantor hereunder, until Tenant's Accrued Liabilities have been paid in full.

5. This Guaranty shall be a continuing guaranty and Guarantor's obligations under this Guaranty shall remain in full force and effect without regard to, and shall not be impaired or affected by: (a) any amendment, extension, renewal, or modification of, or addition or supplement to, any of the terms, conditions or provisions of the Lease, or the actual or purported assignment of any of the obligations, covenants and agreements contained in this Guaranty or the Lease or the actual or purported assignment of Tenant's leasehold estate under the Lease, or any subletting of the Premises or any portion thereof; (b) any substitution or release, in whole or in part, of any security for the Lease or this Guaranty which may be held at any time by Landlord; (d) any exercise or non-exercise by Landlord of any right, power, or remedy under or in respect of the Lease or any security held at any time by Landlord (including any security deposit under the Lease), or any waiver of any such right, power, or remedy; (e) the voluntary or involuntary commencement of any case or proceeding under the Federal Bankruptcy Code or any state or foreign bankruptcy, insolvency, or similar statute affecting Tenant or any other guarantor, the liquidation, dissolution,

merger, consolidation, sale, or other disposition of all or substantially all of the assets of Tenant or any other guarantor, the marshalling of the assets and liabilities, receivership, insolvency, assignment for the benefit of creditors, the reorganization, arrangement, composition with creditors, or re-adjustment of debts or other similar events of proceedings, or the appointment of a receiver, conservator, custodian or sequestrator of all or part of the property of Tenant or any other guarantor, or any allegation or contest of the validity of this Guaranty or the Lease in any such proceeding or the discharge or release of Tenant or any other guarantor in any such proceeding; it being specifically understood, consented and agreed to that this Guaranty shall remain and continue in full force and effect and shall be enforceable against Guarantor to the same extent and with the same force and effect as if such events and proceedings had not been instituted; and it is the intent and purpose of this Guaranty that Guarantor shall and does hereby waive all rights and benefits which might accrue to Guarantor by reason of any such proceeding or case; (f) any limitations of Tenant's liability under the Lease or which may now or hereafter be imposed by any statute, regulation or rule of law, or any illegality, irregularity, invalidity or unenforceability, in whole or in part, of the Lease;  h) any failure of Landlord to mitigate the damages resulting from any default by Tenant under the Lease, (i) any failure by Landlord to preserve any security under the Lease; or (j)any other circumstance, whether or not Guarantor shall have had notice or knowledge thereof.

6.  If Tenant becomes insolvent or shall be adjudicated bankrupt or shall file for reorganization or similar relief, or if such petition is filed by Tenant's creditors under any future Federal or State law, Guarantor's obligations hereunder may nevertheless be enforced against Guarantor.  The termination of the Lease pursuant to the exercise of any rights of a trustee or receiver in any of the foregoing proceedings shall not affect Guarantor's obligations hereunder or create in Guarantor any set-off against such obligations.  Neither Guarantor's obligations under this Guaranty nor any remedy for enforcement thereof shall be impaired, modified, or limited in any manner by any impairment, modification, waiver, or discharge resulting from the operation of any present or future provision under the Federal Bankruptcy Act or any other statute or decision of any court.

7.  GUARANTOR HEREBY:  (A) IRREVOCABLY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY FEDERAL, STATE, COUNTY OR MUNICIPAL COURT SITTING IN THE COUNTY OF NEW YORK IN RESPECT TO ANY ACTION OR PROCEEDING BROUGHT THEREIN BY LANDLORD AGAINST GUARANTOR CONCERNING ANY MATTER ARISING OUT OF OR IN ANY WAY RELATING TO THIS GUARANTY OR THE LEASE; (B) EXPRESSLY WAIVES ANY RIGHTS OF GUARANTOR PURSUANT TO THE LAWS OF ANY OTHER JURISDICTION BY VIRTUE OF WHICH EXCLUSIVE JURISDICTION OF THE COURTS OF ANY OTHER JURISDICTION MIGHT BE CLAIMED;; (C) IRREVOCABLY WAIVES ALL OBJECTIONS AS TO VENUE AND ANY AND ALL RIGHTS GUARANTOR MAY HAVE TO SEEK A CHANGE OF VENUE WITH RESPECT TO ANY SUCH ACTION OR PROCEEDING; (E) AGREES THAT THE LAWS OF THE STATE OF NEW YORK (regardless OF ANY CONFLICTS OF LAWS PRINCIPLES) SHALL GOVERN IN ANY SUCH ACTION OR PROCEEDING, AND WAIVES ANY DEFENSE TO ANY ACTION OR PROCEEDING GRANTED OR ALLOWED BY THE LAWS OF ANY OTHER COUNTRY OR JURISDICTION UNLESS SUCH DEFENSE IS ALSO ALLOWED BY THE LAWS OF THE STATE OF NEW YORK; AND (F) AGREES THAT ANY FINAL JUDGMENT RENDERED AGAINST GUARANTOR IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW, AND EXPRESSLY CONSENTS TO THE AFFIRMATION OF THE VALIDITY OF ANY SUCH JUDGMENT BY THE COURTS OF ANY OTHER JURISDICTION SO AS TO PERMIT EXECUTION THEREON.  GUARANTOR FURTHER AGREES THAT ANY ACTION OR PROCEEDING BY GUARANTOR AGAINST LANDLORD WITH RESPECT TO ANY MATTERS ARISING OUT OF OR IN ANY WAY RELATING TO THE LEASE SHALL BE BROUGHT ONLY IN THE STATE OF NEW YORK, COUNTY OF NEW YORK.  GUARANTOR HEREBY REPRESENTS THAT they are aware of NO LAWS WHICH WOULD PRECLUDE, IMPAIR, OR HINDER THE RECOGNITION OF ANY JUDGMENT RENDERED BY ANY SUCH COURT SITTING IN THE STATE OF NEW YORK BY AND THE ENFORCEMENT OF ANY SUCH JUDGMENT BY, THE COURTS OF ANY OTHER JURISDICTION, AND GUARANTOR AGREES THAT GUARANTOR SHALL

NOT INTERPOSE ANY DEFENSE OR CLAIM AGAINST, AND SHALL CONSENT TO THE ISSUANCE OF, ALL NECESSARY DOCUMENTS BY THE COURTS OF ANY OTHER JURISDICTION IN ORDER TO EXECUTE UPON ANY SUCH JUDGMENT.  NOTHING IN THIS GUARANTY SHALL AFFECT THE RIGHT OF LANDLORD TO SERVE PROCESS IN ANY MANNER PERMITTED BY LAW.

8.   AS A FURTHER INDUCEMENT TO LANDLORD TO ACCEPT THE LEASE AND IN CONSIDERATION THEREOF, GUARANTOR AGREES THAT IN ANY ACTION OR PROCEEDING BROUGHT ON, UNDER OR BY VIRTUE OF THE GUARANTY, GUARANTOR SHALL AND DOES HEREBY WAIVE TRIAL BY JURY.

9.   Guarantor represents and warrants to Landlord that Guarantor has the full power, authority, and legal right to execute and deliver, and to perform and observe the provisions of, this Guaranty including the payment of all monies hereunder.  This Guaranty constitutes the legal, valid, and binding obligation of Guarantor enforceable in accordance with its terms and does not conflict with and is not prohibited by any agreement, document or any other instrument or the order of any court to which Guarantor is a party or by which Guarantor is bound.

10. Guarantor represents and warrants that, as of the date hereof, and after giving effect to this Guaranty and the obligations evidenced hereby, (i) he is solvent and will not be rendered insolvent by this Guaranty or the enforcement of Landlord's rights and remedies under this Guaranty, (ii) the fair saleable value of Guarantor's assets exceeds and are expected to continue to exceed Guarantor's known liabilities (both fixed and contingent), and (iii) Guarantor is and expects to continue to be able to pay Guarantor's debts as they mature.

11. Guarantor covenants and agrees with Landlord that Guarantor shall not, so long as Guarantor's obligations under this Guaranty continue, transfer or pledge any material portion of Guarantor's assets for less than full and adequate consideration.

12. All of Landlord's rights and remedies under the Lease or under this Guaranty are intended to be distinct, separate, and cumulative and no such right and remedy therein or herein mentioned is intended to be in exclusion of or a waiver of any of the others.

13.   This Guaranty contains the sole and entire understanding and agreement with respect to its entire subject matter, and all prior discussions, representations, agreements, and understandings heretofore had with respect thereto are merged herein.  This Guaranty cannot be changed or terminated orally.

14. If any provision of this Guaranty is held by a court of competent jurisdiction to be illegal, invalid, or unenforceable under present or future laws, such provision shall be fully severable, shall not impair or invalidate the remainder of this Guaranty and the effect thereof shall be confined to the provision held to be illegal, invalid, or unenforceable.

15. Guarantor's obligations and duties hereunder may not be assigned to any party without Landlord's prior written consent.

16.    Guarantor shall pay on demand all of Landlord's reasonable costs and expenses (including, without limitation, attorneys' and investigators' fees and disbursements) incurred in connection with the enforcement and/or collection of this Guaranty.

17. Guarantor represents and warrants that neither Guarantor nor, if Guarantor is other than an individual, any person owning, directly or indirectly, 10% or more of an interest in Guarantor, is an SDN.  For purposes of this Guaranty, an **"SDN"** is someone (a) who is on the list of "Specially designated Nationals and Blocked Persons" promulgated by the Office of Foreign Assets Control of the U.S. Department of the Treasury pursuant to 31 C.F.R. Part 500, or (b) with whom Landlord is prohibited or restricted from doing business pursuant to the United States Patriot Act or any other law, rule, regulation, order, or governmental action (an "**Anti-Terrorism Law**").  Guarantor shall, upon request of Landlord, provide (and cause each principal of Guarantor to provide) such information (including, without limitation, certification) as may be required to enable Landlord to comply with any Anti-Terrorism Law.

18. If Guarantor is an individual, then in the event of the death of Guarantor, the obligations of the deceased Guarantor under this Guaranty shall continue as an obligation against his estate as to all of Tenant's Accrued Liabilities that may be outstanding on the date of Guarantor's death, and any renewals or extensions thereof.  The terms and conditions of this Guaranty, including, without limitation, the consents and waivers set forth herein, shall remain in effect with respect to Tenant's Accrued Liabilities described in the preceding sentence in the same manner as if such Guarantor had not died.

19. Each reference herein to Landlord shall be deemed to include its successors and assigns, in whose favor the provisions of this Guaranty shall also inure.  Each reference herein to Guarantor shall be deemed to include the heirs, distributes, executors, administrators, legal representatives, successors, and permitted assigns of Guarantor, as applicable, all of whom shall be bound by the provisions of this Guaranty.

20. Capitalized terms not defined herein shall have the meanings as set forth in the Lease.

21.    Guarantor shall be released from the obligations herein upon the completion of all of Tenant's required obligations under the Lease.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.
SIGNATURE PAGE FOLLOWS.]

**IN WITNESS WHEREOF**, the undersigned has executed this Guaranty of Lease as of the date set forth above.

<div align="center">GUARANTOR:</div>

<div align="center"><em>Edward B. Hubbuch</em></div>
<div align="center">EDWARD B. HUBBUCH</div>

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) ss.: |
| County of __Kings__ | ) |

On the __19th__ day of October, in the year 2022, before me, the undersigned, a Notary Public in and for said State, personally appeared personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that, by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Signature and Office of individual taking acknowledgment

# EXHIBIT B

# PUBLIC INSTAGRAM ACCOUNT FOR
# LUNAR ESTATES OF CA LLC
# OWNER WON MOON



# EXHIBIT C

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: PART 52

-------------------------------------------------------------------X

LUNAR ESTATES, LLC d/b/a :     Index No. LT-322987-23/NY
LUNAR ESTATES OF CA, LLC, :
      :
       Petitioner-Landlord, :     **STIPULATION OF**
      :     **SETTLEMENNT**
       - against - :
      :
MEMPHIS SEOUL NO. 2 LLC, :
      :
       Respondent-Tenant, :
      :
"ABC CORP" and "XYZ INC" :
      :
       Respondents-Undertenants. :
      :
Address: 123 First Avenue :
       Ground Floor Store and Portion of :
       Basement Below
       New York, New York 10003

-------------------------------------------------------------------X

IT IS HEREBY STIPULATED AND AGREED, by and between the parties hereto

and their respective counsel that this proceeding is hereby settled as follows:

1.      Respondent MEPHIS SEOUL NO. 2 LLC ("Respondent") hereby appears

in this proceeding by its counsel Hamutal G. Lieberman and admits and concedes the personal

jurisdiction of this Court and waives any and all defenses that Respondent may have with respect

to this proceeding. Respondent agrees to the filing of this Stipulation in lieu of an Answer and

hereby waives, with prejudice, any counterclaims it might have as against Petitioner.

2.      Respondent hereby withdraws its order to show cause with prejudice.

3.    Respondent acknowledges that as of February 29, 2024, Respondent is in arrears in payment of rent, additional rent to Petitioner in the amount of $130,269.50, which amount includes water and sewer charges which have been billed though January 5, 2024 (the "Arrears").

4.    Respondent acknowledges that judgment of possession and warrant of eviction were properly issued.

5.    Respondent shall pay current rent and additional rent each month when due and shall make payment of the Arrears as follows:

    a)  $30,000.00 on or before May 1, 2024;

    b)  $30,000.00 on or before September 1, 2024; and

    c)  Commencing October 1, 2024 respondent shall pay the remaining arrears in eleven equal monthly payments of $5,855.80 with the balance of $5,855.70 to be paid by October 1, 2025. Provided Respondent has fully complied with the terms of this Stipulation by the beginning of the eleventh month, Petitioner shall credit Respondent's Arrears $6,072.00, which amount is equal to all late fees charged to date and will accept $5,639.50 for the eleventh month in full satisfaction of the Arrears.

6.    All payments shall be made on or before the 1st day of the month in which they are due.

7.    Petitioner shall apply all payments first to current rent, then to arrears accruing after the commencement of this proceeding, then to prior arrears.

8.    In the event of a default in the terms of this Stipulation which is not cured within five (5) days of notice to Respondent and Respondent's counsel sent by overnight delivery

using a nationally recognized overnight delivery service that maintains a package tracking system, Petitioner may accelerate the execution of the warrant of eviction. The earliest possible eviction date is October 2, 2025.

9.  In the event of a default by respondent, petitioner shall be entitled to recover all attorneys fees incurred from the inception of this proceeding and may restore this proceeding to the calendar by motion for a hearing on the amount of attorneys' fees incurred and for entry of a money judgment against respondent for all unpaid amounts due pursuant to this Stipulation.

10.  Provided Respondent is not in default under the terms of this Stipulation, upon Respondent's full compliance with all the terms of this Stipulation, the judgment of possession and the warrant of eviction shall be automatically vacated.

11.  Petitioner may desire to change the cold water meter, which measures the cold water consumption by the Premises, and install a meter which measures hot water being provided by the Petitioner to the Premises, if so, respondent shall provide access to Petitioner on forty-eight (48) hours' notice for the installation of hot and cold water meters by Petitioner at Petitioner's sole costs and expense.

12.  Respondent acknowledges that Respondent is required to provide its own hot water and that Petitioner has been providing hot water to the Premises free of charge since August, 2023. Petitioner may discontinue providing hot water to the Premises on thirty (30) days' notice to Respondent.

13.  This Court shall retain jurisdiction over this matter. Respondent shall not, under any circumstances, make any ex parte application to this Court or any other Court; except as permitted by this Stipulation. Subject to the foregoing, any applications to the Court must be made upon prior written notice to the other party's attorneys and they must be given the

FILED: NEW YORK CIVIL COURT - L&T 02/20/2024 03:49 PM INDEX NO. LT-322987-23/NY
NYSCEF DOC. NO. 38  Case 25-cv-04840-PGS  Document 11-1 Filed 07/14/25 Page 59 of 125  RECEIVED NYSCEF: 02/20/2024

opportunity to be present at the time of the application for the order to show cause.

14. The terms of this Stipulation are the result of extensive negotiations between the parties. This Stipulation shall be binding upon the respective parties, their heirs, assigns, executors, administrators and successors-in-interest to their property All parties shall be deemed to have drawn these documents in order to avoid any negative inference by any court as against the preparer of the document. This Stipulation may not be modified orally.

15. This Stipulation may be executed in one or more counterparts, each of which when so executed and delivered shall be deemed an original, but all of which when taken together shall constitute but one and the same instrument. Facsimile signatures shall be deemed original signatures. 16. Petitioner discontinues this proceeding as to Respondents ABC Corp. and XYZ Inc.

Dated: New York, New York
February 16, 2024

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]
[SIGNATURE PAGE TO FOLLOW

4 of 5

CORNICELLO, TENDLER &
BAUMEL-CORNICELLO, LLP
*Attorneys for Petitioner-Landlord*


By: _____
     Jason A. Kranzberg, Esq.

29 Broadway, 25th Floor
New York, New York 10006
(212) 994-0260
jkranzberg@ctbclaw.com

MEMPHIS SEOUL, NO. 2 LLC
*Respondent-Tenant*


By: *Edward B. Hubbuch*
     Name: Edward B. Hubbuch
     Title: Managing Partner


HELBRAUN & LEVEY, LLP
*Attorney for Respondent-Tenant*


By: *Hamutal Lieberman*
     Hamutal G. Lieberman, Esq.

40 Fulton Street, 28 Fl
New York, NY 10038
(212) 219-1193
Hamutal.lieberman@helbraunlevey.com

Z:\WP\101386-03\Stipulation of Settlement 02.15.24 v2.docx

So ordered:

Dated: 2/16/2024

HON. ILANA J. MARCUS

# EXHIBIT D



**Bart Hubbuch <bart@getmemphisseoul.com>**

## 123 First Avenue issues

**Bart Hubbuch** <bart@getmemphisseoul.com>                                  Wed, Feb 22, 2023 at 11:15 AM
To: Jack Mosseri <jmosseri@slrgrp.com>
Cc: Richard Blue <rblue@getmemphisseoul.com>

Jack:

Following up on our conversation last night:

**HOT WATER**

1. The hot water tank is missing and appears to have been recently removed.

2. According to my GC, who took pictures, the pipe to the hot water was recently cut using a special tool. The cut is "fresh," according to him, meaning in the past few days. The GC told me he washed his hands inside the unit as recently as last week and hot water was coming out of the faucet.

3. In addition to the cut in the pipe, a cap of some kind was placed on it (not by us).

**GAS CONNECTION**

1. The existing gas meter, which is the property of the gas company and is supposed to remain in place, is missing. My GC said the only logical explanation is that the landlord or one of his reps took it, because this was a functioning restaurant with gas as recently as last summer (Organic Grill).

2. Replacing a gas meter and getting the new one inspected is a costly and time-consuming process, according to my GC, and has the potential to severely delay our opening.

Now, I did insist in the lease on the utilities being direct-metered and not sub-metered, as they requested. But the above actions apparently taken by the landlord happened long after I signed the lease, were not done in consultation with us and would seemingly violate the lease's "as is" clause.

The attorney I used, Leopold Raic (lraic@rhakimlaw.com), was pro bono through a program for small businesses coordinated by the city. I need to check with him to see if follow-up like this still covered by that program or if I need to shell out for a retainer. If it is the latter, this would merely add to the pile of unnecessary costs caused by the landlord's behavior.

As I mentioned to you yesterday, I have been completely baffled by the landlord's adversarial relationship with us from literally the first moment I spoke with David Edelman (who told me he is also a part owner of the building along with being the property manager).

But please make it clear to Greg and the landlord that I am not afraid to stand up for myself. My attorney has already told me I have a very strong case for "fraudulent conveyance," should I choose that option. I would prefer not to, but that option is now on the table.

Bart

# EXHIBIT E

# KEY PARAGRAPH IN LEASE RIDER
# PERTAINING TO MANDATORY NOTICE
# OF BASEMENT ENTRY

83.	Basement Space.  Tenant shall have full use of that portion of the basement in the Premises which has been demised to Tenant (exclusive of any meter and boiler rooms, the "**Basement Space**") and Landlord, throughout the Term, shall have free, unfettered access to all mechanical installations of Landlord, including but not limited to the meter and boiler rooms, and Tenant shall not construct partitions or other obstructions and shall not place or store or permit the storage or placement of any item(s) that may prevent or interfere with Landlord's free access thereto, or interfere with the moving of Landlord's equipment to and from the enclosures containing said installations. Landlord shall use commercially reasonable efforts not to disrupt Tenant's use of the Basement Space or the Premises while Landlord is exercising Landlord's right to enter the Basement Space and the Premises.  In the event Landlord needs to enter the Basement Space to access the mechanical installations, Landlord shall provide Tenant with at least twenty-four (24) hours prior notice (which notice may be provided telephonically or via email) except in the case of an emergency.

# EXHIBIT F



Lunar Estates, LLC
c/o J&M Realty Services Corp.
343 St Nicholas Ave #1
New York, NY 10027

Barn United
673 Fifth Ave
13th Fl
New York, NY 10022

**1041**

DATE        AMOUNT

03/31/2023    $1,000.00

ONE THOUSAND AND 00/100

TO THE ORDER OF
BUILT RIGHT CONSTRUCTION INC.
24-39 92ND STREET
EAST ELMHURST, NY 11369

MEMO: 00091809 - 21

*J Edlen*

1041  026014588  9855545666

105619000157 TW04C020 2023-04-13 15:35:04
KeyAmt 1000.00
4327437366
408540XXXXXXXX9023

# EXHIBIT G

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF    NEW YORK
*TRIBUNAL CIVIL DE LA CIUDAD DE NEW YORK*
*CONDADO DE*    NEW YORK

INDEX NO. L/T    322987/23
MARSHAL'S DOCKET NO.    25502

**Petitioner**
*Landlord*

LUNAR ESTATES LLC DBA LUNAR
ESTATES OF CA LLC   **against**

**Respondent**
*Tenant*

MEMPHIS SEOUL NO 2  LLC
123 FIRST AVE GRD FL STRE & PORT.OF BSMT
APT#:
NEW YORK    NY  10003

**Respondent**
*Undertenant*



**City Marshal**
**GEORGE ESSOCK JR. #71**
**36-30 BELL BLVD.**
**Bayside, NY 11361**
**Tel: 718.423.7500**

## NOTICE OF EVICTION - 14 DAYS

**To the above tenant(s) and undertenant(s):**

The Court has issued a warrant of eviction. If you do not vacate the location listed above within FOURTEEN DAYS after the date of this notice, YOU MAY BE EVICTED, WITHOUT FURTHER NOTICE ON THE FOLLOWING BUSINESS DAY or on any business day after. "Business Days" are Monday through Friday except legal holidays.

**HOW CAN I STOP THIS EVICTION?**

- The ONLY way you can stop this eviction is with a Court order prior to eviction that (1) temporarily stays your eviction, or (2) vacates a warrant for the non-payment of rent, after a deposit or payment with the Court of the full rent due.
- You may apply for such an order at the Civil Court, Landlord-Tenant part, in your rough. Contact information for the Courts is available at the link below.
- If granted, a temporary stay will stop this eviction until the stay expires or is vacated by the Court.

**HOW CAN I BE EVICTED?**

- If you do nothing in response to this notice, you may be evicted without further notice.
- If a Court has already ordered that you be evicted if you fail to make a payment or comply with the Court's order by a certain date, your failure to pay or comply with the Court's order by that date may result in your eviction without further notice.

**HOW CAN I GET HELP?**

- New York City provides free legal services for tenants facing eviction. Call 718-557-1379 for information about how to access free legal assistance. Free interpretation services are available.
- If you are dependent upon a person in the military service of the United States, let the clerk of the Court know immediately in order to protect your rights. Contact information for the Clerk is available at the link below.
- The Department of Social Services may be able to help you with back payments or other assistance. Call 718-557-1399 or 311 for information. Free interpretation services are available.

**Date of Notice/Fechada†**    7/03/24

**Earliest Eviction Date/**
**Primera Fecha de Desalojo**    7/18/24

## NOTIFICACION DE DESALOJO - 14 DIAS

A los inquilinos y subinquilinos citados arriba:

El tribunal ha emitido una orden de desalojo por la cual, de no desocupar el lugar indicado arriba dentro de CATORCE DÍAS después de la fecha de la presente notificación, PODRÍAN DESALOJARLO SIN PREVIO AVISO A PARTIR DEL DÍA HÁBIL SIGUIENTE, a contar de lunes a viernes excepto los días festivos oficiales.

**¿CÓMO DETENGO EL DESALOJO?**

- La ÚNICA forma es con un dictamen que emita el tribunal antes del desalojo (1) que lo suspenda temporalmente o (2) que desestime una orden judicial por impago o después de realizar depósito o saldar el alquiler ante el tribunal.
- Podrá solicitar dicho dictamen en la Sala de Asuntos entre Propietario e Inquilino en el tribunal civil de su municipio. Vea los datos de contacto de los tribunales en el enlace al pie de página.
- De ser concedido dicho dictamen, una suspensión temporera detendrá el desalojo hasta que venza o bien lo desestime el tribunal.

**¿CÓMO PODRÍAN DESALOJARME?**

- De hacer caso omiso a esta notificación, podrían desalojarlo sin previo aviso.
- Si el tribunal ya dictaminó que lo desalojen por impago o incumplimiento de dicha orden en fecha determinada, podrían desalojarlo sin previo aviso.

**¿DÓNDE CONSIGO AYUDA?**

- La ciudad ofrece servicios legales gratis a inquilinos con amenaza de desalojo. Llame al 718-557-1379 y averigüe cómo conseguirla. Se dispone de interpretación gratis.
- Si depende de alguien en el servicio militar de los Estados Unidos, proteja sus derechos al informárselo enseguida al secretario del tribunal, cuyos datos de contacto aparecen en el enlace al pie de página.
- El Departamento de Servicios Sociales (Department of Social Services) podría ayudarle con los pagos atrasados y demás asuntos. Infórmese por el 718-557-1399 o el 311. Se dispone de interpretación gratis.

**More Information / Más información en**
nyc.gov/doi/evictions (212) 709-7900

1

驱逐通知 - 更多信息

Уведомление о выселении: дополнительная информация

উচ্ছেদের সমন – আরও তথ্যের জন্য

إشعار إخلاء – مزيد من المعلومات

انخلاء کا نوٹس – مزید معلومات

驅逐通知 - 更多資訊

Avi Konsènan Degèpisman: plis enfòmasyon

퇴거 통지 - 자세한 정보

Avis d'expulsion: plus d'informations

Powiadomienie o eksmisji: dodatkowe informacje

† The date of this notice shall be on or after the date the notice is served on respondent..
† La presente notificación está fechada a partir del día de entrega al demandado

# EXHIBIT H



34

# EXHIBIT I



LAW ENFORCEMENT

# City Marshals Cited for Unprofessionalism, Antisemitic Remarks or Other Misdeeds

*From booting the wrong cars to seizing funds outside their jurisdiction, a dozen current city marshals have been sanctioned by the Department of Investigation since 2018.*

BY **GREG B. SMITH**   |
MAY 28, 2024, 5:00 A.M.

REPUBLISH



Marshal Justin Grossman's Bay Ridge office, May 24, 2024. Credit: Ben Fractenberg/THE CITY

In December 2019, City Marshal Howard Schain sought to evict husband-and-wife tenants from their basement apartment in Brooklyn. It's the kind of confrontation that has the potential for friction — and often results in

conflicting accounts that make determining the truth impossible.

But in this case, the tenants recorded video of the whole thing.

On the video, one tenant is seen descending a staircase into the apartment and zooming in on a crumpled up notice of eviction on the floor. Then the tenant — who later told investigators that Schain had tossed the notice to the ground when they refused to sign his receipt — ascends the stairs and confronts Schain.

In response, Schain yells, "I'm gonna make your life miserable…piece of shit."

Schain stalks off and gets in his car — but he isn't done yet. He exits the car and returns to continue the argument with the tenant, who points out that they're recording the encounter.

"Stick it someplace," Schain says before driving away.

A few weeks later, the tenant went to the Manhattan offices of the city Department of Investigation (DOI) with the video in hand.

Two years later, DOI investigators viewed yet another video of Schain.

During evictions, marshals must keep a meticulous inventory of all items removed from an apartment. But in one incident, DOI compared a Schain inventory to what they saw in the video and realized he had excluded "numerous boxes of sneakers and a keyboard" from his list.

In both cases DOI issued Schain a warning letter, but as it happens, the department was already quite familiar with him.

In 2000, the veteran marshal agreed to a four-month suspension and a $50,000 fine to **settle DOI's charges** that he had falsified records, lost his badge, allowed a car to be a towed with a child inside and chased a scofflaw motorist onto the entry ramp of the Brooklyn-Queens Expressway.

Schain is one of 14 marshals sanctioned by DOI since 2018, including two who have retired or resigned. The other 12 are among the 28 marshals currently empowered to evict tenants, seize assets of debtors and take possession of vehicles in New York City on behalf of landlords and lenders.

A review of investigative summaries obtained by THE CITY via the Freedom of Information Law reveals that DOI sanctioned these marshals for infractions including unprofessional behavior during evictions, attaching boots to the wrong vehicles, making racist and antisemitic comments and placing levies on debtors' assets outside their New York City jurisdiction.

Marshals are not city employees. They are appointed by the mayor based on recommendations from a panel made up of appointees of the mayor, local law schools and the presiding justices of the First and Second Department of the state court system.

Tasked with collecting debts, marshals in return pocket hundreds of thousands of dollars in fees known as "poundage" annually, with some taking in more than a million dollars in fees in a given year. Schain, for instance, collected more than $1 million in fees and netted income of $1.06 million in 2023, after expenses.

As of this week, none of the 28 marshals currently in this job have been appointed by Mayor Eric Adams. All are holdovers from prior administrations.

A mayoral spokesperson, Liz Garcia, said the advisory committee "is currently reviewing marshal candidates. While we have not had any staffing capacity issues throughout the administration, we are always assessing our staffing needs and will have more to say after the candidate review process."

## Racist and Antisemitic Remarks

Interacting with the public appears to be a particular sore point for some marshals.

Marshal Robert Solimine received an admonition after a vendor reported to DOI that Solimine routinely made disparaging remarks about the Hasidic Jewish community, African Americans, Muslims and unspecified "foreigners."

The vendor, who had been hired by the city Department of Finance to affix boots to scofflaw vehicles, alleged Solimine referred to Jewish people as "curlies" and said that certain neighborhoods were "areas that negatively changed since Blacks or 'foreigners' had moved in."

Solimine admitted using the term "curlies," saying that the comments "showed poor judgment." But he insisted "they were not comments made as a direct impact upon an individual."

In 2013, Solimine made **headlines** for placing a boot on a volunteer ambulance, rendering it unable to respond to calls for several hours. Solimine, who retired as a marshal in 2021, could not be reached for comment.

## Bungled Evictions

Evictions also often present unique problems for marshals, the DOI records show. Last October, for instance, DOI got an interesting tip from Sheriff Anthony Miranda: a marshal (Miranda wouldn't say which one) had discovered a big cache of marijuana and cash inside an apartment during an eviction when the tenant wasn't present. But somehow, the stash got stolen during the eviction because the marshal departed the scene for a period of time.

DOI figured out that the marshal involved was Robert Renzulli, who told them that after discovering the drugs and money, he called the NYPD to secure them. But when the NYPD didn't show up, Renzulli said, he became thirsty. He said he stationed the building's superintendent outside the locked door while he went to get water. While he was by his car, Renzulli got a call from the super telling him about noises coming from inside the empty apartment.

When he returned and entered the apartment, the weed and cash were gone and the window to the fire escape was open, Renzulli claimed.

Asked to explain why he'd left the apartment with the contraband inside unoccupied, Renzulli explained he needed water "as it was a hot day and he'd walked up and down five flights of stairs twice with his tool kit."

DOI issued him a warning letter for failing to report this incident to them. Renzulli did not respond to THE CITY's inquiry.

A sadder interaction involved Marshal George Essock Jr., who was cited by DOI for failing to ensure as required that an Adult Protective Services caseworker was present when evicting a 76-year-old elderly veteran, described in records as "confused" during the eviction. DOI noted this was the second such incident for Essock Jr., who did not return THE CITY's call seeking comment.

DOI also cited Marshal Justin Grossman for giving misinformation to investigators regarding an eviction. When a tenant claimed he had never received the required second notification of an eviction, Grossman claimed a judge had decreed that the notification wasn't necessary. But when DOI investigators checked the judge's order, there was no such decree.

Grossman admitted to DOI he'd never read the order and took the word of the landlord's lawyer. He did not respond to THE CITY's inquiry.

## Wrong Boots

The DOI records also document how marshals erroneously seized vehicles, causing headaches for their owners — and triggering citations from the department.

Marshal Matthew Regan, for example, placed the dreaded boot on the wrong car after it was identified by a license plate reader (LPR) as eligible for seizure.

The car had a vanity plate, and when DOI inquired, Regan admitted he was "aware the (LPR) program keeps 'mixing up vanity plates,'" but that he didn't notice the vehicle's registration code, which would have revealed he was booting the wrong car. Regan did not respond to THE CITY's inquiry.





A Volkswagen with a car boot was parked across the street from NYPD's 6th Precinct on Friday afternoon, Sept. 7, 2022. Credit: Hiram Alejandro Durán/THE CITY

For Marshal Edward Guida the issue was altering documents submitted to the Department of Finance after he booted the wrong car. DOI determined Guida had changed the vehicle identification number on a Chrysler and its model year from 2003 to 2016 to match the information taken from a license plate reader.

"It was unclear why the booted vehicle's information was manually changed," DOI's report said, noting that, "Guida exclaimed that he did not know what DOF and DOI wanted him to say besides the fact that 'the evidence showed that he had booted the wrong vehicle.'"

Last week Guida returned THE CITY's call stating, "It was nothing crazy. I hope you don't make us sound like killers. You're supposed to just contact DOI." He promised a spokesperson, Michael Woloz, who represents the City Marshal's Association, would call back with a comment.





Marshal Edward Guida's Corona office had a poster about rooting out corruption, May 24, 2024. Credit: Alex Krales/
THE CITY

One vehicle owner's interaction with a city marshal was even more agita-inducing. DOI determined that
Marshal Stephen Biegel did not properly notify the owner before placing a boot on the car, towing it away and
then auctioning it off.

The enraged owner contacted DOI stating that he'd left the car for repairs at an auto body shop and that his
plates had been exchanged for another which was, apparently, on Biegel's watchlist for booting.

A staffer in Biegel's office did not run the required Department of Motor Vehicles check, which would have
revealed the plate was not matched to the vehicle identification number. The employee was fired, and Biegel
was issued a warning letter. After the inquiry, Biegel told DOI he'd returned the purchase money to the auction
winner and returned the car to its actual owner.

## Out of Bounds

Biegel has also been cited for another recurring problem that has triggered multiple DOI citations: marshals
seizing bank accounts and other assets that are located outside their jurisdiction.

Marshals are restricted to pursue debtors' assets located only within the boundaries of New York City, and they
must serve notice in person. But in the last five years, DOI has repeatedly cited city marshals for illegally
placing levies on hundreds of thousands of dollars held in bank accounts outside of city limits, often serving
notice to debtors by email or fax.

In November 2019, Marshal Vadim Barbarovich **resigned** after DOI established he'd routinely pursued assets
outside New York City and then lied about it under oath.

Since then DOI has cited three other marshals, two of whom had to return funds and pay minor penalties —
Biegel and Richard Pagnotta — for placing levies on assets outside the five boroughs.

DOI determined Pagnotta had received $26,670 in fees for securing $378,000 for various creditors by seizing
assets outside New York City. He agreed to refund the city for those fees and also pay a $2,667 fine. Pagnotta
did not return THE CITY's call seeking comment.

With Biegel, DOI ultimately found he had served 105 levies improperly. In 20 of those, Biegel collected more
than $691,000, pocketing $40,000 in poundage fees.

Confronted with the findings, Biegel acknowledged to DOI he is required to serve in person and only within the

city boundaries, stating "I apologize that we are here." Biegel ultimately returned $40,000 to the city and paid an extra $4,000 in fines. Going forward, he was required to keep a daily log documenting he was personally serving levy notices only within New York City.

As THE CITY recently **reported**, Biegel was sued early this month by a company, Zomongo TV, accusing him of seizing $900,000 from a Toronto bank account as he sought to collect debt owed to Capital Advance Services. Attorney General Letitia James recently sued Capital Advance, deeming them to be a predatory lender charging outrageous interest rates of up to 200%. Zomongo's lawsuit alleges the cash advance firm relied "almost exclusively" on Biegel to collect its debts.

In 2023, Biegel collected $3 million in fees, netting income of $1.1 million after expenses, records show.

Biegel did not return THE CITY's calls seeking comment on the DOI disciplinary actions or the lawsuit allegations.

---

© 2025 THE CITY REPORT, INC. ALL RIGHTS RESERVED

POWERED BY NEWSPACK

# EXHIBIT J

**(FOR OFFICE USE ONLY)**

**INSTRUCTIONS:**
Place only **ONE** letter or number in each space and leave a blank space between words.

**CIVIL COURT OF THE CITY OF NEW YORK**
**COMMERCIAL CLAIMS PART**
**STATEMENT OF CLAIM**

(Your)   **I. CLAIMANT'S INFORMATION**

| | |
|---|---|
| BUSINESS NAME | TASTELAND HOLDINGS LLC |
| OTHER INFO (Doing Business As or In Care Of) | c/o EDWARD B. HUBBUCH |
| PRINCIPAL OFFICE ADDRESS | 394 LINCOLN PLACE A5 |

MIDDLE INITIAL

BOROUGH, CITY, TOWN OR VILL.   BROOKLYN   STATE   NY   ZIP 11238

PHONE NO. (646) 544-7597   EMAIL  BART@GETMEMPHISSEOUL.COM

(Their)   **II. DEFENDANT'S INFORMATION\***

LAST NAME (or Full Business Name)   J&M REALTY SERVICES CORP.

FIRST NAME

ADDRESS of Residence or Place of Business or Employment   341 ST. NICHOLAS AVENUE   MIDDLE INITIAL

BOROUGH, CITY, TOWN OR VILL.   NEW YORK   STATE   NY   ZIP 10027

OTHER INFO [Doing Business As] [In Care Of] [Attention To]   c/o JERRY EDELMAN

PHONE NO. (212) 721-0424   EMAIL  JEDELMAN@JMREALTY.ORG

**III. CLAIM**

Amount Claimed:  $ 10,000.00   (Maximum $10,000)   Date of Occurrence or Transaction:   7-18-24

Briefly state your claim here: (Include Identifying Number(s) - Receipt #, Claim #, Account #, Policy #, Ticket #, License #)

Defendant is property manager for 123 First Avenue, New York, NY 10003. Plaintiff is owner of a restaurant formerly located at this address and involved in an ongoing legal dispute with defendant and the owner of the property over defendant's gross negligence in getting plaintiff's gas service disconnected, an event that devastated plaintiff's business model before plaintiff even had a chance to open. When plaintiff finally realized that reconnection of gas service would be cost-prohibitive, they decided to surrender the property and were told by the Marshal's office that eviction would commence July 24, 2024. However, the Marshal unexpectedly commenced eviction on July 18, 2024, trapping plaintiff's equipment and belongings inside the property. Among that property is plaintiff's federally trademarked recipe book and several pieces of the plaintiff's federally trademarked branding. This recipe book and branding are the plaintiff's trademarked intellectual property, and the recipe book is vital to plaintiff's operation and constitutes official business trade secrets. Despite repeated requests, the defendant refuses to return this property that they do not have the right to possess.

July 30, 2024
**Today's Date**   **Signature of Claimant or Agent**

YOU MUST COMPLETE ONE OF THE CERTIFICATIONS ON THE REVERSE SIDE

CIV-SC-70 (Revised 01/28/21)

---

CERT'D #

COA CODE

CLAIM AMT.
$

FEE
STANDARD FEE PLUS POSTAGE
☐ CLAIMANT V. DEFENDANT
NO FEE; POSTAGE ONLY
☐ DEFENDANT V. THIRD PARTY
☐ CLAIMANT V. ADD'L DEFENDANT
☐ WAGE CLAIM TO $300

LANGUAGE

DATE DATA ENTERED

DATE NOTICES MAILED

CASE TYPE:
MULTI DFT ☐   CTR/CLM ☐
3 PARTY ☐   CRS/CMPLT ☐

FIRST DATE

DAY COURT
☐ STATUTORY   ☐ OTHER

☐ CONSUMER TRANSACTION
☐ OTHER COMMERCIAL CLAIMS

# EXHIBIT K



Bart Hubbuch <bart@getmemphisseoul.com>

---

# Tasteland Holdings LLC v. J&M Realty Services Corp.

18 messages

---

**Noren, Benjamin** <bn@dhclegal.com>                           Thu, Aug 1, 2024 at 1:45 PM
To: "bart@getmemphisseoul.com" <bart@getmemphisseoul.com>
Cc: David Edelman <David@jmrealty.org>

Mr. Hubboch,

We represent J&M Realty Services Corp. ("J&M") with respect to the attached Small Claims Action.  We have no interest in depriving you of your "federally trademarked recipe book" or "federally trademarked branding."

We can facilitate the return of these items in exchange for your agreement to: (1) dismiss the attached action; (2) release J&M and Lunar Estates LLC from any further liability; (3) not further disparage J&M; and (4) remove the defamatory Instagram Post which falsely accuses J&M of "gross negligence."

Please let me know if you are amenable to this proposed resolution.

Best,

Ben

---



**Benjamin Noren, Esq.**

Davidoff Hutcher & Citron LLP

605 Third Avenue,  New York,  NY 10158

Firm: 212.557.7200   Direct: 646.428.3120

Fax: 212.286.1884  Cell: 516.567.5706

Email: bn@dhclegal.com

Website

**IMPORTANT NOTICE:** Beware of Cyber Fraud. You should <u>never</u>

wire money to any bank account that our office provides to you via email
without first speaking with our office. Further, do not accept emailed
wiring instructions from anyone else without voice verification from a known
employee of our office. Even if an email looks like it has come from this
office or someone involved in your transaction. Please call us first at a number
you know to be correct for this office to verify the information before wiring
any money. Be particularly wary of any request to change wiring instructions
you already received.
****************************************************************************
STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any
attachments to this message are intended for the exclusive use of the
addressee(s) and may contain confidential or privileged information.
If you are not the intended recipient, please notify us immediately
by email reply to sender or by telephone to Davidoff Hutcher & Citron
LLP at (800) 793-2843, ext. 3284, and destroy all copies of this
message and any attachments.
****************************************************************************

---

 **TASTELAND HOLDINGS v. J&M REALTY SERVICES.pdf**
181K

---

**Bart Hubbuch** <bart@getmemphisseoul.com>                    Thu, Aug 1, 2024 at 3:40 PM
To: "Noren, Benjamin" <bn@dhclegal.com>

Mr. Noren:

Your client continues to be in illegal possession of our federally trademarked intellectual property, specifically our recipe
book, and I demand its immediate return or I will take further legal action to recover it.

You might think you're being humorous with the sarcastic quote marks, but that "federally trademarked recipe book" has
produced more than $3 million in food sales in our five-year history. You also apparently are not aware that, when
restaurants are sold, the purchaser is first and foremost buying the recipe book.

With more than $3 million in total food sales, a practical valuation of $5 million could realistically be assigned to our
proprietary recipe book. So I would strongly advise your client that his continued illegal possession is unwise and could
prove very financially costly in the long run.

As for your claim of defamation, in New York City, commercial landlords are required to maintain essential utilities (gas,
electricity and water) during unoccupied periods in order to ensure public safety, avoid service disruption, prevent damage
to the property and facilitate new tenant occupancy.

Your client:

1) ignored collection notices from Con Edison sent to the building address in May 2022 and July 2022;

2) failed to maintain the gas connection with the required placeholder designation though Con Ed during the six months
between the departure of the previous tenant and Memphis Seoul signing its lease;

3) did not inform Memphis Seoul before we signed our lease that they had failed to maintain the gas connection from May
2022 until October 2022, and that gas service was in danger of termination as a result;

4) allowed and enabled representatives from Con Ed to enter our basement space with no notice to us in February 2023,
at which time Con Edison disconnected our gas service and removed the gas meter located on our side of the basement;

5) breached our lease agreement with this clear violation of paragraph 83 of the lease rider, which required the landlord to
give us 24-hour notice before entering our basement space;

6) admitted in writing that Con Ed was allowed into our basement space by the building superintendent without notice to
us. I also have a cancelled check from your client paying my general contractor for the damage stemming from a
second violation of paragraph 83 in February 2023, when they entered our basement space without notice and used a
special tool to sever our hot-water line.

Your client has claimed that they bear no responsibility for any of this because the lease requires the tenant to arrange and obtain gas service. However, please note that there is no language in the lease establishing a specific timeline or deadline for the tenant to arrange said gas service.

As a result of this negligence, I was forced to spend more than $100,000 of my limited funds in ultimately fruitless pursuit of restoring gas service. And that total doesn't include an estimated $100,000 in corporate catering lost due specifically to the fact that our concept — which revolves around fried food — was forced to operate at less than 25% capacity without gas service for the fryers.

I have already sued my former attorneys over their actions in this entire debacle, which has brought me to the brink of personal financial ruin, and I insist on retaining the right to eventually sue your clients over their role in it, too.

However, as a show of good faith, I am willing to dismiss the attached action and remove the Instagram post in return for our recipe book, our branded signage and all of our second-hand kitchen equipment (the Henny Penny fryer and the dishwasher system are both leased, are not the property of your clients and will be repossessed by their respective owners). I will also pay to remove all of it and clean the space at no cost to your client.

Please let me know how you would like to proceed.

Sincerely,


Bart Hubbuch


**BART HUBBUCH**
Founder & owner
bart@getmemphisseoul.com
(646) 544-7597


On Aug 1, 2024, at 1:45 PM, Noren, Benjamin <bn@dhclegal.com> wrote:


Mr. Hubboch,

We represent J&M Realty Services Corp. ("J&M") with respect to the attached Small Claims Action.  We have no interest in depriving you of your "federally trademarked recipe book" or "federally trademarked branding."

We can facilitate the return of these items in exchange for your agreement to: (1) dismiss the attached action; (2) release J&M and Lunar Estates LLC from any further liability; (3) not further disparage J&M; and (4) remove the defamatory Instagram Post which falsely accuses J&M of "gross negligence."

Please let me know if you are amenable to this proposed resolution.

Best,
Ben


_____

**<image001.jpg>**
[Quoted text hidden]


[Quoted text hidden]
************************************************************************<TASTELAND HOLDINGS v.
J&M REALTY SERVICES.pdf>

---

**Noren, Benjamin** <bn@dhclegal.com>                          Fri, Aug 2, 2024 at 1:29 PM
To: Bart Hubbuch <bart@getmemphisseoul.com>

I disagree with almost everything you have said.  Nevertheless, if you would like our assistance in turning over the recipe book and branding, and the other requested items, we will need you to do more than dismiss the action and take down the Instagram Post.  We need a general release and a non-disparagement agreement.  If you are not amenable to that, we will await the outcome of your lawsuit.

---



**Benjamin Noren, Esq.**

Davidoff Hutcher & Citron LLP

605 Third Avenue,  New York,  NY 10158

Firm: 212.557.7200   Direct: 646.428.3120

Fax: 212.286.1884   Cell: 516.567.5706

Email: bn@dhclegal.com

Website

---

**From:** Bart Hubbuch <bart@getmemphisseoul.com>
**Sent:** Thursday, August 1, 2024 3:40 PM
**To:** Noren, Benjamin <bn@dhclegal.com>
**Subject:** Re: Tasteland Holdings LLC v. J&M Realty Services Corp.

**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

[Quoted text hidden]
[Quoted text hidden]

---

**Bart Hubbuch** <bart@getmemphisseoul.com>                    Fri, Aug 2, 2024 at 2:27 PM
To: "Noren, Benjamin" <bn@dhclegal.com>

Mr. Noren:

I am willing to sign the non-disparagement agreement and take down the Instagram post, but I will not sign a general release.

Moreover, please be advised that your client now has until **6 p.m. today, August 2, 2024,** to return the intellectual property illegally in their possession and schedule our reclamation of the equipment or I will withdraw the small-claims

action and replace it on Monday with a lawsuit in New York Supreme Court citing conversion and replevin as the primary causes of action and requesting immediate injunctive relief for our intellectual property.

I will also remind you that "Memphis Seoul" is a federally registered trademark, and we have more than $3 million in fully documented food sales in our five-year history using that proprietary recipe book. That means by recognized industry standards I can realistically assign a practical valuation of $5 million to it.

It's your client's call — either give us back the intellectual property illegally in their possession and let us reclaim our equipment at no cost to them in return for the non-disparagement agreement and IG takedown, or we will see what the legal system thinks about all of this.

Bart Hubbuch



**BART HUBBUCH**
Founder & owner
bart@getmemphisseoul.com
(646) 544-7597

On Aug 2, 2024, at 1:29 PM, Noren, Benjamin <bn@dhclegal.com> wrote:

I disagree with almost everything you have said. Nevertheless, if you would like our assistance in turning over the recipe book and branding, and the other requested items, we will need you to do more than dismiss the action and take down the Instagram Post. We need a general release and a non-disparagement agreement. If you are not amenable to that, we will await the outcome of your lawsuit.

_____

**<image001.jpg>**
**Benjamin Noren, Esq.**
Davidoff Hutcher & Citron LLP
605 Third Avenue,  New York,  NY 10158
Firm: 212.557.7200   Direct: 646.428.3120
Fax: 212.286.1884   Cell: 516.567.5706
Email: bn@dhclegal.com
Website

---

**From:** Bart Hubbuch <bart@getmemphisseoul.com>
**Sent:** Thursday, August 1, 2024 3:40 PM
**To:** Noren, Benjamin <bn@dhclegal.com>
**Subject:** Re: Tasteland Holdings LLC v. J&M Realty Services Corp.

**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

---

Mr. Noren:

Your client continues to be in illegal possession of our federally trademarked intellectual property, specifically our recipe book, and I demand its immediate return or I will take further legal action to recover it.

You might think you're being humorous with the sarcastic quote marks, but that "federally trademarked recipe book" has produced more than $3 million in food sales in our five-year history. You also apparently are not aware that, when restaurants are sold, the purchaser is first and foremost buying the recipe book.

With more than $3 million in total food sales, a practical valuation of $5 million could realistically be assigned to our proprietary recipe book. So I would strongly advise your client that his continued illegal possession is unwise and could prove very financially costly in the long run.

As for your claim of defamation, in New York City, commercial landlords are required to maintain essential utilities (gas, electricity and water) during unoccupied periods in order to ensure public safety, avoid service disruption, prevent damage to the property and facilitate new tenant occupancy.

Your client:

1) ignored collection notices from Con Edison sent to the building address in May 2022 and July 2022;

2) failed to maintain the gas connection with the required placeholder designation though Con Ed during the six months between the departure of the previous tenant and Memphis Seoul signing its lease;

3) did not inform Memphis Seoul before we signed our lease that they had failed to maintain the gas connection from May 2022 until October 2022, and that gas service was in danger of termination as a result;

4) allowed and enabled representatives from Con Ed to enter our basement space with no notice to us in February 2023, at which time Con Edison disconnected our gas service and removed the gas meter located on our side of the basement;

5) breached our lease agreement with this clear violation of paragraph 83 of the lease rider, which required the landlord to give us 24-hour notice before entering our basement space;

6) admitted in writing that Con Ed was allowed into our basement space by the building superintendent without notice to us. I also have a cancelled check from your client paying my general contractor for the damage stemming from a second violation of paragraph 83 in February 2023, when they entered our basement space without notice and used a special tool to sever our hot-water line.

Your client has claimed that they bear no responsibility for any of this because the lease requires the tenant to arrange and obtain gas service. However, please note that there is no language in the lease establishing a specific timeline or deadline for the tenant to arrange said gas service.

As a result of this negligence, I was forced to spend more than $100,000 of my limited funds in ultimately fruitless pursuit of restoring gas service. And that total doesn't include an estimated $100,000 in corporate catering lost due specifically to the fact that our concept — which revolves around fried food — was forced to operate at less than 25% capacity without gas service for the fryers.

I have already sued my former attorneys over their actions in this entire debacle, which has brought me to the brink of personal financial ruin, and I insist on retaining the right to eventually sue your clients over their role in it, too.

However, as a show of good faith, I am willing to dismiss the attached action and remove the Instagram post in return for our recipe book, our branded signage and all of our second-hand kitchen equipment (the Henny Penny fryer and the dishwasher system are both leased, are not the property of your clients and will be repossessed by their respective owners). I will also pay to remove all of it and clean the space at no cost to your client.

Please let me know how you would like to proceed.

Sincerely,

Bart Hubbuch

<image002.png>

[Quoted text hidden]
[Quoted text hidden]

---

**Noren, Benjamin** <bn@dhclegal.com>                    Mon, Aug 5, 2024 at 1:16 PM
To: Bart Hubbuch <bart@getmemphisseoul.com>

Mr. Hubboch,

We will agree to your counter-proposal.  To be clear, we are agreeing to facilitate the return of your recipe book, IP and other equipment, in exchange for your agreement to dismiss the small claims action, sign a non-disparagement agreement, remove the Instagram post (and any other publicly disparaging comments about J&M), and remove all of the items in the space (at your expense), and clean it, at no cost to J&M.

Please confirm your agreement to this, and I will prepare a more formal agreement.

If we move quickly on this, I can get you into the space by Wednesday or Thursday of this week.



[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

---

**Bart Hubbuch** <bart@getmemphisseoul.com>                    Mon, Aug 5, 2024 at 2:06 PM
To: "Noren, Benjamin" <bn@dhclegal.com>

Mr. Noren:

Great news. Please advise on the next steps on your end. I will start looking into movers for Wednesday or Thursday.

Bart

> On Aug 5, 2024, at 1:16 PM, Noren, Benjamin <bn@dhclegal.com> wrote:

Mr. Hubboch,

We will agree to your counter-proposal.  To be clear, we are agreeing to facilitate the return of your recipe book, IP and other equipment, in exchange for your agreement to dismiss the small claims action, sign a non-disparagement agreement, remove the Instagram post (and any other publicly disparaging comments about J&M), and remove all of the items in the space (at your expense), and clean it, at no cost to J&M.

Please confirm your agreement to this, and I will prepare a more formal agreement.

If we move quickly on this, I can get you into the space by Wednesday or Thursday of this week.

_____

**<image001.jpg>**

**Benjamin Noren, Esq.**

Davidoff Hutcher & Citron LLP

605 Third Avenue,  New York,  NY 10158

Firm: 212.557.7200   Direct: 646.428.3120

Fax: 212.286.1884   Cell: 516.567.5706

Email: bn@dhclegal.com

Website

---

**From:** Bart Hubbuch <bart@getmemphisseoul.com>
**Sent:** Friday, August 2, 2024 2:27 PM
**To:** Noren, Benjamin <bn@dhclegal.com>
**Subject:** Re: Tasteland Holdings LLC v. J&M Realty Services Corp.

**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

---

Mr. Noren:

I am willing to sign the non-disparagement agreement and take down the Instagram post, but I will not sign a general release.

Moreover, please be advised that your client now has until **6 p.m. today, August 2, 2024,** to return the intellectual property illegally in their possession and schedule our reclamation of the equipment or I will withdraw the small-claims action and replace it on Monday with a lawsuit in New York Supreme Court citing conversion and replevin as the primary causes of action and requesting immediate injunctive relief for our intellectual property.

I will also remind you that "Memphis Seoul" is a federally registered trademark, and we have more than $3 million in fully documented food sales in our five-year history using that proprietary recipe book. That means by recognized industry standards I can realistically assign a practical valuation of $5 million to it.

It's your client's call — either give us back the intellectual property illegally in their possession and let us reclaim our equipment at no cost to them in return for the non-disparagement agreement and IG takedown, or we will see what the legal system thinks about all of this.

Bart Hubbuch

<image002.png>

[Quoted text hidden]
[Quoted text hidden]

---

**Noren, Benjamin** <bn@dhclegal.com>                                   Mon, Aug 5, 2024 at 2:53 PM
To: Bart Hubbuch <bart@getmemphisseoul.com>

I will prepare a settlement agreement under the lines we discussed.  The movers could come from 9 AM – 5 PM.

_____



[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

---

**Bart Hubbuch** <bart@getmemphisseoul.com>                             Mon, Aug 5, 2024 at 7:53 PM
To: "Noren, Benjamin" <bn@dhclegal.com>

OK, I will schedule this with my people and get back to you. We have big catering events all day Wednesday and Thursday, so Friday might be the earliest date we can do this.

> On Aug 5, 2024, at 2:53 PM, Noren, Benjamin <bn@dhclegal.com> wrote:
>
> I will prepare a settlement agreement under the lines we discussed.  The movers could come from 9 AM – 5 PM.
>
> _____
> [Quoted text hidden]
> [Quoted text hidden]
> [Quoted text hidden]

---

**Noren, Benjamin** <bn@dhclegal.com>                    Tue, Aug 6, 2024 at 10:14 AM
To: Bart Hubbuch <bart@getmemphisseoul.com>

OK.  I am not sure we can do Friday.  Can you give me a few days that work for you?

_____



[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

---

**Noren, Benjamin** <bn@dhclegal.com>                    Tue, Aug 6, 2024 at 10:34 AM
To: Bart Hubbuch <bart@getmemphisseoul.com>

Here is a draft of the proposed Settlement Agreement.  Please let me know if you have any edits.

Best,

Ben

_____



**Benjamin Noren, Esq.**

Davidoff Hutcher & Citron LLP

605 Third Avenue,  New York,  NY 10158

Firm: 212.557.7200   Direct: 646.428.3120

Fax: 212.286.1884   Cell: 516.567.5706

Email: bn@dhclegal.com

Website

[Quoted text hidden]
[Quoted text hidden]

---

📄 **Tasteland Settlement Agreement (01008597).docx**
26K

---

**Bart Hubbuch** <bart@getmemphisseoul.com>                    Tue, Aug 6, 2024 at 12:16 PM
To: "Noren, Benjamin" <bn@dhclegal.com>

We need to get the equipment Friday or Saturday. It's really causing us problems not having it.

On Aug 6, 2024, at 10:14 AM, Noren, Benjamin <bn@dhclegal.com> wrote:

OK.  I am not sure we can do Friday.  Can you give me a few days that work for you?

_____

**<image001.jpg>**

[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

---

**Noren, Benjamin** <bn@dhclegal.com>                           Tue, Aug 6, 2024 at 12:31 PM
To: Bart Hubbuch <bart@getmemphisseoul.com>

OK.  Assuming you sign the settlement agreement and dismiss the action, we can do Friday.

_____



[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

---

**Bart Hubbuch** <bart@getmemphisseoul.com>                    Tue, Aug 6, 2024 at 4:32 PM
To: "Noren, Benjamin" <bn@dhclegal.com>

Mr. Noren:

Please see attached. The Instagram post has been removed, and I will withdraw the small-claims action today or tomorrow.

I will be out of town Friday, but we are doing the move ourselves and my crew will have the COI with Lunar Estates and J&M listed when they arrive Friday morning.

However, be advised that this is not a one-day job. This is a multi-day project (I would estimate three days), so we will require access again on Sunday and early next week.

Bart



> On Aug 6, 2024, at 10:34 AM, Noren, Benjamin <bn@dhclegal.com> wrote:
>
> <Tasteland Settlement Agreement (01008597).docx>

---

📄 **SIGNED - Tasteland Settlement Agreement (01008597).pdf**
180K

---

**Noren, Benjamin** <bn@dhclegal.com>                    Tue, Aug 6, 2024 at 4:44 PM
To: Bart Hubbuch <bart@getmemphisseoul.com>


OK – See fully executed settlement agreement.  Please dismiss the smalls claim action, and let me know if Friday will work for the move-out.

---



**Benjamin Noren, Esq.**

Davidoff Hutcher & Citron LLP

605 Third Avenue,  New York,  NY 10158

Firm: 212.557.7200   Direct: 646.428.3120

Fax: 212.286.1884   Cell: 516.567.5706

Email: bn@dhclegal.com

Website

---

**From:** David Edelman <David@jmrealty.org>
**Sent:** Tuesday, August 6, 2024 4:41 PM
**To:** Noren, Benjamin <bn@dhclegal.com>; Jerry Edelman <jedelman@jmrealty.org>
**Subject:** RE: Tasteland Holdings LLC v. J&M Realty Services Corp.

---

**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

---

Attached

David Edelman

J&M Realty Services Corp.

341-343 St Nicholas Ave. Suite 1

New York, NY 10027

O: 212-721-0424

jmrealty.org

---

**From:** Noren, Benjamin <bn@dhclegal.com>
**Sent:** Tuesday, August 6, 2024 4:39 PM
**To:** David Edelman <David@jmrealty.org>; Jerry Edelman <jedelman@jmrealty.org>
**Subject:** FW: Tasteland Holdings LLC v. J&M Realty Services Corp.

Please counter-sign.

_____



**Benjamin Noren, Esq.**

Davidoff Hutcher & Citron LLP

605 Third Avenue,  New York,  NY 10158

Firm: 212.557.7200   Direct: 646.428.3120

Fax: 212.286.1884   Cell: 516.567.5706

Email: bn@dhclegal.com

Website

---

**From:** Bart Hubbuch <bart@getmemphisseoul.com>
**Sent:** Tuesday, August 6, 2024 4:32 PM
**To:** Noren, Benjamin <bn@dhclegal.com>
**Subject:** Re: Tasteland Holdings LLC v. J&M Realty Services Corp.


CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST


[Quoted text hidden]




> On Aug 6, 2024, at 10:34 AM, Noren, Benjamin <bn@dhclegal.com> wrote:
>
> <Tasteland Settlement Agreement (01008597).docx>

[Quoted text hidden]
[Quoted text hidden]

---

📄 **SIGNED - Tasteland Settlement Agreement (01008597) SIGNED.pdf**
161K

---

**Bart Hubbuch** <bart@getmemphisseoul.com>                    Wed, Aug 7, 2024 at 3:02 PM
To: "Noren, Benjamin" <bn@dhclegal.com>

Please find attached the claim withdrawal form. I will have it notarized this afternoon and file it tomorrow and send you the final version. Our for tomorrow got canceled by the rain, so we will need access to the space tomorrow during the day. My guys will bring the COI naming Lunar Estates and J&M with them.

Bart




On Aug 6, 2024, at 4:44 PM, Noren, Benjamin <bn@dhclegal.com> wrote:


OK – See fully executed settlement agreement.  Please dismiss the smalls claim action, and let me know if Friday will work for the move-out.

**<image001.jpg>**

**Benjamin Noren, Esq.**

Davidoff Hutcher & Citron LLP

605 Third Avenue,  New York,  NY 10158

Firm: 212.557.7200   Direct: 646.428.3120

Fax: 212.286.1884   Cell: 516.567.5706

Email: bn@dhclegal.com

Website

---

**From:** David Edelman <David@jmrealty.org>
**Sent:** Tuesday, August 6, 2024 4:41 PM
**To:** Noren, Benjamin <bn@dhclegal.com>; Jerry Edelman <jedelman@jmrealty.org>
**Subject:** RE: Tasteland Holdings LLC v. J&M Realty Services Corp.

---

**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

Attached

David Edelman

J&M Realty Services Corp.

341-343 St Nicholas Ave. Suite 1

New York, NY 10027

O: 212-721-0424

jmrealty.org

---

**From:** Noren, Benjamin <bn@dhclegal.com>
**Sent:** Tuesday, August 6, 2024 4:39 PM
**To:** David Edelman <David@jmrealty.org>; Jerry Edelman <jedelman@jmrealty.org>
**Subject:** FW: Tasteland Holdings LLC v. J&M Realty Services Corp.

Please counter-sign.

---

**<image001.jpg>**

**Benjamin Noren, Esq.**

Davidoff Hutcher & Citron LLP

605 Third Avenue,  New York,  NY 10158

Firm: 212.557.7200   Direct: 646.428.3120

Fax: 212.286.1884   Cell: 516.567.5706

Email: bn@dhclegal.com

Website

---

**From:** Bart Hubbuch <bart@getmemphisseoul.com>
**Sent:** Tuesday, August 6, 2024 4:32 PM
**To:** Noren, Benjamin <bn@dhclegal.com>
**Subject:** Re: Tasteland Holdings LLC v. J&M Realty Services Corp.


CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST


Mr. Noren:

Please see attached. The Instagram post has been removed, and I will withdraw the small-claims action today or tomorrow.

I will be out of town Friday, but we are doing the move ourselves and my crew will have the COI with Lunar Estates and J&M listed when they arrive Friday morning.

However, be advised that this is not a one-day job. This is a multi-day project (I would estimate three days), so we will require access again on Sunday and early next week.

Bart




> On Aug 6, 2024, at 10:34 AM, Noren, Benjamin <bn@dhclegal.com> wrote:
>
> <Tasteland Settlement Agreement (01008597).docx>


**IMPORTANT NOTICE:**Beware of Cyber Fraud. You should never
wire money to any bank account that our office provides to you via email
without first speaking with our office. Further,do not accept emailed
wiring instructions from anyone else without voice verification from a known
employee of our office. Even if an email looks like it has come from this
office or someone involved in your transaction. Please call us first at a number
you know to be correct for this office to verify the information before wiring
any money. Be particularly wary of any request to change wiring instructions
you already received.
*******************************************************************

STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any
attachments to this message are intended for the exclusive use of the
addressee(s) and may contain confidential or privileged information.
If you are not the intended recipient, please notify us immediately
by email reply to sender or by telephone to Davidoff Hutcher & Citron
LLP at (800) 793-2843, ext. 3284, and destroy all copies of this
message and any attachments.
***********************************************************************

**IMPORTANT NOTICE:**Beware of Cyber Fraud. You should <u>never</u>
wire money to any bank account that our office provides to you via email
without first speaking with our office. Further,<u>do not</u> accept emailed
wiring instructions from anyone else without voice verification from a known
employee of our office. Even if an email looks like it has come from this
office or someone involved in your transaction. <u>Please call us first at a number
you know to be correct for this office</u> to verify the information before wiring
any money. Be particularly wary of any request to change wiring instructions
you already received.
***********************************************************************
STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any
attachments to this message are intended for the exclusive use of the
addressee(s) and may contain confidential or privileged information.
If you are not the intended recipient, please notify us immediately
by email reply to sender or by telephone to Davidoff Hutcher & Citron
LLP at (800) 793-2843, ext. 3284, and destroy all copies of this
message and any attachments.
***********************************************************************

&lt;SIGNED - Tasteland Settlement Agreement (01008597) SIGNED.pdf&gt;

---


**WITHDRAWL.pdf**
52K

---

**Noren, Benjamin** &lt;bn@dhclegal.com&gt;                    Wed, Aug 7, 2024 at 3:08 PM
To: Bart Hubbuch &lt;bart@getmemphisseoul.com&gt;

We can do tomorrow from 10:30 - 4:30.  Does that work?

---



**Benjamin Noren, Esq.**

Davidoff Hutcher & Citron LLP

605 Third Avenue,  New York,  NY 10158

Firm: 212.557.7200   Direct: 646.428.3120

Fax: 212.286.1884   Cell: 516.567.5706

Email: bn@dhclegal.com

**From:** Bart Hubbuch <bart@getmemphisseoul.com>
**Sent:** Wednesday, August 7, 2024 3:02 PM
**To:** Noren, Benjamin <bn@dhclegal.com>
**Subject:** Re: Tasteland Holdings LLC v. J&M Realty Services Corp.

**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

Please find attached the claim withdrawal form. I will have it notarized this afternoon and file it tomorrow and send you the final version. Our for tomorrow got canceled by the rain, so we will need access to the space tomorrow during the day. My guys will bring the COI naming Lunar Estates and J&M with them.

Bart

On Aug 6, 2024, at 4:44 PM, Noren, Benjamin <bn@dhclegal.com> wrote:

OK – See fully executed settlement agreement.  Please dismiss the smalls claim action, and let me know if Friday will work for the move-out.

_____

**<image001.jpg>**

[Quoted text hidden]
[Quoted text hidden]

_____

**<image001.jpg>**

[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

<SIGNED - Tasteland Settlement Agreement (01008597) SIGNED.pdf>

[Quoted text hidden]

**Bart Hubbuch** <bart@getmemphisseoul.com>                                    Wed, Aug 7, 2024 at 3:21 PM
To: "Noren, Benjamin" <bn@dhclegal.com>

Yes, that's fine.

> On Aug 7, 2024, at 3:08 PM, Noren, Benjamin <bn@dhclegal.com> wrote:
>
> We can do tomorrow from 10:30 - 4:30.  Does that work?
>
> _____
> [Quoted text hidden]
> [Quoted text hidden]
> [Quoted text hidden]

---

**Bart Hubbuch** <bart@getmemphisseoul.com>                                    Thu, Aug 8, 2024 at 10:31 AM
To: "Noren, Benjamin" <bn@dhclegal.com>

Mr. Noren:

Please find the COI that was requested. My guys will be there later this morning or early in the afternoon for the initial round of removal.

Bart



On Aug 7, 2024, at 3:08 PM, Noren, Benjamin <bn@dhclegal.com> wrote:


We can do tomorrow from 10:30 - 4:30.  Does that work?


_____
**<image001.jpg>**
**Benjamin Noren, Esq.**
Davidoff Hutcher & Citron LLP
605 Third Avenue,  New York,  NY 10158
Firm: 212.557.7200   Direct: 646.428.3120
Fax: 212.286.1884   Cell: 516.567.5706
Email: bn@dhclegal.com
Website

**From:** Bart Hubbuch <bart@getmemphisseoul.com>
**Sent:** Wednesday, August 7, 2024 3:02 PM
**To:** Noren, Benjamin <bn@dhclegal.com>
**Subject:** Re: Tasteland Holdings LLC v. J&M Realty Services Corp.


**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

Please find attached the claim withdrawal form. I will have it notarized this afternoon and file it tomorrow and send you the final version. Our for tomorrow got canceled by the rain, so we will need access to the space tomorrow during the day. My guys will bring the COI naming Lunar Estates and J&M with them.

Bart

On Aug 6, 2024, at 4:44 PM, Noren, Benjamin <bn@dhclegal.com> wrote:

OK – See fully executed settlement agreement.  Please dismiss the smalls claim action, and let me know if Friday will work for the move-out.

_____

<image001.jpg>
**Benjamin Noren, Esq.**
Davidoff Hutcher & Citron LLP
605 Third Avenue,  New York,  NY 10158
Firm: 212.557.7200   Direct: 646.428.3120
Fax: 212.286.1884   Cell: 516.567.5706
Email: bn@dhclegal.com
Website

**From:** David Edelman <David@jmrealty.org>
**Sent:** Tuesday, August 6, 2024 4:41 PM
**To:** Noren, Benjamin <bn@dhclegal.com>; Jerry Edelman <jedelman@jmrealty.org>
**Subject:** RE: Tasteland Holdings LLC v. J&M Realty Services Corp.

**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

Attached

David Edelman
J&M Realty Services Corp.
341-343 St Nicholas Ave. Suite 1
New York, NY 10027
O: 212-721-0424
jmrealty.org

**From:** Noren, Benjamin <bn@dhclegal.com>
**Sent:** Tuesday, August 6, 2024 4:39 PM
**To:** David Edelman <David@jmrealty.org>; Jerry Edelman <jedelman@jmrealty.org>
**Subject:** FW: Tasteland Holdings LLC v. J&M Realty Services Corp.

Please counter-sign.

**<image001.jpg>**
**Benjamin Noren, Esq.**
Davidoff Hutcher & Citron LLP
605 Third Avenue,  New York,  NY 10158
Firm: 212.557.7200   Direct: 646.428.3120
Fax: 212.286.1884   Cell: 516.567.5706
Email: bn@dhclegal.com
Website

---

**From:** Bart Hubbuch <bart@getmemphisseoul.com>
**Sent:** Tuesday, August 6, 2024 4:32 PM
**To:** Noren, Benjamin <bn@dhclegal.com>
**Subject:** Re: Tasteland Holdings LLC v. J&M Realty Services Corp.

CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST

Mr. Noren:

Please see attached. The Instagram post has been removed, and I will withdraw the small-claims action today or tomorrow.

I will be out of town Friday, but we are doing the move ourselves and my crew will have the COI with Lunar Estates and J&M listed when they arrive Friday morning.

However, be advised that this is not a one-day job. This is a multi-day project (I would estimate three days), so we will require access again on Sunday and early next week.

Bart

> On Aug 6, 2024, at 10:34 AM, Noren, Benjamin <bn@dhclegal.com> wrote:
>
> <Tasteland Settlement Agreement (01008597).docx>

**IMPORTANT NOTICE:**Beware of Cyber Fraud. You should never
wire money to any bank account that our office provides to you via email
without first speaking with our office. Further,do not accept emailed
wiring instructions from anyone else without voice verification from a known
employee of our office. Even if an email looks like it has come from this
office or someone involved in your transaction. Please call us first at a number
you know to be correct for this office to verify the information before wiring
any money. Be particularly wary of any request to change wiring instructions

you already received.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

STATEMENT OF CONFIDENTIALITY

The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify us immediately by email reply to sender or by telephone to Davidoff Hutcher & Citron LLP at (800) 793-2843, ext. 3284, and destroy all copies of this message and any attachments.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


**IMPORTANT NOTICE:**Beware of Cyber Fraud. You should <u>never</u> wire money to any bank account that our office provides to you via email without first speaking with our office. Further,<u>do not</u> accept emailed wiring instructions from anyone else without voice verification from a known employee of our office. Even if an email looks like it has come from this office or someone involved in your transaction. <u>Please call us first at a number you know to be correct for this office</u> to verify the information before wiring any money. Be particularly wary of any request to change wiring instructions you already received.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

STATEMENT OF CONFIDENTIALITY

The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify us immediately by email reply to sender or by telephone to Davidoff Hutcher & Citron LLP at (800) 793-2843, ext. 3284, and destroy all copies of this message and any attachments.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<SIGNED - Tasteland Settlement Agreement (01008597) SIGNED.pdf>


**IMPORTANT NOTICE:**Beware of Cyber Fraud. You should <u>never</u> wire money to any bank account that our office provides to you via email without first speaking with our office. Further,<u>do not</u> accept emailed wiring instructions from anyone else without voice verification from a known employee of our office. Even if an email looks like it has come from this office or someone involved in your transaction. <u>Please call us first at a number you know to be correct for this office</u> to verify the information before wiring any money. Be particularly wary of any request to change wiring instructions you already received.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

STATEMENT OF CONFIDENTIALITY

The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify us immediately by email reply to sender or by telephone to Davidoff Hutcher & Citron LLP at (800) 793-2843, ext. 3284, and destroy all copies of this

message and any attachments.

****************************************************************

---

 **TASTELAND COI.pdf**
735K



**From:** **Noren, Benjamin** bn@dhclegal.com 🖉
**Subject:** Memphis Seoul Access
**Date:** August 9, 2024 at 11:27 AM
**To:** Bart Hubbuch bart@getmemphisseoul.com

---

Bart,

You cannot just come to the premises as you wish. That is not how this is going to work.  This needs to be preplanned so J&M can have someone there.  Do you want to come back on Monday or Tuesday of next week from 10:30-4:30?



**Benjamin Noren, Esq.**
Davidoff Hutcher & Citron LLP
605 Third Avenue,  New York,  NY 10158
Firm: 212.557.7200   Direct: 646.428.3120
Fax: 212.286.1884   Cell: 516.567.5706
Email: bn@dhclegal.com
Website

**IMPORTANT NOTICE:** Beware of Cyber Fraud. You should <u>never</u> wire money to any bank account that our office provides to you via email without first speaking with our office. Further, <u>do not</u> accept emailed wiring instructions from anyone else without voice verification from a known employee of our office. Even if an email looks like it has come from this office or someone involved in your transaction. <u>Please call us first at a number you know to be correct for this office</u> to verify the information before wiring any money. Be particularly wary of any request to change wiring instructions you already received.
*************************************************************************
STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify us immediately by email reply to sender or by telephone to Davidoff Hutcher & Citron LLP at (800) 793-2843, ext. 3284, and destroy all copies of this message and any attachments.
*************************************************************************



**From:** **Noren, Benjamin** bn@dhclegal.com
**Subject:** RE: Memphis Seoul Access
**Date:** August 15, 2024 at 11:18 AM
**To:** Bart Hubbuch  bart@getmemphisseoul.com

Bart,

J&M is a small family-run business.  It cannot allot endless days to supervising your move-out.  We provided you with three-days.  You should have been able to complete the move-out in that time.  Indeed, David expected you to arrive at 10:30 am on Tuesday, and for some reason your team didn't show till 1:30 pm.

J&M is running on limiting staffing until September.  David is away, and there is no one available to give you access to the premises at this time.  Unfortunately, we will not be able to give you access until September.



**Benjamin Noren, Esq.**
Davidoff Hutcher & Citron LLP
605 Third Avenue,  New York,  NY 10158
Firm: 212.557.7200   Direct: 646.428.3120
Fax: 212.286.1884   Cell: 516.567.5706
Email: bn@dhclegal.com
Website

---

**From:** Bart Hubbuch <bart@getmemphisseoul.com>
**Sent:** Thursday, August 15, 2024 9:45 AM
**To:** Noren, Benjamin <bn@dhclegal.com>
**Subject:** Re: Memphis Seoul Access

**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

Mr. Noren:

We can argue about this all day, or your client can give us access this morning and both sides can thankfully be done with this entire matter.

We only have a small amount of equipment left to remove. Why your client wants to make this difficult or drag it out any longer is an extreme mystery to me.

Bart

On Aug 14, 2024, at 4:27PM, Bart Hubbuch <bart@getmemphisseoul.com> wrote:

Mr. Noren:

Mr. Noren.

We are down to our last day needed for removal of all the equipment and for cleanup.

However, your client needlessly denied us access today without giving a reason, and his repeated antagonistic behavior is causing me to consider my legal options.

If your client required specific appointments for access, you should have written it into the agreement. There is no wording that requires me to set appointment times or ask for permission. However, this behavior by your clients doesn't surprise me in the least — it just continues a long pattern of the Edelmans thinking that rules and lease clauses don't apply to them.

We require access Thursday (tomorrow).

Bart

On Aug 9, 2024, at 11:27 AM, Noren, Benjamin <bn@dhclegal.com> wrote:

Bart,

You cannot just come to the premises as you wish. That is not how this is going to work.  This needs to be preplanned so J&M can have someone there.  Do you want to come back on Monday or Tuesday of next week from 10:30-4:30?

_____

<image001.jpg>
**Benjamin Noren, Esq.**
Davidoff Hutcher & Citron LLP
605 Third Avenue,  New York,  NY 10158
Firm: 212.557.7200   Direct: 646.428.3120
Fax: 212.286.1884   Cell: 516.567.5706
Email: bn@dhclegal.com
Website

**IMPORTANT NOTICE:** Beware of Cyber Fraud. You should <u>never</u> wire money to any bank account that our office provides to you via

wire money to any bank account that our office provides to you via email
without first speaking with our office. Further, <u>do not</u> accept emailed
wiring instructions from anyone else without voice verification from a known
employee of our office. Even if an email looks like it has come from this
office or someone involved in your transaction. <u>Please call us first at a number</u>
<u>you know to be correct for this office</u> to verify the information before wiring
any money. Be particularly wary of any request to change wiring instructions
you already received.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*

STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any
attachments to this message are intended for the exclusive use of the
addressee(s) and may contain confidential or privileged information.
If you are not the intended recipient, please notify us immediately
by email reply to sender or by telephone to Davidoff Hutcher & Citron
LLP at (800) 793-2843, ext. 3284, and destroy all copies of this
message and any attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*

**IMPORTANT NOTICE:** Beware of Cyber Fraud. You should <u>never</u>
wire money to any bank account that our office provides to you via email
without first speaking with our office. Further, <u>do not</u> accept emailed
wiring instructions from anyone else without voice verification from a known
employee of our office. Even if an email looks like it has come from this
office or someone involved in your transaction. <u>Please call us first at a number</u>
<u>you know to be correct for this office</u> to verify the information before wiring
any money. Be particularly wary of any request to change wiring instructions
you already received.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any
attachments to this message are intended for the exclusive use of the

addressee(s) and may contain confidential or privileged information.
If you are not the intended recipient, please notify us immediately
by email reply to sender or by telephone to Davidoff Hutcher & Citron
LLP at (800) 793-2843, ext. 3284, and destroy all copies of this
message and any attachments.
************************************************************************



**From:** **Noren, Benjamin**  bn@dhclegal.com  📎
**Subject:** RE: Memphis Seoul Access
**Date:** September 10, 2024 at 1:50 PM
**To:** Bart Hubbuch  bart@getmemphisseoul.com

_____

OK.  I will reach out to David and get back to you shortly.  Just to confirm it will only be one day, correct?

_____



**Benjamin Noren, Esq.**
Davidoff Hutcher & Citron LLP
605 Third Avenue,  New York,  NY 10158
Firm: 212.557.7200   Direct: 646.428.3120
Fax: 212.286.1884   Cell: 516.567.5706
Email: bn@dhclegal.com
Website

_____

**From:** Bart Hubbuch <bart@getmemphisseoul.com>
**Sent:** Tuesday, September 10, 2024 1:49 PM
**To:** Noren, Benjamin <bn@dhclegal.com>
**Subject:** Re: Memphis Seoul Access

_____

**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

_____

Benjamin:

Now that it is September, we would like to come and get the rest of our belongings. This Friday (9/13) would be our preference. Please let me know if this works for David.

Bart Hubbuch

On Aug 15, 2024, at 11:18 AM, Noren, Benjamin <bn@dhclegal.com> wrote:

Bart,

J&M is a small family-run business.  It cannot allot endless days to supervising your move-out.  We provided you with three-days.  You should have been able to complete the move-out in that time.  Indeed, David expected you to arrive at 10:30 am on Tuesday, and for some reason your team didn't show till 1:30 pm.

J&M is running on limiting staffing until September.  David is away, and there is no one available to give you access to the premises at this time.  Unfortunately, we will not be able to give you access until September.

_____

<image001.jpg>
**Benjamin Noren, Esq.**
Davidoff Hutcher & Citron LLP
605 Third Avenue,  New York,  NY 10158
Firm: 212.557.7200   Direct: 646.428.3120
Fax: 212.286.1884   Cell: 516.567.5706
Email: bn@dhclegal.com
Website

---

**From:** Bart Hubbuch <bart@getmemphisseoul.com>
**Sent:** Thursday, August 15, 2024 9:45 AM
**To:** Noren, Benjamin <bn@dhclegal.com>
**Subject:** Re: Memphis Seoul Access

**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

---

Mr. Noren:

We can argue about this all day, or your client can give us access this morning and both sides can thankfully be done with this entire matter.

We only have a small amount of equipment left to remove. Why your client wants to make this difficult or drag it out any longer is an extreme mystery to me.

Bart


> On Aug 14, 2024, at 4:27PM, Bart Hubbuch
> <bart@getmemphisseoul.com> wrote:
>
> Mr. Noren:
>
> We are down to our last day needed for removal of all the equipment
> and for cleanup.
>
> However, your client needlessly denied us access today without giving
> a reason, and his repeated antagonistic behavior is causing me to
> consider my legal options.
>
> If your client required specific appointments for access, you should
> have written it into the agreement. There is no wording that requires
> me to set appointment times or ask for permission. However, this

me to set appointment times or ask for permission. However, this behavior by your clients doesn't surprise me in the least — it just continues a long pattern of the Edelmans thinking that rules and lease clauses don't apply to them.

We require access Thursday (tomorrow).

Bart

> On Aug 9, 2024, at 11:27 AM, Noren, Benjamin <bn@dhclegal.com> wrote:
>
> Bart,
>
> You cannot just come to the premises as you wish. That is not how this is going to work.  This needs to be preplanned so J&M can have someone there.  Do you want to come back on Monday or Tuesday of next week from 10:30-4:30?
>
> _____
> <image001.jpg>
> **Benjamin Noren, Esq.**
> Davidoff Hutcher & Citron LLP
> 605 Third Avenue,  New York,  NY 10158
> Firm: 212.557.7200   Direct: 646.428.3120
> Fax: 212.286.1884   Cell: 516.567.5706
> Email: bn@dhclegal.com
> Website
>
> **IMPORTANT NOTICE:** Beware of Cyber Fraud. You should never
> wire money to any bank account that our office provides to you via email
> without first speaking with our office. Further, do not accept emailed
> wiring instructions from anyone else without voice

veritication from a known
employee of our office. Even if an email looks like it has come from this
office or someone involved in your transaction. Please call us first at a number
you know to be correct for this office to verify the information before wiring
any money. Be particularly wary of any request to change wiring instructions
you already received.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any
attachments to this message are intended for the exclusive use of the
addressee(s) and may contain confidential or privileged information.
If you are not the intended recipient, please notify us immediately
by email reply to sender or by telephone to Davidoff Hutcher & Citron
LLP at (800) 793-2843, ext. 3284, and destroy all copies of this
message and any attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**IMPORTANT NOTICE:** Beware of Cyber Fraud. You should never
wire money to any bank account that our office provides to you via email
without first speaking with our office. Further, do not accept emailed
wiring instructions from anyone else without voice verification from a known
employee of our office. Even if an email looks like it has come from this
office or someone involved in your transaction. Please call us first at a number
you know to be correct for this office to verify the information before wiring
any money. Be particularly wary of any request to change wiring instructions
you already received.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any
attachments to this message are intended for the exclusive use of the
addressee(s) and may contain confidential or privileged information.

addressee(s) and may contain confidential or privileged information.
If you are not the intended recipient, please notify us immediately
by email reply to sender or by telephone to Davidoff Hutcher & Citron
LLP at (800) 793-2843, ext. 3284, and destroy all copies of this
message and any attachments.
*************************************************************************

**IMPORTANT NOTICE:** Beware of Cyber Fraud. You should <u>never</u>
wire money to any bank account that our office provides to you via email
without first speaking with our office. Further, <u>do not</u> accept emailed
wiring instructions from anyone else without voice verification from a known
employee of our office. Even if an email looks like it has come from this
office or someone involved in your transaction. <u>Please call us first at a number
you know to be correct for this office</u> to verify the information before wiring
any money. Be particularly wary of any request to change wiring instructions
you already received.
*************************************************************************
STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any
attachments to this message are intended for the exclusive use of the
addressee(s) and may contain confidential or privileged information.
If you are not the intended recipient, please notify us immediately
by email reply to sender or by telephone to Davidoff Hutcher & Citron
LLP at (800) 793-2843, ext. 3284, and destroy all copies of this
message and any attachments.
*************************************************************************


Subject: RE: Memphis Seoul Access
Date: September 10, 2024 at 3:30 PM
To: Bart Hubbuch  bart@getmemphisseoul.com

BN

---

Bart – We can provide access on Friday from 9:00 – 3:00 pm.  This will be your last opportunity to move out.  Please complete your move out on that date, as we cannot devote more J&M resources to your move-out.

---



**Benjamin Noren, Esq.**
Davidoff Hutcher & Citron LLP
605 Third Avenue,  New York,  NY 10158
Firm: 212.557.7200   Direct: 646.428.3120
Fax: 212.286.1884   Cell: 516.567.5706
Email: bn@dhclegal.com
Website

---

**From:** Bart Hubbuch <bart@getmemphisseoul.com>
**Sent:** Tuesday, September 10, 2024 1:49 PM
**To:** Noren, Benjamin <bn@dhclegal.com>
**Subject:** Re: Memphis Seoul Access

**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

Benjamin:

Now that it is September, we would like to come and get the rest of our belongings. This Friday (9/13) would be our preference. Please let me know if this works for David.

Bart Hubbuch

On Aug 15, 2024, at 11:18 AM, Noren, Benjamin <bn@dhclegal.com> wrote:

Bart,

J&M is a small family-run business.  It cannot allot endless days to supervising your move-out.  We provided you with three-days.  You should have been able to complete the move-out in that time.  Indeed, David expected you to arrive at 10:30 am on Tuesday, and for some reason your team didn't show till 1:30 pm.

J&M is running on limiting staffing until September.  David is away, and there is no one available to give you access to the premises at this time.  Unfortunately, we will not be able to give you access until September.

_____

**<image001.jpg>**
**Benjamin Noren, Esq.**
Davidoff Hutcher & Citron LLP
605 Third Avenue,  New York,  NY 10158
Firm: 212.557.7200   Direct: 646.428.3120
Fax: 212.286.1884   Cell: 516.567.5706
Email: bn@dhclegal.com
Website

---

**From:** Bart Hubbuch <bart@getmemphisseoul.com>
**Sent:** Thursday, August 15, 2024 9:45 AM
**To:** Noren, Benjamin <bn@dhclegal.com>
**Subject:** Re: Memphis Seoul Access

**CAUTION: EXTERNAL MAIL. DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS YOU DO NOT TRUST**

---

Mr. Noren:

We can argue about this all day, or your client can give us access this morning and both sides can thankfully be done with this entire matter.

We only have a small amount of equipment left to remove. Why your client wants to make this difficult or drag it out any longer is an extreme mystery to me.

Bart

> On Aug 14, 2024, at 4:27PM, Bart Hubbuch <bart@getmemphisseoul.com> wrote:
>
> Mr. Noren:
>
> We are down to our last day needed for removal of all the equipment and for cleanup.
>
> However, your client needlessly denied us access today without giving a reason, and his repeated antagonistic behavior is causing me to consider my legal options.
>
> If your client required specific appointments for access, you should have written it into the agreement. There is no wording that requires

have written it into the agreement. There is no wording that requires me to set appointment times or ask for permission. However, this behavior by your clients doesn't surprise me in the least — it just continues a long pattern of the Edelmans thinking that rules and lease clauses don't apply to them.

We require access Thursday (tomorrow).

Bart

> On Aug 9, 2024, at 11:27 AM, Noren, Benjamin <bn@dhclegal.com> wrote:

Bart,

You cannot just come to the premises as you wish. That is not how this is going to work.  This needs to be preplanned so J&M can have someone there.  Do you want to come back on Monday or Tuesday of next week from 10:30-4:30?


**Benjamin Noren, Esq.**
Davidoff Hutcher & Citron LLP
605 Third Avenue,  New York,  NY 10158
Firm: 212.557.7200   Direct: 646.428.3120
Fax: 212.286.1884   Cell: 516.567.5706
Email: bn@dhclegal.com
Website

**IMPORTANT NOTICE:**Beware of Cyber Fraud. You should never
wire money to any bank account that our office provides to you via email
without first speaking with our office. Further,do not accept emailed

wiring instructions from anyone else without voice verification from a known
employee of our office. Even if an email looks like it has come from this
office or someone involved in your transaction. <u>Please call us first at a number</u>
<u>you know to be correct for this office</u> to verify the information before wiring
any money. Be particularly wary of any request to change wiring instructions
you already received.
*************************************************************************
***************

STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any
attachments to this message are intended for the exclusive use of the
addressee(s) and may contain confidential or privileged information.
If you are not the intended recipient, please notify us immediately
by email reply to sender or by telephone to Davidoff Hutcher & Citron
LLP at (800) 793-2843, ext. 3284, and destroy all copies of this
message and any attachments.
*************************************************************************
***************

**IMPORTANT NOTICE:**Beware of Cyber Fraud. You should <u>never</u>
wire money to any bank account that our office provides to you via email
without first speaking with our office. Further,<u>do not</u> accept emailed
wiring instructions from anyone else without voice verification from a known
employee of our office. Even if an email looks like it has come from this
office or someone involved in your transaction. <u>Please call us first at a number</u>
<u>you know to be correct for this office</u> to verify the information before wiring
any money. Be particularly wary of any request to change wiring instructions
you already received.
*************************************************************************
STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any
attachments to this message are intended for the exclusive use of the

attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify us immediately by email reply to sender or by telephone to Davidoff Hutcher & Citron LLP at (800) 793-2843, ext. 3284, and destroy all copies of this message and any attachments.
*************************************************************************

**IMPORTANT NOTICE:** Beware of Cyber Fraud. You should <u>never</u> wire money to any bank account that our office provides to you via email without first speaking with our office. Further, <u>do not</u> accept emailed wiring instructions from anyone else without voice verification from a known employee of our office. Even if an email looks like it has come from this office or someone involved in your transaction. <u>Please call us first at a number you know to be correct for this office</u> to verify the information before wiring any money. Be particularly wary of any request to change wiring instructions you already received.
*************************************************************************
STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify us immediately by email reply to sender or by telephone to Davidoff Hutcher & Citron LLP at (800) 793-2843, ext. 3284, and destroy all copies of this message and any attachments.
*************************************************************************

# EXHIBIT L

# SETTLEMENT AGREEMENT

This **SETTLEMENT AGREEMENT** (the "Agreement"), effective as of August  6 , 2024, is made and entered into by and between Tasteland Holdings LLC d/b/a Memphis Seoul ("Tasteland"), on the one side, and J&M Realty Services Corp. ("J&M"), on the other. Tastleland and J&M are herein referred to together as "the Parties," with each of the Parties referred to as a "Party".

## RECITALS

**WHEREAS**, on or about July 30, 2024, Tasteland filed a Statement of Claim against J&M in the Civil Court of the City of New York, Commercial Claims Part, bearing Index Number CC-000385-24/NY (the "Action")

**NOW, THEREFORE**, for and in consideration of the covenants, promises, and releases set forth herein, and other goods and valuable consideration, the sufficiency and adequacy of which is hereby specifically acknowledged, the Parties hereby agree, as follows:

## TERMS AND CONDITIONS OF SETTLEMENT

1.     **Dismissal of Action.**  Tasteland agrees to dismiss and discontinue, with prejudice, the Action immediately, but no later than within five (5) days of the Effective Date of this Agreement.

2.      **Removal of Instagram Post.**   Tasteland agrees to immediately remove the Instagram post, that was posted on or about July 17, 2024, by @getmemphisseoul, which refers to J&M's alleged "gross negligence."

3.      **Return of Property.**   J&M will facilitate the return of Tasteland's Recipe Book and provide it with access to its former leasehold at 123 First Avenue, New York, New York 10003 (the "Premises"), where Tasteland will arrange, at its sole cost, for the removal of its personal property.  If Tasteland hires a private moving company to obtain the belongings, that company shall have insurance coverage at a minimum of $1,000,000, and list J&M and Lunar Estates LLC as additional insured.   Prior to gaining entry, Tasteland will provide J&M with a copy of the requisite insurance.  In addition, Tasteland shall be responsible for removing all of its personal property and leaving the Premises in a broom-swept condition.

4.      **Non-Disparagement.**   Tasteland agrees that it, and its owners, and officers (including Edward B. Hubbuch) will refrain from taking actions or making statements, written or oral, which disparage or defame J&M, its owners, or employees, including, but not limited to Jerry Edelman, David Edelman, and Jessica Edelman.  Further, Tasteland agrees to withdraw any disparaging social media posts or articles regarding J&M. However, nothing herein, prevents Tasteland from complying with a lawful subpoena, or testifying truthfully in any action.

5.      **Knowing and Voluntary Execution.** The undersigned represent and warrant to one another that they have completely read and fully understand each of the terms and provisions of this Agreement, that they have been represented by counsel, and that they

have executed this Agreement of their own free will based upon their own judgment and the advice of their own attorneys without reliance upon any statement or representation of others not specifically set forth in this Agreement.

6.      **Construction of Agreement.** The undersigned acknowledge that they have sought and received whatever competent advice and counsel as was necessary for them to form a full and complete understanding of all rights and obligations herein, and that they have voluntarily entered into this Agreement, and that the preparation of this Agreement has been their joint effort.  The language herein expresses their collective intent, and the resulting document shall not, solely as a matter of judicial construction, be construed more severely against one of the undersigned than any other.

7.      **Cooperation.** Each of the Parties hereto agrees to execute all such reasonable further instruments, and to take all such reasonable further actions as may be reasonably required in order to fully effectuate the terms and provisions of this Agreement and any transactions contemplated herein.

8.      **Legal Fees and Costs.** Each party hereto shall bear its own costs and expenses (including attorney's fees) in connection with the negotiation, drafting, and consummation of this Agreement.

9.      **Authorization.** The Parties hereto represent that they are duly authorized to enter into this Agreement and all associated settlement documents.

10.      **Entire Agreement.** This Agreement supersedes any and all prior agreements, representations or understandings (whether oral or written) between the Parties hereto concerning the Action, and represents the entire, complete and fully-integrated

understanding and agreement with respect to the subject matter hereof, and can only be amended, supplemented or changed by written document signed by all of the Parties hereto.

11. **Governing Law and Venue.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York without reference to principles of conflict of laws. The Supreme Court of the State of New York, County of New York, will retain jurisdiction to hear all matters in connection with any alleged violation(s) of the Agreement. The undersigned consent to personal jurisdiction of the Supreme Court of the State of New York, County of New York.

12. **Successors and Assigns.** The provisions of this Agreement shall be binding upon, and inure to the benefit of, the Parties and their respective successors and assigns.

13. **Illegality or Invalidity.** If any provision contained herein is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of this Agreement, such provision will be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.

14. **Modifications to and Interpretation of Agreement.** This Agreement may not be modified, unless in writing and executed by each of the Parties.  The provisions of this Agreement shall be applied and interpreted in a manner consistent with each other so as to carry out the purposes and intent of the undersigned.

15.    **Assignment of Agreement.** No party to this Agreement shall assign or transfer in any way whatsoever the rights of that party hereunder, without the written consent of all of the Parties.

16.    **Signatures.** This Agreement may be executed in one or more counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, when so executed together, shall constitute one and the same agreement and shall be deemed to be an original.  Further, facsimile or electronic copies of such signed counterparts shall constitute originals for the purposes of this Agreement and may be used in lieu of the originals for any purpose. Upon request by any party, originally executed documents will be provided.

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound, have caused this Agreement to be executed as of the first date set forth above.

**TASTELAND HOLDINGS LLC**

By: _Edward B. Hubbuch_  Dated: ___Aug. 6, 2024_____
      Edward B. Hubbuch

**J&M REALTY SERVICES CORP.**

By: _____  Dated: _____
      David Edelman